CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

4/12/2024

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

SHANTA LYNETTE BROWN

*and*

AQUASHA SANDIDGE

*Plaintiffs*,

v.

THE CITY OF LYNCHBURG, *et al.*,

*Defendants.*

CASE NO. 6:23-cv-00054

MEMORANDUM OPINION
& ORDER

JUDGE NORMAN K. MOON

This case arises from the events surrounding a traffic stop in April 2020. A Lynchburg Police Department officer pulled over a driver, who is the son of Plaintiff Shanta Brown and the brother of Plaintiff Aquasha Sandidge. Plaintiffs claim that they and others protested the officer's conduct during the stop, and they were subsequently subjected to excessive force, arrested without cause, and maliciously prosecuted. Now that the criminal proceedings against them have terminated in their favor, Plaintiffs bring this suit against the police officers involved and the City of Lynchburg.

This matter is before the Court on the Motions to Dismiss filed by Defendants the City of Lynchburg, Officer Seth Reed, Deputy Zachary Miller, and Officer Robbin Miller. Dkts. 8, 17, 18. The Court concludes that Plaintiffs make sufficient allegations to survive the Motions to Dismiss, except for their municipal liability claims against the City based failure to train and to discipline the Police Officer Defendants and ratification of their use of force. Claims 9, 10, 11, 12, 13, and 14 will therefore be dismissed. Plaintiffs' other claims survive.

1

**Background**

The following facts in the Complaint are assumed true for purposes of resolving this

motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate

standard of review).

This case arises out of events that occurred in the evening of April 28, 2020, in front of

the Jobber's Overalls apartment building in Lynchburg. Dkt. 1 ¶¶ 12–13. Plaintiff Shanta Brown

lived in the apartment building with her adult daughter, Plaintiff Aquasha Sandidge, and her

eighteen-year-old son, Terron Pannell. ¶ 12. A number of Lynchburg Police Department

("LPD") officers came to the scene that day. ¶¶ 24, 40, 62. The three named Defendants are

Officer Seth Reed, Officer Zachary Miller, and Officer Robbin Miller (the "Officer

Defendants").

On the day in question, Officer Zachary Miller,[1] who at the time was employed by the

LPD, was parked down the street from the Jobber's Overalls apartments in a marked LPD patrol

vehicle. ¶¶ 11, 14. He saw a car with a missing front license plate, operated by Pannell, drive

by.[2] ¶¶ 14–15. Pannell was alone. ¶ 15. Officer Zachary Miller initiated a traffic stop as Pannell

pulled into a parking space in front of the apartment building where he lived; Plaintiffs were

home at the time. ¶¶ 16, 18. Officer Zachary Miller parked his vehicle in the middle of the

parking lot with its headlights shining on Pannell's stopped car, while Pannell remained in the

---

[1] Because there are two Officer Defendants with the last name Miller, the Court will refer
to each with both first and last names. The Complaint alleges that Zachary Miller was employed
by the LPD "as a police officer" at the time of the events giving rise to this case, but that he is
currently a Deputy Sheriff in Amherst County. ¶ 9. Due to its focus on actions taken by LPD
officers, this Memorandum Opinion refers to Zachary Miller as an officer rather than by his
current title when discussing his role in April 2020.

[2] Although the traffic stop of Pannell gave rise to the events at the core of this case,
Pannell himself is not a party.

driver's seat. ¶ 17. From the window of their apartment, Plaintiffs could see the traffic stop and they came outside to stand near Pannell's stopped car. ¶ 19.

Officer Zachary Miller called for a canine unit to respond to the scene and sniff Pannell's car for drugs. ¶ 20. He then approached the car. ¶ 21. Pannell gave his name and social security number, and told Officer Zachary Miller that he did not have a driver's license and had borrowed the car from a neighbor to pick up food. ¶¶ 21–22. Officer Zachary Miller returned to his police vehicle, where he allegedly delayed the process of issuing a traffic summons with the goal of buying time for the canine unit to arrive on scene. ¶¶ 22–23.

