EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

SHANTA LYNETTE BROWN, et. al.,        )
                                      )
            Plaintiffs,               )
                                      )
v.                                    )        Case No. 6:23cv54
                                      )
THE CITY OF LYNCHBURG, et al.,        )
                                      )
            Defendants.               )

## DEFENDANTS' RULE 26 EXPERT DISCLOSURES

Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Defendants City of

Lynchburg, LPD Officer Seth Reed, Deputy Zachary Miller and LPD Officer Robbin Miller, by

counsel, hereby disclose the following expert witness in this action:

1.    Lt. S. Grady Orr
      Mechanicsville, VA

   a. Lt. Orr's opinion and the basis and reasons for his opinions are stated in Exhibit A;

   b. Lt. Orr's *curriculum vitae*, attached as Exhibit B, sets forth his qualifications, any
      publications authored in the last ten (10) years, any cases in which he has testified
      as an expert by deposition or at trial in the last four (4) years; and his fee schedule.

Lt. Orr bases his opinions upon his review of the materials, his education, training and
experience. He will rely upon materials identified in his report and any additional materials that
may be disclosed through discovery and trial. He may use illustrations and demonstrative aids.

The attached opinion of Lt. Orr is based upon the expert's review of materials currently available
to the defendants and may be amended if and when additional information becomes available
during discovery and following the depositions of the plaintiffs' expert(s).

EXHIBIT A

CITY OF LYNCHBURG, LPD OFFICER SETH
REED, DEPUTY ZACHARY MILLER, and
LPD OFFICER ROBBIN MILLER

By: /s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB # 22299)
John R. Fitzgerald (VSB # 98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia  24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
        johnf@guynnwaddell.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was e-mailed to the

foregoing designation this 14th day of October, 2024, to the following:

M. Paul Valois
James River Legal Associates
7601 Timberlake Road
Lynchburg, VA 24502
Phone: 434-845-4529
Fax:    434-845-8536
Email: mvalois@vbclegal.com
*Counsel for Plaintiffs*

/s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB # 22299)
John R. Fitzgerald (VSB # 98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia  24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
        johnf@guynnwaddell.com
*Counsel for Defendants*

2

Shanta Brown, et al v. CITY OF LYNCHBURG, et al.

# EXHIBIT A

## Defendants' Expert Disclosure

# S. Grady Orr

Mechanicsville, VA 23116

October 11, 2024

Disclosures of S. Grady Orr

RE:    Shanta Brown and Aquasha Sandidge v. City of Lynchburg, et al.
       U.S. District Court, Lynchburg, Case No: 6:23-CV00054

**Background and Qualifications**:

I have served as a law enforcement officer in Henrico County, Virginia since 2006. While currently assigned as the Lieutenant, Drug Enforcement Unit – Organized Crime Section, I have also held various other positions during my tenure which include Patrol Officer, Field Training Officer (FTO), Academy Training Coordinator, Narcotics Detective, Patrol Sergeant, Criminal Investigative Sergeant (Robbery Unit), and Patrol Lieutenant.

I was certified as a Virginia Department of Criminal Justice Services (DCJS) General Instructor in 2010. I was also certified as a DCJS Defensive Tactics Instructor in 2010. I have served as a Henrico County Police Division Officer Survival Instructor since 2013 and have held the Division's designation as Chief Instructor for our Officer Survival program since 2016. In my capacity, both as a Defensive Tactics and Officer Survival Instructor, I have developed lesson plans and provided training in numerous topics, to include: armed encounters (both firearm and edged weapon related), dealing with violent and disorderly individuals, high-risk and unknown risk traffic stops, ambush survival for police officers, Verbal Defense and Influence, force-on-force Simunition firearms training, and training on proper response to the many call types that police officers regularly encounter.

I most recently created and instructed the De-escalation and Force Mitigation training that has now been imparted to all our current Henrico Police Division members, and I hold the Chief Instructor role for that mission.

I have remained current in my field by attending topic related courses sponsored by groups such as the Virginia State Police, Bureau of Justice Assistance, the Police Executive Research Forum (PERF), and the Force Science Institute, as well as recertifying as an instructor through Virginia DCJS as required.

I am frequently consulted by our Executive Leadership and Internal Affairs Investigators on use of force and officer safety related matters and best practices. I also consult monthly as an SME on our agency's Use of Force Review Board wherein all incidents involving force are scrutinized for appropriateness of action and areas of potential improvement.

1

EXHIBIT A

I earned a Bachelor of Arts Degree, in International Studies and Political Science, from Virginia Military Institute in 2004. I completed the 17th Session of the National Criminal Justice Command College in 2022 receiving a Graduate Certificate from the University of Virginia.


**Methodology**:


I utilize a four-step methodology when examining law enforcement related issues involving police related issues and police practices. This methodology is utilized by experienced and respected subject matter experts in the fields of use of force and police practice.

A. *Formulate an Understanding of the Facts*: Following a review of the information I am provided I will develop and state my understanding of the facts. If my understanding of the facts and circumstances change, or new information is provided post-initial review, my evaluation of those facts and opinions are subject to change.

B. *Analyze the Actions of the Parties*: The second step involves analysis of the actions taken by the involved law enforcement officers. The analysis is based upon such items as: documentation by the officer(s), internal/external investigations of the matter, physical evidence, and other related information.

C. *Compare Training Standards and Practices*: The third step involves comparing the officers' conduct during the event to established training standards and practices. Standards of training and practice include, but are not limited to: relevant Virginia law, department policies and procedures, and applicable statewide law enforcement training programs.

D. *Explain the Consistencies/Inconsistencies*: The fourth step involves explaining how the actions of the officer(s) did, or did not, conform to the applicable standards of training and practice within law enforcement.


