IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| SHANTA LYNETTE BROWN, ) | |
| and ) | |
| AQUASHA SANDIDGE, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action: 6:23cv00054 |
| ) | |
| THE CITY OF LYNCHBURG, *et al.*, ) | |
| ) | |
|     Defendants. ) | |

## **DEFENDANTS REED, Z. MILLER, AND R. MILLER'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Seth Reed, Zachary Miller, and Robbin Miller (collectively, the "Officers"), by counsel, respectfully submit this memorandum in support of their motion for summary judgment.

## INTRODUCTION

Plaintiffs Shanta Brown and Aquasha Sandidge claim pursuant to 42 U.S.C. § 1983 that on April 28, 2020, the Officers unlawfully detained, used excessive force against, and maliciously prosecuted them in violation of their 4th, 5th, and 14th Amendment rights (Counts 1-6). Plaintiffs also put forth the common law equivalents of those claims: false imprisonment, assault and battery, and malicious prosecution (Counts 15-20). However, the undisputed facts—the vast majority of which were recorded on officer body-worn and dash cameras—show that the Officers had reasonable suspicion to detain Plaintiffs, probable cause to arrest and charge them, and used only the amount of force necessary to do so. Accordingly, the Officers are entitled to summary judgment.

<u>STATEMENT OF FACTS</u>

On the night of April 28, 2020, Lynchburg Police Department ("LPD") Officer Zachary Miller ("Officer Miller") was monitoring traffic in his patrol vehicle from the parking lot in front of the Liberty warehouse on 12th Street in Lynchburg, VA. (Dep. Z. Miller at 13-14.)[1] Around 10:00 pm, a vehicle missing a front license plate drove past, so Officer Miller followed the vehicle into the parking lot of the Kemper Lofts apartment complex on Kemper Street. (*Id.*; Z. Miller Dash Cam at 00:24-44.[2]) The vehicle pulled into a parking spot in front of the Jobbers Overall apartment building, and Officer Miller pulled behind it and turned on his emergency lights signaling a traffic stop. (*Id.*)

Officer Miller exited his police cruiser and engaged with the young Black male driver, who he learned was Terron Pannell ("Pannell"). (Z. Miller Body Cam at 00:07-01:21.)[3] Officer Miller ascertained that Pannell did not have a driver's license and that the vehicle did not belong to him. (*Id.*) Pannell said he had borrowed the vehicle from his friend in order to get something to eat for his children and pick up their clothes from the washer. (Dep. Pannell at 7.)[4] While Officer Miller questioned Pannell, his back-up officer, LPD Officer Tereika Grooms ("Officer Grooms") arrived on scene. (Grooms Body Cam 00:00-15.)[5] Officer Miller returned to his police cruiser and began processing the summons for the traffic violation of not displaying a front license plate and driving without a license. (Z. Miller Body Cam 01:23-37.) In so doing, he discovered that Pannell had a prior conviction on his record for possession of marijuana. (Dep. Z. Miller at 50-51.)

---

[1] The deposition transcript of Zachary Miller is attached hereto as Exhibit 1.
[2] The dash camera footage of Zachary Miller is attached hereto as Exhibit 2.
[3] The body camera footage of Zachary Miller is attached hereto as Exhibit 3.
[4] The deposition transcript of Terron Pannell is attached hereto as Exhibit 4.
[5] The body camera footage of Tereika Grooms is attached hereto as Exhibit 5.

Meanwhile Plaintiffs Shanta Lynette Brown ("Brown") and her daughter, Aquasha Sandidge ("Sandidge") (together, "Plaintiffs"), had observed from the window of their apartment Pannell, their son and brother, respectively, being questioned by Officer Miller. (Dep. Brown at 14-15[6]; Dep. Sandidge at 6-7[7].) Plaintiffs immediately left the apartment and went outside where they approached the stopped vehicle and asked what was going on. (*Id.*; Grooms Body Cam 00:27-30.) Officer Grooms asked Plaintiffs to stay back for a minute and said they would have to ask Officer Miller. (Grooms Body Cam 00:27-01:03.) Plaintiffs continued to approach the driver's side of the vehicle and Officer Grooms again asked them to stay away from the vehicle, but Plaintiffs disregarded her request. (*Id.*) Brown said "I'm his mother." (*Id.*) Officer Grooms said, "That doesn't matter. I asked you to stay back. I'm asking you to step back from the car. Can you step back from the car?" (*Id.*) Brown aggressively looked Officer Grooms up and down and then turned and walked toward the front of the vehicle. (*Id.*)

Meanwhile, Officer Miller was also ordering Plaintiffs to move away from the vehicle and stand over near the building entrance while the officers conducted their traffic stop, and added that he would come talk to them. (Z. Miller Body Cam 01:38-02:01.) Plaintiffs moved away from the vehicle Pannell was in, but remained standing in front of the vehicle immediately to the right, and did not move back to the building entrance like Officer Miller had requested. (Grooms Body Cam 00:47-01:03.) Shortly thereafter, Officer Miller asked Officer Grooms to attempt to get consent for them to search the vehicle, and she obliged. (Z. Miller Body Cam 02:27-02:40; Grooms Body Cam 01:35-40.) As Officer Grooms circled behind the vehicle to approach the driver's door, Brown again moved from where she had been standing on the sidewalk and approached Officer Grooms' position near the front of the vehicle. (Grooms Body Cam 01:40-46.) While Officer

---

[6] The deposition transcript of Shanta Brown is attached hereto as Exhibit 6.