Another LPD officer, Tereika Grooms, arrived on the scene under an LPD policy that automatically dispatched backup during after-dark stops. ¶ 24. While Officer Zachary Miller remained in his vehicle, he directed Officer Grooms to seek Pannell's consent to a vehicle search. ¶¶ 25–27. Pannell refused consent. ¶ 27. Officer Seth Reed—the second individual Defendant in this case—also arrived on the scene. ¶ 28. Officer Reed conferred with Officer Zachary Miller, then went over to Pannell's car and ordered him to get out for the canine unit drug sniff. ¶¶ 28–29. Pannell told Officer Reed that he was afraid, and politely refused to get out of the car. ¶¶ 30–31. Officers Reed and Zachary Miller, who were each two inches taller and at least 50 pounds heavier than Pannell, then seized him, pulled him from the car, slammed him face down on the pavement, and handcuffed his hands behind his back before walking him to Officer Zachary Miller's LPD vehicle. ¶¶ 32–35. Officers Reed and Zachary Miller held Pannell against the LPD vehicle, demanded that he spread his legs, and then slammed him to the pavement again. ¶ 37. Officer Reed pressed Pannell to the pavement with a knee to his back. ¶ 38. A growing crowd of neighbors and spectators began protesting loudly at the force used on

3

Pannell. ¶ 39. Prompted by a call for assistance, all available LPD officers responded to the scene. ¶ 40.

When Officers Reed and Zachary Miller forced Pannell to the ground, he began to scream for his mother, Plaintiff Shanta Brown, who had witnessed the force used on her son. ¶¶ 41–42. Brown ran toward her son, followed by her daughter, Plaintiff Aquasha Sandidge. ¶¶ 43–44. Sandidge, who was recording on her cell phone, did not get as close to Pannell as Brown did because Officer Grooms came between the two. ¶¶ 44–45.

Brown did not initiate any contact with Officers Reed or Zachary Smith when she ran to her son. ¶ 46. However, before she reached him, Officer Zachary Miller shoved Brown and Officer Grooms escorted her away to an area near the front doors of the apartment building. ¶ 47. Sandidge followed. ¶ 48. Officer Reed, who stayed by the LPD vehicle, ordered Officer Zachary Miller to handcuff Plaintiffs. ¶¶ 49, 58. Without announcement or explanation, Officer Zachary Miller seized Brown and began pulling her arms behind her back. ¶ 51. Brown protested without using force against Zachary Miller, and he threw her to the ground, causing bruises, lacerations, and abrasions. ¶¶ 52–53.

Defendant Officer Robbin Miller arrived on the scene, ran to where Plaintiffs were being detained, and attempted to handcuff Sandidge. ¶ 54. Officer Robbin Miller did this by grabbing Sandidge from behind without giving her any verbal notice or instruction. *Id.* ¶¶ 54, 100. Sandidge struggled. *Id.* Officer Robbin Miller and Officer Zachary Miller handcuffed Sandidge, then threw her to the ground, injuring her. *Id.* ¶¶ 102–03.

During the struggle, Sandidge's phone, still recording, fell to the ground. ¶ 56. Officer Zachary Miller observed this and turned off the recording application in order to prevent recording of the arrests and detentions. ¶ 57. Officer Reed, still at the LPD vehicle, could not see

4

the other officers' interactions with Brown and Sandidge because his view of the apartment entrance area was obstructed by parked cars. ¶ 58.

Brown, Sandidge, and Pannell were placed in police vehicles and taken to the magistrate's office. ¶¶ 60–61. A sergeant who had not been on site during the initial events arrived and questioned the LPD officers as to how the traffic stop devolved and sparked protest. ¶ 62. Officer Zachary Miller initially told the sergeant that he had not been assaulted at all. ¶ 63. This story later changed. *Id.*