**Materials Reviewed**:


1. **City of Lynchburg Police Department Policies and Procedures**
   a. Policy PD19-0602 (Use of Force)
   b. Policy PD-20-0406 (Recording Police Activities)


2. **City of Lynchburg Police Department Documents and Reports**
   a. CCN2020-006129 (Incident Report)
   b. Dispatch Record – CCN2020-006129
   c. Injury Report – Detective Robbin Miller

3. **Audio/Video Recordings and Other Digital Images**
   a. Video: BWC for Officer Zachary Miller
   b. Video: BWC for Officer Seth Reed
   c. Video: BWC for Officer Tereika Grooms
   d. Video: Dash Cam Video for Officer Zachary Miller
   e. Video: Dash Cam Video for Officer Seth Reed
   f. Video: Dash Cam Video for Officer Tereika Grooms

4. **Legal Documents**
   a. Plaintiff's Summons and Complaint – Filed 09/18/2023
   b. Plaintiff's Rule 26 Expert Disclosures – Mr. Mark S. Dunston
   c. Arrests warrants for Shanta Brown and Aquasha Sandidge

5. **DCJS Training Manual and Compulsory Minimum Training Standards**
   https://www.dcjs.virginia.gov/law-enforcement/manual

6. **Commission on Accreditation for Law Enforcement Agencies** [CALEA]
   https://www.calea.org

7. **Code of Virginia**
   https://law.lis.virginia.gov/vacode

**Understanding of the Facts:**

On Tuesday, April 28, 2020, at approximately 2208 hours, Officer Zachary Miller was on duty, in uniform and displaying his badge of authority, while operating a marked Lynchburg Police vehicle. Officer Z. Miller observed a dark colored Kia SUV that was not displaying a front license plate and initiated a traffic stop on the vehicle. Upon Officer Z. Miller activating his vehicle's emergency lights to alert the driver to pull over, the vehicle had already begun pulling into the parking lot of the Jobber's Overall Apartments on Kemper Street in Lynchburg, VA. The violator vehicle pulled into a parking space directly adjacent to the sidewalk and front side of the apartment building.

Upon initial approach of the vehicle, Officer Z. Miller contacted the driver of the vehicle who identified himself as Terron Pannell and advised that he did not have a driver's license. During this initial interaction between Officer Z. Miller and Pannell, Officer Tereika Grooms arrived in order to function as a backup for Officer Z. Miller. Officer Grooms took up a position on the passenger side of the vehicle as is normal for a backup officer on a traffic stop.

Within approximately 30 seconds of Officer Grooms arriving on-scene to function as backup for Officer Z. Miller, two adult females (later identified as Shanta Brown and Aquasha Sandidge) exited the front of the apartment building and approached the front of Pannell's vehicle on the

3

sidewalk. Officer Grooms politely asked the two females to "stay back for a minute" and advised them that she wasn't aware of the exact situation and that they would have to ask the other officer (Z. Miller). Upon being advised by Officer Grooms that they would have to ask Officer Z. Miller what was going on, Brown and Sandidge proceeded to walk in closer toward the driver's side of the vehicle as Brown stated, "I'm his mother." At that point, Officer Z. Miller tells her he will talk with her in a minute, as he is returning to his car to do the business of the traffic stop and issue a summons.

When Brown and Sandidge disregarded Officer Grooms' direction to stay back from the car, Grooms walked around the back of Pannell's vehicle to the driver's side and gave Brown and Sandidge further direction to stay back from the vehicle. Officer Grooms still maintained her professional composure upon having to ask Brown to step back from the vehicle a second time. Brown can be seen on Grooms' bodycam looking her up and down and then slowly complying by stepping back up onto the sidewalk in front of Pannell's vehicle. At the same time, in Officer Z. Miller's bodycam, he can be seen partially exiting his patrol vehicle in the midst of conducting the functions of his traffic stop in order to support Officer Grooms in giving direction to Brown and Sandidge to please stay back from Pannell's vehicle. Officer Z. Miller advises Brown and Sandidge that he will come speak to them when he has the opportunity to do so.

While Brown and Sandidge wait on the sidewalk, Brown can be heard via Officer Grooms' bodycam saying, "this don't make no sense."

Within the following minute, Officer Z. Miller asks Officer Grooms over the radio to see if she can obtain consent from Pannell to search the vehicle. Officer Grooms acknowledges the request and proceeds back around to the driver side of the vehicle to speak with Pannell. Officer Grooms speaks with Pannell for a period of time, and Pannell ultimately denies consent to search the vehicle. Officer Grooms advises Officer Z. Miller that consent to search the vehicle was denied.

When asked by Pannell if she smells marijuana, Officer Grooms advises that she does not smell it. At this point the verbal exchange between Officer Grooms and Pannell ends and she walks back around to the passenger side of Pannell's vehicle. Officer Grooms asks Shanta Brown if the vehicle that Pannell is driving is registered to her and Brown responds, "No, this isn't my car. I don't know whose car this is." Brown goes on to tell Officer Grooms, "I don't even now why he's driving the car, to be perfectly honest."

While in his vehicle conducting the functions of the traffic stop, Officer Z. Miller radios for Officer Seth Reed (a drug K9 officer) to respond to his location to conduct a K9 drug screen of Pannell's vehicle (this occurs at 3:51 on Officer Z. Miller's bodycam). Officer Seth Reed arrives less than four minutes later and speaks with Officer Z. Miller (7:48 on Z. Miller's bodycam).

At 00:50 on Officer Reed's bodycam, he can be seen advising Officer Grooms that he (Reed) is going to have Pannell get out of the vehicle for the purposes of doing a K9 screen. Several seconds later Officer Reed engages with Pannell and advises Pannell that he needs him to step out of the vehicle and stand with the other officer.