[7] The deposition transcript of Aquasha Sandidge is attached hereto as Exhibit 7.

Grooms began speaking to Pannell, Officer Miller once again had to order Plaintiffs to move away from the vehicle and stand by the front door to the building, or at least on the other side of the car. (Z. Miller Body Cam 03:00-33.) Brown argued with Officer Miller, shouting over Officer Grooms' questions to Pannell. (Grooms Body Cam 02:01-02:30.) Ultimately, Plaintiffs did move back to the other side of the car away from Officer Grooms. (*Id.*) Officer Grooms politely requested consent to search the vehicle from Pannell, but he refused. (Grooms Body Cam 02:15-02:40.) Officer Grooms informed Officer Miller that Pannell had refused consent. (*Id.* 02:40-43.)

Officer Miller then called LPD Officer Seth Reed ("Officer Reed") on the radio and requested that he come in order to perform a sniff test with his LPD K9 Officer Knox. (Dep. Z. Miller at 24, 57; Dep. Reed at 9-10[8]; Z. Miller Body Cam 03:42-54.) While Officer Miller did not have any evidence at that time that Pannell had any illicit drugs in his possession, he knew about Pannell's prior convictions and his lack of a driver's license while operating a motor vehicle that did not belong to him. (Dep. Z. Miller at 14, 16, 50.)

As Officer Miller continued to process the traffic summons, LPD Officer Seth Reed ("Officer Reed") arrived on scene and approached Officer Miller's police cruiser. (Reed Body Cam 00:28-38.[9]) Officer Miller informed him that consent to search had been denied, that Pannell was a known gang member and had marijuana history, and that there was just one person in the vehicle. (Z. Miller Body Cam 07:46-52.)

Officer Reed then approached the stopped vehicle and ordered Pannell out of the vehicle, which is routine in order to have the K9 perform an open air sniff of the car exterior. (Reed Body Cam 00:45-55; Dep. Reed at 10-11.) At this point, Brown interjected herself and told Officer Reed loud enough for Pannell to hear that Pannell did not have to exit the vehicle unless he was being

---

[8] The deposition transcript of Seth Reed is attached hereto as Exhibit 8.

[9] The body camera footage of Seth Reed is attached hereto as Exhibit 9.

detained. (*Id.* 00:55-59.) Officer Reed respectfully informed Brown that she was mistaken, that Pannell did need to exit the vehicle because he had ordered him to, and that she had nothing to do with this traffic stop. He also informed her that she needed to move away from the vehicle because he was going to conduct a scan on the vehicle with his K9. (*Id.* 00:59-01:13.)

At this, Pannell began claiming that he was "scared" and that he "fear[ed] for his life now." (*Id.* 01:13-22.) Officer Reed calmly and directly ordered Pannell out of the vehicle twice more so he could bring the K9 to perform an open air sniff of the car exterior, but Pannell refused the order, so Officer Reed then opened the driver's side door. (*Id.* 01:22-37.) Officer Miller saw this from his police cruiser, so he got out and approached the vehicle to assist Officer Reed. (Z. Miller Body Cam 08:42-49.) Pannell repeatedly told Officer Reed that he was scared of him and refused to exit the vehicle. Officer Reed then reached into the vehicle and grasped Pannell's arm. (*Id.* 01:37-44.) Pannell resisted being removed from the vehicle, so Officer Miller also grasped Pannell's arm. (*Id.*) Meanwhile Officer Grooms had circled around the front of the vehicle to insert herself in between Plaintiffs, who were verbally interjecting themselves in the situation, and Officers Reed and Miller. Officer Grooms also advised Pannell to "just step out of the car" and "make it easier" for Officer Reed to conduct his scan. (Grooms Body Cam 07:35-56.) Pannell actively resisted the officers removing him from the vehicle, so they took Pannell to the ground in between the vehicle he had been driving and the vehicle parked next to it. (Reed Body Cam 01:47-53.) Pannell began screaming and calling for his mother and telling Sandidge to "record this." (*Id.* 01:53-02:15.)

At this, Brown began barging into Officer Grooms, disregarding police commands, in an attempt to get to her son, with such force that she actually knocked Officer Grooms' body camera off of her person and onto the ground. (Grooms Body Cam 08:00-12; Miller Dash Cam 09:54-10:10.) Sandidge began screaming, "What the fuck is y'all doing?" (*Id.*) Officers Reed and Miller

5

then lifted Pannell up off the ground and walked him toward Officer Miller's police cruiser in order to search him for weapons and place him into custody in the back of the cruiser so they could proceed with the K9 open air sniff of the exterior of the vehicle. (Reed Body Cam 02:17-37; Miller Body Cam 08:53-09:40; Grooms Dash Cam 1 9:25-50[10].)

When the three men arrived at the cruiser and Officer Miller attempted to spread Pannell's feet apart for the search, Pannell began thrashing around and kicking backwards, so the officers in tandem took Pannell back to the ground and held him there. (*Id.*) Pannell began screaming for his mother. (*Id.*) Brown rushed past Officer Grooms and toward the officers, who were attempting to restrain a resistant Pannell on the ground. (Grooms Dash Cam 1 09:27-59.) As Brown rapidly approached, Officer Miller used his left arm to deflect Brown, which sent a jolt through Officer Miller into Officer Reed, causing both officers unwanted physical contact. (*Id.*; Depo. Reed at 33, 51.)