Officer Reed then allegedly lied to the sergeant. ¶ 64. He stated that while he was pinning Pannell to the ground in the parking lot, Brown and Sandidge assaulted both himself and Officer Zachary Miller. *Id.* Further, Officer Reed reported that when Pannell was still in his car, Pannell said "I ain't getting out of the fucking car!" and "don't fucking touch me!" when in fact Pannell had politely stated that he was afraid of the police and said "please don't touch me, sir." ¶ 65. Officer Reed also allegedly lied when he stated that he witnessed Sandidge assaulting Officer Robbin Miller by the apartment building entrance. ¶ 66. The area was not visible from his vantage point at the time. *Id.*

The Officer Defendants went to the magistrate's office to obtain arrest warrants for Plaintiffs and Pannell. ¶ 67. Plaintiffs allege that Officer Defendants colluded to fabricate false evidence against them. ¶ 68. Accordingly, Officer Reed and Officer Zachary Miller testified that Brown had assaulted both of them, and that she had obstructed justice. ¶ 69. Officer Zachary Miller specified that Brown assaulted them before Pannell was handcuffed. ¶ 70. Officer Robbin Miller testified that Sandidge assaulted her. ¶ 71. As a result of the Officer Defendants' testimony, Brown was charged with two felony counts of assault and battery of law enforcement officers (namely, Zachary Miller and Reed). ¶ 72. She was also charged with obstructing justice,

a misdemeanor, before being released on bond. ¶¶ 74, 76. Sandidge was charged with

feloniously assaulting Robbin Miller and held without bond for six days. ¶¶ 73, 75.

Both Plaintiffs had their freedom restricted by bond conditions for more than three years

before the false charges against them were dismissed. ¶ 77. Brown was acquitted of all three

charges by a jury in the Lynchburg Circuit Court on March 14, 2023. ¶ 82. Also in March 2023,

the charge against Sandidge was dismissed on the prosecution's *nolle prosequi* motion. ¶ 81.

At the time of the incident—April 28, 2020—Brown was a correctional officer in good

standing with the Virginia Department of Corrections. ¶ 13. She had held that position since

2017. *Id.* Zachary Miller allegedly gave a false statement to a Department of Corrections

investigator that caused Brown to lose her job. ¶ 78. Brown lived on unemployment benefits

until she was able to get a job as a grocery store cashier. ¶ 79. Also, Brown's bond conditions

prevented her from continuing in her profession as a correctional officer. ¶ 80.

Brown and Sandidge claim to have suffered physical, mental, and emotional damages,

including abrasions, contusions, pain, humiliation, fear, loss of liberty, anxiety, loss of sleep, and

extreme emotional distress caused by the conduct of Reed, Zachary Miller, and the City of

Lynchburg. ¶¶ 86–87. Sandidge also names Robbin Miller as a responsible party. ¶ 87.

Plaintiffs allege on information and belief that the uses of force against them were

investigated by the Chief of the Lynchburg Police Department, but that none of the officers

involved were disciplined or counseled. Plaintiffs allege that Officer Reed and Officer Zachary

Miller can be heard in conversations recorded on bodycam video fabricating false evidence

against Brown, and that this footage was available during the investigation of the use of force.

¶¶ 172–73. As to fabrication of evidence against Sandidge, Plaintiffs state that Officer Reed,

Officer Zachary Miller, and Officer Robbin Miller were likewise recorded during that

conversation, and that this footage too was available during the investigation. ¶¶ 182–83. The Police Chief, who allegedly investigated and issued no discipline as to the Officer Defendants, has final policymaking authority as to use of force. ¶ 85.

Against the Officer Defendants, Plaintiffs raise claims of excessive use of force, unlawful seizure, malicious prosecution, civil assault and battery, false imprisonment, and common law malicious prosecution. (Claims 1–6 and 15–20).

As to their claims against the City, Plaintiffs allege that the LPD has an unconstitutional custom or practice of permitting excessive force. (Claims 7 and 8). In support, they briefly describe 15 different instances of unwarranted force used by the LPD, occurring primarily between 2016 and 2019. ¶ 83 a–o. They also bring claims against the City for failure to train LPD officers in use of force, failure to discipline LPD officers for use of excessive force, and ratification of the Defendant LPD Officers' use of excessive force against Plaintiffs. (Claims 9–14).