4

At this time, Shanta Brown inappropriately interjects herself into the situation by walking over to the driver's side of the vehicle saying, "he ain't got to get out of that car." Officer Reed advises Brown that Pannell does have to get out of the car if they ask him to and further advises Brown that she has nothing to do with the traffic stop. Brown responds by affirming that Pannell is her son.

Officer Reed asks Brown to stand away from the vehicle and advises that he is a K9 officer who is going to conduct a scan of the vehicle. Pannell begins to protest verbally and begins to claim that he is in fear for his life.

Officer Reed opens the driver's door to Pannell's vehicle and advises him that he needs to step out of the vehicle. At this time, Pannel has both hands in the air and says, "I'm scared, bruh. I'm so scared right now." Pannell further says to Reed, "Do not touch me. Please, don't touch me." And then, "I'm scared. I fear for my life. I'm scared of you, sir. I'm telling you that I'm scared of you, sir." While this exchange is going on between Officer Reed and Pannell, Shanta Brown can be heard in the background continuing to protest and interject herself verbally into the situation.

While Pannell is protesting Officer Reed's instructions to exit the vehicle, Officer Grooms (from her position on the passenger side of the vehicle) is attempting to urge Pannell to make it easier and step out of the vehicle.

A moment later Pannell is removed from the vehicle by Officers Reed and Z. Miller after he demonstrated non-compliance to the officer's direction to step out of the vehicle. Officer Z. Miller and Officer Reed safely remove Pannell from the vehicle and place him in a prone position on the ground so that he can be handcuffed and a frisk of his person conducted.

While Pannell is being extracted from the vehicle by Officers Reed and Z. Miller, Grooms can be seen on her bodycam and dash cam having moved around to the front of the driver's side of the vehicle to continue to implore Pannell to step out of the vehicle. Brown can be seen on Grooms' bodycam and dash cam physically trying to move herself into the situation and gets so close to Officer Grooms that Grooms' bodycam is actually knocked off as Grooms tried to get Brown to back away from where Officers Reed and Z. Miller are attempting to detain Pannell. Brown eventually complies with Officer Grooms and steps back up onto the sidewalk.

While Pannell is prone on the ground and being handcuffed, Brown or Sandidge (unknown exactly) can be heard in the background screaming, "What is y'all doing?" and "He is wrong." One of the plaintiffs can also be heard asking for officers' badge numbers and information.

Pannell is safely handcuffed and is quickly helped up off the ground to a standing position and taken toward the back of Officer Z. Miller's patrol vehicle. From the time that Pannell is extracted from the vehicle to the time he is standing back up on his feet with officers' assistance is approximately 30 seconds.

EXHIBIT 2

Upon attempting to conduct a search of Pannell's person, Officer Reed asks Pannell if he has anything on his person that is going to hurt him (such as sharp objects). At this time, Pannell begins to flail about and becomes more noncompliant while asking what he did. Due to Pannell's actively resistive behavior, Officers Reed and Z. Miller again take Pannell to the ground and Brown can be seen via dash cam trying to encroach upon officers and get to Pannell while Reed and Z. Miller address Pannell's noncompliant behavior. It can be seen on dash cam that Officer Z. Miller stands up and pushes Brown backward to keep her away from the situation.

It is important to note that at 09:58 on Officer Z. Miller's bodycam that Officer Grooms can be seen attempting to handcuff Shanta Brown but is unsuccessful. Grooms eventually abandons the attempt to handcuff Brown and physically disengages to further attempt to separate Brown and Sandidge from the situation using verbal tactics. Officer Grooms is able to successfully convince both Brown and Sandidge to back up onto the sidewalk in front of the main doors to the apartment building.

At 03:15 on Officer Reed's bodycam, he instructs Officer Z. Miller to place both Shanta Brown and Aquasha Sandidge into handcuffs. At 03:18 (Reed's bodycam), Detective R. Miller arrives and comes first to assist Officer Reed. Detective R. Miller can then be seen moving toward the front of the building to assist his fellow officers. Due to his position, Reed was unable to see what took place further between Brown, Sandidge, and officers, and was not in the best position to make the decision as to the need to detain Brown and Sandidge in that moment. After taking direction from Officer Reed, Officer Z. Miller reapproaches the sidewalk where Shanta Brown is standing and as he reaches out to put his hands on her person, Z. Miller instructs her to put her arms behind her back and turn around. At that time, Brown pulls back and begin to turn away from Officer Z. Miller. It is unable to be seen clearly, but it appears that as Officer Z. Miller attempts to gain control of Brown's arm, and as she continues to actively resist, Brown falls to the ground at which time both Officers Z. Miller and Grooms attempt to gain control of Brown's arms to safely place her into handcuffs.

While Officers Z. Miller and Grooms work to safely handcuff Shanta Brown, Aquasha Sandidge can be heard screaming in the background to "get the fuck off of her" (presumably referring to Brown) and can also be seen at 10:35 (Z. Miller's bodycam) approaching over the back of Officer Grooms while they try to handcuff Brown. It is at this time that Detective R. Miller has arrived to assist and begins to attempt to separate and detain Aquasha Sandidge.

As seen on Officer Reed's dash cam footage, it appears that as Detective R. Miller attempts to go hands on with Sandidge from behind to remove her away from the officers trying to handcuff Brown, Sandidge resists R. Miller's attempts to compel her movement. Upon resisting Detective R. Miller, Sandidge and Detective R. Miller appear to simultaneously lose their balance backwards causing Sandidge to fall on top of Detective R. Miller. As this happens, Officer Z. Miller can be seen using his body weight as leverage to remove Sandidge from on top of Detective R. Miller's

person. Sandidge is then able to be quickly secured in handcuffs after she is removed from on top of Detective R. Miller.