After Brown had been pushed away, Officer Grooms, with Sandidge in tow, reinserted herself in between the other officers and Brown, while Brown continued to shout at the officers. (Grooms Dash Cam 1 09:45-59.) Sandidge also continued to scream and was filming the interaction on her cell phone. (*Id.*) Brown attempted to push past Officer Grooms yet again, so Officer Grooms circled behind her and attempted to restrain Brown's arms behind her to detain her. (*Id.*) But Brown yanked away. (*Id.*) Officer Grooms temporarily abandoned her attempt to detain Brown and continued to block her from assaulting the officers again. (*Id.* 09:58-10:12.) Officer Grooms, with Officer Miller's help, managed to corral Brown and Sandidge back toward the front of the building. (*Id.* 10:12-20.) That is when Officer Reed ordered the other officers to place Plaintiffs in handcuffs. (Reed Body Cam 03:11-15; Z. Miller Body Cam 10:20-24.)

---

[10] The first recording of dash camera footage of Tereika Grooms is attached hereto as Exhibit 10.

Officer Miller left Officer Reed with Pannell in handcuffs on the ground and proceeded toward Plaintiffs near the front entrance of the apartment building. (Z. Miller Body Cam 10:10-25.) Meanwhile LPD Detective Robbin Miller ("Detective Miller") arrived in plain clothes and approached Officer Reed, who asked Detective Miller to help the other officers with detaining Plaintiffs. (Reed Body Cam 03:15-20; Grooms Dash Cam 10:18-25.) At the front entrance to the building, Officer Miller ordered Brown to put her hands behind her back and as he and Officer Grooms attempted to restrain her, she resisted and they went to the ground. (Z. Miller Body Cam 10:27-38.) Sandidge was behind them screaming and filming on her phone, and Detective Miller ordered her to put her hands behind her back, attempting to restrain Sandidge. (Reed Dash Cam 03:43-59.[11]) Sandidge resisted and shoved Detective Miller in the chest, assaulting him. (*Id.*) Detective Miller proceeded to attempt to restrain Sandidge, who resisted, causing them to trip over Brown, who was lying on the ground. (*Id.*) Detective Miller and Sandidge lost balance and fell backwards. (*Id.*) Officer Miller saw them falling with Sandidge on top of Detective Miller and sprang into action to assist Detective Miller with gaining control of Sandidge. (*Id.*; Z. Miller Body Cam 10:40-50.) Officer Miller pulled Sandidge off of Detective Miller, who had injured his elbow during the fall. (Z. Miller Body Cam 10:48-53, 18:30-48; R. Miller Injury Report.[12]) Officer Miller assisted Detective Miller with restraining Sandidge on the ground and, seeing her cell phone lying on the ground next to her, picked it up, disconnected what he thought was a phone call, turned off the screen, and secured the phone on his person as evidence. (Z. Miller Body Cam 11:35-40; Depo. Z. Miller at 68-70.)

The Plaintiffs were both secured in handcuffs and ushered into the back of police cruisers. (Z. Miller Body Cam 12:10-13:12; Reed Dash Cam 05:10-36; Grooms Dash Cam 1 12:15-50.)

---

[11] The dash camera footage of Seth Reed is attached hereto as Exhibit 11.
[12] The injury report of Robbin Miller is attached hereto as Exhibit 12.

Brown received some abrasions on her legs, but neither received nor requested medical attention. (Dep. Brown at 32.) Sandidge suffered no injuries and sought no medical treatment. (Dep. Sandidge at 20.) Plaintiffs were then driven to the magistrate's office—Brown with Officer Grooms, Sandidge with LPD Officer Thomas Hall. (Hall Dash Cam 10:20-20:10[13]; Grooms Dash Cam 2 00:00-05:12[14].) Officer Miller and Officer Reed testified that they had been assaulted by Brown and that she had obstructed their investigation. (Reed Body Cam 20:37-23:23.) Detective Miller later obtained a warrant on Sandidge for assaulting a police officer. (Incident Report at 13[15]; Depo. R. Miller at 15[16].) Plaintiffs were charged accordingly. Brown was charged with felony assault on a law enforcement officer by Officer Reed and Officer Miller and misdemeanor obstruction of a law enforcement officer by Officer Miller. (Warrants of Arrest.[17]) Sandidge was charged was misdemeanor obstruction by Officer Miller and felony assault by Detective Miller. (*Id.*)

On or about March 10, 2023, Sandidge's charges were dismissed on the prosecution's motion for *nolle prosequi*. (Dep. Sandidge at 24; Compl., ECF 1, ¶ 81.) Brown was acquitted of all three criminal charges by a jury in the Lynchburg Circuit Court on March 14, 2023. (Acquittal Order.)[18]

PROCEDURAL HISTORY

On September 18, 2023, Plaintiffs filed their complaint (the "Complaint") pursuant to 42 U.S.C. § 1983 and Virginia law against the Officers and the City. (ECF 1). In the Complaint,

---

[13] The dash camera footage of Thomas Hall is attached hereto as Exhibit 13.
[14] The second recording of dash camera footage of Tereika Grooms is attached hereto as Exhibit 14.
[15] The LPD Incident Report from the April 28, 2020 incident is attached hereto as Exhibit 15.
[16] The deposition transcript of Robbin Miller is attached hereto as Exhibit 16.
[17] The arrest warrants against Shanta Brown and Aquasha Sandidge related to the April 28, 2020 offenses are attached hereto as Exhibit 17.
[18] The March 14, 2023 Order from the Circuit Court for the City of Lynchburg noting the not guilty verdict on all three counts against Shanta Brown is attached hereto as Exhibit 18.