### Legal Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in a plaintiff's favor, *Rubenstein*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts"

or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v.*

*United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks

omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics,"

instead a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that

"only a complaint that states a plausible claim for relief survives a motion to dismiss").

### Analysis

#### a.  The Statute of Limitations

All Defendants argue that Plaintiffs' claims (aside from those for malicious prosecution)[3]

are barred by Virginia's two-year statute of limitations for personal injury cases, which applies

to the actions at hand. Dkt. 9 at 9–10.[4] They point out that the alleged wrongs took place in April

2020 and that Plaintiffs filed this action in September 2023, more than three years later. *Id.* at 10.

Plaintiffs respond that the statute of limitations was tolled under Va. Code § 8.01-229(k).

The statute provides that "[i]n any personal action for damages, if a criminal prosecution arising

out of the same facts is commenced, the time such prosecution is pending shall not be computed

as part of the period within which such a civil action may be brought." *Id.*  The criminal cases

against Plaintiffs were resolved in March of 2023, when Brown was acquitted of all three

charges by a jury in the Lynchburg Circuit Court and the charge against Sandidge was dismissed

---

[3] Defendants concede that Plaintiffs' causes of action for malicious prosecution accrued in March of 2023, and so were timely brought. Dkt. 9 at 9, n2.

[4] The statute of limitations is the only defense raised by the Defendant Officers in the Memorandum in Support of their Motions to Dismiss. Dkt. 9.

on a *nolle prosequi* motion. Dkt. 1, ¶¶ 81–82. Plaintiffs argue that those criminal proceedings arose from the same facts as the claims brought in this case. Dkt. 14 at 1–2.

Defendants insist that the tolling statute does not apply because the facts that would be necessary to prove that Plaintiffs were criminally liable are different from the facts that must be proven to find the Defendants civilly liable in this action. Dkt. 22 at 1–3. They point to this Court's decision in *Brown v. Edmonds*, No. 7:12-CV-00267, 2012 WL 2526735, at *2 (W.D. Va. June 29, 2012). In that case, this Court found that the tolling statute did not apply based on the difference between the facts needed to prove malicious wounding (by another inmate of the jail where the plaintiff was held) and the facts that would prove negligence of the jail authorities who allowed the wounding to occur. *Id.*

Here, however, the Court concludes that Plaintiffs' claims arise out of the "same facts" as the criminal prosecutions. The question in *Brown v. Edmonds* was whether the jail authorities should have foreseen the violent attack by one inmate on another. That focuses on the knowledge of parties *other* than those involved in the criminal proceeding, *before* the event at the heart of that criminal proceeding. *Id.* Here, one incident involving the interactions of a specific set of actors during a very limited timeframe underlies both the now-concluded criminal proceedings against the Plaintiffs and their current civil claims. Such an extensive overlap more than meets the statute's "same facts" requirement for tolling. *See Booth v. Higgins*, No. 7:19-CV-00429, 2020 WL 4209061, at *5 (W.D. Va. July 22, 2020) (denying a motion to dismiss based on the statute of limitations because the claim was timely brought under Va. Code § 8.01-229(k), where a prisoner brought a civil case against a jail nurse who had been prosecuted for conduct analogous to that alleged by the plaintiff). Consequently, Plaintiffs' claims fall within those preserved by Va. Code § 8.01-229(k) and are not barred by the statute of limitations.

b. *Municipal Liability*

Brown and Sandidge each bring four claims—essentially, four theories of municipal liability—against the City of Lynchburg. The claims are: that the City maintained an unconstitutional custom or practice of excessive use of force by the LPD (Claims 7 and 8); that the City failed to train LPD officers in the use of force (Claims 9 and 10); that the City failed to discipline the Defendant Officers for their use of force against Plaintiffs (Claims 11 and 12); and that the City ratified the Defendant Officers' use of excessive force (Claims 13 and 14). Dkt. 1 ¶¶ 147–208. These claims are brought under 42 U.S.C. § 1983. *Id.* The City moves to dismiss all the claims against it. Dkt. 8.

i.   *Unconstitutional custom or practice of excessive force (Counts 7 and 8)*

A municipality "is liable under § 1983 if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690–91, (1978)). Policy can be found in written ordinances and regulations or the decisions of individual policymaking officials, while custom can "arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691) (some internal quotation marks omitted).