At this time, both Brown and Sandidge are secured in handcuffs and the physical struggle between LPD officers, and the two plaintiffs, is concluded. Both Brown and Sandidge are quickly gotten up off the ground and taken to be placed into separate patrol vehicles.

**Opinions**:

Based upon my understanding of the facts, my review of materials provided/referenced, and the totality of my education, training, and experience within law enforcement, I have developed the following opinions to a reasonable degree of professional certainty:

A. The City of Lynchburg Police Department (henceforth recognized as "LPD") is accredited by the Commission on Accreditation for Law Enforcement Agencies (CALEA) and has been so accredited since 1989. Considered the Gold Standard in Public Safety, CALEA is an accreditation organization created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriff's Association (NSA), and the Police Executive Research Forum (PERF). CALEA provides law enforcement agencies across the United States with an avenue for demonstrating that they meet commonly accepted professional standards for efficient and effective agency operation based upon both constitutional requirements and recognized best practices.

B. The Department of Criminal Justice Services (DCJS) is empowered by the Code of Virginia to establish policy and compulsory minimum training standards. These training standards are published in the Virginia Criminal Justice Training Reference Manual (VCJTRM). DCJS standards are based on constitutional requirements applicable to law enforcement officers, as announced and interpreted by the United States Supreme Court and lower courts, and best practices. Certain theoretical and practical knowledge is required to be demonstrated by law enforcement personnel prior to obtaining certification as a police officer/deputy sheriff in the Commonwealth of Virginia. As certified law enforcement officers in the Commonwealth of Virginia, Officers Zachary Miller, Seth Reed, and Robbin Miller have been trained and have fulfilled these requirements. Based upon their personal observations, as influenced by their training and experience, they were inclined to detain both Shanta Brown and Aquasha Sandidge to try to bring a very disorderly situation to a safer conclusion and keep it from escalating further.

The DCJS minimum training standards that pertain to this situation are as follows:

a. VCJTRM Performance Outcome 6.2 – Restrain publicly intoxicated, disruptive, or violent individuals.

i.   Trainees are given a practical exercise to demonstrate techniques regarding restraint of publicly intoxicated, disruptive, or violent individuals.

ii.  Objectives 6.2.1 through 6.2.6 require trainees to be able to identify and utilize the following in the determination of a best course of action:

   1.   Officer Safety considerations (Objective 6.2.1)

      a.   Key planning elements related to isolating a disruptive individual from other members of the public. (Objective 6.2.1.1)
      b.   Use of available backup officer(s). (Objective 6.2.1.2)

   2.   Command presence (stance, posture, eye contact). (Objective 6.2.2)

   3.   Communication skills to minimize antagonistic responses. (Objective 6.2.3)

   4.   Appropriate escalation/de-escalation on a force continuum. (Objective 6.2.4)

   5.   Restraint procedures. (Objective 6.2.5)

   6.   Effecting an arrest. (Objective 6.2.6)

b.  VCJTRM Performance Outcome 6.6 – Identify the use of force necessary and appropriate to law enforcement services.

   i.   Trainees are given a written or practical exercise to identify factors that affect the use of reasonable and necessary force.

   ii.  Objectives 6.6.1 through 6.6.3 require trainees to be able to identify and consider the following in their determination of force used:

      1.   Factors affecting the use of force (Objective 6.6.1):

         a.   Subject actions (6.6.1.1)
         b.   Officer perception (6.6.1.2)

      2.   Factors affecting the use of deadly force (Objective 6.6.2):

         a.   Intent (6.6.2.1)

8

        b.  Ability (6.6.2.2)

        c.  Means (6.6.2.3)

        d.  Opportunity (6.6.2.4)

        e.  Legal criteria (6.6.2.5)

3.  General considerations for use of force (Objective 6.6.3)

    a.  Key elements for appropriate response for situations where a violent reaction to law enforcement service is foreseen, e.g., multiple officers/backup. (6.6.3.1)

    b.  Elements of command presence (stance, posture, eye contact). (6.6.3.2)

    c.  Avoiding unintentional and/or unnecessarily antagonistic and provoking verbal and nonverbal factors by the officer. (6.6.3.3)

    d.  Primary aspects of proper verbalization (invoke authority, announcement of arrest, clarity). (6.6.3.4)

    e.  Appropriate escalation/de-escalation on a use of force continuum. (6.6.3.5)

    f.  Application of handcuffs and additional restraints. (6.6.3.6)

c.  VCJTRM Performance Outcome 6.7 – Control non-violent groups, hostile groups, and/or disorderly assemblies, and when necessary, physically restrain a crowd or confront in riot formation.

    i.  Trainees are given a written and/or practical exercise to identify factors to consider when controlling non-violent or hostile groups.

    ii.  Objectives 6.7.1 through 6.7.3 require trainees to be able to identify the following:

1.  The elements of the following offenses (Objective 6.7.1):

    a.  Unlawful assembly (6.7.1.1)

    b.  Disturbing the peace (6.7.1.2)

    c.  Incitement to riot (6.7.1.3)

    d.  Disorderly conduct in public places (6.7.1.4)

2.  Three factors for controlling non-violent groups, i.e., peaceable assemblies. (Objective 6.7.2)

3.  Three factors to consider when dealing with hostile groups. (Objective 6.7.3)

d. VCJTRM Performance Outcome 6.8 – Break up fights between two or more persons.

    i. Trainees are given a practical exercise to demonstrate techniques for breaking up fights between two or more persons during a simulation exercise.

    ii. Objectives 6.8.1 through 6.8.4 require trainees to be tested on the following:

        1. Evaluating the situation. (Objective 6.8.1)

        2. Intervening verbally. (Objective 6.8.2)

        3. Using the appropriate level of force. (Objective 6.8.3)

        4. Using officer safety procedures. (Objective 6.8.4)

e. VCJTRM Performance Outcome 6.10 – Use weaponless techniques to subdue a person resisting arrest or to control a person.