Plaintiffs alleged  that the Officers: used excessive force against them in violation of their Fourth

and Fourteenth Amendment rights (Counts 1 and 2); unlawfully seized them in violation of their

Fourth and Fourteenth Amendment rights (Counts 3 and 4); maliciously prosecuted them in

violation of their Fourth, Fifth, and Fourteenth Amendment rights (Counts 5 and 6); assaulted and

battered them in violation of Virginia common law (Counts 15 and 16); falsely imprisoned them

in violation of Virginia common law (Counts 17 and 18); and maliciously prosecuted them in

violation of Virginia common law (Counts 19 and 20). (Compl. ¶¶ 88-146, 209-40.)

On November 27, 2023, the City and Officer Reed filed their motion to dismiss (ECF 8)

and memorandum in support (the "Memorandum") (ECF 9). On December 13, 2023, Officer

Zachary Miller filed his motion to dismiss, adopting the Memorandum (ECF 17). On the same

day, Detective Robbin Miller filed his motion to dismiss, adopting the Memorandum (ECF 18).

In its April 12, 2024 memorandum opinion and order, the Court dismissed multiple counts

against the City. All of Plaintiffs' claims against the Officers survived.

ARGUMENTS AND AUTHORITIES

## I.     Standard of Review.

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). Establishing the parameters for consideration of a motion for

summary judgment, the Supreme Court has stated that

> the judge must ask himself not whether he thinks the evidence
> unmistakably favors one side or the other but whether a fair-minded
> jury could return a verdict for the plaintiff on the evidence
> presented. The mere existence of a scintilla of evidence in support
> of the plaintiff's position will be insufficient; there must be evidence
> on which the jury could reasonably find for the plaintiff. The judge's

> inquiry, therefore, unavoidably asks whether reasonable jurors
> could find by a preponderance of the evidence that the plaintiff is
> entitled to a verdict . . . .

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To withstand a motion for summary

judgment, the non-moving party must produce "significantly probative" evidence from which a

reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924,

930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249-50).

## II. The Officers are entitled to qualified immunity on the excessive force claims (Counts 1 and 2).

Qualified immunity shields government officials from civil liability so long as their

conduct does not violate clearly established constitutional rights of which a reasonable person

would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts use a two-pronged

inquiry to resolve questions of qualified immunity. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014).

The first asks whether the facts, taken in the light most favorable to the plaintiff, show a

constitutional violation. *Id.* at 655-66. The second asks whether the right was clearly established

at the time of the violation. *Id.* at 666. Courts have discretion to decide the order in which to

decide these two questions. *Id.*

"Whether a seizure is unreasonable is an 'objective determination,' and based on the 'facts

and circumstances confronting [the officer] without regard to [his] underlying intent or

motivation.'" *Ray v. Roane*, Civil Action No. 5:17-cv-00093, 2022 U.S. Dist. LEXIS 174876, at

\*13 (W.D. Va. Sep. 27, 2022) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). An

"officer's conduct 'must be judged from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight.'" *Id*.

The Fourth Amendment's prohibition on unreasonable seizures bars law enforcement

officers from using excessive force while seizing a citizen. *Jones v. Buchanan*, 325 F.3d 520, 527

(4th Cir. 2003). Courts evaluate excessive force claims under an objective reasonableness standard. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). An officer's subjective intent or motivation in using force is irrelevant to the decision. *E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). Rather, courts examine the officer's actions in light of the objective facts and circumstances confronting him, without regard to his underlying intent. *Id.*

In *Graham v. Connor*, the United States Supreme Court provided a non-exhaustive list of factors for courts to consider in evaluating whether force was reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. These factors are not exclusive; courts should also account for other objective circumstances relevant to the use of force. *Dolgos*, 884 F.3d at 179. "The ultimate question is whether the totality of the circumstances justified a particular sort of seizure." *Id.* (internal quotations and citations omitted). The analysis "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *County of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1546 (2017). The calculus of reasonableness "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. If a seizure is reasonable in light of all relevant circumstances, there is no claim for excessive force. *Id.* at 1547.

Courts consider the following non-exhaustive list of factors when evaluating excessive force claims: the relationship between the need for the use of force and the amount of force used;

11

the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount

of force; the severity of the security problem at issue; the threat reasonably perceived by the officer;

and whether the plaintiff was actively resisting. *Martin v. Shaw*, 2021 U.S. Dist. LEXIS 31330,

at *11 (W.D. Va. Feb. 19, 2021) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

## A.  Z. Miller is entitled to qualified immunity because he did not violate Plaintiffs' clearly established constitutional rights.