Where a plaintiff seeks to establish liability based on an unconstitutional municipal custom, they must demonstrate that such practices are "so frequent in occurrence that actual or constructive knowledge is implied." *Jackson v. Brickey*, 771 F. Supp. 2d 593, 604 (W.D. Va. 2011) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997)). A court may infer that a custom exists "from continued inaction in the face of a known history of

*widespread* constitutional deprivations on the part of city employees" but not "merely from municipal inaction in the face of *isolated* constitutional deprivations by municipal employees." *Milligan v. City of Newport News*, 743 F.2d 227, 229–30 (emphasis added). The "duration and frequency" of the constitutional deprivations must establish that policymakers (1) had actual or constructive knowledge of the conduct and (2) failed to stop or correct it due to their "deliberate indifference." *Owens*, 767 F.3d at 402 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1386–91 (4th Cir. 1987)) (internal quotation marks omitted). The custom "must be of such a character that municipal employees could reasonably infer from it tacit approval of the conduct in issue." *Milligan*, 743 F.2d at 230.

Specifically, constitutional violations must be specific and similar enough that a municipality's indifference to them could be seen as a "deliberate choice." *Carter*, 164 F.3d at 218 (requiring a "close fit" between the unconstitutional policy and constitutional violation"). Still, "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403 (allowing claim of *Brady* violations to proceed where plaintiff's "brief, but non-conclusory, allegations" of "[r]eported and unreported cases from the period of time before and during the events complained of" and "a number of motions [that] were filed and granted" supported conclusion that Baltimore Police Department "knowingly turn[ed] a blind eye" to the suppression of exculpatory evidence) (internal quotation marks omitted).

Here, Plaintiffs support their claim with a list of fifteen incidents in which they allege that LPD officers used excessive force. Dkt. 1 ¶ 83. The incidents span roughly two decades (2001 to 2020), and involve a variety of types of force, including shootings, attacks by canine units, beatings, deployments of tasers, and injuries incurred while LPD officers already had individuals

11

down on the ground. *Id.* In terms of both time and behavior, some of the alleged incidents are far removed from the events of this case—e.g., that LPD officers pepper sprayed someone in 2001 for using an obscenity. *Id.* ¶ 83 (a).

Twelve of the fifteen alleged incidents occurred between 2016 and 2020. *Id.* ¶ 83 c–o. Plaintiffs provide a specific date and the general circumstances of each incident, the name of the individual who was allegedly subjected to force by LPD officers, and the type of force used. *Id.* Three of the incidents that are alleged to have occurred in 2019 and one in March of 2020. *Id.* ¶ 83 (l)–(o). Of the 2019 incidents, one involved a man being thrown to the ground and injured by LPD officers when he was allegedly obstructing justice; in another incident a woman was injured by LPD officers "while allegedly trespassing while walking toward the exit at the River Ridge Mall[;]" in a third incident, LPD officers threw to the ground and beat a man who exited his car after being stopped for "an alleged 'window tint violation.'" *Id.* ¶ 83 (l), (m), (n). Plaintiffs also allege that in 2018, an individual was shot in his home by LPD officers while he was unarmed, presented no threat, and was neither committing a crime or attempting to flee. *Id.* ¶ 83 (h).