    i. Trainees are given a written and practical exercise to demonstrate weaponless techniques to subdue a person resisting arrest or to control a person.

    ii. Objectives 6.10.1 through 6.10.8 require trainees to be tested on the following:

        1. Identification of psychological and physiological effects of sudden stress related to each effect and reaction using an anatomical chart or volunteer. (Objective 6.10.1)

        2. Identification of basic principles and fundamentals of defensive tactics. (Objective 6.10.2)

        3. Demonstration of technique of approach. (Objective 6.10.3)

        4. Demonstration of blocking principles designed to neutralize attack. (Objective 6.10.4)

        5. Demonstration of weaponless techniques to control person. (Objective 6.10.5)

10

EXHIBIT A

6. Demonstration of blocking techniques with a partner using safety equipment in a controlled environment that provides for minimizing potential injury to the trainee or partner (Objective 6.10.6)

7. Demonstration of techniques to prevent a takedown to the ground. (Objective 6.10.7)

8. Demonstration of the ability to protect the firearm and other weapons on the duty belt while on the ground. (Objective 6.10.8)

f.  VCJTRM Performance Outcome 6.11 – Subdue a physically attacking person.

   i.  Trainees are given a practical exercise to demonstrate techniques for defending oneself against a physically attacking person and subduing a person during a simulation exercise using a volunteer or instructor.

   ii.  Objectives 6.11.1 through 6.11.5 require trainees to be tested on the following:

      1. Identification of weapon considerations of suspect and officer (Objective 6.11.1)

      2. Demonstration of defensive strategy designed to protect officers' vulnerable targets. (Objective 6.11.2)

      3. Demonstration of offensive active countermeasures designed to neutralize aggressor for de-escalation. (Objective 6.11.3)

      4. Demonstration of de-escalation by (Objective 6.11.4):

         a. Decentralizing suspect to prone position for handcuffing. (6.11.4.1)
         b. Disengaging from suspect. (6.11.4.2)

      5. Demonstration of escalation in life and death struggle (Objective 6.11.5)

g.  VCJTRM Performance Outcome 6.12 – Subdue a resisting suspect and place in a prone position.

   i.  Trainees are given a practical exercise to demonstrate proper methods of subduing and placing a resisting suspect in a prone position.

11

    ii.  Objective 6.12.1 through 6.12.4 trainees to be tested on the following:

        1.  Demonstration of safe contact and initial control. (Objective 6.12.1)

        2.  Demonstration of decentralization to prone position with minimal risk of suspect injury. (Objective 6.12.2)

        3.  Demonstration of stabilization in prone position for cuffing procedure. (Objective 6.12.3)

        4.  Demonstration of bringing a handcuffed person to his or her feet. (Objective 6.12.4)

C.  Police Officers dealing with intoxicated, disruptive/disorderly, and/or violent individuals is very difficult and fraught with uncertainties and the inability of officers to be completely aware of the intentions and capabilities of said individual(s). These scenarios are challenging enough when officers are dealing with only a single disruptive/disorderly individual and only become exponentially more challenging when officers are dealing with multiple persons, as was the case with this incident on April 28, 2020.

In this incident, based on their actions taken, I find that Officers Z. Miller, S. Reed, and R. Miller acted within their training and the parameters of the listed performance outcomes in order to bring a dangerous and increasingly volatile situation to a safe conclusion. By placing Shanta Brown into handcuffs Officers Z. Miller and Grooms were attempting to de-escalate the situation for everyone involved. Brown's behavior, if allowed to escalate again, could have potentially led to a higher level of force being necessary if Officer Z. Miller had not followed through with the decision to detain Brown when he did. As it was seen, Officer Grooms had already attempted but was unsuccessful at detaining Brown prior to Officer Seth Reed giving Officer Z. Miller the direction to do so.

D.  The level of force utilized by Officers Z. Miller and R. Miller to lawfully detain Shanta Brown, and subsequently, Aquasha Sandidge complies with the LPD's use of force policy.

    a.  The LPD policy related to Use of Force (PD19-0602) that would have governed the date of this incident went into effect in August 2019 and is the guiding document for the force application utilized in the matter brought forth by the Plaintiffs.

    b.  The LPD Use of Force policy provides various definitions to include non-lethal force, reasonable belief, and physical force, but does not give a definition of excessive force.

      i.  Reasonable belief is defined in this policy as "when facts or circumstances the officer knows, or should know, are such to cause an ordinary and prudent person to act or think in a similar way under similar circumstances."

      ii.  Physical force is defined in this policy as "bodily force exceeding the normal force required to take a person into custody.

E.  The Code of Virginia defines "excessive force" as "any force that is objectively unreasonable given the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade by flight."

    a.  The totality of the circumstances in this incident includes the following factors:

      i.  Officers were attempting to solely interact with Terron Pannell. To this end, officers repeatedly asked Brown and Sandidge to step back and disengage from the situation. Brown and Sandidge continued to disregard officers and interject themselves into the situation despite officers asking them to stop.

      ii.  Shanta Brown attempted to physically interject herself into the officers' lawful objectives twice during the entire encounter. The first time being when officers were initially taking Terron Pannell out of the vehicle, and a second time when officers had taken Pannell back to the patrol car and were attempting a pat down/search at which time Pannell began to flail about and demonstrate active resistance. During both instances, Shanta Brown attempted to push herself into the situation where officers were attempting to control Pannell.

      iii.  Shanta Brown stated that she was a correctional officer by profession. To this fact, it is quite reasonable to assume that Brown has likely dealt with non-compliant inmates in a jail setting and knows or should know the potential danger it poses to officers when otherwise non-involved persons/inmates try to interject/intervene physically into a situation that officers are trying to address. Despite this fact, I have often instructed many police officers that when emotions are high, rational thinking is inversely low which would stand to be directly applicable to this incident and thus an explanation for Shanta Brown's behavior.