The circumstances of this case required "quick and decisive action in the face of volatile

and changing circumstances.'" *Nadelin v. Martin*, 1998 U.S. App. LEXIS 29516, at *9-10 (4th

Cir. Nov. 19, 1998) (quoting *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994)).  Importantly,

"'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers,' . . . violates the Fourth Amendment." *Graham*, 490 U.S. 396 (quoting *Johnson v. Glick*,

481 F.2d 1028, 1033 (2d Cir. 1973)).  This holds true even if police could "have handled the

situation in a kinder and gentler manner." *Nadelin*, 1998 U.S. App. LEXIS at *11.

Officer Miller only attempted to detain Brown after she had physically assaulted him and

Officer Reed and obstructed their arrest and search of Pannell. Brown had rapidly approached and

made contact with them while they were busy trying to control Pannell on the ground, causing

Officer Miller to have to repel Brown with his arm and sending a jolt into Officer Reed. Because

Brown had obstructed their arrest and search of Pannell and had assaulted them, Officer Reed

rightfully ordered Officer Miller to detain Brown in handcuffs. Officer Miller and Officer Grooms

attempted to handcuff Brown while she was standing, but her active resistance led to having to

handcuff her on the ground. Brown received some abrasions on her legs during the incident but

did not require or request any medical attention.

Brown's active interference with Officer Miller's and Officer Reed's performance of their

police duties prompted Reed's order to detain her.  And when Officer Miller first attempted to

detain Brown, he did so while standing up.  Officer Miller executed a takedown only after Brown refused to submit her hands and physically resisted. Officer Miller's use of force against Brown was a proportionate, incremental, and reasonable response to Brown's actions.

As for the claim of excessive force by Sandidge, Officer Miller only used force against Sandidge after she had resisted being detained by Detective Miller and had caused herself and Detective Miller to fall backwards onto the ground. Officer Miller only used enough force necessary to remove Sandidge from atop Detective Miller and restrain her so that Detective Miller could handcuff her. Sandidge did not suffer any injuries and did not require or request medical attention.

 "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'"  *E.W. v. Dolgos*, 884 F.3d 172, 192 (4th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Fourth Circuit Court of Appeals has confirmed that officers are allowed to use proportionate force when a suspect resists lawful detention because deciding otherwise "would be inviting any suspect who is unhappy about a [lawful arrest] to resist that [arrest] in the hopes that the officers will simply desist rather than risk liability."  *Brown v. Gilmore*, 278 F.3d 362, 370 (4th Cir. 2002).  Trial courts in the Fourth Circuit have found that an officer's decision to take down a suspect was justified in response to even less resistance by a suspect. *See, Geba v. Norris*, 2016 U.S. Dist. LEXIS 191562, at *14-15 (E.D. Va. Apr. 4, 2016) (defendant officer acted reasonably by tackling plaintiff, who was merely suspected of public intoxication, when plaintiff attempted to leave the police trailer despite the officer's command for her to stay); *Jackson v. Boyd*, 1997 U.S. Dist. LEXIS 20429, at *6-7 (E.D.N.C. Nov. 18, 1997)

(defendant officer acted reasonably by tackling plaintiff when plaintiff fled on foot after being informed he was under arrest for carrying a concealed weapon).

Officer Miller escalated his force from verbal commands when it was clear that Plaintiffs would not voluntarily comply, and de-escalated force when they were secure. *See Unus v. Kane*, 565 F.3d 103, 120-21 (4th Cir. 2009) (finding the officers properly assessed the situation as it progressed and escalated and de-escalated force based on the circumstances presented). Officer Miller did not violate Plaintiffs' Fourth or Fourteenth Amendment rights because his use of force was reasonable given Plaintiffs' physical resistance to being detained. Moreover, in light of *Nadelin*, *Graham*, *Gilmore*, and the other authorities discussed, no reasonable officer in Officer Miller's position would have known he violated the Plaintiffs' constitutional rights. Accordingly, Officer Miller is entitled to qualified immunity.

### B. Reed is entitled to qualified immunity because he did not use any force—excessive or otherwise—against Plaintiffs.

Under the first prong of the qualified immunity analysis—whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation, *Tolan*, 572 U.S. at 655-66—Officer Reed is entitled to qualified immunity. The video evidence clearly shows that Officer Reed did not use any force whatsoever against either of the Plaintiffs. Therefore, no reasonable juror could find that Officer Reed used excessive force against Plaintiffs.

### C. R. Miller is entitled to qualified immunity because Sandidge cannot establish any excessive force as a matter of law, and R. Miller did not violate Sandidge's clearly established rights.

In *Gilmore*, the Fourth Circuit Court of Appeals evaluated an arrestee's excessive force claim "based on allegations that a police officer had handcuffed her, causing her wrists to swell, dragged her to the police cruiser, and then pulled her into the vehicle." *Dolgos*, 884 F.3d at 180 (citing *Gilmore*, 278 F.3d at 369). In that case, the court "found that the circumstances justified

14

the 'minimal level of force applied' because, as the officer approached a crowded scene on the street, he attempted to arrest the plaintiff for failure to follow another officer's orders . . . ." *Id.* It was, therefore, "not 'unreasonable for the officers to believe that a suspect who had already disobeyed one direct order would balk at being arrested . . . .'" *Id.*