Brown alleges that when she approached the spot where officers had slammed her son into the pavement, Officer Zachary Miller shoved her away, then grabbed her from behind without notice, handcuffed her, and threw her to the ground, causing injury. Dkt. 1 ¶¶ 37, 43, 46–53, 90, 92. Brown states that while she protested these events she did not touch or use force against the officers. *Id.* ¶¶ 46, 52. Sandidge alleges that she followed Brown as all this occurred, video-recording on her phone, and that Officer Reed ordered Officer Zachary Miller to handcuff her for no reason. *Id.* ¶¶ 44, 45, 48–49, 54–55. While Sandidge concedes that she struggled when Officer Robbin Miller attempted to handcuff her, she asserts that Robbin Miller grabbed her from behind without giving her any verbal notice or instruction. *Id.* ¶¶ 54, 100. Officer Robbin

Miller and Officer Zachary Miller then threw Sandidge to the ground, injuring her. *Id.* ¶¶ 102–103.

Plaintiffs' allegations bear similarity to a number of earlier incidents outlined in the Complaint, in that they concern apparent officer violent escalation stemming from a traffic stop or alleged obstructive behavior. While the City argues that that Complaint suffers from a "lack of specific factual allegations" and offers only "vague and conclusory allegations [that] do not reference any particular factual conduct by city officials to support a policy or custom of excessive force[,]" Dkt. 9 at 7, unconstitutional custom claims can "survive even when [the] plaintiff provides few examples." *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 535–36 (D. Md. 2020). At this point Plaintiffs need not "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994). And here, Plaintiffs allege multiple instances of LPD officers inflicting injury on non-violent people who had either committed a minor infraction or none at all.

At this stage of the litigation, "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Owens*, 767 F.3d at 403. The Court concludes that these allegations of prior examples of excessive force by LPD are similar enough to the force used on Plaintiffs to provide at least constructive notice to the City of the LPD's use of excessive force. The incidents are such that "municipal employees could reasonably infer from [them] tacit approval of the conduct in issue." *Milligan*, 743 F.2d at 230. The Court finds

that Plaintiffs have stated plausible claims based on an unconstitutional custom of excessive use of force, and so are sufficient to survive a motion to dismiss.[5]

    ii.    *Failure to train LPD officers in use of force (Counts 9 and 10)*

Plaintiffs each bring a claim against the City based on its alleged failure to train LPD officers in the constitutional limits on use of force.

A municipality may be liable when its failure to properly train police "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Still, "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Only "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights[] [may] the city . . . be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* Still, "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403.

---

[5] Following *Owens*, district courts in the Fourth Circuit have allowed claims alleging an official custom or pattern of unconstitutional police conduct to proceed when plaintiffs have alleged a similar number of incidents over a similar timeframe. *See, e.g.*, *Washington*, 457 F. Supp. 3d at 536 (citing *Owens* in allowing claim of *Brady* violations to go forward where plaintiff alleged that the Baltimore Police Department fabricated evidence and suppressed exculpatory evidence in four cases resulting in wrongful convictions from 1981 and 1988, in addition to his own wrongful conviction in 1987); *Grim v. Baltimore Police Dep't*, No. ELH-18-3864, 2019 WL 5865561, at *21–22 (D. Md. Nov. 8, 2019) (allowing claim of custom of unconstitutional strip searches to proceed where plaintiff alleged that the Baltimore Police Department received roughly 60 complaints of unlawful strip searches from 2011 to 2016 and described three specific instances of such searches during that timeframe); *Moody v. City of Newport News*, 93 F. Supp. 3d 516, 543 (E.D. Va. 2015) (finding allegation concerning a single shooting that occurred five years before the events underlying plaintiff's case sufficient to support claim of unconstitutional custom of failure to adequately investigate claims of excessive force).

To make out a *Monell* claim for failure to train, a plaintiff must allege (1) that a specific training deficiency causes city employees to violate citizens' constitutional rights and (2) that city policymakers had actual or constructive notice that the deficiency causes such violations. *Canton*, 489 U.S. at 390–91.

Training deficiencies can include (1) "express authorizations of specific unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, or (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." *Spell*, 824 F.2d at 1390. To properly plead that the training deficiency causes constitutional violations, the plaintiff must allege either that an inadequately trained employee engaged in a pattern of unconstitutional conduct or that a constitutional violation is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan Cnty.*, 520 U.S. at 409 (citing *Canton*, 489 U.S. at 390 n.10) ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. . . . Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.") (internal citations omitted). "[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 407–08 (citing *Canton*, 489 U.S. at 390–91).