      iv.  Officer Z. Miller attempted to give Shanta Brown a lawful direction to place her arms behind her back so that she could be placed into handcuffs while standing. It was Brown's decision not to comply and the actively resistive nature of Brown's behavior that ultimately caused both Shanta Brown and

13

Officer Z. Miller to lose balance and go to the ground before she could be successfully handcuffed.

v.   It was Aquasha Sandidge's behavior while Brown was being handcuffed and how she actively resisted Detective R. Miller's attempts to compel her movement away from the situation that caused her to lose her balance and fall backwards on top of Detective R. Miller. Had Sandidge more readily complied with R. Miller's directions to move away, she likely would not have fallen to the ground at all and could have been safely detained while standing.

vi.   At the point officers take a subject into custody, even for an investigatory detention, that person's safety and security then become the responsibility of the officers involved. It is my opinion that these officers acted quickly and within their professional responsibilities to get both Brown and Sandidge up from a position on the ground to a standing position and then further detain them in a patrol vehicle. Additionally, treatment by EMS personnel was offered to and denied by both Brown and Sandidge.

F.   The professional standard used in describing the amount of force one utilizes in response to an individual's resistance is only to the extent it is objectively reasonable to defend oneself or another, to control an individual during an investigative or mental detention, or to lawfully effect an arrest.

a.   An accepted theory utilized in the instruction of control tactics is the "One Plus One" theory of escalation. The theory advocates that the law enforcement officer may use only one level of force greater than the level of resistance used by the subject. The purpose is to ensure the force utilized between the two parties is not stalemated and provides that the force utilized by law enforcement to overcome the resistance is proportional.

G.   The factors to consider in law enforcement today when a use of force decision must be made come from United States Supreme Court case Graham v. Connor (1989) which established the "reasonableness standard" utilized in the use of force justification. These factors to consider are taught to law enforcement personnel across the United States and are as follows:

a.   Severity of the crime;

b.   Whether the suspect poses an immediate threat to the safety of the officer(s) or others;

14

    c. Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

H. There are generally four types of resistance that can be offered by persons: Passive, Active, Aggressive, and Deadly Force.

    a. During Passive Resistance, an individual poses no immediate threat to an officer but is not complying with the lawful orders and is taking minimal physical action to prevent an officer from taking lawful action.

    b. During Active Resistance, an individual's verbal and/or physical actions are intended to prevent an officer from taking lawful action but are not intended to harm the officer.

    c. During Aggressive/Assaultive Resistance, an individual's physical actions/attacking movements are intended to prevent an officer from taking lawful action and may cause injury but are unlikely to cause death or serious physical injury.

    d. During Deadly Force Resistance, an individual's hostile, attacking movements with/without a weapon create a reasonable perception by the officer that the subject intends to cause and has a capability of causing death or serious physical injury to the officer or other.

    e. During the incident on April 28, 2020, based on my review of all the video footage made available to me, it is apparent that Brown not only obstructed justice by attempting to unlawfully intervene in law enforcement action, but also demonstrated Active Resistance when the decision was made to go hands-on and detain her. Furthermore, it is my opinion that Shanta Brown's active resistance to being detained is what caused the response to resistance demonstrated by Officer Z. Miller and resulted in Brown ultimately being handcuffed on the ground versus a standing position.

I. Based upon the type of resistance being presented, it is accepted that law enforcement officers may respond with appropriate force while utilizing the techniques and tools necessary to overcome the resistance encountered and accomplish their lawful objectives.

    a. Force used by law enforcement has been defined in various ways, but generally as the amount of effort needed by the officer to compel compliance by an unwilling subject.

b. The response provided by a law enforcement officer takes into consideration multiple factors such as the individual officer's training, experience, and specific circumstances of the situation.

c. The response is not necessarily a linear progression along a continuum, but a reasonable selection for attempting appropriate de-escalation.

    i. De-escalation is acting or communicating verbally or nonverbally during a potential force encounter in an attempt to stabilize the situation, reduce the intensity of the conflict, and mitigate the amount of force that must utilized.

    ii. The ideal de-escalation of a scenario involves no force being utilized. A successful de-escalation of any scenario is one in which the minimal amount of force is utilized to achieve the lawful objective(s) of the involved officer(s). Had Shanta Brown and Aquasha Sandidge simply complied with officers' lawful directions, it is highly unlikely that the situation would have devolved into both Brown and Sandidge being handcuffed on the ground.

    iii. It is once again important to note that while Officer Grooms did an admirable job attempting to verbally de-escalate throughout the incident, she was largely unsuccessful in doing so. Furthermore, Officer Grooms demonstrated she also knew that detaining the females was a prudent option. As stated in my understanding of the facts above, Officer Grooms can be seen (09:58 on Z. Miller's bodycam) attempting to detain Shanta Brown in handcuffs after Brown was shoved back by Officer Z. Miller. Unfortunately, Grooms was unsuccessful at completing the handcuffing technique alone and chose to disengage from Brown.

    iv. Placing uncooperative individuals into investigative detention after they have chosen to interfere with the lawful objectives of police is commonplace. Additionally, detaining persons who have chosen to interfere is a de-escalation tactic that is an accepted practice in policing for the increased safety of all parties involved. When officers are outnumbered by growing crowds of onlookers, it is unreasonable to assume that they can safely and effectively handle the situation at hand if onlookers are allowed to aggressively approach them and intervene while they address a situation. This was the case with Shanta Brown in this incident and when officers had the safe ability to do so (after Terron Pannell was secured and other officers began to arrive), the decision was made to detain Shanta Brown for her interference.