Similarly, Sandidge takes issue with Detective Miller restraining her arms from behind, taking her to the ground, and handcuffing her. No reasonable juror could find Detective Miller's actions objectively unreasonable. First, Detective Miller did not grab Sandidge until after he had arrived to a chaotic scene, was directed by Officer Reed to handcuff Plaintiffs, had knelt down and attempted to assist Officers Miller and Grooms with handcuffing Brown, and had witnessed Sandidge standing directly behind him and screaming at him and the other officers. At the time, it was objectively reasonable for Detective Miller to stand up and attempt to detain Sandidge in order to prevent any obstruction or assault of the officers. Sandidge then shoved Detective Miller in the chest and actively resisted his attempts to detain her. Even then, Detective Miller did not "take" Sandidge to the ground. Rather, Sandidge resisted Detective Miller, causing him to trip over Brown who lay on the ground behind him being handcuffed, which caused Detective Miller and Sandidge to lose their balance and fall backwards. At that point, Detective Miller's only use of force against Sandidge was to, with the assistance of Officer Miller who had come to his aid, regain control of her hands behind her back and handcuff her. Again, Sandidge suffered no injuries and required no medical attention. She was respectfully walked to Officer Hall's police cruiser and placed inside.

The circumstances surrounding Sandidge's arrest justified the minimal level of force applied by Detective Miller due to the chaotic scene, Sandidge's vocal, verbally abusive refusal to follow officer commands, her obstruction of their performance of their lawful duties, and her physical resistance to being detained. Detective Miller's use of force was objectively reasonable.

Further, in light of *Gilmore*, no reasonable officer in Detective Miller's position would know he violated Sandidge's constitutional rights. Detective Miller is entitled to summary judgment on the excessive force claim.

### III. The Officers are entitled to qualified immunity on the unlawful seizure claims (Counts 3 and 4).

The Officers are entitled to qualified immunity on the unlawful seizure claims because they had the requisite reasonable suspicion to detain Plaintiffs, as well as reason to believe that probable cause existed to arrest Plaintiffs.

An investigatory detention does not violate constitutional standards if the officer has a reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This is an objective inquiry. Rather than focusing on the officer's "subjective frame of mind," courts ask whether the facts known to the officer support an objective finding of "reasonable suspicion." *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008). The investigatory detention may continue for a time reasonably necessary for the police to confirm or dispel the suspicion. *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012).

An arrest, on the other hand, requires probable cause. Probable cause is a "flexible, common-sense standard." *Florida v. Harris*, 568 U.S. 237, 240 (2013) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). It is "determined by a 'totality-of-the circumstances' approach.'" *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Gates*, 462 U.S. at 230). "It is an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.* (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Gray*, 137 F.3d at 769. "[P]robable cause is a lower standard than 'more likely than not,' i.e., a preponderance of the

evidence." *Lucas*, 31 F. Supp. 3d at 811 (citation omitted). "[W]hat is required is a 'fair probability,' given all the circumstances." *Id*. at 812 (citation omitted).

"The probable-cause inquiry turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.'" *Smith*, 848 F.3d at 253 (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). A court should only consider the information the officers had at the time they sought the warrant. *Id.* The probable-cause inquiry "examine[s] the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *Id.* (quoting *Graham*, 831 F.3d at 185).

A police officer need not prove probable cause actually existed to defend against a claim for unlawful seizure. Rather, a police officer has qualified immunity from liability if the facts demonstrate he had a reasonable belief that probable cause existed—*i.e.*, he reasonably believed the arrestee had committed a criminal offense. *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988).

In making this determination, police officers are not required to exhaust every potential avenue of investigation or "resolve every doubt about a suspect's guilt" before probable cause is established. *Torchinsky v. Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991). Once a police officer has a reasonable basis for believing probable cause exists, he is "not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *United States v. Galloway*, 274 F. App'x 241, 249 (4th Cir. 2008) (internal citations omitted). Importantly, "the arresting officer does not have to prove plaintiff's version wrong before arresting him." *Id.*

**A. Reed is entitled to qualified immunity because he had reasonable suspicion to order Plaintiffs' detention and reasonable basis to believe that probable cause existed to arrest Plaintiffs.**

Here, Officer Reed gave the order to place the Plaintiffs "in handcuffs." Officer Miller, Officer Grooms, and Detective Miller actually carried it out. When Officer Reed gave the order, he had reasonable suspicion that Plaintiffs were engaged in obstruction of the Officers' performance of their lawful duties. He arguably had a reasonable basis to believe that probable cause existed to arrest them for that obstruction. Officer Reed had not only experienced Brown's verbal obstruction of his attempts to have Pannell comply with his order to exit the vehicle so he could perform the K9 open-air sniff, but he had been physically assaulted by her while attempting to restrain Pannell on the ground. He had also been verbally assaulted by Sandidge while attempting to detain Pannell. At the very least, Officer Reed had reasonable suspicion that Sandidge was attempting to obstruct their investigation and arrest of Pannell. She had been near Brown the entire time Officer Reed had been on the scene and was verbally assaulting the officers while filming them on her cell phone.

In light of applicable case law, no reasonable officer in Officer Reed's position at that scene would know that he was violating Plaintiffs' constitutional rights by ordering that they be handcuffed. Accordingly, Officer Reed is entitled to qualified immunity on the unlawful seizure claims.