To show city policymakers' notice and conscious disregard of the training deficiency and ensuing constitutional violations, "[a]ctual knowledge may be evidenced by recorded reports to

or discussions by a municipal governing body," and "[c]onstructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Spell*, 824 F.2d at 1387. "If a program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action . . . ." *Bryan Cnty.*, 520 U.S. at 407 (citing *Canton*, 489 U.S. at 390, 397).

Plaintiffs allege that "the need by the City of Lynchburg to train its police officers in the constitutional limits of the use of force is obvious … as evidence[d] by the examples of the unconstitutional use of force by LPD officers previously provided."[6] Dkt. 1 ¶¶ 162–63; 167–68. Plaintiffs further allege that "the lack of training of LPD officers in the constitutional limits of the use of force was a moving force behind" and "a direct and proximate cause of" the injuries that they sustained. *Id.* ¶¶ 164–65, 169–70.

Plaintiffs have not sufficiently alleged a specific training deficiency which causes city employees to violate citizens' constitutional rights. *See Rowell v. City of Hickory*, 341 F. App'x 912, at *4 (4th Cir. 2009) (unpublished per curiam); *accord Johnson v. Balt. Police Dep't*, 452 F. Supp. 3d 283, 309 (D. Md. 2020) (explaining that, on a motion to dismiss, "a plaintiff must provide factual allegations about the specific deficiencies in the [police department's] training to state a failure to train claim"). The bare statement that "LPD has failed to properly train its officers in the use of force" offers only a very general description of deficiency. ¶ 84. Plaintiffs rely on the fifteen prior use-of-force incidents to support their failure to train claims, but these

---

[6] This refers to the fifteen use-of-force incidents discussed *supra*.

diverse occurrences over a twenty-year period cannot save Plaintiffs' over-general allegation as to training deficiency. *See Rowell v. City of Hickory*, 341 F. App'x 912, at *4 (4th Cir. 2009) (unpublished per curiam) (quoting *Canton*, 489 U.S. at 389) ("[M]unicipal liability 'will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible'"). Consequently, Plaintiffs' failure to train claims fail.

### iii.     *Failure to discipline the LPD Officer Defendants (Counts 11 and 12)*

"When addressing a failure to discipline claim, 'an unconstitutional policy or custom based on evidence of a failure to discipline generally requires a showing of a pattern of misconduct in which there has been such a failure.'" *Green v. Mills*, No. 3:19-cv-906, 2020 WL 2850177, at *11 (E.D. Va. June 2, 2020) (quoting 13 Am. Jur. *Proof of Facts* 3d 1, § 12 (2020)).

Plaintiffs allege that Officer Reed and Officer Zachary Miller can be heard in conversations recorded on bodycam video fabricating false evidence against Brown, and that this footage was available during the Lynchburg Police Department's investigation of the use of force. ¶¶ 172–73. Plaintiffs likewise allege that Officer Reed, Officer Zachary Miller, and Officer Robbin Miller were recorded fabricated false evidence against Sandidge, and that this footage too was available during the investigation. ¶¶ 182–83. They allege that the LPD investigated the conduct of the LPD Officer Defendants; that the relevant footage was available; and that the LPD did not discipline the LPD Officer Defendants. *Id.* ¶¶ 172–77; 181–85. They assert that the failure was part of a pattern or practice of allowing unconstitutional use of force, and that the pattern or practice was a moving force behind Plaintiffs' injuries. *Id.* ¶¶ 176–80; 186–90.

As discussed above, Plaintiffs sufficiently allege that the City failed to train LPD officers in use of force, based on the alleged unconstitutional uses of force between 2001 and 2020. Plaintiffs attempt to rely on those incidents to maintain this claim as well. Dkt. 1 ¶¶ 176, 186. However, while Plaintiffs address the use of force in those prior incidents, they do not make *any* allegations (one way or the other) about *discipline* as to the officers involved in the incidents. Plaintiffs only specifically allege failure to discipline the Officer Defendants in this case. Consequently, they have not alleged a pattern of misconduct related to discipline, and their failure to discipline claims fail.