d. It is a common misperception that verbal de-escalation is an absolute remedy to all situations. It is important to understand that the subject(s) in question, in this case

16

Brown and Sandidge, always get a say-so in how the situation will play out. Any subject's behavior has a direct effect on how officers ultimately respond and in this incident Brown's behavior is what caused the decision to be made by officers for her to be placed into handcuffs.

e.  In my professional opinion, Officers Z. Miller, T. Grooms, and S. Reed, all conducted themselves in a manner that is consistent with trying to de-escalate, or not further escalate, the incident. Detective R. Miller arrived after the situation had already devolved and found himself attempting to simply assist his fellow officers by detaining a disorderly Sandidge. Even Officer Grooms demonstrated in her mind the forethought that she had to finally detain Shanta Brown for the purposes of de-escalating the entire situation. Officers repeatedly gave lawful commands for Shanta Brown and Aquasha Sandidge to stay back from officers as they tried to achieve their objectives with Pannell. It was Brown and Sandidge's disobeying of officers' directions that ultimately caused the decision to be made to place them into handcuffs. The question could be posed as to why officers waited to detain Brown and Sandidge for their interference, but due to a lack of officers initially on-scene as they were trying to deal with a non-compliant Terron Pannell it was not safe for officers to try and detain Brown and Sandidge prior to additional backup being called. Both Brown and Sandidge are also not small individuals and could not easily be handled by one single officer, nor is it ever advantageous for one officer alone to try to detain a subject who has proven already to be non-compliant with officers' directions.

J.  In summary, after consideration of all the information made available to me to date, I am of the following opinions related to this matter:

a.  I find that the decisions and actions taken by Officers Zachary Miller and Robbin Miller to detain Shanta Brown and Aquasha Sandidge to be consistent with accepted law enforcement training and practices and reasonable under the circumstances. Although not named in this civil suit, Officer Grooms already attempted to detain Shanta Brown in handcuffs prior to the decision by Officer Z. Miller.

b.  I find Officer Zachary Miller's actions taken, related to his use of force against Shanta Brown, to be reasonable, appropriate and within City of Lynchburg Police Department's Use of Force policy and accepted law enforcement practice.

i.  Officer Z. Miller attempted to instruct Shanta Brown to place her arms behind her back in order to be detained in handcuffs while standing up. This is always the most preferential handcuffing position for officers and is what Officer Z. Miller was trying to accomplish.

17

ii.  At the point that Officer Z. Miller made the decision to detain Shanta Brown, it is my opinion that he was well within the standards held in Graham v. Connor to detain Brown and use the appropriate level of force to do so. The only reason the detention of Brown and Sandidge had not happened prior to that time is due to a lack of officers present, Terron Pannell's behavior, and a growing crowd of onlookers.

c.  I find Detective Robbin Miller's actions taken, related to his use of force against Aquasha Sandidge, to be reasonable, appropriate and within the City of Lynchburg Police Department's Use of Force policy and accepted law enforcement practice.

i.  Detective R. Miller, while attempting to remove Sandidge away from the other officers, was met with resistance, lost his balance, and fell backwards at which time Sandidge fell on top of him, having also appeared to lose her balance.

ci.  I find that the willful Active Resistance, by both Shanta Brown and Aquasha Sandidge, to disregard the legal authority of Officers Z. Miller, R. Miller, and S. Reed, are ultimately the root cause of them being detained in handcuffs on the ground versus in a standing position.

cii.  To address the complaint that Sandidge's phone was taken and turned off by Officer Z. Miller to prevent a recording of an improper arrest, it is my opinion that this complaint has no foundation. By the time Sandidge was detained for obstruction, multiple officers' body cameras and at least two dash cameras were still recording the incident. Therefore, turning off Sandidge's phone from recording was proper and further did nothing to prevent a recording of police conduct.

ciii.  To address the complaint that officers gave false/inconsistent testimony in order to maliciously prosecute the Plaintiffs, it is my opinion that this complaint is merely a matter of biased perspective by the Plaintiffs. To address the complaint that officers gave false/inconsistent testimony in order to maliciously prosecute the Plaintiffs, it is my opinion that this complaint also has no foundation. Based on my experience in 18+ years of law enforcement, I can offer that a large majority of the persons whom I have either personally arrested or whose arrests I have been a witness, have failed to take accountability or responsibility for their own actions in the situation, and it is not uncommon for similar claims to be made, that officers are fabricating events when testimony is given to a magistrate to obtain arrest warrants.

i.  In this incident, Shanta Brown can be seen running up quickly, and nearly on top of, both Officers Z. Miller and S. Reed when they are required to place Terron Pannell in a prone position for the second time due to his active resistance. It was only due to Officer Z. Miller's situational awareness and

18

intervention of Brown's quick approach was he able to prevent Brown from being fully on top of the officers and further interfering while they worked to address Pannell's non-compliant behavior.

ii. As is often the case, body or dash camera footage of the encounter does not definitively show whether Brown contacted Officer Z. Miller or S. Reed prior to Officer Z. Miller rising from his kneeling position to push her away from where officers were dealing with Terron Pannell in a prone position.

iii. Any testimony given before a magistrate to obtain arrest warrants against the Plaintiffs should have mirrored the narratives that each officer contributed to the police report that I have reviewed. As I have read each narrative, they seem to be consistent with my observations of the camera footage that was made available to me. In my experience, I have rarely seen an incident involving similarly resistive and disorderly behavior where a person has agreed with the officer's version of events and accepted their culpability in the incident.

iv. During his testimony to the magistrate, Officer Z. Miller's body camera audio was either turned off or malfunctioning on the video that was made available to me. Therefore, I was unable to observe Officer Miller's testimony to the magistrate.

v. Detective R. Miller was not wearing a body camera and thus I have not heard any audio of his testimony to the magistrate to obtain a warrant against Aquasha Sandidge.

vi. Officer S. Reed's body camera was on and fully functioning during both his testimony and Officer Z. Miller's testimony to the magistrate regarding arrest warrants for Shanta Brown. Based on my observation of their testimony, neither officer gave inconsistent or false testimony to the magistrate in order to obtain arrest warrants for Shanta Brown. Furthermore, although Officer S. Reed had walked away while Brown was giving her version of events to the magistrate, her voice can still be heard via Reed's bodycam audio telling the magistrate that she did pull away from Officer Z. Miller when he attempted to put his hands on her (approximately 25:53 on Officer S. Reed's bodycam video from the jail). Her exact words used to explain this sounded like Brown said she "snatched away from him (Z. Miller)." The rest of Brown's full explanation is not clearly heard.