**B. Z. Miller is entitled to qualified immunity because he had reasonable suspicion to detain Brown and reasonable basis to believe that probable cause existed to arrest Plaintiffs.**

Officer Miller had experienced Plaintiffs' failure to heed his lawful commands to back away from the vehicle in which Pannell was being stopped. He had been assaulted physically by Brown while assisting Officer Reed with controlling Pannell on the ground, and he had been

18

verbally assaulted by Sandidge while doing the same. When his fellow officer, Officer Reed, ordered him to put Plaintiffs in handcuffs, Officer Miller had, at the very least, reasonable suspicion that Plaintiffs were attempting to obstruct their investigation, search and detention of Pannell. Arguably, Officer Miller had a reasonable basis for believing that probable cause existed to arrest Plaintiffs—Brown for obstruction and assault, Sandidge for obstruction. That said, Officer Miller did not actually lay hands on Sandidge until after her resistance caused Detective Miller to fall backwards with her on top of him.

In light of applicable case law, no reasonable officer in Officer Miller's position at that scene would know that he was violating Plaintiffs' constitutional rights by detaining and, ultimately, arresting them. Accordingly, Officer Miller is entitled to qualified immunity on the unlawful seizure claims.

### C. R. Miller is entitled to qualified immunity because he had reasonable suspicion to detain Plaintiffs and reasonable basis to believe that probable cause existed to arrest Sandidge.

Detective Miller had just arrived on the scene when Officer Reed directed him to assist Officers Miller and Grooms with handcuffing Plaintiffs, which they were already in the process of doing with Brown. Based on his fellow officers' direction and their actions at the scene, Detective Miller had reasonable suspicion to believe that criminal activity was afoot, and, regardless, merely attempted to assist Officers Miller and Grooms with handcuffing Brown. It was not until Sandidge stood directly behind the Officers, screaming and verbally assaulting them, that Detective Miller stood up and attempted to detain Sandidge for her obstruction. At that time, he at least had reasonable suspicion that she was attempting to obstruct their arrest of Brown. When Sandidge resisted Detective Miller's detention and shoved him in the chest, assaulting him, Detective Miller

had a reasonable basis for believing that probable cause existed to arrest Sandidge for assault on a law enforcement officer.

In light of applicable case law, no reasonable officer in Detective Miller's position at that scene would know that he was violating Sandidge's constitutional rights by detaining and, ultimately, arresting her. Accordingly, Detective Miller is entitled to qualified immunity on the unlawful seizure claim.

## IV.    The Officers are entitled to summary judgment on the § 1983 malicious prosecution claims (Counts 5 and 6).

In order to succeed on a 42 U.S.C. § 1983 malicious prosecution claim, Plaintiffs must prove that the Officers "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)). Plaintiffs cannot prevail if there was probable cause for their arrest. *Lucas v. Shively*, 31 F. Supp. 3d 800, 811 (W.D. Va. 2014).

As discussed in more detail above, the uncontroverted facts on the record establish that there was at least a reasonable basis for the Officers to believe that probable cause existed to arrest and charge Plaintiffs for obstruction and assault on a law enforcement officer. Plaintiffs had both verbally obstructed the traffic stop of Pannell from the moment they came outside of the apartment building. Brown escalated the obstruction to the point of physically obstructing the investigation, search and detention of her son, Pannell, assaulting Officers Miller and Reed in the process. Sandidge verbally obstructed the detention and search of Pannell and later obstructed the arrest of Brown and assaulted Detective Miller by shoving him in the chest when he attempted to detain her. All of this was recorded on officer body-worn and dash cameras. Plaintiffs were charged accordingly. Even if the Officers did not actually have probable cause, they are entitled to qualified

immunity because they had a reasonable basis to believe that probable cause existed. *See Sevigny*, 846 F.2d at 956.

Sandidge's malicious prosecution claim fails for an additional reason: the criminal proceedings against her were not terminated in her favor. Criminal proceedings have terminated in the plaintiff's favor when the "criminal case against the plaintiff has been disposed of in a way that indicates the plaintiff's innocence." *Snider v. Seung Lee*, 584 F.3d 193, 202 (4th Cir. 2009). When charges are dismissed at the prosecution's request—or by *nolle prosequi*—malicious prosecution plaintiffs have the burden of proving that the *nolle prosequi* disposition was entered under circumstances which imply or are consistent with innocence of the accused." *Nicholas v. Wal-Mart Stores, Inc.*, 33 F. App'x 61, 65 (4th Cir. 2002) (citing *Swick v. Liautaud*, 169 Ill. 2d 504, 662 N.E.2d 1238, 1243, 215 Ill. Dec. 98 (Ill.1996)). Sandidge's charges were dismissed by the prosecution's motion for *nolle prosequi*, and there has been no showing by Plaintiffs that this dismissal of her charges was entered under circumstances which imply her innocence.

## V.     The Officers are entitled to summary judgment on Plaintiffs' assault and battery claims (Counts 15 and 16).

Plaintiffs' assault and battery claims rise and fall with their Fourth Amendment excessive force claims. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994).  For the reasons discussed above, each Officer's use of force was reasonable under the circumstances and did not violate Plaintiffs' Fourth Amendment rights.  Therefore, Plaintiffs' assault and battery claims fail as a matter of law. *See Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) ("A legal justification for the act being complained of will defeat an assault or battery claim.  Importantly, Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties.").

Additionally, the Officers are entitled to state law good faith immunity with respect to Plaintiffs' assault claims. Virginia courts recognize immunity in tort for alleged unlawful actions

taken by police officers if the officers acted under a mistake of law, in good faith, and with a reasonable belief in the validity of their actions. *De Chene v. Smallwood*, 226 Va. 475, 479-80 (1984). As detailed above, the Officers' use of force was reasonable under the existing case law, and they had a reasonable basis to believe that probable cause existed to arrest Plaintiffs and to use the force required. The Officers are entitled to immunity under federal and state law.