<blockquote>iv.    Ratification of the LPD's use of excessive force (Counts 13 and 14)</blockquote>

Plaintiffs also raise *Monell* claims under a ratification theory. Under that theory, when a final policymaker "has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022) (citation omitted). Ratification liability "holds municipalities accountable for the actions for which the municipality is actually responsible." *Id.* In other words, it holds the municipality "liable for *its own decision* to uphold the actions of subordinates." *Id.* However, "the 'official policy' itself must 'inflict' the alleged injury." *Franklin v. City of Charlotte*, 64 F.4th 519, 536 (4th Cir. 2023) (quoting *Monell*, 436 U.S. at 694) (cleaned up).

Plaintiffs allege that the LPD investigated the uses of force against them by the Defendant Officers and that the Chief of the Lynchburg Police Department, a policymaker, had real or constructive knowledge of the investigations. Dkt. 1 ¶¶ 192–94, 201–03. They further allege that the investigations concluded that the uses of force were legal and within LPD policy. *Id.* ¶¶ 195, 204. They state that the Chief of the Lynchburg Police Department therefore ratified

the unconstitutional use of force against them, and that the ratification caused their injuries. *Id.* ¶¶ 196–99; 205–08.

The Fourth Circuit has recently clarified that, when the physical harm caused by use of force has already occurred, an after-the-fact approval of use of force by a city official does not create ratification liability for a municipality. *Franklin*, 64 F.4th at 536–37. The Fourth Circuit distinguished between situations where approval by a policymaker creates a distinct injury—and so creates ratification liability—and those where approval adds nothing to the injuries already suffered. *Id*. Ratification liability *would* arise where, for example, a policymaker approved an employment termination. *Id.* at 537. "Repealing the ratification potentially could restore the employee back to the pre-injury status quo." *Id.* The Fourth Circuit contrasted that with situations where reversing a policymaker's decision cannot undo the injury—as in the case of excessive force. *Id.* at 536–37.

In *Franklin*, a woman whose son had been shot and killed by a police officer sued the city of Charlotte, North Carolina. Her ratification claim was based on the fact that the city manager, "the final decisionmaker in the review of use of force complaints," had declared that the officer who shot her son had acted in conformity with the law and department policy. *Id.* at 536. The Fourth Circuit concluded that "the City Manager's post-facto approval of an internal shooting investigation cannot possibly have caused the constitutional violation" and that no ratification liability arose. *Id.* at 537.

The facts here are analogous to those in *Franklin.* Reversing the approval will not undo the injuries that Plaintiffs allege they suffered due to excessive force.[7] The approval, after the

---

[7] Plaintiffs rely on the Fourth Circuit's decision in *Starbuck*, which allowed a ratification claim to proceed where a school board upheld a disciplinary decision made at the school level. 28 F.4th at 535–36. *Starbuck* states that approval by a policymaker can qualify as a "moving

fact, of excessive force cannot create ratification liability because it is not the source of the injuries. For this reason, Plaintiffs' ratification claims fail.

### Conclusion

For the foregoing reasons, the Court will **DENY** the Motions to Dismiss filed by Deputy Zachary Miller and Officer Robbin Miller, Dkts. 17 and 18. The Court will **GRANT in part** the Motion to Dismiss filed by Officer Seth Reed and the City of Lynchburg, and will dismiss Plaintiffs' failure to train, failure to discipline, and ratification claims, Counts 9–14. Dkt. 8. The motion is otherwise **DENIED**.

It is so **ORDERED**.

The Clerk of the Court is hereby directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this  12th  day of April, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

force" behind injury, *Id.* at 535. In *Starbuck*, reversing the school board's decision would work to remove the injury done to the student plaintiff. Here, by contrast, reversing the Police Chief's approval would not undo the damage caused by excessive force. For this reason, *Starbuck* does not help Plaintiffs maintain their ratification claim.