My opinions are based upon my review of all materials that were made available to me at the time this report was written. It is expected that any additional information (e.g. depositions, video/audio recordings) will be provided to me for review as they become available or discovered to be of

relevance. My opinions may be amended upon receipt and review of such materials and will supplement this report accordingly.

Respectfully Submitted,

S. Grady Orr

Shanta Brown, et al v. CITY OF LYNCHBURG, et al.

# EXHIBIT B

## Defendants' Expert Disclosure

**S. Grady Orr**
Mechanicsville, VA 23116

## BACKGROUND AND QUALIFICATIONS

I have served as a law enforcement officer in Henrico County, Virginia since 2006. While currently assigned as the Narcotics Commander – Organized Crime Section, I have also held various other positions during my tenure which include: Patrol Officer, Field Training Officer (FTO), Academy Training Coordinator, Narcotics Detective, Patrol Sergeant, Criminal Investigative Sergeant (Robbery Unit), and Watch Commander, Patrol Bureau.

I was certified as a Virginia Department of Criminal Justice Services (DCJS) General Instructor in 2010. I was also certified as a DCJS Defensive Tactics Instructor in 2010. I have served as a Henrico County Police Division Officer Survival Instructor since 2013 and have held the Division's designation as Chief Instructor for our Officer Survival program since 2016. In my capacity, both as a Defensive Tactics and Officer Survival Instructor, I have developed lesson plans and provided training in numerous topics, to include: armed encounters (both firearm and edged weapon related), dealing with violent and disorderly individuals, high-risk and unknown risk traffic stops, ambush survival for police officers, Verbal Defense and Influence, force-on-force Simunition firearm training, and training on proper response to the many call types that police officers regularly encounter.

I most recently created and instructed the De-escalation and Force Mitigation training that is imparted to all of our Henrico Police Division members, and I hold the Chief Instructor role for that mission.

I have remained current in my field by attending topic related courses sponsored by groups such as the Virginia State Police, Bureau of Justice Assistance, the Police Executive Research Forum (PERF), and the Force Science Institute, as well as recertifying as an instructor through Virginia DCJS as required.

I am frequently consulted by our Executive Leadership and Internal Affairs Investigators on use of force and officer safety related matters and best practices. I also consult monthly as an SME on our agency's Use of Force Review Board wherein all incidents involving force are scrutinized for appropriateness of action and areas of potential improvement.

I earned a Bachelor of Arts Degree, in International Studies and Political Science, from Virginia Military Institute in 2004. I completed the 17th Session of the National Criminal Justice Command College in 2022 receiving a Graduate Certificate from the University of Virginia.



## PROFESSIONAL EXPERIENCE: Law Enforcement

| | |
|---|---|
| **Henrico County (VA) Police Division** | **2006 – Present** |
|     **Lieutenant:** | **2019 – Present** |
|         Narcotics Commander – Organized Crime Section | |
|         Watch Commander – Patrol Bureau | |
|     **Sergeant:** | **2016 – 2019** |
|         Criminal Investigations – Robbery | |
|         Patrol Bureau – Evening/Midnight Watch | |
|     **Narcotics Detective** | **2013 – 2016** |
|         Organized Crime Section – Drug Enforcement | |
|     **Training Academy Coordinator** | **2011 – 2013** |
|         Henrico Police Training Academy | |
|     **Police Officer** | **2006 – 2011** |
|         Patrol Bureau/Field Training Officer | |
| | |
| **Department of Criminal Justice Services – General Instructor** | **2010 – Present** |
|     Certified Defensive Tactics (DT) Instructor | **2010 – Present** |
|         Assistant Chief DT Instructor | **2013 – 2016** |
|     Henrico Police Officer Survival Instructor | **2012 – Present** |
|         Chief Officer Survival Instructor | **2016 – Present** |
|     De-escalation and Force Mitigation Lead Instructor | **2021 – Present** |

## PROFESSIONAL EXPERIENCE – Subject Matter Expert

| | | |
|---|---|---|
| **2022** | **Deposition** | Vincent Hicks for Aniya Hicks, minor, v. City of Lynchburg, et al |
| | | U.S. District Court, Lynchburg, VA, Case No: 6:21-CV-00043 |

## EDUCATION

**Virginia Military Institute (2004)**

   Bachelor of Arts – International Studies and Political Science

**University of Virginia (2022)**

   National Criminal Justice Command College (NCJCC) – 17th Session

## PUBLICATIONS

I have not authored any publications in the past ten years.

## FEE SCHEDULE

| | | |
|---|---|---|
| **Review of Case Materials** | .......... | $300.00 per hour |
| Oral and/or Written Opinions | | |
| **Depositions** | .......... | $450.00 per hour |
| 3-hour minimum | | |
| **Trial   Testimony** | .......... | $500.00 per hour |
| 4-hour minimum | | |
| **Travel** | .......... | $200.00 per hour |
| **Trial Standby Fee** | .......... | $500.00 per day |
| **Expenses** | .......... | Cost (e.g. Lodging, Food, etc.) |