**VI. The Officers are entitled to summary judgment on Plaintiffs' false imprisonment claims (Counts 17 and 18).**

False imprisonment is "the direct restraint by one person of the physical liberty of another without legal justification." *Strozier v. Town of Blacksburg*, 2021 U.S. Dist. LEXIS 217796, at *5 (W.D. Va. Nov. 10, 2021) (citing *Jordan v. Shands*, 255 Va. 492, 497 (1998)). A claim of false imprisonment is defeated by showing "a sufficient legal excuse, *e.g., probable cause*, to restrain the plaintiff's liberty." *Id.* (emphasis added). As argued previously, the Officers had reasonable suspicion to detain, and probable cause to arrest, the Plaintiffs.

With regard to Officer Miller and Detective Miller's attempts to detain the Plaintiffs prior to their arrests, there was reasonable suspicion to detain them for obstruction of justice, at which point their active resistance to being detained gave the officers probable cause to arrest them. Accordingly, the court should grant summary judgment to the Officers on Plaintiffs' false imprisonment claims.

**VII. The Officers are entitled to summary judgment on Plaintiffs' common law malicious prosecution claims (Counts 19 and 20).**

Plaintiffs bring state law claims of malicious prosecution against the Officers in addition to their § 1983 claims of malicious prosecution. Under Virginia law, to prevail on a malicious prosecution claim, a plaintiff must prove the prosecution was (1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner

22

not unfavorable to the plaintiff. *Dill v. Kroger Ltd. P'ship I*, 300 Va. 99, 109 (2021). These actions are "not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases to ensure that criminal prosecutions are brought in appropriate cases without fear of reprisal by civil actions." *Lewis v. Kei*, 281 Va. 715, 722-23 (2011).

The only difference between a claim of malicious prosecution under Virginia law and a federal malicious prosecution claim is that no malice requirement exists under the federal cause of action. *Cadmus v. Williamson*, 2016 U.S. Dist. LEXIS 11145, at *32 (W.D. Va. Feb. 1, 2016). Malice is not required because the "reasonableness of the seizure should be analyzed objectively under the Fourth Amendment." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183-84 (4th Cir. 1996). In other words, a malicious prosecution claim under Virginia law has to meet a higher burden than a federal cause of action for the same.

As argued previously, probable cause existed to arrest and charge Plaintiffs for obstruction and assault. "[I]n the context of a malicious prosecution action, probable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *R.M.B. v. Bedford Cnty. Sch. Bd.*, 169 F. Supp. 3d 647, 653 (W.D. Va. 2016) (quoting *O'Connor v. Tice*, 281 Va. 1, 9 (2011)). Probable cause does not require evidence sufficient to convict. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963). "The determination of whether a defendant had probable cause to believe that a crime was committed is judged with reference to the time the defendant took the action initiating the criminal charge." *Bennett v. R&L Carriers Shared Servs.*, 744 F. Supp. 2d 494, 514 (E.D. Va. 2010) "The burden of proving there was no probable cause is upon the plaintiff, and if no conflict in the evidence, the existence or nonexistence of probable

cause is a question of law for the court." *Virginia R. & P. Co. v. Klaff*, 123 Va. 262, 262 (1918) (citations omitted).

Defendants need not even address whether there was malice, of which there is no evidence on the record. Accordingly, Defendants are entitled to summary judgment on the state law malicious prosecution claims as well.

Sandidge's malicious prosecution claim fails for an additional reason: the criminal proceedings against her were not terminated in her favor. In Virginia, a court may grant *nolle prosequi* upon "finding good cause to do so" after a prosecutor moves for it. *Duggins v. Commonwealth*, 59 Va. App. 785, 722 S.E.2d 663, 667 (Va. Ct. App. 2012). Importantly, a dismissal by *nolle prosequi* is not a discharge from further prosecution. *Id.* at 666. Under Virginia law, a case that terminates *nolle prosequi* "generally does not act as an acquittal." *Commonwealth v. Garrett*, 276 Va. 590, 606 (2008) (citing Parker v. McCoy, 212 Va. 808, 810 (1972)). A charge must be "disposed of in a way that indicates the plaintiff's innocence" to qualify as favorable termination. *Seung Lee*, 584 F.3d at 202. Sandidge's charges were dismissed by *nolle prosequi*.

CONCLUSION

For the foregoing reasons, Seth Reed, Zachary Miller, and Robbin Miller respectfully request that the Court grant their motion for summary judgment and dismiss the Plaintiffs' claims with prejudice.

SETH REED, ZACHARY MILLER, and
ROBBIN MILLER

By /s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB #22299)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153

Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
           johnf@guynnwaddell.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of November, 2024, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to:

M. Paul Valois (VSB 72326)
James River Legal Associates
7601 Timberlake Road
Lynchburg, VA 24502
T: 434-845-4529
F: 434-845-8536
Email: mvalois@vbclegal.com
*Counsel for Plaintiffs*

/s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB # 22299)
John R. Fitzgerald (VSB # 98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia  24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: JimG@guynnwaddell.com
           JohnF@guynnwaddell.com
*Counsel for Defendants*