**EXHIBIT 1**

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF VIRGINIA
                        LYNCHBURG DIVISION
     ****************************************************
SHANTA LYNETTE BROWN, et al.,

        Plaintiffs,

v.                                  Case No. 6:23cv00054

THE CITY OF LYNCHBURG, et al.,

        Defendants.

     ****************************************************

               DEPOSITION OF ZACHARY MILLER

                      October 29, 2024

                  10:11 a.m. - 11:51 a.m.

                    Lynchburg, Virginia
```

```
REPORTED BY:  Kimberly A. Henderson, RPR
```

```
 1        Deposition of ZACHARY MILLER, taken and

 2   transcribed on behalf of the Defendants, pursuant

 3   to notice and/or agreement to take depositions; by

 4   and before Kimberly A. Henderson, a Registered

 5   Professional Reporter and Notary Public in and for

 6   the Commonwealth of Virginia at Large; commencing

 7   at 10:11 a.m., October 29, 2024, at the offices of

 8   the Lynchburg City Attorney, 900 Church Street,

 9   Lynchburg, Virginia.

10   APPEARANCES OF COUNSEL:

11

12        JAMES RIVER LEGAL ASSOCIATES
          7601 Timberlake Road
13        Lynchburg, Virginia  24502
          434.845.4529
14        mvalois@vbclegal.com
     BY:  PAUL VALOIS, ESQUIRE
15        MARGARET VALOIS, ESQUIRE
               Counsel for the Plaintiffs
16
          GUYNN, WADDELL, CARROLL & LOCKABY, P.C.
17        415 S. College Avenue
          Salem, Virginia  24153
18        540.387.2320
          john@guynnwaddell.com
19   BY:  JOHN R. FITZGERALD, ESQUIRE
               Counsel for the Defendants
20

21

22

23

24

25
```

**EXHIBIT 1**

```
 1              I N D E X
 2  WITNESS                                    PAGE
 3  ZACHARY MILLER
 4      Examination by Mr. Valois              4
 5      Examination by Mr. Fitzgerald          91
 6      Examination by Mr. Valois              92
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**EXHIBIT 1**

```
 1  (10:11 a.m., October 29, 2024)

 2

 3                    ZACHARY MILLER

 4          was sworn and testified as follows:

 5              E X A M I N A T I O N

 6  BY MR. VALOIS:

 7          Q.   And you are now Deputy Miller; is

 8  that right?

 9          A.   Yes, sir.

10          Q.   Work for Bedford County; is that

11  right?

12          A.   Yes, sir.

13          Q.   And you're Zachary Miller, and you

14  are the officer involved in the incident that gave

15  rise to the complaint that was filed?

16          A.   Yes, sir.

17          Q.   Okay.  One of the officers involved?

18          A.   Yes.

19          Q.   All right.  And Deputy is your

20  correct title?

21          A.   Yeah.  So you can call me Zach, or

22  for here you can call me whatever you want to, but

23  Deputy Miller, yes, sir.

24          Q.   All right.  Deputy, have you ever

25  given a deposition before?
```

```
 1              A.   I have, yes, sir.

 2              Q.   All right.  How many times?

 3              A.   Just once.

 4              Q.   All right.  Okay.  Just some

 5   preliminary matters.  You heard me say about break,

 6   if anybody needs a break, I certainly will ask for

 7   one if I need one, if anyone needs one, just let me

 8   know, and we'll take a break.

 9              A.   Yes, sir.

10              Q.   We got plenty of time.  I can't

11   imagine this will take a whole lot of time.

12   There's some video to go over.  Depending upon the

13   competence of my assistant that could be a short

14   period of time or it could take a long time.

15              A.   Yes, sir.

16              Q.   But we'll just have to wait and see

17   how that works out.  So it's important -- we have a

18   court reporter, and one of the first rules of

19   lawyering is you never piss off a court reporter.

20   Okay?

21              A.   Yes, sir.

22              Q.   And so the easiest way to do that is

23   if we talk over each other --

24              A.   Okay.

25              Q.   -- which she'll tell you I'm guilty
```

```
 1  of, extensively.  Okay.
 2              A.   Yes, sir.
 3              Q.   But I'll try not to.  If I ask a
 4  question, please wait until I finish asking the
 5  question.  And if you're giving a response, I'll
 6  wait until I -- I'm going to try and wait until
 7  you've finished answering.  If you're not finished
 8  answering, just let me know, and I'll shut up and
 9  let you answer the question.
10              A.   Yes, sir.
11              Q.   You are testifying under penalty of
12  perjury, just like in court.
13              A.   Yes, sir.
14              Q.   Will be sworn.  And unlike in court,
15  there won't be any judge here to address
16  objections.  So if you hear an objection, the
17  general rule is you can answer unless
18  Mr. Fitzgerald instructs you not to answer.
19              A.   Okay.  Yes, sir.
20              Q.   All right?
21              A.   Yes, sir.
22              Q.   Do you have any questions before we
23  get started?
24              A.   I do not, sir.
25              Q.   All right.  So going back to
```

```
 1  the -- did we bring a copy of the complaint even?
 2  How about -- how about -- let me -- how about
 3  bringing the complaint up on the computer, and I'll
 4  just use it on the computer.  I mean, I can bring
 5  it up on my phone.  We're having a little
 6  technology issue.  Give me just a second and bring
 7  it up on my phone real quick.
 8                  (Off-the-record discussion.)
 9  BY MR. VALOIS:
10          Q.  What have you done to prepare for the
11  deposition today?
12          A.  I've just seen some of the body cam
13  and what I was sent over from my attorney's office
14  about the case.
15          Q.  Have you talked to anyone, who wasn't
16  an attorney, about this case?
17          A.  No, sir.
18          Q.  Have you been told what to say?
19          A.  No, sir.
20          Q.  Have you been instructed on how to
21  answer?
22          A.  No, sir.
23          Q.  In any regard?
24          A.  No, sir.
25          Q.  You're currently with Bedford County
```

**EXHIBIT 1**

```
 1   Sheriff's Department?
 2              A.   Yes, sir.
 3              Q.   When did you start there?
 4              A.   I'd say August, September of '22-ish.
 5   Yeah, somewhere around there, around 2022.
 6              Q.   So you've been there now more than
 7   two years?
 8              A.   No.   Then it would be 2023.
 9              Q.   Been there more than one year?
10              A.   Yeah, about one and a half.   I'm
11   going on my second year.
12              Q.   Where were you before then?
13              A.   Lynchburg City Police Department.
14              Q.   Did you ever work anywhere else?
15              A.   No, sir.   In law enforcement?
16              Q.   Yes?
17              A.   No, sir.
18              Q.   Okay.   And why did you leave
19   Lynchburg?
20              A.   So I live in Bedford County.   Mainly
21   the travel time, travel distance.   My family's in
22   Bedford County.   That's the community I want to
23   serve now.
24              Q.   All right.   And but you weren't
25   asked -- you weren't terminated or asked to leave?
```

**EXHIBIT 1**

Page 9

```
 1              A.   No, sir.
 2              Q.   Have you ever been disciplined in
 3  your career?
 4              A.   Minus a few like informal -- like
 5  nothing formal, nothing formal, no, sir.
 6              Q.   The counseling?
 7              A.   Yeah, just like an informal
 8  counseling, yes, sir.
 9              Q.   Anything, any of that related to this
10  incident?
11              A.   No, sir.
12              Q.   Have you ever been subject to use of
13  force investigation?
14              A.   Yes, sir.
15              Q.   How many uses of force have you had?
16              A.   I couldn't tell you off the top of my
17  head.
18              Q.   Well, when did you begin working for
19  the Lynchburg Police Department?
20              A.   2019.
21              Q.   And was that your first law
22  enforcement job?
23              A.   It was, yes, sir.
24              Q.   Where did you come -- where did you
25  come from before then?  Had you worked before then?
```

**EXHIBIT 1**

Page 10

```
 1              A.   Yes, sir.
 2              Q.   Where did you work?
 3              A.   For -- not a sheriff's office.  I
 4    wasn't a police officer before then, so I worked at
 5    Commonwealth Building Materials.
 6              Q.   And what was your function there?
 7              A.   Inside sales/labor.  I kind of did
 8    whatever they needed me to do.
 9              Q.   How long did you work there?
10              A.   On and off twice since I graduated
11    high school, so probably a total of six years,
12    somewhere around there.
13              Q.   Was that your job right out of high
14    school?
15              A.   Yes, sir.
16              Q.   And where did you go to high school?
17              A.   Staunton River High School.
18              Q.   That's in Bedford County?
19              A.   Yes, sir.
20              Q.   That's on the Roanoke side of Bedford
21    County; right?
22              A.   Yes, sir.  It's Moneta area.
23              Q.   Is that where you're from?
24              A.   Yes, sir.
25              Q.   And what year did you graduate?
```

**EXHIBIT 1**

```
 1              A.    2013.
 2              Q.    All right.  So what brought you into
 3  law enforcement?
 4              A.    To be honest, nothing.  Somebody just
 5  said I would be good at the job, and I should
 6  apply, and so ended up filling out an application
 7  for Lynchburg and got hired.  Didn't, didn't know,
 8  never been through the process, just wanted to see
 9  what the process was like, got hired, and then I
10  fell in love with it.
11              Q.    All right.  And you went to the
12  academy here in town?
13              A.    Yes, sir.
14              Q.    How long was your training there?
15              A.    How long was my training there?
16              Q.    Yeah?
17              A.    I think it's six months, roughly six
18  months, whatever their normal training is.  I think
19  it's like around six months, five-and-a-half
20  months.
21              Q.    And did you complete that training --
22              A.    I did.
23              Q.    -- satisfactorily?
24              A.    I did, sir.
25              Q.    And when did you -- when were you put
```

```
 1  on the street in Lynchburg?
 2          A.   I would say June, July of 2019.  I
 3  started the January academy of 2019.
 4          Q.   So summer of 2019?
 5          A.   Yes, sir.
 6          Q.   And you were a patrol officer?
 7          A.   Yes, sir.
 8          Q.   All right.  And this incident
 9  happened in April of 2020?
10          A.   Yes, sir.
11          Q.   So you had less than a year of
12  experience on the street when this incident took
13  place?
14          A.   Around that time, yes, sir.
15          Q.   Had you received any promotions in
16  Lynchburg?  Were you ever promoted in Lynchburg?
17          A.   Just from the -- no.  I don't think I
18  stayed long enough to get my POII; so, no, sir.  I
19  was just a regular, or from probationary status to
20  normal police officer status.
21          Q.   All right.  Do you remember the
22  incident we're talking about, on April 28th of
23  2020?
24          A.   I do, sir.
25          Q.   All right.  And you've watched the
```

**EXHIBIT 1**

Page 13

```
 1  body cam, you said you've reviewed the body cam?
 2           A.   Yes, sir.
 3           Q.   All right.  Terron Pannell, a young
 4  man driving a -- do you know what kind of car it
 5  was?
 6           A.   It was a -- I want to say it was like
 7  an SUV of some sort.  Yeah, I don't remember the
 8  exact make and model of the car, no, sir.  I think
 9  it was like an SUV-type vehicle, though.
10           Q.   It wasn't his?
11           A.   Huh?
12           Q.   It wasn't his; right?
13           A.   I don't believe it was, no, sir.
14           Q.   And you were -- pulled it
15  over -- were you working radar, or what was your --
16           A.   So at that point, I was just
17  monitoring traffic, and I saw he did not have a
18  front license plate displayed.
19           Q.   Where were you set up monitoring
20  traffic?
21           A.   It was 12th Street and right at the,
22  where the -- I don't know what the address is.  The
23  big warehouse, the Liberty warehouse.  There's a
24  big parking lot to the -- if you're looking at the
25  warehouse from 12th Street, it's on the left.
```

**EXHIBIT 1**

Page 14

```
 1   There's a big open parking lot there.  I was
 2   sitting watching traffic there.
 3           Q.   Okay.  And I believe that they call
 4   it the Consolidated Shoe building?
 5           A.   Could be, yeah.  It was -- we used to
 6   always call it the Liberty warehouse.
 7           Q.   Yeah.
 8           A.   I don't -- I'm unsure what it's
 9   called now.  It's right there on 12th Street on the
10   left-hand side.
11           Q.   All right.  And so you followed that
12   vehicle into the Kemper Lofts apartment complex?
13           A.   Yes, sir.
14           Q.   On Kemper Street?
15           A.   Where it pulled over, yes, sir.
16           Q.   In Lynchburg; right?
17           A.   Yes, sir.
18           Q.   And pretty much lit him up
19   contemporaneously with him pulling into a parking
20   spot; right?
21           A.   Yes, sir.
22           Q.   You got out, you ascertained he
23   didn't have a license, and it wasn't his car?
24           A.   Yes, sir.
25           Q.   Right.  After that you had
```

```
 1   communication with an Officer Grooms.

 2              Do you recall that?

 3        A.   I do, yes, sir.

 4        Q.   All right.  What was the purpose of

 5   that communication?

 6        A.   Which part?  I mean, I asked her to

 7   try to gain consent to search the vehicle.

 8        Q.   For what purpose?

 9        A.   It was just a normal practice I did

10   at that time.  I was -- I asked pretty much

11   everybody I came in contact with if I could search

12   their vehicle, or my backup officer could.

13        Q.   Is it a normal practice to bring

14   somebody else in to ask for consent too?

15        A.   At that point, she was my backup

16   officer, so I was letting her handle the

17   conversation with him while I was back at my car.

18        Q.   But he had already refused you

19   consent; right?

20        A.   I don't recall if I asked consent.  I

21   don't remember asking for consent.  Personally,

22   myself, personally, I don't recall if I asked him

23   for consent.

24        Q.   All right.  And then about two or

25   three minutes later, Seth Reed showed up?
```

**EXHIBIT 1**

```
 1              A.    Yes, sir.

 2              Q.    With his dog Knox; right?

 3              A.    Yes, sir.

 4              Q.    And what was his purpose in showing

 5   up?

 6              A.    What was his purpose in showing up?

 7   I called him on the radio to ask him to come.

 8              Q.    Why would you do that?

 9              A.    At that point, consent had been

10   denied, and so I called him on the radio to come

11   for -- to utilize his K9.

12              Q.    Did you have any evidence that there

13   were any drugs?

14              A.    At that time, no, sir.  Minus -- no,

15   sir, at that time, no.

16              Q.    Had you written the summons out?

17              A.    Before I called him?

18              Q.    Uh-huh?

19              A.    No, sir.

20              Q.    But you started writing the summons

21   out after he arrived; right?

22              A.    It was before he arrived is when I

23   started my summons.

24              Q.    After you called him, but before he

25   arrived?
```

**EXHIBIT 1**

```
 1            A.   Yes.  I was writing the summons in

 2    between the time.

 3            Q.   Right.  And you notified him that he

 4    had denied consent?

 5            A.   Correct.

 6            Q.   All right.  And so Reed got out of

 7    the car, Reed got out of his car, went to the door

 8    of the -- whatever it is, the SUV that Pannell was

 9    in?

10            A.   Yes, sir.

11            Q.   Pannell was in there by himself;

12    right?

13            A.   Yes, sir.

14            Q.   Notified Pannell that he was going to

15    do a dog search, asked Pannell to leave the

16    vehicle?

17            A.   I don't know what he asked him up

18    there.  I don't know.

19            Q.   You haven't seen the body cam?

20            A.   Seth Reed's body cam, I have not.  I

21    did not watch Seth Reed's, and if it was attached

22    to my files, I did not watch his body camera.

23            Q.   But it's your traffic stop?

24            A.   I was in my car at that time, sir.

25            Q.   Right.  But you're conducting the
```

```
 1  stop?
 2          A.   Yes, sir.
 3          Q.   And you call for assistance?
 4          A.   Yes, sir.
 5          Q.   Why is -- why is Reed taking over
 6  then?  What's he doing then?  Why is he taking over
 7  the direction of what Pannell is doing and the
 8  control of the stop at that point?
 9              MR. FITZGERALD:  Object to form.  You
10  may answer.
11              THE WITNESS:  Okay.  I can't answer
12  to what deputy -- or, sorry, Officer Reed was
13  doing.  What he said at the car, I can't say any of
14  that.  I was in my car conducting -- writing my
15  summons.
16  BY MR. VALOIS:
17          Q.   But you heard him direct Pannell to
18  get out of the car multiple times; right?
19          A.   No, sir.  I was in my car.  What led
20  me -- no, sir.  I couldn't hear their conversation
21  up there.
22          Q.   No?
23          A.   No, sir.
24          Q.   All right.  So what did lead you to
25  get out of your car?
```

```
 1              A.   At that point, I saw Officer Reed
 2  grab -- reach into the car, open the door, and grab
 3  him, and then it looked like there was a struggle,
 4  a brief struggle.  Well, I don't know what was
 5  said, what was done.  Opened the door, he grabbed
 6  him, and that's when I exited my car and went up
 7  there.
 8              Q.   What did you do then?
 9              A.   At that point, he was trying, Officer
10  Reed was trying to remove Terron -- is that the
11  correct way to say it -- Terron from the vehicle.
12              Q.   And that was successful?
13              A.   Yes, sir.
14              Q.   In about four seconds, he's out of
15  the car?
16              A.   Yes, sir.
17              Q.   And he's over on the sidewalk in
18  front of the -- right in front of the car, then,
19  standing up in the sidewalk area at the front of
20  that vehicle?
21              A.   We have to -- we had to --
22              MR. FITZGERALD:  Object to form.  You
23  can answer.
24              THE WITNESS:  Okay.
25  BY MR. VALOIS:
```

```
 1              Q.   Where was he positioned when you got
 2   him out of the vehicle?
 3              A.   On the ground next to the vehicle.
 4              Q.   Then he was taken off the ground?
 5              A.   Yes, sir.  We picked him up
 6   afterwards.
 7              Q.   And where did you put him?
 8              A.   We took him back to the back of, I
 9   think it was my police car, to the back to do a --
10              Q.   Immediately?
11              A.   Yeah.  It was very quickly, yes, sir.
12              Q.   There was not a period there where he
13   was standing in front of the car?
14              A.   I don't recall him standing -- in
15   front of his car?
16              Q.   In front of his car while both of you
17   were standing there?
18              A.   I don't -- no, I don't remember him
19   ever standing in front of his car.  I remember
20   removing him from the car.  We handcuffed him, and
21   then he was picked up and taken to the back of my
22   police car to do a search of his person.
23              Q.   Okay.  And was he under arrest at
24   that time?
25              A.   I don't know.  At that time, I don't
```

**EXHIBIT 1**

Page 21

```
 1  know.  He was definitely detained and going into
 2  the back of a police car at that point.
 3           Q.   Right.  He was detained, but do you
 4  understand the difference between being detained
 5  and arrest?
 6           A.   Yes, sir, I do.
 7           Q.   Okay.  You hadn't placed him under
 8  arrest?
 9           A.   At that point I don't believe I had
10  said you're under arrest, no, sir.
11           Q.   And he was being detained on what
12  grounds?
13           A.   You'll have to ask Officer Reed.
14  Officer Reed was the one who initially grabbed onto
15  him to detain him out of the vehicle.
16           Q.   But you assisted in the detention?
17           A.   Yes, sir.
18           Q.   I mean, do you routinely assist in
19  detentions without knowing the basis?
20           A.   If I have an officer that's fighting,
21  with a subject fighting him, yes, sir.  I tend to
22  help out at that point, and then we'll figure out
23  what's happening afterwards, if there's an active
24  disturbance going on between the two.
25           Q.   Okay.  So the presumption then is
```

Page 22

```
 1  that if you see an officer engaged in physical
 2  force with a subject, your presumption is that that
 3  force is justified and that you need to assist; is
 4  that right?
 5          A.   There needs to be assistance to get
 6  the situation under control, whether that be
 7  getting somebody in handcuffs, and then we can talk
 8  about what's going on afterwards, yes, sir.
 9          Q.   All right.  And so your point there
10  was not to detain Terron Pannell, it was to
11  assist --
12          A.   Officer Reed.
13          Q.   -- Officer Reed; right?
14          A.   In detaining Pannell, yes, sir.
15          Q.   Okay.  And then, that accomplished,
16  he was in handcuffs at the front of the vehicle;
17  right?
18          A.   At the, I want to say the back
19  quarter panel.  I don't ever remember him being in
20  front of his vehicle.  I don't ever -- I don't
21  remember him being in front of his vehicle at all.
22          Q.   Was he handcuffed when he was led to
23  the back of the vehicle?
24          A.   He was, yes, sir.
25          Q.   So sometime between being taken out
```

```
 1  of the car and being taken to the back of the
 2  vehicle, he was handcuffed?
 3          A.   He was, yes, sir.
 4          Q.   Who handcuffed him?
 5          A.   I believe I did.
 6          Q.   Where did that occur?
 7          A.    In between -- next to his car, in
 8  between -- there were was a parking lot, parking
 9  spots, his car, another car.  In the middle,
10  between those two cars.
11          Q.   Right in the front of that parking
12  lot, near the sidewalk; right?
13          A.   Yes, sir.
14          Q.   Okay.  So --
15          A.   Yeah.  I think they were in the
16  first -- I didn't mean to interrupt you.  I'm
17  sorry.
18          Q.   Well, he's not under arrest; he's
19  being detained?
20          A.   Yes, sir.
21          Q.   He's handcuffed, and the purpose was
22  ostensibly to run the dog around the car; right?
23          A.    You will have to ask Officer Reed at
24  that point.  I don't know.
25          Q.   Well, that's why you called him;
```

```
 1  right?
 2            A.   Yes, yes.  So he -- something --
 3            Q.   You -- that's the reason --
 4            A.   So if he refused to get out of the
 5  car, he has to get out of the car when asked by law
 6  enforcement --
 7            Q.   Right.
 8            A.   If he -- that's what I'm assuming
 9  Officer Reed was detaining him for.
10            Q.   Well, I'm not -- again, I don't, I
11  don't want to force you into speculation for my own
12  good, but I also don't want you using it for your
13  own good either.
14            A.   Yeah.
15            Q.   I don't want you to speculate as to
16  what Officer Reed's mental state was any more than
17  I want you to -- than I want to do it for you.  I
18  don't want to put words in your mouth.
19            A.   Okay.  Yes, sir.
20            Q.   But I also don't want you putting
21  words in his mouth.
22            A.   Okay.  Yes, sir.
23            Q.   So the point is he's, Officer Reed's
24  there to run the dog to do a drug sniff; right?
25            A.   Correct.
```

**EXHIBIT 1**

Page 25

```
1              Q.   Now you got Pannell at the front of

2   the car, handcuffed, hands behind his back?

3              A.   Correct.

4              Q.   You got a dog, you got a car.

5                   Why isn't the dog running the car?

6              A.   There was a -- it was an active -- so

7   as soon as we got him back to my car, that's when

8   he attempted to kick me in the groin.

9              Q.   Well, I'm not talking about when he's

10  back at your car.  What I'm saying is you pull him

11  out of the car.  Reed goes up to the car, within a

12  few seconds, you have him, both have him out of the

13  car?

14             A.   Correct.

15             Q.   He's taken to the ground.  He's

16  picked back up between the two cars.  This is

17  that -- this is between the car he was driving and

18  another car in the front of the parking lot?

19             A.   Correct.

20             Q.   You have him in handcuffs.  There are

21  two officers standing there.  There's really three,

22  because Grooms is on the other side.  Right.  Now

23  you got three officers and a dog.  The dog was

24  brought to the scene for the purpose of running a

25  free air sniff around this car.  Right.
```

```
 1                    Why didn't that happen?
 2                    MR. FITZGERALD:  Object to form.  You
 3  may answer.
 4  BY MR. VALOIS:
 5           Q.   You wanted the dog there?
 6           A.   Yeah.
 7           Q.   Why didn't you say okay -- so why
 8  didn't you say to Reed, hey, now you can run the
 9  dog, the guy's out of the car?
10           A.   Yeah.
11           Q.   You have the dog.  I brought you here
12  to run the dog.  I asked for your assistance to run
13  the dog.
14                    Why didn't you ask him to run the
15  dog?
16                    MR. FITZGERALD:  Object to form.  You
17  may answer.
18                    THE WITNESS:  Okay.  So
19  very -- let's -- I'm going to go from my point of
20  view, not Officer Reed's.  So very chaos situation.
21  We have multiple people screaming and hollering at
22  us.  We have Terron, who is not being cooperative.
23  He's jerking, pulling, trying to pull from me,
24  trying to pull from us.
25  BY MR. VALOIS:
```

```
 1            Q.   Right.

 2            A.   At that point, on my end -- I can't

 3  say when Officer Reed can run a vehicle or not.

 4  That's up to him.  But on my end, we needed to get

 5  him placed somewhere, which was in the back of a

 6  patrol car, to try to deescalate the situation.

 7  Because there was, we had -- I don't -- I didn't

 8  know there were -- at that time, people were

 9  screaming, yelling at us.

10            Q.   Okay.

11            A.   And he's also actively kicking,

12  pulling from us --

13            Q.   Right.

14            A.   -- the whole time, trying to get him

15  back to the vehicle as well.

16            Q.   Okay.

17            A.   So I wanted to put him in the back of

18  the car.

19            Q.   Okay.  But now you've changed the

20  purpose of taking him back to the car on me.

21  Earlier you said he was brought there to search

22  him.  Okay.  Earlier you testified that the purpose

23  in bringing him to the back of the car was to

24  search him.

25                 Now you're saying that the purpose of
```

 1  bringing him to the back of the car was to

 2  deescalate?

 3          A.   So we have to search --

 4               MR. FITZGERALD:  Object to form.  You

 5  may answer.

 6               THE WITNESS:  So we have -- I have to

 7  search him before I place him in a patrol car, per

 8  LPD policy.  So at that, when I answered that, that

 9  was still correct, because when we took him to the

10  car to place him in a vehicle, he has to be

11  searched before I put him in the back of that car.

12  BY MR. VALOIS:

13          Q.   It's your -- so is it your

14  understanding that anyone who is detained gets put

15  in the back of a police car?

16          A.   Not necessarily.  They don't have to

17  be placed in the back of a police car.

18          Q.   Who makes that decision as to whether

19  they get put into the police car?

20          A.   I think the officers at the time,

21  depending on what the situation calls for.

22          Q.   All right.

23          A.   And at that time, it was a very

24  chaotic situation.

25          Q.   All right.  So let me follow you up

1  on the policy here.

2           Is it your understanding of your

3  policy, your official policy at Lynchburg at the

4  time, that if you as an officer detain somebody

5  without probable cause, but with a reasonable

6  suspicion that criminal activity may be afoot, that

7  you get the right to search their person if you

8  decide to put them in a police car?

9           A.   Well, at that time, we had probable

10 cause to arrest him for obstruction.  There was

11 probable cause there.  I can't speak for Officer

12 Reed; but.

13          Q.   I just asked you if he was under

14 arrest or whether he was being detained?

15          A.   At that -- in my -- from my point of

16 view, I did not place him under arrest at that

17 point.  That's what I can answer to.  I did not

18 place him under arrest.  He was being detained.  He

19 was being placed in the back of a police car.

20          Q.   And yet you're searching him?

21          A.   To put him in the back of a police

22 car, yes, sir.

23          Q.   Okay.  And so what I'm -- but my

24 question is this is with regard to your

25 understanding of official policy at the time?

1          A.   And I will -- I haven't been there

2    for two years, so I don't know if things have

3    changed.  I don't know --

4          Q.   That's fair.

5          A.   I will just say that too.

6          Q.   We're only talking about on April

7    28th of 2020.  Okay.

8               But your understanding of policy, as

9    it existed then, is that if you had detained

10   someone on what you believe to be a reasonable and

11   articulable suspicion of some criminal activity,

12   any criminal activity, right, and you have the

13   discretion to decide whether or not they go in a

14   police car, and you exercise that discretion to

15   place them in a police car that that gives you the

16   power to search them, their persons?

17         A.   Okay.  If they, I'll say I'm under

18   the understanding if they go -- if they're

19   handcuffed and get placed into the back of a patrol

20   car, they are to be searched when they go into that

21   car.

22         Q.   Well, that's too broad an answer for

23   me.  I need to pin you down on this.

24         A.   Okay.

25         Q.   Okay.  Because that encompasses areas

**EXHIBIT 1**

```
 1  where you have formal arrests, where you have

 2  outstanding warrants, where you have capiases.

 3  There are a million different situations that can

 4  result in a person being handcuffed.

 5                  I'm talking about the specific

 6  situation where you may have reasonable and

 7  articulable suspicion to believe that some criminal

 8  activity is afoot, and you're willing -- and you

 9  make the decision to detain that person.  Right.

10  And you -- and then you make the decision to place

11  them into a police car.  You've testified that you

12  had that discretion.

13                  Under those circumstances, did policy

14  allow you to search their persons without a warrant

15  or without consent?

16                  MR. FITZGERALD:  Object to form.  You

17  may answer.

18                  THE WITNESS:  I can't -- I can't

19  answer.  I don't -- I just know what I -- I'm

20  trying to explain my understanding of the policy.

21  I know if I handcuff somebody in the City of

22  Lynchburg, and they go into the back of my patrol

23  car, whether that be for detention, for arrest,

24  reasonable suspicion, if they have to go into my

25  patrol car, they are to be searched at that point.
```

```
 1   BY MR. VALOIS:
 2              Q.   Okay.
 3              A.   And we did that, I did it with
 4   civilians that I just gave a ride to, that they
 5   were to be searched before they got in the back of
 6   my vehicle.  That is my -- I'm trying to answer
 7   your question the best I can, Mr. Valois.
 8              Q.   That's fine.
 9              Say a civilian needs a ride and you
10   give them a ride, a courtesy ride, do you ask
11   for -- do you notify them that they're going to be
12   searched?
13              A.   Yes.  And I tell -- and if they are
14   refusing, they do not get in my car.
15              Q.   Right.  But that is not afforded to
16   someone in detention.
17              If they're being detained, they can't
18   refuse; right?
19              A.   Okay.  I mean, if they're going in
20   the back of my police car, they're getting
21   searched.  And that's what the scenario called for.
22   We were trying to deescalate it at that point.  It
23   was a chaotic situation.  We needed to separate
24   people.
25              He was going in the back of my police
```

1  car, so he was going to be searched at that point.

2  I'm trying to answer the best I can, Mr. Valois.

3  That's just my understanding, and that's what I

4  know of the policy.

5          Q.    Well, what I'm really trying to get

6  pinned down is if that comports, what you said,

7  that that's your understanding of the policy, and

8  it was going happen, is that how you were trained?

9          A.    I was trained in a situation that is

10  a very chaotic situation, there's -- that's a way

11  to try to -- you know, you try to separate

12  everybody apart from each other.  So at that point,

13  we were just trying to place him in the back of my

14  car.

15          He was -- at that point I know he was

16  detained.  I don't know if -- I don't know if he

17  was under arrest by Officer Reed.  I can't

18  speculate.  He may, he may have been.  I just know

19  he was detained at that point for his actions, and

20  then he was going to be placed in the back of my

21  police car while we figured out what was going on.

22          Q.    All right.  And so in the -- you went

23  to search him?

24          A.    Yes, sir.

25          Q.    All right.  And did you notify him

```
 1  that he was being searched?

 2           A.   I believe so.  On body camera I tell

 3  him, yes.  I don't know if I tell him exactly he's

 4  going to be searched, but I place him up against

 5  the car.  I don't know if I went through my spiel

 6  of checking for weapons.  I don't remember if I

 7  heard that on body camera or not.

 8           Q.   All right.  But --

 9           A.   Actually, I do, I do.  I remember.  I

10  say, "You got anything that's going to stick, poke

11  or cut me?"  I do remember saying, asking him if he

12  had anything on him that was going to stick, poke

13  or cut me.

14           Q.   Did you use those -- did you tell him

15  that he was being searched?

16           A.   I can't say if I verbatimally said

17  you're being searched.

18           Q.   And you didn't ask for consent for a

19  search?

20           A.   No, sir.

21           Q.   And he specifically denied consent to

22  a search?

23           A.   Of his vehicle, yes, sir.

24           Q.   Well, he never consented to any

25  search of anything; right?
```

```
 1                  MR. FITZGERALD:  Object to form.  You
 2   may answer.
 3                  THE WITNESS:  He was going in the
 4   back of my car.  He was being placed in the back of
 5   my car.  He was going to be searched whether he
 6   wanted to or not wanted to.
 7   BY MR. VALOIS:
 8          Q.   But you -- I'm asking you about,
 9   specifically, about consent?
10          A.   I never asked him, Mr. Pannell,
11   can or -- can I or can't I search you?
12          Q.   And he never expressed anything, any
13   form of consent to any search?
14          A.   Not that I remember, no, sir.
15          Q.   Okay.  How many officers were at the
16   scene?
17          A.   Depends.  What part?
18          Q.   Well, at this time, at this time,
19   when he's going in the car?
20          A.   I think still just three of us.
21          Q.   All right.  And everybody armed?
22          A.   Armed?
23          Q.   Yes?
24          A.   Yes, sir.
25          Q.   Everybody wearing uniform, badge of
```

```
 1  authority?
 2          A.   Yes, sir.
 3          Q.   There's also a dog present, K9
 4  present?
 5          A.   I do not believe that dog was out at
 6  this time, though.  I think it was inside the
 7  vehicle still, inside the handler's vehicle.
 8          Q.   But it was -- it was available for
 9  deployment if necessary; right?
10          A.   Yeah.  I mean, you'd have to -- I
11  mean, it was there.  I don't know what his thing
12  is --
13          Q.   And other units, other units are
14  arriving?  At some at some point, someone called
15  for assistance?
16          A.   Yeah.  I think it was a -- I think it
17  was a moment from where we got keyed up or where,
18  when we were struggling with Pannell, and they
19  heard the struggle, and that's when they toned us
20  out.
21          Q.   All right.  And then, so you're up
22  against the car, you got this kid.
23               How tall are you?
24          A.   I'm about six-two.
25          Q.   How much did you weigh then?  Do you
```

Page 37

```
 1  know?
 2              A.   280, 285.
 3              Q.   And Reed was there, how tall is Reed?
 4  Do you have any idea?
 5              A.   I mean, probably six foot, maybe less
 6  than six foot, five-eleven.
 7              Q.   All right.  This kid, Pannell, he's
 8  18; right?
 9              A.   Yeah.  Possibly at that time, yes,
10  sir.
11              Q.   How tall is he?
12              A.   I don't -- maybe five-nine,
13  five-eight, five-nine, five-ten, somewhere around
14  there.
15              Q.   About what, 150, something like that?
16              A.   Yeah, 150, yeah.
17              Q.   Skinny?
18              A.   Yeah, he wasn't a big guy.  I would
19  say he wasn't a big guy.
20              Q.   So there's two of you, one on each
21  side, going to search him, and somehow Pannell goes
22  from being vertical at the side of your car to
23  being facedown in the asphalt?
24              A.   Yes, sir.
25              Q.   In about less than ten seconds?
```

**EXHIBIT 1**

Page 38

```
 1              A.    Yes, sir.

 2              Q.    How did that happen?

 3              A.    At that point, he tried to kick us.

 4   He was trying to kick us with our feet, and then he

 5   actually like tried to walk himself up the vehicle.

 6   And then that's when we turned him and placed him

 7   on the ground.

 8              Q.    All right.

 9              A.    And he was trying to jerk from us,

10   pull from us.  I mean, he was trying to -- the

11   whole kit and caboodle.

12              Q.    All right.  Now I'm going to circle

13   back in time, because like you said, there's a lot

14   of people out there, and there was confusing

15   circumstances; right?

16              A.    It was chaos.

17              Q.    Yeah.  Other people had arrived at

18   the front of the building; is that correct?

19              A.    Officer, who do you mean by other

20   people, officers or like individuals?

21              Q.    A bunch of residents from the

22   apartment --

23              A.    Yes, sir.

24              Q.    -- were out there?

25              A.    Yes, sir.
```

```
 1              Q.   There were people from the apartment
 2   next door hooting and hollering from the complex
 3   next door?
 4              A.   Yes, sir.  It was chaos.
 5              Q.   There was -- and specifically Shanta
 6   Brown and Aquasha Sandidge came out from the front
 7   of the building?
 8              A.   Yes, sir.
 9              Q.   In the front area there; right?
10              A.   Yes, sir.
11              Q.   And so Shanta Brown is Terron
12   Pannell's mother, were you made aware of that?
13              A.   Yeah, I'm sure, yeah.  The mother and
14   I think was it a sister or an aunt or something.
15              Q.   Shanta Brown is Aquasha Sandidge's
16   mother, and Aquasha Sandidge is Terron's
17   half-sister.
18              A.   Okay.
19              Q.   Were you aware of all that?
20              A.   At that exact time?
21              Q.   Probably not back then?
22              A.   I don't remember at that exact time.
23   I know they -- I know they're related.  I couldn't
24   remember which one was mom, which one was sister.
25   I knew they were all related somehow.
```

**EXHIBIT 1**

```
 1           Q.   Okay.  And you see it in the video
 2   that Shanta comes out, and she's basically
 3   squawking at you guys about what you're doing is
 4   illegal and not correct?
 5                MR. FITZGERALD:  Object to form.  You
 6   may answer.
 7                THE WITNESS:  Yeah, she was
 8   screaming, yeah.
 9   BY MR. VALOIS:
10           Q.   Specifically that she did not
11   perceive that what you were doing was legal?
12           A.   At the time I don't know exactly what
13   she was yelling.  I can't say word for word what
14   she was yelling, but she was yelling.
15           Q.   Have you heard that on the body
16   cam?
17           A.   Okay.  Yeah, yeah, on the body cam,
18   yeah.
19           Q.   Have you heard what she was yelling
20   on the body cam?
21           A.   I don't -- I don't recall.  Even on
22   my audio system, with my watching it, it ain't that
23   great either, so I can't, I can't hear everything.
24           Q.   But she never came to the door of the
25   vehicle when Terron was in it?
```

**EXHIBIT 1**

Page 41

```
 1            A.   She was over at the door where Terron
 2    was at at some point, because I asked him to step
 3    to the other side of the vehicle.
 4            Q.   Well, you asked her, yeah, in fact,
 5    to step away --
 6            A.   This is before they -- I'm sorry.  I
 7    didn't mean to interrupt you.  I'm sorry.
 8            Q.   Well, let's start back at the
 9    beginning.  Okay.
10            So you pull up, you and Terron,
11    you're dealing with Terron Pannell by yourself;
12    right?
13            A.   Yes, sir.
14            Q.   Grooms is with you, I guess she auto
15    responds at night; right?
16            A.   Yeah.  You have two officers at
17    night.
18            Q.   You had a two-on-one policy at night?
19            A.   Yes, at that time, yes, sir.
20            Q.   So she's there automatically whenever
21    you're called there?
22            A.   Yes, sir.
23            Q.   And then so at first it's you, within
24    a few minutes, seconds, it's her?
25            A.   Yeah.  I'd say a couple minutes,
```

 1  probably, yeah.

 2          Q.   Yeah, but so far it's just a traffic

 3  stop?

 4          A.   Yes, sir.

 5          Q.   So far there's nothing going on?

 6          A.   Yes, sir.

 7          Q.   Right.  Then he denies consent, Reed

 8  comes.  Right.

 9               And at this time, we have people

10  exiting the building, the apartment building,

11  through the front door of the apartment building,

12  standing in an area where if you're coming out of

13  the building, there's a little rocky area to the

14  left; is that right?

15          A.   Yeah.  I'm trying to --

16               MR. FITZGERALD:  Object to form.  You

17  may answer.

18               THE WITNESS:  Yes, sir.

19  BY MR. VALOIS:

20          Q.   Right.  And then on the right is

21  the --

22          A.   It's like bushes or something.

23          Q.   But when you come out of the door of

24  the apartment building, you would turn right to get

25  to where you are?

**EXHIBIT 1**

```
 1            A.    Yes.

 2            Q.    A couple cars over?

 3            A.    Yeah, it wasn't far.  Like you just

 4  come out the door, and we were like right there at

 5  like the 1 or 2:00 out that door.

 6            Q.    So when she comes out the door, she's

 7  real close to where you are anyway, just by coming

 8  out the door?

 9            A.    Yes, sir.

10            Q.    Right.  So she came out, and she's

11  running her mouth, she's (descriptive sound);

12  right?  But did she ever touch you?

13                  MR. FITZGERALD:  Object to form.  You

14  may answer.

15                  THE WITNESS:  No, sir.

16  BY MR. VALOIS:

17            Q.    Okay.

18            A.    And she wasn't -- she was out there,

19  or she wasn't -- yeah, she never touched me.

20            Q.    Right.  And she didn't say anything

21  when it was just you?

22            A.    No, sir.

23            Q.    It was only when Reed came; right?

24  She was dealing -- Grooms was talking to her

25  mostly; right?
```

**EXHIBIT 1**

Page 44

```
1              A.   Yeah.  Because I had him --

2              Q.   Right?

3              A.    -- get over to that just so I could

4    be away from the car.  I asked him to get away from

5    the driver's side of the car.  Yes, sir.  That's

6    what I remember.

7              Q.   Let me know if I'm wrong.  I'm

8    leading here a lot just to try to help get it

9    right, but if I'm not right, tell me; all right?

10             A.   Yeah.

11             Q.   But Grooms was basically directing

12   this lady; right?

13             A.   From -- yeah, I was in my car, so

14   yes.  She was up there talking to them, yes.

15             Q.   And Grooms, Officer Grooms, was

16   pushing the lady, said, "Look, look, look," and

17   pushed her over to that rocky area?

18             A.   Yeah.

19             MR. FITZGERALD:  Object to form.  You

20   may answer.

21             THE WITNESS:  Yes.  Trying

22   to -- because I believe I instruct at one point,

23   from my vehicle, if they could just please move

24   over to the side for me.

25   BY MR. VALOIS:
```

**EXHIBIT 1**

Page 45

```
 1              Q.   All right.  And so she did that, she
 2   did that until her kid got yanked and thrown down
 3   on the asphalt?
 4              A.   Yeah.  I would -- I would -- yes,
 5   sir.
 6              Q.   All right.  Now, you have kids?
 7              A.   I do, yes, sir.
 8              Q.   If one of your kids gets taken down
 9   on the asphalt, are you going to stand there, or
10   are you going to go over to where your kid is?
11              MR. FITZGERALD:  Object to form.  You
12   can answer.
13   BY MR. VALOIS:
14              Q.   You can answer it.
15              A.   Yeah, I mean, I'm going to be honest,
16   I wasn't -- I was raised some type of way.  So if
17   my kid is getting thrown on the ground by a police
18   officer, I'm going to say my kid probably did
19   something to earn that, so --
20              Q.   But what if you -- what if your kid
21   is getting thrown down by somebody you don't trust?
22              A.   I mean, then to -- you got to -- you
23   don't -- you don't -- you still can't interject
24   yourself in the situation.  It ain't going
25   to -- personally, me, personally, how I feel, I
```

 1  would not interject myself into that situation.

 2              I would try to keep my son calm and

 3  tell him, hey, just listen to what they're -- what

 4  they're trying to do.  We'll figure this out at the

 5  end of it.

 6          Q.   Right.

 7          A.   Personally, that's what I would --

 8          Q.   Right.  As long as you perceive

 9  justice is being done; right?

10              MR. FITZGERALD:  Object to form.  You

11  can answer.

12              THE WITNESS:  Yeah.  As long as --

13  BY MR. VALOIS:

14          Q.   You perceive justice is being done?

15          A.   That's -- yeah, whatever's,

16  whatever's -- I don't know the situation with my

17  kid, but if he's, you know --

18          Q.   But you're -- as a law enforcement

19  officer, you're in the business of interceding when

20  you see people getting slammed around when

21  injustice is being done; right?

22          A.   Yes, sir.

23          Q.   When laws are being violated?

24          A.   Yes, sir.

25          Q.   And if you saw somebody getting

 1  thrown around when the law is being violated,
 2  thrown to the ground, would you hesitate, or would
 3  you tell them take their lumps?
 4          MR. FITZGERALD:  Object to form.  You
 5  may answer.
 6          THE WITNESS:  So in this situation,
 7  he was refusing to get out of the vehicle, so we
 8  had to use -- I mean, at one point, I'm -- I'm
 9  holding onto an arm with everything I got to keep
10  him from pulling back inside of that vehicle.
11          And so at that point, yes, we had to
12  remove him from that vehicle.  He was instructed to
13  get out of the vehicle.  He refused to get out of
14  the vehicle.  So at that point, we had to -- well,
15  I see Officer Reed initiate trying to get him out
16  of the car.
17  BY MR. VALOIS:
18          Q.   You don't have to get him out of the
19  vehicle?
20          A.   I go out to do a -- from my
21  understanding -- Officer Reed would have to testify
22  to this.  From my understanding of a K9, they do
23  not do it with anybody in the vehicle, from my
24  understanding.  That's my understanding of their
25  policy, how they work.  You would have to ask

```
 1  Officer Reed more on that.
 2            Q.   Okay.  But you don't, you -- as a
 3  traffic stop, you don't have to bring the dog
 4  there, that was a discretionary act?
 5            A.   Yes, sir, it was.
 6            Q.   You don't have to ask Grooms to ask
 7  consent for a search when you don't have any belief
 8  that there are any drugs there?  You're fishing at
 9  that point?
10            A.   Yes, sir.  I asked, yes, sir.
11            Q.   Right.  But you didn't have any
12  reasonable, articulable suspicion to believe there
13  are drugs there?
14            A.   No, sir.
15            Q.   Right.  You didn't have any reason to
16  bring a drug dog there.  All this is done without
17  any basis?
18                 MR. FITZGERALD:  Object to form.
19  BY MR. VALOIS:
20            Q.   Wait a minute, but you've already
21  testified to that; right?
22            A.   I'm allowed to ask for those
23  resources, yes, sir.  I'm allowed to ask people
24  for --
25            Q.   Yeah, but you didn't have any basis
```

```
 1   for it?
 2           A.   It doesn't matter.  I'm allowed to,
 3   I'm still --
 4           Q.   Have you been trained that way?
 5           A.   I can ask for a K9 to come to a
 6   scene, then it's up to Officer Reed to decide if he
 7   wants to run his K9 on that car or not.
 8           Q.   Do you routinely do that?
 9           A.   Ask for an officer, a K9 officer?
10           Q.   Yes?
11           A.   In the City of Lynchburg, yes, sir, I
12   did.
13           Q.   Every time?
14           A.   I wouldn't say every time, but a lot
15   of times, yes, sir.
16           Q.   How many times?
17           A.   Couldn't tell you.
18           Q.   So like if you're -- when you're
19   driving on a Sunday past Thomas Road, and you pull
20   some old lady over for speed coming home from
21   church, do you ask for a drug dog then?
22                MR. FITZGERALD:  Object to form.  You
23   may answer.
24                THE WITNESS:  Depends, it just
25   depends on what's going on.
```

```
 1  BY MR. VALOIS:
 2            Q.    Depends on what?
 3            A.    It just depends.
 4            Q.    Does it depend on what color she is?
 5            A.    No, sir, it doesn't.
 6            Q.    No, it does not?
 7            A.    It doesn't have to do nothing with
 8  that.
 9            Q.    Depend on what gender she is?
10            A.    So it's a lot of history when we run
11  their names, run them through NCIC, VCIN, what kind
12  of criminal history they've been involved in.  If
13  somebody's been in the drug game, if they've been
14  arrested a bunch of times for possessions, for
15  distributions, all that comes into play, yes, sir.
16            Q.    This kid didn't have anything?
17            A.    He had marijuana history, yes, sir,
18  he did.
19            Q.    He had a simple possession of
20  marijuana?
21            A.    That's, that's history, sir.
22            Q.    Okay.
23            A.    I'm not trying to be -- I'm not
24  trying to be facetious --
25                  MR. FITZGERALD:  I just -- I just
```

```
 1  want to advise my client to just allow Mr. Valois
 2  to ask his question and then answer it.
 3                  THE WITNESS:  Okay.
 4                  MR. FITZGERALD:  Just for the
 5  reporter.
 6  BY MR. VALOIS:
 7          Q.  He had a simple possession of weed as
 8  a juvenile; is that correct?
 9          A.  Yeah, yes, sir.
10          Q.  All right.  That's not the crime of
11  the century; right?  Is that enough, is that enough
12  in your mind, to justify bringing the drug dog in,
13  that somebody you pulled over had a possession of
14  marijuana in their past?
15          A.  Yes.
16          Q.  It is?
17          A.  Yeah.
18          Q.  You do it every time?
19          A.  Not -- it's legal now, so it's not
20  illegal --
21          Q.  No, but was it your practice?  Was
22  your practice every time you pulled somebody --
23          A.  I can't say every time.
24          Q.  Let me finish my question.
25          A.  Sorry.
```

**EXHIBIT 1**

Page 52

```
 1            Q.   Was it your practice, when you were

 2  an officer for the City of Lynchburg, that when you

 3  pulled somebody over, you ran their VCIN, and if

 4  they had a possession of marijuana, you paused the

 5  stop and call for a drug dog?  Was that your

 6  practice?

 7            A.   I would just say a lot of times, yes,

 8  sir.

 9            Q.   Well, I mean, how many?  What

10  percentage of times we talking?

11            A.   I can't give you a percentage.  I

12  don't know a percentage.

13            Q.   How did you make -- what criteria did

14  you use when you exercising that discretion?

15            A.   I just looked at their history, and

16  if I thought I needed a K9, I would ask for a K9.

17            Q.   When you look at the history, what

18  would you look at in the history to determine

19  whether they need a K9?

20            A.   Any drug history.

21            Q.   Any drug history at all?

22            A.   Yes, sir, generally.

23            Q.   So everybody you pulled over that had

24  a drug history, you would call a K9?

25            A.   I would --
```

```
 1                    MR. FITZGERALD:  Object to form.  You
 2    can answer.
 3    BY MR. VALOIS:
 4           Q.    What?
 5           A.    I would ask -- I can't say every
 6    single time.  I can't testify to every single time.
 7    A lot of times, yes.
 8           Q.    What percentage of the time?
 9           A.    I can't even give you a percentage,
10    sir.  A lot.  I can just say a lot of the time,
11    yes, I would.  I would ask if one was available.
12           Q.    And what drugs?  Even if it's just
13    weed?
14           A.    At that time, yes, sir.  It was
15    illegal still at that time.
16           Q.    And so it was your belief
17    that -- essentially that a past record justified a
18    detention?
19                    MR. FITZGERALD:  Object to form.  You
20    may answer.
21                    THE WITNESS:  That's not why he was
22    detained, was his past record, no, sir.
23    BY MR. VALOIS:
24           Q.    You recognize that a traffic stop is
25    a detention as contemplated by the Fourth Amendment
```

```
1   to the United States Constitution?
2               A.   I stopped him for no front license
3   plate, sir.  That's why he was detained in a
4   traffic stop.
5               Q.   Do you recognize that that
6   traffic -- any traffic stop, any traffic stop, is a
7   detention?
8               A.   Yes, sir.
9               Q.   As contemplated by the Fourth
10  Amendment to the United States Constitution?
11              A.   Yes, sir.
12              Q.   Do you recognize that in order to
13  extend a traffic stop beyond the purpose of the
14  stop, in this case a tag violation, you have to
15  have a reasonable and articulable suspicion to
16  believe that criminal activity is afoot?
17              A.   Yes, sir.  Yes, sir.
18              Q.   All right.  In this case, in order to
19  bring a drug dog in, in order to delay a stop,
20  right, you have to have a reasonable and
21  articulable suspicion in order to bring the drug
22  dog in; right?
23              A.   Yes, sir.
24              Q.   Do you understand that?
25              A.   Yes, sir.
```

**EXHIBIT 1**

```
 1              Q.   What was your reasonable and
 2   articulable suspicion to bring the drug dog in in
 3   this case?
 4              A.   I don't -- I don't feel I delayed the
 5   stop.
 6              Q.   Okay.  You called -- you talked to
 7   Grooms to ask for consent before you started
 8   writing the summons?
 9              A.   Yes, sir.
10              Q.   You called Reed in to ask him to come
11   in and had a conversation with him; right?
12              A.   Yes, sir.
13              Q.   Before you started writing the
14   summons?
15              A.   Yes, sir.
16              Q.   Then you waited another minute before
17   you got the clipboard out and started writing the
18   summons?
19              A.   Yes, sir.
20              Q.   That's a delay.
21              A.   The car is messy --
22              Q.   Right.  The stop with -- the writing
23   of the summons was delayed, there was a delay
24   there.
25                   What was the -- why was it delayed
```

1  that long?

2          A.   In my opinions, I was not delaying

3  the traffic stop.  That's, in my belief I was not

4  delaying.  I got on the radio, said, "Hey, Reed,

5  can you come here?"  And as I asked Tereika, I

6  believe it was in passing as I was walking back to

7  my car.  So I'm not -- I don't -- in my belief, I

8  did not delay the traffic stop.  So that's my

9  answer to that.

10          Q.   If you're going to bring the drug dog

11  in anyway, why bother with asking for consent?

12  When he denied -- why would you bother asking

13  Grooms for consent, which is denied, if you intend

14  to bring the drug dog in if he refuses?

15              MR. FITZGERALD:  Object to form.  You

16  may answer.

17  BY MR. VALOIS:

18          Q.   Why not just bring the drug dog in?

19          A.   It was my practice, at least, I

20  always ask for consent to search.  We always ask

21  for consent to search.  I can't say we.  I always

22  tried to get consent to search the vehicle before a

23  K9 was deployed on that vehicle.

24          Q.   Why?

25          A.   Just -- I can't -- I don't know if I

**EXHIBIT 1**

1  know an exact why.  Just so they can -- if they

2  allowed me to search it, that's -- then they did, I

3  didn't need a K9 at that point.  If they say no,

4  then I would need a K9 at that point to search that

5  vehicle.

6          Q.   But you had already asked for the

7  drug dog before you found out that he denied

8  consent?

9          A.   From my personal beliefs, I believe I

10 had already learned he did not give consent, and

11 then I asked Reed to come, on the radio.

12         Q.   Are you sure about that?  Are you

13 willing to testify under oath right now that you're

14 sure?

15         A.   As I remember, that -- that's -- as I

16 remember, that's what I remember from it.

17         Q.   All right.

18         A.   And I believe it was very quickly

19 both things happening.  So as I remember, that's

20 how it happened.

21         Q.   All right.  So in any event, so you

22 have this Pannell kid up against the car, your

23 patrol car?

24         A.   Yes, sir.

25         Q.   Right.  Within a few seconds, he's

```
 1  facedown in the ground?
 2            A.   Yes, sir.
 3            Q.   All right.  Reed has got his knee on
 4  his back.
 5                 You see that in the video; right?
 6            A.   Yes, sir.
 7            Q.   All right.  You're dealing with his
 8  arms up front, and then Mama comes running up
 9  between two cars towards you?
10            A.   Yes, sir.
11            Q.   She's got Grooms at her side; right?
12            A.   At that time, I could not see
13  what -- what was happening.
14            Q.   But Mama never hit you?
15            A.   I do remember feeling -- I got -- I
16  had to hand-check her back off of me.  So at that
17  point, it was from behind me.  I remember, from
18  what I recall, I was pushed, and I had to do a
19  hand-check to get her off of me.
20            Q.   But you testified at trial that you
21  couldn't say it was her?
22            A.   It was whoever I hand-checked.
23  That's what --
24            Q.   It could have been -- Grooms was
25  there too; right?
```

```
 1              A.   Yes, sir, she was.  Or I don't know
 2  where she was in -- at the time I don't know where
 3  she was in relation.  It was from behind, so it was
 4  hard for me to see anything at that point.  I
 5  couldn't see nothing that was going on behind me.
 6              Q.   But you testified at trial,
 7  when -- you recall testifying at our jury trial?
 8              A.   Yes, sir.
 9              Q.   Right.  Because Shanta was actually
10  charged with assaulting both you and Seth Reed?
11              A.   Yes, sir.
12              Q.   All right.  And I asked you, "Can you
13  say that this woman ever touched you?"  And you
14  said you can't?
15              A.   Because it was from behind me, yes,
16  sir.
17              Q.   Right.  And because Grooms was right
18  there too.
19              But in any event, it wasn't like a
20  punch or anything; right?
21              A.   No, sir, I wasn't punched.
22              Q.   You can't tell what part of the body
23  contacted what; right?
24              A.   No, sir.  Because my back was turned,
25  yes, sir.
```

**EXHIBIT 1**

Page 60

```
 1          Q.   You can't even tell if it was
 2  intentional or accidental?
 3          A.   I mean, speculation, if you're on the
 4  ground, and I run up to you and hit you, that's
 5  probably intentional.
 6          Q.   Was it a hit with a hand?
 7          A.   No, sir.  If I brush into you, that
 8  would be intentional.  You with your back turned to
 9  me and I brush up against you, my assumption,
10  that's intentional.
11          Q.   Well, if it was Grooms that did it,
12  are you saying Grooms intentionally did it?
13              MR. FITZGERALD:  Object to form.  You
14  may answer.
15  BY MR. VALOIS:
16          Q.   It could have been Grooms that did
17  it; you think Grooms would intentionally kick you
18  or assault you while you're trying to do your job?
19              MR. FITZGERALD:  Object to form.  You
20  may answer.
21              THE WITNESS:  No, sir.
22  BY MR. VALOIS:
23          Q.   I mean, it could have just been
24  incidental contact or an accident; right?  I mean,
25  you don't know because you can't see it?
```

**EXHIBIT 1**

Page 61

```
 1             A.   Yes, sir.  My back was turned.
 2             Q.   Right.  All right.  So at this point,
 3   Grooms is successful.  She gets Shanta, drags
 4   Shanta back to the rocks again; right?  And
 5   Aquasha's over there; right?  Right?
 6             A.   Yeah.  I'm just trying to picture
 7   where they were, yes, sir.
 8             Q.   Over by the door?
 9             A.   Yes, sir.
10             Q.   Right.  All right.  So now Terron is
11   getting up, and Robbin Miller shows up, Rob Miller.
12   His first name is Robbin.  They call him Rob.
13             You know Rob Miller; right?
14             A.   Yes, sir.
15             Q.   He shows up, he's not wearing a
16   uniform; right?
17             A.   So when he first showed -- he was
18   not.  I never knew he was there until I saw him
19   getting thrown in -- or falling into the grass with
20   somebody.
21             Q.   All right.  Well, let's -- let's back
22   up.
23             This situation got more and more
24   involved with the public?
25             MR. FITZGERALD:  Objection.
```

Page 62

```
 1   BY MR. VALOIS:
 2            Q.   More and more people were pouring out
 3   all the time.
 4                 Is that a fair characterization?
 5                 MR. FITZGERALD:  Object to form.  You
 6   can answer.
 7                 THE WITNESS:  Yeah, there was a lot
 8   of people there.
 9   BY MR. VALOIS:
10            Q.   And more coming?
11            A.   Yeah.
12            Q.   Right.  And a lot of the people there
13   were yelling and screaming and angry; right?
14            A.    It was chaos, yes, sir.
15            Q.   Right.  And so a call went out over
16   the radio for assistance; right?
17            A.   Yeah.  And I just can't remember when
18   that call came out.  I can't remember if it was
19   when we -- the first struggle or afterwards.  I
20   can't remember when that call came out.
21            Q.   Well, within short order, a whole
22   bunch of police officers began responding?
23            A.   Yes, sir.
24            Q.   Right?
25            A.   There was a lot of people there at
```

```
 1  one point.
 2              Q.   A lot of people got there; right?
 3  And this incident went from being a simple tag stop
 4  to being a full on near riot.  It could have
 5  evolved into a riot, had the potential, wouldn't
 6  you agree?
 7              A.   Yeah, it was just a lot of people
 8  there.
 9              MR. FITZGERALD:  Object to form.  You
10  can answer, though.
11              THE WITNESS:  Yeah, I mean, I
12  don't -- I can't tell you when it's going to turn
13  into a riot or not.
14  BY MR. VALOIS:
15              Q.   No, but I mean ---
16              A.   There was a lot of people there.
17              Q.   It was enough of a concern to bring
18  how many officers there?  Would it be fair to say a
19  dozen, at least?
20              A.   Eight to twelve.
21              Q.   Yeah, a bunch; right?
22              A.   Yes, sir.
23              Q.   And so you never saw what happened.
24  Aquasha Sandidge was charged with assaulting Rob
25  Miller.
```

```
 1                    That was her only charge; is that

 2   correct?

 3           A.    I believe so.

 4                    MR. FITZGERALD:  Object to form.  You

 5   can answer.

 6                    THE WITNESS:  Yeah, I believe so.

 7   BY MR. VALOIS:

 8           Q.    But you didn't take out that charge?

 9           A.    I -- no, I don't believe I did that.

10           Q.    And you didn't provide any evidence

11   that -- you didn't -- you did not testify that you

12   saw what happened with Rob Miller?

13           A.    No, sir.  I just saw everybody going

14   to the bushes.

15           Q.    Right.  And you went to the

16   magistrate's office; right?  And you testified

17   that -- what had happened with you; right?

18           A.    Yes, sir.

19           Q.    And you said that both of -- both of

20   them had contacted -- you testified that you were

21   assaulted by Aquasha too, didn't you?

22           A.    I don't recall.  I don't think I ever

23   got a charge on Aquasha.  I might be getting them

24   confused.  Whichever, the one I hand-checked was

25   the one I got a charge on.  And I get their, I get
```

 1  them -- I think that was Shanta, the mom.
 2          Q.   Right.
 3          A.   I don't recall, I don't remember
 4  getting a charge on Aquasha.
 5          Q.   Well, you say the one that you
 6  hand-checked being mom.  But I need to be clear
 7  here in your testimony.
 8               You understand it's important; right?
 9          A.   Yes, sir.
10          Q.   You understand people's lives are on
11  the line based upon the truthfulness of what
12  happens in proceedings like this; right?
13          A.   Yes, sir.
14          Q.   All right.  And you said that the one
15  you put a hand-check on, but you can't say whether
16  that was Grooms or whether it was Shanta?
17          A.   No, I did not hand-check Officer
18  Grooms.  I hand-checked -- I mean, I haven't seen
19  these people in four years, five years.  So if I
20  could see a -- I hand-checked the mom.  The one I
21  got a charge on was who I hand-checked backwards,
22  and that's on my body camera, which is, I believe,
23  at the end of the day is Shanta Brown.
24          Q.   Okay.  So you pushed on Shanta
25  Brown?

```
 1            A.   Correct.  I pushed Shanta Brown away
 2    from me.
 3            Q.   All right.  And then she -- but you
 4    didn't take out any charge on Aquasha?
 5            A.   I don't -- I don't think I did.
 6            Q.   All right.  Now, after all this
 7    happened, everybody gets arrested?
 8            A.   Yes, sir.
 9            Q.   Right.  Shanta gets arrested, Aquasha
10    gets arrested, Terron.  Everybody gets arrested.
11    They get put in cars.  Everybody's off to the
12    magistrate to take out the warrants and stuff.
13    Right.  A supervisor shows up.
14                 Is that standard practice?
15            A.   Yeah, yeah.  I mean, for a situation
16    like that, yeah, a supervisor is going to be there.
17            Q.   Especially in this case, he's -- he's
18    upset because half of his department has been
19    called out for this thing probably; right?
20                 MR. FITZGERALD:  Object to form.  You
21    may answer.
22                 THE WITNESS:  He was showing up to
23    see what we needed.  I don't think he was upset
24    with us.  He was just seeing what we needed, what
25    was going on, what was --
```

```
 1  BY MR. VALOIS:
 2           Q.   Let me say -- I won't say upset,
 3  concerned, I would say?
 4           A.   He was just wanting to know -- I
 5  mean, they're going to want to show up and want to
 6  know what's going on.
 7           Q.   Right.
 8           A.   Yeah.  I wouldn't say --
 9           Q.   I mean, that's a substantial portion
10  of the city's police force that's involved in this
11  one incident?
12           A.   Yes, sir.
13           Q.   Right.  And so he shows up, and did
14  you talk to him?
15           A.   I do believe so, yes, sir.
16           Q.   And what did you tell him?
17           A.   At that point, I can't remember word
18  for word at that point.  I know at one point he
19  asked me what had happened.  And then I believe I
20  kind of go through a brief spiel about what led up
21  to everything happening.  And then I can't testify
22  word for word what I spoke to him about.
23           Q.   All right.  And but you were involved
24  in the tussle with Aquasha; correct?
25           A.   I wouldn't say -- yes, I helped
```

```
 1  handcuff her, yes.
 2            Q.   Yeah.  And she -- Rob Miller had
 3  started it; right?  He's the one that first put
 4  hands on her; right?
 5            A.   In that, all I saw was it was -- like
 6  I said, we were all up against that door, and next
 7  thing you know, I saw Aquasha and Rob Miller
 8  go -- I see Rob's feet go up in the air, and I see
 9  them both hit the bushes.  That's what I saw, so at
10  that point, I left my spot to assist just
11  handcuffing her.  That's what I did, and then I
12  believe I go back to Shanta.
13            Q.   All right.  And then Rob's wearing
14  like a flannel shirt or something?
15            A.   Yeah.
16            Q.   And a vest?
17            A.   Yeah, I can't remember what color it
18  was.
19            Q.   Yeah.  And so Aquasha is recording
20  this thing on her phone.
21                 Do you remember that?
22            A.   So I don't know if it was a recording
23  or a phone call.  To my recollection, she was on
24  the phone.  That's what I remember.  She was on a
25  phone call.
```

**EXHIBIT 1**

Page 69

1          Q.   Well, you actually reached out and

2     turned her phone off at some point?

3          A.   Yeah.  After she was handcuffed,

4     I -- yeah, I think I -- from what I remember, I hit

5     the hang-up button on the phone call, on the phone.

6          Q.   Why would you do that?

7          A.   Just -- I mean, at that time, I don't

8     know who -- I mean, she could have been calling

9     telling people to -- I mean, that's why we control

10    phones when we're -- when people are arrested,

11    because they can call, have people show up, do

12    anything like that.

13              So at that point, I just seen the

14    phone there.  Honestly, I didn't want it to get

15    broken either.  I hang it up.  I think I treat it

16    with respect after that, and then we go on about

17    our way, about our --

18         Q.   Did you pick up the phone?

19         A.   I don't recall if I picked it -- I

20    think I did pick it up.  I think I did.  I can't

21    recall 100 percent if I picked it up, but I do

22    think I picked it up.

23         Q.   Well, eventually or at that time?

24         A.   I want to say it was, from what I

25    remember, it was right around the same time I hung

```
 1   it up as well.
 2            Q.   All right.  And then so the
 3   reason -- the reason that you approached Mom and
 4   Aquasha to detain them, to put them in handcuffs,
 5   was why?
 6            A.   At that point, it was a very chaotic
 7   scene, and I was instructed to do so by another
 8   officer.
 9            Q.   Is he a superior officer?
10            A.   He was a more -- I mean, superior, he
11   wasn't like a boss, but he was a more experienced
12   officer than me, yes, sir.
13            Q.   Which officer was that?
14            A.    Officer Reed.
15            Q.   And that was when Terron was facedown
16   on the ground after being taken to the ground from
17   your vehicle; right?
18            A.   Correct.  After the -- after the
19   hand-check incident, and --
20            Q.   And he said put them in handcuffs?
21            A.   Yes.  I recall him saying, "Put her
22   in handcuffs."
23            Q.   Was that to arrest her?
24            A.   At that point I don't know what he
25   was -- he was instructing me to put them in
```

**EXHIBIT 1**

```
 1  handcuffs.  It was a very chaotic situation.  I
 2  also felt that it was justifiable she go in
 3  handcuffs as well --
 4          Q.   Okay.
 5          A.   -- until we figured out what was
 6  going on.
 7          Q.   But Aquasha didn't come out to the
 8  front.
 9               So you're saying that Mom came out
10  and you said that you hand-checked Mom; right?
11          A.   Correct.  From behind, when she came
12  from behind.
13          Q.   Right.  She was there with Grooms,
14  right next to -- fairly close to where you had
15  Terron pinned down; right?
16          A.   Yes, sir.
17          Q.   But Aquasha never did that, Aquasha
18  stayed back behind; right?
19          A.   So --
20               MR. FITZGERALD:  Object to form.  You
21  can answer.
22               THE WITNESS:  So what I recall from
23  when she, Ms. Shanta Brown, went in the handcuffs,
24  she was more towards the sidewalk of the building.
25  They were not quite -- when before she went in the
```

```
 1   hand -- she was still not in handcuffs at that

 2   point.

 3                   Officer Grooms was attempting, trying

 4   to get her back towards the sidewalk or the door.

 5   And my -- from my recollection, they were really

 6   close to that sidewalk.  If not, they might have

 7   been on the sidewalk when I attempted to arrest

 8   her, or put her in handcuffs.

 9   BY MR. VALOIS:

10           Q.   But why?  I mean, I'm trying to get

11   to the why is she going in handcuffs?

12           A.   Well --

13           Q.   You're doing it because somebody told

14   you to, but that obviously brings up the question

15   if somebody told you throw her off a bridge would

16   you throw her off a bridge?

17           A.   Well, no.  She had also came -- I had

18   to hand-check her on the ground, because she had

19   come up and pushed us from behind, or me from

20   behind.  I got hit from somewhere.  I hand-checked

21   her.

22           Q.   I'm not talking about Shanta?

23           A.   Okay.  Aquasha, you're talking about

24   Aquasha.

25           Q.   Aquasha?
```

**EXHIBIT 1**

Page 73

```
 1              A.   So Aquasha --
 2              Q.   We've talked about Shanta, and you
 3  said that you hand-checked, you've already
 4  hand-checked her?
 5              A.   Yeah.  So then we all kind of meet
 6  back somehow towards the door of the building,
 7  where Aquasha's there.  That's when I first realize
 8  Detective Miller's there, and then I see Detective
 9  Miller go feet overhead, pretty much, into bushes
10  with Aquasha, and then he's struggling with
11  Aquasha, trying to handcuff her.  So I leave
12  Shanta, go handcuff Aquasha --
13              Q.   Right.
14              A.   -- then go back to Shanta.
15              Q.   I'm just trying to figure out why is
16  Aquasha being handcuffed?  All she's doing is
17  videotaping the event.
18              A.   Well, from -- I mean, they
19  just -- they end up in the bushes, and Rob Miller's
20  trying to put her in handcuffs.  That's --
21              Q.   You're helping him?
22              A.   I do help him, yes, sir.  Because I
23  see him -- I literally -- I see him, I don't know
24  how he flipped into the bushes.  I don't know what
25  happened with that, but I see his feet go up above
```

```
 1  in the air, see him land in the bushes with her,

 2  and then he's telling her to put her hands -- I

 3  don't know verbatim, but he's trying to put her in

 4  handcuffs at that point.

 5          Q.   But what I'm saying is, okay, you're

 6  out there on the parking lot.  Seth Reed says put

 7  them in handcuffs, right, meaning Shanta and

 8  Aquasha.

 9               Now, Shanta, you've testified you

10  hand-checked?

11          A.   Correct.

12          Q.   Okay.  Aquasha is sitting 25 feet

13  away, filming it on the phone?

14          A.   Well --

15               MR. FITZGERALD:  Object to form.  You

16  can answer.

17               THE WITNESS:  When I put her in

18  handcuffs, we were all in a big ball right by the

19  doors --

20  BY MR. VALOIS:

21          Q.   I know, but --

22          A.   -- together.

23          Q.   Follow along.  Let me finish.

24          A.   Yes, sir.  I'm trying.  I might be

25  getting confused with it.
```

```
 1            Q.   Let me set this up.  Tell me, tell me
 2  where I'm wrong in my narrative.  Tell me what
 3  mistake I'm making when I'm finished.  Okay.
 4  You're out in the parking lot, you and Seth are out
 5  in the parking lot about 20 feet away, 25 feet away
 6  from the door to the entrance.
 7                 Is that fair?
 8            A.   Yes, yes, sir.
 9            Q.   Okay.  You got Terron Pannell
10  facedown in the pavement.  Reed has a position with
11  his knee on his rear back, butt area.  Right.
12  You're getting, you're securing him.  Right.
13  Shanta, Mama, has come out with Grooms, had
14  whatever contact happened there, we don't know.
15                 But you do know you hand-checked her,
16  Shanta?
17            A.   Yes, yes, sir.
18            Q.   All right.  So at that point, Reed
19  says put handcuffs on them, meaning Aquasha and
20  Shanta?
21            A.   Okay.
22                 MR. FITZGERALD:  Object to form.  You
23  can answer.
24  BY MR. VALOIS:
25            Q.   Is that your understanding?  Is that
```

```
1   so far what -- is that accurate?
2             A.   So I'll say from my personal, from my
3   view on that scene, I was attempting to handcuff
4   Shanta.  I was not dealing with Aquasha at that
5   point.
6             Q.   Okay.
7             A.   At that point, I was attempting to
8   handcuff Shanta --
9             Q.   Okay.
10            A.   -- when we all got back to the door.
11            Q.   Okay.
12            A.   I had no -- I was not going to put
13  handcuffs on Aquasha.  I didn't know -- like I
14  said, she wasn't really --
15            Q.   Okay.
16            A.   I do agree with you on that.  She was
17  over there by the door.  So I was attempting to
18  handcuff Shanta.  A struggle ensued there as well.
19  Then out of my peripherals, I see a detective and a
20  female, Aquasha --
21            Q.   Right.
22            A.   -- all of a sudden wrestling in the
23  bushes pretty much --
24            Q.   Wrestling in the bushes; right?
25            A.   -- so then I go over, assist Rob
```

```
 1  Miller, Detective Miller --
 2            Q.   To handcuff?
 3            A.   -- with handcuffing.  Then I go back
 4  to Shanta.
 5            Q.   Okay.  But you were not -- so is it
 6  fair to characterize your testimony this way:  You
 7  did intend to handcuff Shanta, but not intend to
 8  handcuff Aquasha, and the only reason you
 9  participated in the handcuffing of Aquasha was
10  because Rob Miller was engaged in an altercation
11  with Aquasha and that you were there to assist him,
12  and that's what you did?
13            A.   I would, I would agree with that
14  statement, yes, sir.
15            Q.   Okay.  All right.  All right.  And so
16  had you had any communication with Robbin Miller
17  prior to this?
18            A.   Prior to the incident?
19            Q.   Prior to where -- had you had any
20  communication with Rob Miller regarding this
21  incident prior to your assisting him in handcuffing
22  Aquasha?
23            A.   No, sir.
24            Q.   No.  Okay.  And so everybody gets
25  handcuffed.  Right.  And you don't know why Rob
```

```
 1  Miller -- he'd have to testify as to why he's
 2  trying to handcuff --
 3            A.    Aquasha.
 4            Q.    -- Aquasha?
 5            A.    Yes, sir.  I just seen them
 6  struggling off to my -- out of my peripherals while
 7  I was struggling with Shanta.
 8            Q.    Okay.  All right.  And so then -- all
 9  right.
10            Do you recall telling the supervisor
11  at the scene that nobody assaulted you?
12            A.    I don't recall personally.  I can't
13  remember saying that.  But I do know there is, I
14  believe there's body camera.  I do say that on body
15  camera, so I would have to say, yes, I said that,
16  if that's on body camera.
17            Q.    Okay.  Why would you tell a
18  supervisor that you weren't assaulted and then go
19  to the magistrate's office and take out an assault
20  warrant?
21            A.    Because it was -- it was a chaotic
22  scene.  So at that point, I was still trying to
23  figure out what had happened with Shanta, with
24  Aquasha.  We were trying to figure out what had
25  happened, then after me and Officer Reed spoke, we
```

1  both agreed that I was, in fact, I was pushed or

2  hit or struck.  I can't tell.  It's from

3  the -- it's from the back I was pushed, hit or

4  struck.

5           And then that, which entailed me

6  having to hand-check Aquasha, or Shanta, away from

7  me.  And that's when, at that point, then I

8  decided, we decided that that was an assault and

9  that's what I would arrest for.

10          Q.  And so it was after you talked with

11  Reed, so it was after you talked with Reed?

12          A.  After we figured out what -- I would

13  say, yeah, we went through what had happened.

14          Q.  When you say "went through," what was

15  that process, went through?

16          A.  I mean, just talked like what he saw,

17  what I saw, what transpired.  Because like I said,

18  it was so chaotic, so fast.  I mean, after then

19  it's like a little small debrief.  We kind of just

20  were figuring out what had happened.

21          Q.  But Reed never told you that he saw

22  Shanta assault you though; right?

23          A.  Yeah, but Shanta was the one I shoved

24  off of me.

25          Q.  Right.  You put hands on her, but

```
 1  you've testified that you can't say she put hands
 2  on you; right?  And did Reed, Reed never told you
 3  that he did -- that she did it, did he?
 4            A.   I don't recall if he ever told me she
 5  did it.
 6            Q.   So how do we get to the point where
 7  you're telling the magistrate she did?
 8            A.   So my back is turned.  All of a
 9  sudden I feel a hit.  I turn, and there is a female
10  who is not a coworker, not a anything else related,
11  not my wife or anybody relation to me, who ends up
12  being Shanta Brown, directly within where I have to
13  physically hand-check her back, so I --
14            Q.   But there are two ladies there.
15  They're standing right next to you.
16                 Grooms is there right -- in fact,
17  Grooms is arguably closer to you, if you've seen
18  the video; right?
19                 MR. FITZGERALD:  Object to form.  You
20  may answer.
21  BY MR. VALOIS:
22            Q.   Well, we can play the video.
23            A.   Where I get -- yeah, where I get
24  pushed from and where I turn to defend myself or
25  hit or struck, where I turn to defend myself,
```

**EXHIBIT 1**

Page 81

```
 1  Shanta Brown was directly there, and that's where I
 2  pushed back.  It was not Officer Grooms who was in
 3  my -- I'm going to say in my bubble right there.
 4  Then I give a hand-check back, and that's what
 5  entails from there.
 6           Q.   All right.  But the question I have
 7  is, all right, so you -- you knew all that.  You
 8  knew the hand-check had occurred when you talked to
 9  your supervisor, and yet you're telling your
10  supervisor you're not assaulted; right?  And then
11  you talk to Reed and you have a conversation.  Reed
12  never tells you that he saw -- did Reed ever tell
13  you that he witnessed an assault?
14           A.   I don't recall what he said to me
15  verbatim.
16           Q.   All right.
17           A.   I don't recall.  I know we just -- we
18  just talked about what had happened, and that's
19  when I was like, well, I was pushed or hit or
20  struck.  And that's when I charged for assault.
21           MR. VALOIS:  I'll tell you what, why
22  don't we take a little breather, and can you figure
23  out how to get that thing going?  We'll play some
24  videos.
25           MS. VALOIS:  In theory.
```

**EXHIBIT 1**

Page 82

```
 1                    MR. VALOIS:  Yeah.  Why don't we call
 2    like a 10-minute break.  Will that work?
 3                    MR. FITZGERALD:  Is that all right
 4    with you?
 5                    THE WITNESS:  Yeah, I'm good.
 6                    MR. VALOIS:  All right.  Off the
 7    record.
 8                    (Recess.)
 9                    MR. VALOIS:  And we are back on the
10    record.
11    BY MR. VALOIS:
12            Q.   So, Deputy, a couple more questions.
13    I'm looking at this list of things.
14                    Do you recall Reed asking you, after
15    the incident occurred, if your body cam was still
16    rolling?
17            A.   I don't.  Off the top of my head I
18    don't, sir, no, sir.
19            Q.   Is that routine for officers to ask
20    that before they talk?
21            A.   Yeah.  Just -- yeah.  We, a lot of
22    times if we're speaking together, mute our body
23    cameras.
24            Q.   Why would you do that?
25            A.   Because conversations can go from us
```

 1  talking about what happened to then what your kids
 2  did yesterday to -- I mean, they can just go from
 3  anywhere really quick.  So a lot of times we just
 4  mute our cameras while speaking to each other.  But
 5  I do not recall if he asked me personally if it was
 6  muted or rolling.
 7          Q.   Now, the -- did you tell the
 8  supervisor that you didn't mean to take Terron
 9  down?
10          A.   I don't recall saying that.
11               (Video playing.)
12               THE WITNESS:  So that was onto Seth.
13  So when I took him down, I believe, if I want to
14  recall right, we went to the ground, and I crashed
15  into Seth, into Seth's knees at that point.  And so
16  at that point, I'm telling Seth, Officer Reed, I
17  did not mean to take him down in the ground into
18  you like that.
19  BY MR. VALOIS:
20          Q.   Okay.  And now I got the long one.
21  Tell you what I'm going to do.  I'm going
22  to -- this body cam, a lot of it's you talking to
23  Terron stuff, but let's get to the part where --
24               (Video playing.)
25

**EXHIBIT 1**

Page 84

```
 1  BY MR. VALOIS:
 2          Q.   Yeah.  I like that one.  Let's get to
 3  the part where Shanta comes running out to the
 4  parking lot.
 5              (Video playing.)
 6  BY MR. VALOIS:
 7          Q.   All right.  Man, that's Terron
 8  screaming his head off; right?
 9          A.   Yes, sir.
10          Q.   Terron's got a set of pipes on him?
11          A.   Yeah, he does.
12          Q.   Although if I were 150 pounds, and I
13  had 450 pounds of cop on me, I'd probably be
14  screaming too.
15          A.   Yeah.
16              (Video playing.)
17              THE WITNESS:  I think I was talking
18  to Shanta right there, if I'm correct.
19  BY MR. VALOIS:
20          Q.   Yeah.  This is just a really long
21  video, and a lot of it is just --
22              MR. FITZGERALD:  And while he's going
23  through the video, I just want to note for the
24  record that the defendant is not viewing the video.
25  He's only listening to it.
```

**EXHIBIT 1**

Page 85

```
 1                    MR. VALOIS:  Right.  I haven't
 2   presented the video for -- I'm going to, eventually
 3   my goal is to let the defendant control the video.
 4   I'm just trying to get it to the window of time
 5   that he can operate it so we don't waste a bunch of
 6   time.  I'm not -- none of this is evidence so far.
 7   This is just me working the video for --
 8                    (Video playing.)
 9   BY MR. VALOIS:
10            Q.   You know how to do this, you know how
11   to work VLC; right?
12            A.   The --
13            Q.   VLC?
14            A.   Yeah, like the movie thing.
15            Q.   Right, yeah.  See if you can get it
16   to the part where you're getting -- where
17   you -- out there in the parking lot where you feel
18   somebody hit you.
19                    MS. VALOIS:  If it's easier, I've got
20   a regular mouse over here.  I can't stand the touch
21   pad.
22                    THE WITNESS:  All right.  So where is
23   this at?  Whose body camera is this?
24                    MR. VALOIS:  I think it's yours.
25                    THE WITNESS:  This one mine?
```

```
1                    MR. FITZGERALD:  You want to use a

2   mouse?

3                    THE WITNESS:  Yeah, that would

4   probably be a little bit easier.

5                    MS. VALOIS:  It should just work.

6                    THE WITNESS:  All right.  Which part

7   do you want, sir?

8                    MR. VALOIS:  The part where he's on

9   the ground and Shanta comes running out with

10  Grooms.

11                    (Video playing.)

12                    THE WITNESS:  This is like a little

13  snippet.  I don't know why I can't like go forward

14  in this one.  See, because this is after the fact.

15  Yeah, this is definitely, because there's -- yeah,

16  there's a lot of people there.

17                    How do I -- do you know how to

18  go -- like is that just a -- I don't know how to

19  like bring this back.  You see what I'm saying?

20                    MR. FITZGERALD:  Is it down here?

21                    MR. VALOIS:  Oh, that's going to

22  be -- this is a screenshot.  This is a video of a

23  screenshot.

24                    THE WITNESS:  Okay.  Then this

25  is -- this is going to be after, I believe, Shanta
```

**EXHIBIT 1**

Page 87

```
 1  and Aquasha had gone in handcuffs.
 2              MR. VALOIS:  No.  There's -- the
 3  whole, the whole thing starts when you -- when you
 4  start at the beginning, you'll see it's where you
 5  pull in.
 6              THE WITNESS:  I don't know how to
 7  control.  You see, I can't like go back in the
 8  video now.
 9              MR. VALOIS:  Can you put it to the
10  beginning of the video?
11              MS. VALOIS:  I can try.
12              MR. FITZGERALD:  Something's going
13  on.  It's frozen.
14              THE WITNESS:  Yeah.  So like it's
15  kind of like --
16              MR. FITZGERALD:  It's unable to go
17  back.
18              THE WITNESS:  It's like on the -- so
19  at the bottom part, I can go forward and back, but
20  just --
21              MS. VALOIS:  Yeah.  So this part is
22  the screenshot.
23              THE WITNESS:  Okay.
24              MS. VALOIS:  This is your actual,
25  this very bottom part is the actual control.
```

**EXHIBIT 1**

```
 1                    THE WITNESS:  Okay.  But I can't go
 2  back far enough for that because that's, that's
 3  ahead of.
 4                    MS. VALOIS:  Where did it go?  Did
 5  you do F11 on this or something?
 6                    MR. VALOIS:  No.
 7                    MS. VALOIS:  Oh, that's back at the
 8  beginning.  All right.
 9                    THE WITNESS:  I want to say from it's
10  like 11 minutes or something.
11                    MS. VALOIS:  That's weird.  The
12  pointer is moving like a ghost.  All right.  All
13  right.  Hold on a second here.
14                    (Video playing.)
15                    THE WITNESS:  So then how can I fast
16  forward?
17                    MS. VALOIS:  I'm going to turn it
18  down so we don't go deaf.  Down here.
19                    THE WITNESS:  Okay.
20                    MS. VALOIS:  And this one.  See?
21                    THE WITNESS:  Okay.  All right.
22                    (Video playing.)
23                    THE WITNESS:  All right.  So which
24  part did you want, where -- before, just before she
25  came back?
```

```
 1              MR. VALOIS:  I want to get to the
 2   part where you claim that you hand-checked her.
 3   Right around that, right around that area.  I want
 4   to see this.  I want to see the interaction there
 5   with the hand-check.  Well, you know what?
 6                   (Video playing.)
 7              MR. VALOIS:  You know what?
 8              THE WITNESS:  So it's going to be
 9   right here.
10              MR. VALOIS:  It's not going to be
11   in --
12              THE WITNESS:  It's hard.  You can't
13   see much from mine, I don't think.
14              MR. VALOIS:  Grooms is in the back.
15   Grooms lost her body cam.  Her body cam fell off.
16   There's another body cam on there that might have
17   it.
18              MS. VALOIS:  I've seen the clip.  I
19   know what you're looking for.  That was before.
20              THE WITNESS:  I'm at my part, if
21   that's what you want to --
22              MR. VALOIS:  No.  It occurs to me I'm
23   beating a dead horse with that video.  Your video
24   is not going to have a real good depiction of what
25   happened.  There is another one out there, but I
```

 1   don't know that it justifies wasting another half

 2   hour of everybody's time to go look for it.

 3                  THE WITNESS:  Okay.

 4                  MR. VALOIS:  So anyhow --

 5                  THE WITNESS:  Do you want me to -- do

 6   you want this back, sir?

 7                  MR. VALOIS:  Give it to my lovely

 8   bride over there.  She's lucky she's still got her

 9   looks because her charm needs a little work.  I'm

10   sorry.  Yeah, but -- I'm trying to think if there's

11   any other thing I need to worry about here.

12   BY MR. VALOIS:

13          Q.   Is there anything you would have done

14   different looking back in hindsight?

15          A.   I don't think so, sir.

16          Q.   Everything you did you believe

17   comported with your training?

18          A.   Yes, sir.

19          Q.   And you weren't given any counseling,

20   or any talking to, about this incident at all?

21          A.   No, sir.

22          Q.   And all your actions, you believe,

23   comported with LPD official policies and

24   directives?

25          A.   Yes, sir.

**EXHIBIT 1**

Page 91

```
 1              MR. VALOIS:  I tell you what, I don't
 2  have any other questions.  You can -- you have any
 3  questions for him?
 4                 E X A M I N A T I O N
 5  BY MR. FITZGERALD:
 6         Q.   Did you -- did you lie to make up
 7  charges on Shanta Brown?
 8         A.   No, sir.
 9         Q.   Did you -- did you slam Shanta Brown
10  to the ground?
11         A.   No, sir.
12         Q.   Do you recall how Shanta Brown went
13  from standing to down on the ground, the
14  circumstances that surrounded that?
15         A.   Next to the door, yeah.  I told her
16  to put her hands behind her back, and then she, I
17  believe, she told me she wasn't going to, and then
18  we end up on the ground.  I don't remember if it
19  was a push, or if it was just our momentum carrying
20  us towards the door.  We ended up falling down to
21  the ground.
22         Q.   So she resisted?  Did she resist
23  being detained?
24         A.   I had to forcefully put her hands
25  behind her back, yes sir.
```

```
 1                 MR. FITZGERALD:  I don't have any
 2     further questions.
 3                     E X A M I N A T I O N
 4     BY MR. VALOIS:
 5             Q.   When you say "detained," were you
 6     arresting her?
 7             A.   Like at that -- at that time, she was
 8     being detained at that point.  At that point, I
 9     don't think -- there was so much going on.  There
10     was -- she was being detained.  She was a major
11     part of the issues we were having on scene.
12             Q.   What was the basis for detention?
13             A.   The screaming, the coming up and
14     pushing us, the just -- she completely interfering
15     with what we were trying to do.
16             Q.   The coming up and pushing you?
17             A.   From behind.  Being in my bubble,
18     from behind me.  That's what I'll say.
19             Q.   All right.  But you weren't arresting
20     her?
21             A.   She was being detained at that point.
22     Yeah, she wasn't being --
23             Q.   So you didn't have any -- at that
24     instant, you did not have probable cause to arrest?
25             A.   She was being detained at that point.
```

```
 1  I don't --

 2              Q.   That's not the question?

 3              A.   Yeah, I mean, yeah, I could have

 4  arrested her for obstruction.  I could have said,

 5  hey, you're under arrest for obstruction.  Hey,

 6  you're under -- I mean, that's the one I would have

 7  gone with at that time until we figured out what

 8  was -- everything that was going on.  But, yes, I

 9  think I had enough probable cause to arrest her for

10  obstruction of justice, yes, sir.

11              Q.   All right.  Well, unfortunately, that

12  opens the door to a little bit more.  Okay.  I was

13  trying to get out of here, but it doesn't look like

14  it's going to happen.

15              A.   That's okay, sir.

16              Q.   Yeah.  Obstruction of justice, what

17  are the elements of that offense, as you understand

18  them to be?

19              A.   So how -- interfering with my

20  investigation.  There was an interference with what

21  we were trying to do.

22              Q.   All right.

23              A.   That's what I'm going to

24  go -- that'll be my answer for that question.

25              Q.   So, and what was the -- what was the
```

```
 1  specific interference?
 2            A.   Coming up behind us push, striking,
 3  or hitting me on the shoulder, me having to
 4  hand-check her back.  Her screaming, her refusing
 5  to go to where she was told to go.  We could not
 6  focus on the task at hand.  We were -- our focus
 7  was completely shifted to her now.
 8            Q.   You said you couldn't focus on the
 9  task at hand?
10            A.   Yes, sir.
11            Q.   But the task at hand was what?
12            A.   Putting, trying to place Terron
13  Pannell into the back of my vehicle, yes, sir.  We
14  could not even accomplish that at that time.
15            Q.   That had been -- well, at the time he
16  was facedown on the ground?
17            A.   Yes.  This is a very -- it was a very
18  quick, this is less than two minutes all this
19  happened.
20            Q.   Right.  But within that two minutes,
21  he's in the back of the car?
22            A.   No, sir.  When this happened, he was
23  still on the ground.  When I was instructed
24  to he was still actively screaming, pulling, trying
25  to kick away from Officer Reed.  That's why I go
```

1   back to try to help Officer Reed.

2                  Then Officer Reed instructs me to now

3   go handcuff Shanta Bryant, to put her in handcuffs

4   at that point, because she was also now becoming a

5   big problem on scene as well.

6           Q.   Well, to be clear, he instructs you

7   to put handcuffs on both of them?

8           A.   If that's what he said, that's what

9   he said.  I don't recall.  I just remember him

10  saying go put handcuffs -- how I remember it was,

11  "Go put handcuffs on her."  That's how I remember

12  him saying it.

13          Q.   All right.  And the handcuffs -- but

14  is it your understanding that obstruction of

15  justice occurs when someone is standing close to a

16  police officer without touching them?

17          A.   I was hit, struck, or something,

18  towards the back.  And then also --

19          Q.   But you don't know who did it?

20          A.   I also had, I had to physically push

21  her back from me.  Also she --

22          Q.   But you don't know if she was

23  touching you?

24          A.   She continually kept trying to come

25  up to us and push past Officer Grooms as well.

```
 1  Officer Grooms was doing everything she could to
 2  try to get her back towards the door.  That, I feel
 3  that's probable cause for obstruction.
 4            Q.   Okay.  How did it obstruct you from
 5  putting handcuffs on Terron, from doing what you
 6  had to do with Terron?
 7            A.   Because she's -- I'm not -- I'm just
 8  going to be honest, she has -- you talking
 9  400 -- she has about 300 pounds on Officer Grooms.
10  So, you know, Grooms is trying to do everything she
11  can.  From my point of view, it looked like she
12  could not get Shanta Brown back.
13                 And then I go, Terron is still
14  kicking, screaming, hollering with Officer Reed.  I
15  go to help Officer Reed.  Officer Reed said he's
16  fine staying where he's at, to go help Officer
17  Grooms and to go put, I remember hearing him say,
18  her in handcuffs.  He may have said, "Put them in
19  handcuffs."
20            Q.   But you got the kid in the car?
21  Terron got in, he was placed in the car?
22            A.   Afterwards, yes, sir, after.
23            Q.   She didn't prevent you from doing
24  that?
25            A.   Yes, she did.  We could not -- he was
```

```
1   not --
2            Q.   How did she prevent it?
3            A.   He was not in the car when she went
4   into handcuffs, because he was still fighting and
5   kicking and hollering.  They were still on the
6   ground together.  But Officer Reed had enough
7   control of him to be able to just keep him on the
8   ground, and then instructed me to go place Shanta
9   Brown in handcuffs.  That's what happened.  He was
10  not in the back of the --
11           Q.   But when that occurred, Shanta Brown
12  was not next to you?
13           A.   When I was instructed --
14           Q.   When you were instructed to put
15  handcuffs on this, on Shanta Brown, Shanta Brown
16  was backed over by the door?
17           A.   I had just been instructing them to
18  get back.  I turn, go to Officer Reed to help
19  Terron.  She's still pushing, screaming.  Officer
20  Reed then instructs me to go put handcuffs on her.
21  So I snap back, and I go put handcuffs on her to
22  detain her.
23           Q.   But when you put handcuffs on her,
24  when Reed says put handcuffs on them, where are
25  they standing?
```

```
 1              A.   At pretty much -- I mean, like I
 2   recall, like where we said, right there around the
 3   car, whether it was up on the sidewalk, up on the
 4   pavement, it was --
 5              Q.   But not where you are, she's not
 6   standing next to you at that point, she's moved;
 7   right?  I mean, from you hand -- from the time you
 8   hand-check her until the time you get the
 9   instruction to put handcuffs on her, she's standing
10   back where she's been told to stand?
11              A.   There's -- yeah, I mean, it's within
12   15 feet, I would say --
13              Q.   Yeah.
14              A.   -- probably 15, 20 feet.
15              Q.   But she's standing exactly where you
16   told her to stand and exactly where Grooms told her
17   to stand?
18              A.   I don't know where Officer Grooms
19   told her to stand at.
20              Q.   Where you told her to stand?
21              A.   So I was trying to get everybody
22   back.  I was trying to get everybody back.  I
23   turned to go help Seth Reed.  This is what I recall
24   from this exact moment.
25              Q.   Right.
```

```
 1              A.   I returned back to help Officer Reed.
 2    As I take one to two steps towards Officer Reed, he
 3    says, I recall, "Put her in handcuffs."
 4              Q.   Right.
 5              A.   He might have said them, so that's
 6    when I turn around --
 7              Q.   I know that's when you happen --
 8              A.   So --
 9              Q.   -- my point is, correct me if I'm
10    wrong, at that time, when Reed says put them in
11    handcuffs, okay, and they are standing in the area
12    where you told them to go stand in the first
13    place?
14              A.   At the very beginning of the call --
15              Q.   Yeah.
16              A.   -- yes, sir.  But things had changed
17    drastically since the very first time --
18              Q.   Well, they're standing --
19              A.   -- on the call.
20              Q.   Grooms took them back there; right?
21    You see in the video Grooms directs them to go
22    there, and they're standing where Grooms said to
23    go?
24              A.   Yeah.  I -- it seemed -- I don't
25    know.  I don't understand.
```

**EXHIBIT 1**

```
 1              Q.    Okay.

 2              A.    I'm trying to -- I'm trying to --

 3              Q.    Okay.  Okay.  The point is you said

 4    the purpose is to get the kid into the car?

 5              A.    Yes.  That's what we were --

 6              Q.    So he could be detained?

 7              A.    -- trying to do, yes, sir.

 8              Q.    He's not even under arrest at this

 9    point?

10              A.    Yes, sir.

11              Q.    We don't know, I guess; right?  He's

12    being detained for some reason?

13              A.    Yes, sir.

14              Q.    Suspicion of having a past marijuana

15    record or something.  Okay.

16                    For some reason he's going in the

17    back of a police car?

18              A.    Yes, sir.

19              Q.    At your use of discretion.  You've

20    made all these decisions.  You've made the decision

21    to bring the drug dog in.  You made the decision to

22    put them in the back of a police car.  You made the

23    decision to handcuff him.  Reed made the decision

24    to pull him out of the vehicle.

25                    These are all discretionary acts;
```

**EXHIBIT 1**

```
 1   right?
 2                   MR. FITZGERALD:  Objection to form.
 3   You may answer.
 4                   THE WITNESS:  Okay.
 5   BY MR. VALOIS:
 6           Q.   All those are discretionary acts --
 7           A.   Yes, sir.
 8           Q.   -- that the officers at the scene are
 9   exercising on this kid?
10           A.   Did you -- can you go back and -- did
11   you say that it was also discretionary to pull him
12   out of the vehicle as well?
13           Q.   Yes.
14           A.   So my understanding, he was asked to
15   exit the vehicle and did not.  So at that point,
16   that's not a discretionary --
17           Q.   Right.  But you don't have to ask him
18   to get out of the vehicle?
19           A.   Okay.
20           Q.   Right?
21           A.   Okay.  You're right.  Yes, sir.
22           Q.   That's itself an act of discretion.
23   And millions -- people get pulled over left and
24   right without being asked to leave vehicles.  I got
25   pulled over by Bauserman.  I'm like, I thought I
```

**EXHIBIT 1**

```
1  was the only person in town not to get pulled over
2  by Bauserman until he got me.  Okay.  And I got
3  pulled over by Bauserman, and he didn't ask me to
4  get out of the vehicle.
5           A.    I understand.  I just wanted to make
6  sure I was answering your question correctly.
7           Q.    But these are all discretionary acts;
8  right?
9           A.    Yes, sir.
10          Q.    And so -- but you're accomplishing
11 them.  You get him out of the vehicle, you get him
12 in handcuffs, you get him searched, you throw -- he
13 ends up in the back of a police car.  All this
14 happens.  It wasn't prevented.  All that happened?
15          A.    So it was -- at the time, he was not
16 even searched at the time when we were on the
17 ground and she went into handcuffs, because
18 we -- so he went from the car, as we were
19 attempting to search him, we had to place him on
20 the ground.  Then the incident with Shanta Brown
21 happened.  Then we're trying to get them back.
22                At that point, he wasn't even
23 searched yet.  So then we -- I'm instructed -- I'm
24 helping Tereika, trying to get Shanta Brown back.
25 I go back to try to help Officer Reed and get, just
```

```
 1   finish this thing up.  I'm instructed to go put
 2   them in the handcuffs, and so that's what I do.  I
 3   go detain, attempt to detain her.
 4           Q.   Right.  But he ends up in the back of
 5   the car.  The purpose, you've said, you said --
 6           A.   Yes.
 7           Q.   -- the purpose is to get this kid in
 8   the back of the car?
 9           A.   Yes, sir.
10           Q.   That happened?
11           A.   Yes, sir.  After --
12           Q.   It was not prevented?
13           A.   It -- after, after everybody was
14   handcuffed and the situation was contained.
15           Q.   Yeah.  It maybe was delayed?
16           A.   It was -- it happened.
17           Q.   She didn't help you get this -- she
18   was -- she hindered you maybe; right?  I mean, she
19   made it more difficult?
20           A.   I could not help another officer
21   struggling with him kicking, screaming, not letting
22   him be searched.  I was unable to help that
23   officer, or him help me, due to me having to now
24   focus attention on Shanta Brown.
25           Q.   But she's standing by the door.  You
```

**EXHIBIT 1**

Page 104

```
 1  went to her.  It's not like -- it's not like he
 2  said put handcuffs on her, she's grabbing Terron's
 3  neck.  She's not even anywhere around Terron at
 4  that time.  You had to leave him with her.
 5              You had to leave him with Terron in
 6  order to leave him there to walk towards these two
 7  to do that, and they're where Grooms put her;
 8  right?
 9          A.   Yeah.  So I had to -- how I remember,
10  I had to -- I was still with Officer Reed.  I had
11  to go help Officer Grooms with Shanta Brown because
12  she was, in my opinion, she was moving Tereika back
13  towards our direction, in my opinion.
14              We -- I push, we're getting them
15  back.  I don't remember word for word what I said
16  on body camera but I know I'm yelling commands to
17  them.  I turn back, take two steps, and then that's
18  when Officer Reed says go ahead and put her in
19  handcuffs too.  And then I turn back to put her in
20  handcuffs.
21          Q.   Right.
22          A.   I'm trying to answer --
23          Q.   Right.  But at this time Reed's got
24  Terron on the ground?
25          A.   Correct.
```

1     Q.   He picked -- how does Terron get into

2  the back of the car?

3     A.   After -- I don't -- I don't remember

4  if it was me personally.  I'd have to go back and

5  watch.  It was after the fact.  We had to, or

6  everybody had to go, or Shanta Brown, at least, had

7  to go in handcuffs before we were able to get him

8  off the ground and even search him to put him in

9  the back of a car.

10     Q.   Why?  Why did Shanta Brown have to go

11  in handcuffs if she's not standing right next to

12  him?

13     A.   So she -- somebody struck, hit, or

14  pushed me from behind.  I hand-checked them back.

15  Now, from my point of view, she's now walking

16  another officer back towards us, pointing,

17  screaming, yelling, hollering.

18            I go down to try to tell her to -- I

19  don't know exactly what I tell her verbatim on body

20  camera.  I'll agree with whatever body camera says

21  I said I said.  And then, as I take two steps back

22  to try to help Officer Reed with this, that's when

23  I'm instructed to put Shanta Brown in handcuffs.

24  So then I go do that.  So I'm trying to, I'm trying

25  to answer the best I can for you.

**EXHIBIT 1**

```
 1              Q.   Okay.  Well, we're circling all the
 2    way around.
 3                   My point here is that the kid ends up
 4    in the car?
 5              A.   After the fact, yes sir.
 6              Q.   Well, within a few minutes, within
 7    like a -- less than like a minute?
 8              A.   When they got handcuffed, I was --
 9              Q.   Right.
10              A.   -- we were able to get him in a car.
11              Q.   Everybody's handcuffed; right?  And
12    they're all in the car; right?  So it did happen?
13              A.   Yes, sir.
14              Q.   Right.  I mean, he did -- now, was
15    Shanta handcuffed before Terron went in the car?
16              A.   Yeah, I would probably say yes, sir.
17              Q.   Probably?
18              A.   Yeah.  Because Officer Reed was still
19    with him.  At that point I was dealing with Shanta
20    Brown.
21              Q.   I mean, he was handcuffed on the
22    ground.  He was handcuffed when he went down on the
23    ground?
24              A.   Yes, sir.
25              Q.   Why didn't you just pick him up and
```

```
1  put him in the car?
2          A.   Because he was actively -- I mean,
3  pulling from us, tugging from us.  And then we were
4  also trying to deal with Shanta at that point too.
5          Q.   Well, you were dealing with Shanta in
6  a different area?
7          A.   Yes, sir.
8          Q.   Reed's over here.  Why doesn't Reed
9  just pick him up?  There's other cops there.
10 Why --
11         A.   I can't ask -- I can't talk for what
12 Officer Reed --
13         Q.   Well, where I'm going with this is --
14         A.    I know we -- two of us had him
15 against the car, and he was able to, trying to pull
16 away from us.  And it was, I mean, you say 150
17 pounds, you know.
18         Q.   Okay.  He's 5-foot-6, 150 pounds
19 soaking wet on a lucky day?
20         A.   You'd be -- imagine what somebody
21 that doesn't want to be searched can do.  So I'll
22 just leave it at that.  I mean, just size, size
23 don't matter on a lot of things.
24         Q.   Well, let me ask you this.
25              Have you been trained to deal with
```

```
 1  subjects?

 2           A.   Yeah, I have been.

 3           Q.   Have you received combat training?

 4           A.   Not combat training, no, sir.

 5           Q.   Hand-to-hand training?

 6           A.   Yes, sir.

 7           Q.   Okay.  You've been trained how to

 8  fight; right?  You learn that; right?

 9           A.   Yes, sir.

10           Q.   You get specialized training,

11  essentially martial arts training.  You learn how

12  to do the leg sweeps and all the things that you do

13  to deal with kids like --

14           A.   Yes, sir.

15           Q.   So I mean, he never hit you, Terron

16  never hit you?

17           A.   He was attempting to kick us, and

18  then kick up the car when this -- when he

19  eventually got placed onto the ground.

20           Q.   All right.  But I want to -- you

21  said prevented you from putting him in the car.  My

22  point is he got in -- it didn't prevent.

23                You understand prevent means make it

24  not happen?

25           A.   Yeah.
```

**EXHIBIT 1**

```
 1                Q.    Like, you know --
 2                A.    Yes, sir.  I know what prevent means,
 3    yes, sir.
 4                Q.    It did happen?
 5                A.    It did happen eventually, after
 6    everybody went into handcuffs.
 7                Q.    It just made it harder for you to do
 8    it; right?
 9                A.    So I could not -- it would have
10    taken -- in my opinion, it would have taken two of
11    us to deal with Terron Pannell at that point,
12    probably even three or four to search him, to
13    thoroughly search him, to put him in the back of a
14    vehicle.  At that point that could not happen
15    because I had to take my attention away from him to
16    Shanta Brown because of her actions.
17                Q.    But you stayed there with Shanta
18    Brown, dealing with her, so did Rob Miller, dealing
19    with Aquasha.
20                      You stayed with her the whole time
21    dealing with her after you arrested her?
22                A.    I attempted to go back to --
23                Q.    Right.
24                A.    -- and I don't know what -- my back
25    was turned.  Again, I don't know what Officer Reed
```

1  seen, because when I initially saw Tereika with

2  Shanta --

3         Q.   Right.

4         A.   -- it looked as if Shanta was walking

5  Tereika back to us --

6         Q.   I understand.

7         A.   -- because Tereika is a small female.

8         Q.   Right.  You've testified that you

9  perceived there was a threat that Shanta was going

10 to come back to the scene?

11        A.   Yeah.  So then I go -- I go -- I yell

12 what I yell or say what I say.  Then I turn around.

13 I don't know, I can't speak for what happened.  I

14 mean, for all I know, Shanta could have started

15 doing it again, I'm unsure of.  All of a sudden,

16 Officer Reed says, within two to three, I would say

17 one to three steps, it wasn't -- I didn't get far

18 away from her, tells me to place handcuffs on her.

19        Q.   Right.

20        A.   And then so I do that, sir.

21        Q.   Right.  And you stay there, you stay

22 with Shanta dealing with her?

23        A.   Yes.  And then --

24        Q.   Right.  And with Aquasha --

25        A.   -- helped with Aquasha, yes, sir.

**EXHIBIT 1**

Page 111

```
1              Q.   So you're out of the scene anyway?
2              A.   At that point, yes.
3              Q.   So they didn't even need you to put
4      Terron in the car; somebody else did that?
5              A.   So I, at that point, I mean, now
6      Shanta is -- I mean, everybody's resisting.  So
7      I'm -- we're having to -- it's three of us against
8      three people as well, so, or four, I don't know.
9      Rob Miller was there, but nobody wants to put their
10     hands behind their back and listen to me.  So
11     that's what --
12             Q.   Right.
13             A.   I don't know what happened with
14     Terron.  I don't know if he was in the car.
15             Q.   Right.  Because somebody else took
16     care of him.  He ended up in the car because he got
17     to the magistrate.
18                  He didn't walk; right?
19             A.   Yes, sir.  I know he ended up in a
20     car after.
21             Q.   So he got there; right?
22             A.   After we had to --
23             Q.   All right.  So he's -- he's in
24     the -- he's in the -- so it happened; right?
25             A.   It did, yes, sir.
```

**EXHIBIT 1**

```
 1                 Q.    And I want to make sure, because you
 2    said that it prevented him from getting in the car.
 3    I want to make sure you understand it didn't
 4    prevent him from getting in.
 5                 He did end up getting into a police
 6    car and going to the magistrate's office?
 7                 A.    After I had to handcuff and detain
 8    Shanta Brown.
 9                 Q.    Well, after you did handcuff and
10    detain him?
11                 A.    Yes, sir.
12                 Q.    But it didn't prevent that from
13    happening is what I'm saying?
14                 A.    Yes, sir.  I mean -- okay.
15                 Q.    It did happen?
16                 A.    In my opinion, it -- she did prevent.
17    I mean, because I had -- I could not pay attention
18    to Terron with Officer Reed.  I had to -- all my
19    attention had to be divided to her because she was
20    walking an officer to me in my -- in my -- that's
21    what I saw.  I go to deal with her and tell her to
22    get back.
23                 So now my attention, I have no focus
24    on Terron because of me having to tell her to get
25    back or do whatever I want her to do.  And then I
```

```
 1  take two steps back.  I don't know what Officer
 2  Reed saw.  Maybe -- I know she was still screaming
 3  and hollering, but I can't testify to what happened
 4  to -- then all of a sudden I was told, hey, she
 5  needs to go in handcuffs.  And that's what I did.
 6            Q.   Right.  You put her in handcuffs?
 7            A.   Yes, sir.
 8            Q.   But then you stayed with her?
 9            A.   Me --
10            Q.   You?
11            A.   -- yes, sir.
12            Q.   Right.  Somebody else dealt with
13  Terron.
14            You could have, after you had her in
15  handcuffs, had Grooms watch her at that point;
16  right?
17            A.   But at that time, there was -- there
18  was only a couple of us there.  There was only a
19  few of us there.  So I could not -- I'm just
20  confused about what you're asking, I think.  I know
21  Terron was eventually -- I will agree with you,
22  yes, he was eventually placed in a car.
23            But it was after we had detained
24  everybody else too and got them to be able to go to
25  cars.  In my opinion, that's what -- I could not
```

```
 1  help with Terron.  I could not do anything with
 2  Terron because of Shanta Brown's actions towards us
 3  and towards the situation.
 4          Q.   Right.  But you didn't have -- but he
 5  got in the car no matter what you did?
 6          A.   I'm sorry, I didn't hear you, sir.
 7          Q.   He got in the car without your help.
 8               Somebody else put him in the car?
 9          A.   Okay.  But at the time that we were
10  trying to do our job, I was unable to do that based
11  off of we were -- I was prevented of doing that
12  because of Shanta Brown's actions towards us.
13          Q.   But the job got done?
14          A.   Yes.  I'll agree with you.  At some
15  point it got done.
16          Q.   The job got done; right?
17          A.   Yes, sir.
18               MR. VALOIS:  Okay.  That's all.
19  That's where I was trying to get with that.  So
20  with that, I don't have any further questions.
21               MR. FITZGERALD:  Neither do I.
22
23
24
25
```

**EXHIBIT 1**

1              MR. VALOIS:  Thank God.  Off the record.

2           (Deposition concluded at 11:51 a.m.)

3           (Reading and signature waived.)

4                     *****

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2           I, KIMBERLY A. HENDERSON, a

3  Registered Professional Reporter and Electronic

4  Notary Public in and for the Commonwealth of

5  Virginia at Large, Notary Registration Number

6  359658, whose commission expires November 30, 2025,

7  do certify that the aforementioned appeared before

8  me, was sworn by me, and was thereupon examined by

9  counsel; and that the foregoing is a true, correct,

10 and full transcript of the testimony adduced to the

11 best of my ability.

12           I further certify that I am neither

13 related to nor associated with any counsel or party

14 to this proceeding, nor otherwise interested in the

15 event thereof.

16           Given under my hand and Notarial seal

17 at Forest, Virginia, this 19th day of November,

18 2024.

19

20

21           *Kimberly A. Henderson*

22       Kimberly A. Henderson, Notary Public

23         Commonwealth of Virginia at Large

24

25

**EXHIBIT 1**

| A | | | | |
|---|---|---|---|---|
| **ability** 116:11 | **agreement** 2:3 | **anyway** 43:7 | **areas** 30:25 | 101:24 |
| **able** 97:7, 105:7 | **ahead** 88:3 | 56:11, 111:1 | **arguably** 80:17 | **asking** 6:4 |
| 106:10, 107:15 | 104:18 | **apart** 33:12 | **arm** 47:9 | 15:21, 34:11 |
| 113:24 | **ain't** 40:22 | **apartment** | **armed** 35:21 | 35:8, 56:11 |
| **academy** 11:12 | 45:24 | 14:12, 38:22 | 35:22 | 56:12, 82:14 |
| 12:3 | **air** 25:25, 68:8 | 39:1, 42:10 | **arms** 58:8 | 113:20 |
| **accident** 60:24 | 74:1 | 42:11, 42:24 | **arrest** 20:23 | **asphalt** 37:23 |
| **accidental** 60:2 | **al** 1:3, 1:6 | **APPEARANC...** | 21:5, 21:8 | 45:3, 45:9 |
| **accomplish** | **allow** 31:14 | 2:10 | 21:10, 23:18 | **assault** 60:18 |
| 94:14 | 51:1 | **appeared** 116:7 | 29:10, 29:14 | 78:19, 79:8 |
| **accomplished** | **allowed** 48:22 | **application** 11:6 | 29:16, 29:18 | 79:22, 81:13 |
| 22:15 | 48:23, 49:2 | **apply** 11:6 | 31:23, 33:17 | 81:20 |
| **accomplishing** | 57:2 | **approached** | 70:23, 72:7 | **assaulted** 64:21 |
| 102:10 | **altercation** | 70:3 | 79:9, 92:24 | 78:11, 78:18 |
| **accurate** 76:1 | 77:10 | **April** 12:9 | 93:5, 93:9 | 81:10 |
| **act** 48:4, 101:22 | **Amendment** | 12:22, 30:6 | 100:8 | **assaulting** 59:10 |
| **actions** 33:19 | 53:25, 54:10 | **Aquasha** 39:6 | **arrested** 50:14 | 63:24 |
| 90:22, 109:16 | **and/or** 2:3 | 39:15, 39:16 | 66:7, 66:9 | **assist** 21:18 |
| 114:2, 114:12 | **angry** 62:13 | 63:24, 64:21 | 66:10, 66:10 | 22:3, 22:11 |
| **active** 21:23 | **answer** 6:9, 6:17 | 64:23, 65:4 | 69:10, 93:4 | 68:10, 76:25 |
| 25:6 | 6:18, 7:21 | 66:4, 66:9 | 109:21 | 77:11 |
| **actively** 27:11 | 18:10, 18:11 | 67:24, 68:7 | **arresting** 92:6 | **assistance** 18:3 |
| 94:24, 107:2 | 19:23, 26:3 | 68:19, 70:4 | 92:19 | 22:5, 26:12 |
| **activity** 29:6 | 26:17, 28:5 | 71:7, 71:17 | **arrests** 31:1 | 36:15, 62:16 |
| 30:11, 30:12 | 29:17, 30:22 | 71:17, 72:23 | **arrived** 16:21 | **assistant** 5:13 |
| 31:8, 54:16 | 31:17, 31:19 | 72:24, 72:25 | 16:22, 16:25 | **assisted** 21:16 |
| **acts** 100:25 | 32:6, 33:2, 35:2 | 73:1, 73:10 | 38:17 | **assisting** 77:21 |
| 101:6, 102:7 | 40:6, 42:17 | 73:11, 73:12 | **arriving** 36:14 | **associated** |
| **actual** 87:24 | 43:14, 44:20 | 73:16, 74:8 | **articulable** | 116:13 |
| 87:25 | 45:12, 45:14 | 74:12, 75:19 | 30:11, 31:7 | **ASSOCIATES** |
| **address** 6:15 | 46:11, 47:5 | 76:4, 76:13 | 48:12, 54:15 | 2:12 |
| 13:22 | 49:23, 51:2 | 76:20, 77:8 | 54:21, 55:2 | **assuming** 24:8 |
| **adduced** 116:10 | 53:2, 53:20 | 77:9, 77:11 | **arts** 108:11 | **assumption** |
| **advise** 51:1 | 56:9, 56:16 | 77:22, 78:3 | **ascertained** | 60:9 |
| **afforded** 32:15 | 60:14, 60:20 | 78:4, 78:24 | 14:22 | **attached** 17:21 |
| **afoot** 29:6, 31:8 | 62:6, 63:10 | 79:6, 87:1 | **asked** 8:25, 8:25 | **attempt** 103:3 |
| 54:16 | 64:5, 66:21 | 109:19, 110:24 | 15:6, 15:10 | **attempted** 25:8 |
| **aforementioned** | 71:21, 74:16 | 110:25 | 15:20, 15:22 | 72:7, 109:22 |
| 116:7 | 75:23, 80:20 | **Aquasha's** 61:5 | 17:15, 17:17 | **attempting** 72:3 |
| **agree** 63:6 | 93:24, 101:3 | 73:7 | 24:5, 26:12 | 76:3, 76:7 |
| 76:16, 77:13 | 104:22, 105:25 | **area** 10:22 | 29:13, 35:10 | 76:17, 102:19 |
| 105:20, 113:21 | **answered** 28:8 | 19:19, 39:9 | 41:2, 41:4, 44:4 | 108:17 |
| 114:14 | **answering** 6:7 | 42:12, 42:13 | 48:10, 56:5 | **attention** 103:24 |
| **agreed** 79:1 | 6:8, 102:6 | 44:17, 75:11 | 57:6, 57:11 | 109:15, 112:17 |
| | **anybody** 5:6 | 89:3, 99:11 | 59:12, 67:19 | 112:19, 112:23 |
| | 47:23, 80:11 | 107:6 | 83:5, 101:14 | **attorney** 2:8 |

7:16
**attorney's** 7:13
**audio** 40:22
**August** 8:4
**aunt** 39:14
**authority** 36:1
**auto** 41:14
**automatically**
41:20
**available** 36:8
53:11
**Avenue** 2:17
**aware** 39:12
39:19

**B**

**back** 6:25, 15:17
20:8, 20:8, 20:9
20:21, 21:2
22:18, 22:23
23:1, 25:2, 25:7
25:10, 25:16
27:5, 27:15
27:17, 27:20
27:23, 28:1
28:11, 28:15
28:17, 29:19
29:21, 30:19
31:22, 32:5
32:20, 32:25
33:13, 33:20
35:4, 35:4
38:13, 39:21
41:8, 47:10
56:6, 58:4
58:16, 59:24
60:8, 61:1, 61:4
61:21, 68:12
71:18, 72:4
73:6, 73:14
75:11, 76:10
77:3, 79:3, 80:8
80:13, 81:2
81:4, 82:9
86:19, 87:7

87:17, 87:19
88:2, 88:7
88:25, 89:14
90:6, 90:14
91:16, 91:25
94:4, 94:13
94:21, 95:1
95:18, 95:21
96:2, 96:12
97:10, 97:18
97:21, 98:10
98:22, 98:22
99:1, 99:20
100:17, 100:22
101:10, 102:13
102:21, 102:24
102:25, 103:4
103:8, 104:12
104:15, 104:17
104:19, 105:2
105:4, 105:9
105:14, 105:16
105:21, 109:13
109:22, 109:24
110:5, 110:10
111:10, 112:22
112:25, 113:1
**backed** 97:16
**backup** 15:12
15:15
**backwards**
65:21
**badge** 35:25
**ball** 74:18
**based** 65:11
114:10
**beat** 65:17
**basically** 40:2
44:11
**basis** 21:19
48:17, 48:25
92:12
**Bauserman**
101:25, 102:2
102:3
**beating** 89:23
**becoming** 95:4

**Bedford** 4:10
7:25, 8:20, 8:22
10:18, 10:20
**began** 62:22
**beginning** 41:9
87:4, 87:10
88:8, 99:14
**behalf** 2:2
**belief** 48:7
53:16, 56:3
56:7
**beliefs** 57:9
**believe** 13:13
14:3, 21:9, 23:5
30:10, 31:7
34:2, 36:5
44:22, 48:12
54:16, 56:6
57:9, 57:18
64:3, 64:6, 64:9
65:22, 67:15
67:19, 68:12
78:14, 83:13
86:25, 90:16
90:22, 91:17
**best** 32:7, 33:2
105:25, 116:11
**beyond** 54:13
**big** 13:23, 13:24
14:1, 37:18
37:19, 74:18
95:5
**bit** 86:4, 93:12
**body** 7:12, 13:1
13:1, 17:19
17:20, 17:22
34:2, 34:7
40:15, 40:17
40:20, 59:22
65:22, 78:14
78:14, 78:16
82:15, 82:22
83:22, 85:23
89:15, 89:15
89:16, 104:16
105:19, 105:20

**boss** 70:11
**bother** 56:11
56:12
**bottom** 87:19
87:25
**break** 5:5, 5:6
5:8, 82:2
**breather** 81:22
**bride** 90:8
**bridge** 72:15
72:16
**brief** 19:4, 67:20
**bring** 7:1, 7:4
7:6, 15:13, 48:3
48:16, 54:19
54:21, 55:2
56:10, 56:14
56:18, 63:17
86:19, 100:21
**bringing** 7:3
27:23, 28:1
51:12
**brings** 72:14
**broad** 30:22
**broken** 69:15
**brought** 11:2
25:24, 26:11
27:21
**Brown** 1:3, 39:6
39:11, 39:15
65:23, 65:25
66:1, 71:23
80:12, 81:1
91:7, 91:9
91:12, 96:12
97:9, 97:11
97:15, 97:15
102:20, 102:24
103:24, 104:11
105:6, 105:10
105:23, 106:20
109:16, 109:18
112:8
**Brown's** 114:2
114:12
**brush** 60:7, 60:9

**Bryant** 95:3
**bubble** 81:3
92:17
**building** 10:5
14:4, 38:18
39:7, 42:10
42:10, 42:11
42:13, 42:24
71:24, 73:6
**bunch** 38:21
50:14, 62:22
63:21, 85:5
**bushes** 42:22
64:14, 68:9
73:9, 73:19
73:24, 74:1
76:23, 76:24
**business** 46:19
**butt** 75:11
**button** 69:5

**C**

**caboodle** 38:11
**call** 4:21, 4:22
14:3, 14:6, 18:3
52:5, 52:24
61:12, 62:15
62:18, 62:20
68:23, 68:25
69:5, 69:11
82:1, 99:14
99:19
**called** 14:9, 16:7
16:10, 16:17
16:24, 23:25
32:21, 36:14
41:21, 55:6
55:10, 66:19
**calling** 69:8
**calls** 28:21
**calm** 46:2
**cam** 7:12, 13:1
13:1, 17:19
17:20, 40:16
40:17, 40:20

82:15, 83:22
89:15, 89:15
89:16
**camera** 17:22
34:2, 34:7
65:22, 78:14
78:15, 78:16
85:23, 104:16
105:20, 105:20
**cameras** 82:23
83:4
**capiases** 31:2
**car** 13:4, 13:8
14:23, 15:17
17:7, 17:7
17:24, 18:13
18:14, 18:18
18:19, 18:25
19:2, 19:6
19:15, 19:18
20:9, 20:13
20:15, 20:16
20:19, 20:20
20:22, 21:2
23:1, 23:7, 23:9
23:9, 23:22
24:5, 24:5, 25:2
25:4, 25:5, 25:7
25:10, 25:11
25:11, 25:13
25:17, 25:18
25:25, 26:9
27:6, 27:18
27:20, 27:23
28:1, 28:7
28:10, 28:11
28:15, 28:17
28:19, 29:8
29:19, 29:22
30:14, 30:15
30:20, 30:21
31:11, 31:23
31:25, 32:14
32:20, 33:1
33:14, 33:21
34:5, 35:4, 35:5

35:19, 36:22
37:22, 44:4
44:5, 44:13
47:16, 49:7
55:21, 56:7
57:22, 57:23
94:21, 96:20
96:21, 97:3
98:3, 100:4
100:17, 100:22
102:13, 102:18
103:5, 103:8
105:2, 105:9
106:4, 106:10
106:12, 106:15
107:1, 107:15
108:18, 108:21
111:4, 111:14
111:16, 111:20
112:2, 112:6
113:22, 114:5
114:7, 114:8
**care** 111:16
**career** 9:3
**CARROLL**
2:16
**carrying** 91:19
**cars** 23:10
25:16, 43:2
58:9, 66:11
113:25
**case** 1:5, 7:14
7:16, 54:14
54:18, 55:3
66:17
**cause** 29:5
29:10, 29:11
92:24, 93:9
96:3
**century** 51:11
**certainly** 5:6
**certify** 116:7
116:12
**changed** 27:19
30:3, 99:16
**chaos** 26:20

38:16, 39:4
62:14
**chaotic** 28:24
32:23, 33:10
70:6, 71:1
78:21, 79:18
**characterization**
62:4
**characterize**
77:6
**charge** 64:1
64:8, 64:23
64:25, 65:4
65:21, 66:4
**charged** 59:10
63:24, 81:20
**charges** 91:7
**charm** 90:9
**checking** 34:6
**church** 2:8
49:21
**circle** 38:12
**circling** 106:1
**circumstances**
31:13, 38:15
91:14
**City** 1:6, 2:8
8:13, 31:21
49:11, 52:2
**city's** 67:10
**civilian** 32:9
**civilians** 32:4
**claim** 89:2
**clear** 65:6, 95:6
**client** 51:1
**clip** 89:18
**clipboard** 55:17
**close** 43:7, 71:14
72:6, 95:15
**closer** 80:17
**College** 2:17
**color** 50:4
68:17
**combat** 108:3
108:4
**come** 9:24, 9:25

16:7, 16:10
42:23, 43:4
49:5, 55:10
56:5, 57:11
71:7, 72:19
75:13, 95:24
110:10
**comes** 40:2
42:8, 43:6
50:15, 58:8
84:3, 86:9
**coming** 42:12
43:7, 49:20
62:10, 92:13
92:16, 94:2
**commands**
104:16
**commencing**
2:6
**commission**
116:6
**Commonwealth**
2:6, 10:5, 116:1
116:4, 116:23
**communication**
15:1, 15:5
77:16, 77:20
**community** 8:22
**competence**
5:13
**complaint** 4:15
7:1, 7:3
**complete** 11:21
**completely**
92:14, 94:7
**complex** 14:12
39:2
**comported**
90:17, 90:23
**comports** 33:6
**computer** 7:3
7:4
**concern** 63:17
**concerned** 67:3
**concluded** 115:2
**conducting**

17:25, 18:14
**confused** 64:24
74:25, 113:20
**confusing** 38:14
**consent** 15:7
15:14, 15:19
15:20, 15:21
15:23, 16:9
17:4, 31:15
34:18, 34:21
35:9, 35:13
42:7, 48:7, 55:7
56:11, 56:13
56:20, 56:21
56:22, 57:8
57:10
**consented** 34:24
**Consolidated**
14:4
**Constitution**
54:1, 54:10
**contact** 15:11
60:24, 75:14
**contacted** 59:23
64:20
**contained**
103:14
**contemplated**
53:25, 54:9
**contemporaneo...**
14:19
**continually**
95:24
**control** 18:8
22:6, 69:9, 85:3
87:7, 87:25
97:7
**conversation**
15:17, 18:20
55:11, 81:11
**conversations**
82:25
**cooperative**
26:22
**cop** 84:13
**cops** 107:9

copy 7:1
correct 4:20
  17:5, 19:11
  24:25, 25:3
  25:14, 25:19
  28:9, 38:18
  40:4, 51:8, 64:2
  66:1, 67:24
  70:18, 71:11
  74:11, 84:18
  99:9, 104:25
  116:9
correctly 102:6
counsel 2:10
  2:15, 2:19
  116:9, 116:13
counseling 9:6
  9:8, 90:19
County 4:10
  7:25, 8:20, 8:22
  10:18, 10:21
couple 41:25
  43:2, 82:12
  113:18
court 1:1, 5:18
  5:19, 6:12, 6:14
courtesy 32:10
coworker 80:10
crashed 83:14
crime 51:10
criminal 29:6
  30:11, 30:12
  31:7, 50:12
  54:16
criteria 52:13
currently 7:25
cut 34:11, 34:13

**D**

day 65:23
  107:19, 116:17
dead 89:23
deaf 88:18
deal 107:4
  107:25, 108:13

109:11, 112:21
dealing 41:11
  43:24, 58:7
  76:4, 106:19
  107:5, 109:18
  109:18, 109:21
  110:22
dealt 113:12
debrief 79:19
decide 29:8
  30:13, 49:6
decided 79:8
  79:8
decision 28:18
  31:9, 31:10
  100:20, 100:21
  100:23, 100:23
decisions 100:20
deescalate 27:6
  28:2, 32:22
defend 80:24
  80:25
defendant 84:24
Defendants 1:7
  2:2, 2:19
definitely 21:1
  86:15
delay 54:19
  55:20, 55:23
  56:8
delayed 55:4
  55:23, 55:25
  103:15
delaying 56:2
  56:4
denied 16:10
  17:4, 34:21
  56:12, 56:13
  57:7
denies 42:7
department 8:1
  8:13, 9:19
  66:18
depend 50:4
  50:9

depending 5:12
  28:21
depends 35:17
  49:24, 49:25
  50:2, 50:3
depiction 89:24
deployed 56:23
deployment
  36:9
deposition 1:9
  2:1, 4:25, 7:11
  115:2
depositions 2:3
deputy 4:7, 4:19
  4:23, 4:24
  18:12, 82:12
descriptive
  43:11
detain 21:15
  22:10, 29:4
  31:9, 70:4
  97:22, 103:3
  103:3, 112:7
  112:10
detained 21:1
  21:3, 21:4
  21:11, 23:19
  28:14, 29:14
  29:18, 30:9
  32:17, 33:16
  33:19, 53:22
  54:3, 91:23
  92:5, 92:8
  92:10, 92:21
  92:25, 100:6
  100:12, 113:23
detaining 22:14
  24:9
detective 73:8
  73:8, 76:19
  77:1
detention 21:16
  31:23, 32:16
  53:18, 53:25
  54:7, 92:12
detentions

21:19
determine 52:18
  57:7, 100:21
difference 21:4
different 31:3
  90:14, 107:6
difficult 103:19
direct 18:17
directing 44:11
direction 18:7
  104:13
directives 90:24
directly 80:12
  81:1
directs 99:21
disciplined 9:2
discretion 30:13
  30:14, 31:12
  52:14, 100:19
  101:22
discretionary
  48:4, 100:25
  101:6, 101:11
  101:16, 102:7
discussion 7:8
displayed 13:18
distance 8:21
distributions
  50:15
DISTRICT 1:1
  1:1
disturbance
  21:24
divided 112:19
DIVISION 1:2
dog 16:2, 17:15
  23:22, 24:24
  25:4, 25:5
  25:23, 25:23
  26:5, 26:9
  26:11, 26:12
  26:13, 26:15
  36:3, 36:5, 48:3
  48:16, 49:21
  51:12, 52:5
  54:19, 54:22
  55:2, 56:10

56:14, 56:18
  57:7, 100:21
doing 18:6, 18:7
  18:13, 40:3
  40:11, 72:13
  73:16, 96:1
  96:5, 96:23
  110:15, 114:11
door 17:7, 19:2
  19:5, 39:2, 39:3
  40:24, 41:1
  42:11, 42:23
  43:4, 43:5, 43:6
  43:8, 61:8, 68:6
  72:4, 73:6, 75:6
  76:10, 76:17
  91:15, 91:20
  93:12, 96:2
  97:16, 103:25
doors 74:19
dozen 63:19
drags 61:3
drastically
  99:17
driver's 44:5
driving 13:4
  25:17, 49:19
drug 24:24
  48:16, 49:21
  50:13, 51:12
  52:5, 52:20
  52:21, 52:24
  54:19, 54:21
  55:2, 56:10
  56:14, 56:18
  57:7, 100:21
drugs 16:13
  48:8, 48:13
  53:12
due 103:23

**E**

Earlier 27:21
  27:22
earn 45:19

**easier** 85:19
86:4
**easiest** 5:22
**Eight** 63:20
**either** 24:13
40:23, 69:15
**Electronic**
116:3
**elements** 93:17
**encompasses**
30:25
**ended** 11:6
91:20, 111:16
111:19
**ends** 80:11
102:13, 103:4
106:3
**enforcement**
8:15, 9:22, 11:3
24:6, 46:18
**engaged** 22:1
77:10
**ensued** 76:18
**entailed** 79:5
**entails** 81:5
**entrance** 75:6
**Especially** 66:17
**ESQUIRE** 2:14
2:15, 2:19
**essentially**
53:17, 108:11
**et** 1:3, 1:6
**event** 57:21
59:19, 73:17
116:15
**eventually**
69:23, 85:2
108:19, 109:5
113:21, 113:22
**everybody**
15:11, 33:12
35:21, 35:25
52:23, 64:13
66:7, 66:10
77:24, 98:21
98:22, 103:13

**everybody's**
66:11, 90:2
106:11, 111:6
**evidence** 16:12
64:10, 85:6
**evolved** 63:5
**exact** 13:8
39:20, 39:22
57:1, 98:24
**exactly** 34:3
40:12, 98:15
98:16, 105:19
**Examination**
3:4, 3:5, 3:6
**examined** 116:8
**exercise** 30:14
**exercising** 52:14
101:9
**existed** 30:9
**exit** 101:15
**exited** 19:6
**exiting** 42:10
**experience**
12:12
**experienced**
70:11
**expires** 116:6
**explain** 31:20
**expressed** 35:12
**extend** 54:13
**extensively** 6:1

## F

**F11** 88:5
**facedown** 37:23
58:1, 70:15
75:10, 94:16
**facetious** 50:24
**fact** 41:4, 79:1
80:16, 86:14
105:5, 106:5
**fair** 30:4, 62:4
63:18, 75:7

77:6
**fairly** 71:14
**falling** 61:19
91:20
**family's** 8:21
**far** 42:2, 42:5
43:3, 76:1, 85:6
88:2, 110:17
**fast** 79:18, 88:15
**feel** 45:25, 55:4
80:9, 85:17
96:2
**feeling** 58:15
**feet** 38:4, 68:8
73:9, 73:25
74:12, 75:5
75:5, 98:12
98:14
**fell** 11:10, 89:15
**felt** 71:2
**female** 76:20
80:9, 110:7
**fight** 108:8
**fighting** 21:20
21:21, 97:4
**figure** 21:22
46:4, 73:15
78:23, 78:24
81:22
**figured** 33:21
71:5, 79:12
93:7
**figuring** 79:20
**filed** 4:15
**files** 17:22
**filling** 11:6
**filming** 74:13
**fine** 32:8, 96:16
**finish** 6:4, 51:24
74:23, 103:1
**finished** 6:7, 6:7
75:3
**first** 5:18, 9:21
23:16, 41:23
61:12, 61:17
62:19, 68:3

73:7, 99:12
99:17
**fishing** 48:8
**Fitzgerald** 2:19
3:5, 6:18, 18:9
19:22, 26:2
26:16, 28:4
31:16, 35:1
40:5, 42:16
43:13, 44:19
45:11, 46:10
47:4, 48:18
49:22, 50:25
51:4, 53:1
53:19, 56:15
60:13, 60:19
61:25, 62:5
63:9, 64:4
66:20, 71:20
74:15, 75:22
80:19, 82:3
84:22, 86:1
86:20, 87:12
87:16, 91:5
92:1, 101:2
114:21
**five** 65:19
**five-and-a-half**
11:19
**five-eight** 37:13
**five-eleven** 37:6
**five-nine** 37:12
37:13
**five-ten** 37:13
**flannel** 68:14
**flipped** 73:24
**focus** 94:6, 94:6
94:8, 103:24
112:23
**follow** 28:25
74:23
**followed** 14:11
**follows** 4:4
**foot** 37:5, 37:6
**force** 9:13, 9:15
22:2, 22:3

24:11, 67:10
**forcefully** 91:24
**foregoing** 116:9
**Forest** 116:17
**form** 18:9
19:22, 26:2
26:16, 28:4
31:16, 35:1
35:13, 40:5
42:16, 43:13
44:19, 45:11
46:10, 47:4
48:18, 49:22
53:1, 53:19
56:15, 60:13
60:19, 62:5
63:9, 64:4
66:20, 71:20
74:15, 75:22
80:19, 101:2
**formal** 9:5, 9:5
31:1
**forward** 86:13
87:19, 88:16
**found** 57:7
**four** 19:14
65:19, 109:12
111:8
**Fourth** 53:25
54:9
**free** 25:25
**front** 13:18
19:18, 19:18
19:19, 20:13
20:15, 20:16
20:19, 22:16
22:20, 22:21
23:11, 25:1
25:18, 38:18
39:6, 39:9
42:11, 54:2
58:8, 71:8
**frozen** 87:13
**full** 63:4, 116:10
**function** 10:6
**further** 92:2

114:20, 116:12

**G**

**gain** 15:7
**game** 50:13
**gender** 50:9
**general** 6:17
**generally** 52:22
**getting** 22:7
  32:20, 45:17
  45:21, 46:20
  46:25, 61:11
  61:19, 64:23
  65:4, 74:25
  75:12, 85:16
  104:14, 112:2
  112:4, 112:5
**ghost** 88:12
**give** 7:6, 32:10
  52:11, 53:9
  57:10, 81:4
  90:7
**given** 4:25
  90:19, 116:16
**gives** 30:15
**giving** 6:5
**go** 5:12, 10:16
  26:19, 30:13
  30:18, 30:20
  31:22, 31:24
  45:10, 47:20
  67:20, 68:8
  68:8, 68:12
  69:16, 71:2
  73:9, 73:12
  73:14, 73:25
  76:25, 77:3
  78:18, 82:25
  83:2, 86:13
  86:18, 87:7
  87:16, 87:19
  88:1, 88:4
  88:18, 90:2
  93:24, 94:5
  94:5, 94:25

95:3, 95:10
95:11, 96:13
96:15, 96:16
96:17, 97:8
97:18, 97:20
97:21, 98:23
99:12, 99:21
99:23, 101:10
102:25, 103:1
103:3, 104:11
104:18, 105:4
105:6, 105:7
105:10, 105:18
105:24, 109:22
110:11, 110:11
112:21, 113:5
113:24
**goal** 85:3
**God** 115:1
**goes** 25:11
  37:21
**going** 6:6, 6:25
  8:11, 17:14
  21:1, 21:24
  22:8, 26:19
  32:11, 32:19
  32:25, 33:1
  33:8, 33:20
  33:21, 34:4
  34:10, 34:12
  35:3, 35:5
  35:19, 37:21
  38:12, 42:5
  45:9, 45:10
  45:15, 45:18
  45:24, 49:25
  56:10, 59:5
  63:12, 64:13
  66:16, 66:25
  67:5, 67:6, 71:6
  72:11, 76:12
  81:3, 81:23
  83:21, 83:21
  84:22, 85:2
  86:21, 86:25
  87:12, 88:17

89:8, 89:10
89:24, 91:17
92:9, 93:8
93:14, 93:23
96:8, 100:16
107:13, 110:9
112:6
**good** 11:5, 24:12
  24:13, 82:5
  89:24
**grab** 19:2, 19:2
**grabbed** 19:5
  21:14
**grabbing** 104:2
**graduate** 10:25
**graduated**
  10:10
**grass** 61:19
**great** 40:23
**groin** 25:8
**Grooms** 15:1
  25:22, 41:14
  43:24, 44:11
  44:15, 44:15
  48:6, 55:7
  56:13, 58:11
  58:24, 59:17
  60:11, 60:12
  60:16, 60:17
  61:3, 65:16
  65:18, 71:13
  72:3, 75:13
  80:16, 80:17
  81:2, 86:10
  89:14, 89:15
  95:25, 96:1
  96:9, 96:10
  96:17, 98:16
  98:18, 99:20
  99:21, 99:22
  104:7, 104:11
  113:15
**ground** 20:3
  20:4, 25:15
  38:7, 45:17
  47:2, 58:1, 60:4

70:16, 70:16
72:18, 83:14
83:17, 86:9
91:10, 91:13
91:18, 91:21
94:16, 94:23
97:6, 97:8
102:17, 102:20
104:24, 105:8
106:22, 106:23
108:19
**grounds** 21:12
**guess** 41:14
  100:11
**guilty** 5:25
**guy** 37:18, 37:19
**guy's** 26:9
**GUYNN** 2:16
**guys** 40:3

**H**

**half** 8:10, 66:18
  90:1
**half-sister** 39:17
**hand** 60:6, 72:1
  94:6, 94:9
  94:11, 98:7
  116:16
**hand-check**
  58:16, 58:19
  65:15, 65:17
  70:19, 72:18
  79:6, 80:13
  81:4, 81:8, 89:5
  94:4, 98:8
**hand-checked**
  58:22, 64:24
  65:6, 65:18
  65:20, 65:21
  71:10, 72:20
  73:3, 73:4
  74:10, 75:15
  89:2, 105:14
**Hand-to-hand**
  108:5

**handcuff** 31:21
  68:1, 73:11
  73:12, 76:3
  76:8, 76:18
  77:2, 77:7, 77:8
  78:2, 95:3
  100:23, 112:7
  112:9
**handcuffed**
  20:20, 22:22
  23:2, 23:4
  23:21, 25:2
  30:19, 31:4
  69:3, 73:16
  77:25, 103:14
  106:8, 106:11
  106:15, 106:21
  106:22
**handcuffing**
  68:11, 77:3
  77:9, 77:21
**handcuffs** 22:7
  22:16, 25:20
  70:4, 70:20
  70:22, 71:1
  71:3, 71:23
  72:1, 72:8
  72:11, 73:20
  74:4, 74:7
  74:18, 75:19
  76:13, 87:1
  95:3, 95:7
  95:10, 95:11
  95:13, 96:5
  96:18, 96:19
  97:4, 97:9
  97:15, 97:20
  97:21, 97:23
  97:24, 98:9
  99:3, 99:11
  102:12, 102:17
  103:2, 104:2
  104:19, 104:20
  105:7, 105:11
  105:23, 109:6
  110:18, 113:5

113:6, 113:15
**handle** 15:16
**handler's** 36:7
**hands** 25:2, 68:4
74:2, 79:25
80:1, 91:16
91:24, 111:10
**hang** 69:15
**hang-up** 69:5
**happen** 26:1
33:8, 38:2
93:14, 99:7
106:12, 108:24
109:4, 109:5
109:14, 112:15
**happened** 12:9
57:20, 63:23
64:12, 64:17
66:7, 67:19
73:25, 75:14
78:23, 78:25
79:13, 79:20
81:18, 83:1
89:25, 94:19
94:22, 97:9
102:14, 102:21
103:10, 103:16
110:13, 111:13
111:24, 113:3
**happening**
21:23, 57:19
58:13, 67:21
112:13
**happens** 65:12
102:14
**hard** 59:4, 89:12
**harder** 109:7
**head** 9:17, 82:17
84:8
**hear** 6:16, 18:20
40:23, 114:6
**heard** 5:5, 18:17
34:7, 36:19
40:15, 40:19
**hearing** 96:17
**help** 21:22, 44:8

73:22, 95:1
96:15, 96:16
97:18, 98:23
99:1, 102:25
103:17, 103:20
103:22, 103:23
104:11, 105:22
114:1, 114:7
**helped** 67:25
110:25
**helping** 73:21
102:24
**Henderson** 1:25
2:4, 116:2
116:22
**hesitate** 47:2
**hey** 26:8, 46:3
56:4, 93:5, 93:5
113:4
**high** 10:11
10:13, 10:16
10:17
**hindered** 103:18
**hindsight** 90:14
**hired** 11:7, 11:9
**history** 50:10
50:12, 50:17
50:21, 52:15
52:17, 52:18
52:20, 52:21
52:24
**hit** 58:14, 60:4
60:6, 68:9, 69:4
72:20, 79:2
79:3, 80:9
80:25, 81:19
85:18, 95:17
105:13, 108:15
108:16
**hitting** 94:3
**Hold** 88:13
**holding** 47:9
**hollering** 26:21
39:2, 96:14
97:5, 105:17
113:3

**home** 49:20
**honest** 11:4
45:15, 96:8
**Honestly** 69:14
**hooting** 39:2
**horse** 89:23
**hour** 90:2
**Huh** 13:11
**hung** 69:25

## I

**idea** 37:4
**illegal** 40:4
51:20, 53:15
**imagine** 5:11
107:20
**Immediately**
20:10
**important** 5:17
65:8
**incident** 4:14
9:10, 12:8
12:12, 12:22
63:3, 67:11
70:19, 77:18
77:21, 82:15
90:20, 102:20
**incidental** 60:24
**individuals**
38:20
**informal** 9:4
9:7
**initially** 21:14
110:1
**initiate** 47:15
**injustice** 46:21
**inside** 10:7, 36:6
36:7, 47:10
**instant** 92:24
**instruct** 44:22
**instructed** 7:20
47:12, 70:7
94:23, 97:8
97:13, 97:14
102:23, 103:1

105:23
**instructing**
70:25, 97:17
**instruction** 98:9
**instructs** 6:18
95:2, 95:6
97:20
**intend** 56:13
77:7, 77:7
**intentional** 60:2
60:5, 60:8
60:10
**intentionally**
60:12, 60:17
**interaction** 89:4
**interceding**
46:19
**interested**
116:14
**interference**
93:20, 94:1
**interfering**
92:14, 93:19
**interject** 45:23
46:1
**interrupt** 23:16
41:7
**investigation**
9:13, 93:20
**involved** 4:14
4:17, 50:12
61:24, 67:10
67:23
**issue** 7:6
**issues** 92:11

## J

**JAMES** 2:12
**January** 12:3
**jerk** 38:9
**jerking** 26:23
**job** 9:22, 10:13
11:5, 60:18
114:10, 114:13
114:16

**JOHN** 2:19
john@guynnw...
2:18
**judge** 6:15
**July** 12:2
**June** 12:2
**jury** 59:7
**justice** 46:9
46:14, 93:10
93:16, 95:15
**justifiable** 71:2
**justified** 22:3
53:17
**justifies** 90:1
**justify** 51:12
**juvenile** 51:8

## K

**K9** 16:11, 36:3
47:22, 49:5
49:7, 49:9
52:16, 52:16
52:19, 52:24
56:23, 57:3
57:4
**keep** 46:2, 47:9
97:7
**Kemper** 14:12
14:14
**kept** 95:24
**keyed** 36:17
**kick** 25:8, 38:3
38:4, 60:17
94:25, 108:17
108:18
**kicking** 27:11
96:14, 97:5
103:21
**kid** 36:22, 37:7
45:2, 45:10
45:17, 45:18
45:20, 46:17
50:16, 57:22
96:20, 100:4
101:9, 103:7

106:3
**kids** 45:6, 45:8
83:1, 108:13
**Kimberly** 1:25
2:4, 116:2
116:22
**kind** 10:7, 13:4
50:11, 67:20
73:5, 79:19
87:15
**kit** 38:11
**knee** 58:3, 75:11
**knees** 83:15
**knew** 39:25
61:18, 81:7
81:8
**know** 5:8, 6:8
11:7, 13:4
13:22, 17:17
17:18, 19:4
20:25, 21:1
23:24, 27:8
30:2, 30:3
31:19, 31:21
33:4, 33:11
33:15, 33:16
33:16, 33:18
34:3, 34:5
36:11, 37:1
39:23, 39:23
40:12, 44:7
46:16, 46:17
52:12, 56:25
57:1, 59:1, 59:2
60:25, 61:13
67:4, 67:6
67:18, 68:7
68:22, 69:8
70:24, 73:23
73:24, 74:3
74:21, 75:14
75:15, 76:13
77:25, 78:13
81:17, 85:10
85:10, 86:13
86:17, 86:18

87:6, 89:5, 89:7
89:19, 90:1
95:19, 95:22
96:10, 98:18
99:7, 99:25
100:11, 104:16
105:19, 107:14
107:17, 109:1
109:2, 109:24
109:25, 110:13
110:14, 111:8
111:13, 111:14
111:19, 113:1
113:2, 113:20
**knowing** 21:19
**Knox** 16:2

**L**

**ladies** 80:14
**lady** 44:12
44:16, 49:20
**land** 74:1
**Large** 2:6, 116:1
116:5, 116:23
**law** 8:15, 9:21
11:3, 24:5
46:18, 47:1
**laws** 46:23
**lawyering** 5:19
**lead** 18:24
**leading** 44:8
**learn** 108:8
108:11
**learned** 57:10
**leave** 8:18, 8:25
17:15, 73:11
101:24, 104:4
104:5, 104:6
107:22
**led** 18:19, 22:22
67:20
**left** 13:25, 42:14
68:10, 101:23
**left-hand** 14:10
**leg** 108:12

**legal** 2:12, 40:11
51:19
**letting** 15:16
103:21
**Liberty** 13:23
14:6
**license** 13:18
14:23, 54:2
**lie** 91:6
**line** 65:11
**list** 82:13
**listen** 46:3
111:10
**listening** 84:25
**lit** 14:18
**literally** 73:23
**little** 7:5, 42:13
79:19, 81:22
86:4, 86:12
90:9, 93:12
**live** 8:20
**lives** 65:10
**LOCKABY**
2:16
**Lofts** 14:12
**long** 5:14, 10:9
11:14, 11:15
12:18, 46:8
46:12, 56:1
83:20, 84:20
**look** 44:16
44:16, 44:16
52:17, 52:18
90:2, 93:13
**looked** 19:3
52:15, 96:11
110:4
**looking** 13:24
82:13, 89:19
90:14
**looks** 90:9
**lost** 89:15
**lot** 5:11, 13:24
14:1, 23:8
23:12, 25:18
38:13, 44:8

49:14, 50:10
52:7, 53:7
53:10, 53:10
62:7, 62:12
62:25, 63:2
63:7, 63:16
74:6, 75:4, 75:5
82:21, 83:3
83:22, 84:4
84:21, 85:17
86:16, 107:23
**love** 11:10
**lovely** 90:7
**LPD** 28:8, 90:23
**lucky** 90:8
107:19
**lumps** 47:3
**Lynchburg** 1:2
1:6, 1:12, 2:8
2:9, 2:13, 8:13
8:19, 9:19, 11:7
12:1, 12:16
12:16, 14:16
29:3, 31:22
49:11, 52:2
**LYNETTE** 1:3

**M**

**magistrate**
66:12, 80:7
111:17
**magistrate's**
64:16, 78:19
112:6
**major** 92:10
**making** 75:3
**Mama** 58:8
58:14, 75:13
**man** 13:4, 84:7
**MARGARET**
2:15
**marijuana**
50:17, 50:20
51:14, 52:4
100:14

**martial** 108:11
**Materials** 10:5
**matter** 49:2
107:23, 114:5
**matters** 5:5
**mean** 7:4, 15:6
21:18, 23:16
32:19, 36:10
36:11, 37:5
38:10, 38:19
41:7, 45:15
45:22, 47:8
52:9, 60:3
60:23, 60:24
63:11, 63:15
65:18, 66:15
67:5, 67:9, 69:7
69:8, 69:9
70:10, 72:10
73:18, 79:16
79:18, 83:2
83:8, 83:17
93:3, 93:6, 98:1
98:7, 98:11
103:18, 106:14
106:21, 107:2
107:16, 107:22
108:15, 110:14
111:5, 111:6
112:14, 112:17
**meaning** 74:7
75:19
**means** 108:23
109:2
**meet** 73:5
**mental** 24:16
**messy** 55:21
**middle** 23:9
**Miller** 1:9, 2:1
3:3, 4:3, 4:7
4:13, 4:23
61:11, 61:11
61:13, 63:25
64:12, 68:2
68:7, 73:9, 77:1
77:1, 77:10

77:16, 77:20
78:1, 109:18
111:9
**Miller's** 73:8
73:19
**million** 31:3
**millions** 101:23
**mind** 51:12
**mine** 85:25
89:13
**Minus** 9:4
16:14
**minute** 48:20
55:16, 106:7
**minutes** 15:25
41:24, 41:25
88:10, 94:18
94:20, 106:6
**mistake** 75:3
**model** 13:8
**mom** 39:24
65:1, 65:6
65:20, 70:3
71:9, 71:10
**moment** 36:17
98:24
**momentum**
91:19
**Moneta** 10:22
**monitoring**
13:17, 13:19
**months** 11:17
11:18, 11:19
11:20
**mother** 39:12
39:13, 39:16
**mouse** 85:20
86:2
**mouth** 24:18
24:21, 43:11
**move** 44:23
**moved** 98:6
**movie** 85:14
**moving** 88:12
104:12
**multiple** 18:18

26:21
**mute** 82:22
83:4
**muted** 83:6
**mvalois@vbcle...**
2:14

**N**

**name** 61:12
**names** 50:11
**narrative** 75:2
**NCIC** 50:11
**near** 23:12, 63:4
**necessarily**
28:16
**necessary** 36:9
**neck** 104:3
**need** 5:7, 22:3
30:23, 52:19
57:3, 57:4, 65:6
90:11, 111:3
**needed** 10:8
27:4, 32:23
52:16, 66:23
66:24
**needs** 5:6, 5:7
22:5, 32:9, 90:9
113:5
**neither** 114:21
116:12
**never** 5:19, 11:8
34:24, 35:10
35:12, 40:24
43:19, 58:14
61:18, 63:23
71:17, 79:21
80:2, 81:12
108:15, 108:16
**night** 41:15
41:17, 41:18
**normal** 11:18
12:20, 15:9
15:13
**Notarial** 116:16
**Notary** 2:5

116:4, 116:5
116:22
**note** 84:23
**notice** 2:3
**notified** 17:3
17:14
**notify** 32:11
33:25
**November**
116:6, 116:17
**Number** 116:5

**O**

**oath** 57:13
**Object** 18:9
19:22, 26:2
26:16, 28:4
31:16, 35:1
40:5, 42:16
43:13, 44:19
45:11, 46:10
47:4, 48:18
49:22, 53:1
53:19, 56:15
60:13, 60:19
62:5, 63:9, 64:4
66:20, 71:20
74:15, 75:22
80:19
**objection** 6:16
61:25, 101:2
**objections** 6:16
**obstruct** 96:4
**obstruction**
29:10, 93:4
93:5, 93:10
93:16, 95:14
96:3
**obviously** 72:14
**occur** 23:6
**occurred** 81:8
82:15, 97:11
**occurs** 89:22
95:15
**October** 1:10

2:7, 4:1
**Off-the-record**
7:8
**offense** 93:17
**office** 7:13, 10:3
64:16, 78:19
112:6
**officer** 4:14
10:4, 12:6
12:20, 15:1
15:12, 15:16
18:12, 19:1
19:9, 21:13
21:14, 21:20
22:1, 22:12
22:13, 23:23
24:9, 24:16
24:23, 26:20
27:3, 29:4
29:11, 33:17
38:19, 44:15
45:18, 46:19
47:15, 47:21
48:1, 49:6, 49:9
49:9, 52:2
65:17, 70:8
70:9, 70:12
70:13, 70:14
72:3, 78:25
81:2, 83:16
94:25, 95:1
95:2, 95:16
95:25, 96:1
96:9, 96:14
96:15, 96:15
96:16, 97:6
97:18, 97:19
98:18, 99:1
99:2, 102:25
103:20, 103:23
104:10, 104:11
104:18, 105:16
105:22, 106:18
107:12, 109:25
110:16, 112:18
112:20, 113:1

**officers** 4:17
25:21, 25:23
28:20, 35:15
38:20, 41:16
62:22, 63:18
82:19, 101:8
**offices** 2:7
**official** 29:3
29:25, 90:23
**Oh** 86:21, 88:7
**okay** 4:17, 5:4
5:20, 5:24, 6:1
6:19, 8:18, 14:3
18:11, 19:24
20:23, 21:7
21:25, 22:15
23:14, 24:19
24:22, 26:7
26:18, 27:10
27:16, 27:19
27:22, 29:23
30:7, 30:17
30:24, 30:25
32:2, 32:19
35:15, 39:18
40:1, 40:17
41:9, 43:17
48:2, 50:22
51:3, 55:6
65:24, 71:4
72:23, 74:5
74:12, 75:3
75:9, 75:21
76:6, 76:9
76:11, 76:15
77:5, 77:15
77:24, 78:8
78:17, 83:20
86:24, 87:23
88:1, 88:19
88:21, 90:3
93:12, 93:15
96:4, 99:11
100:1, 100:3
100:3, 100:15
101:4, 101:19

101:21, 102:2
106:1, 107:18
108:7, 112:14
114:9, 114:18
**old** 49:20
**once** 5:3
**open** 14:1, 19:2
**Opened** 19:5
**opens** 93:12
**operate** 85:5
**opinion** 104:12
104:13, 109:10
112:16, 113:25
**opinions** 56:2
**order** 54:12
54:18, 54:19
54:21, 62:21
104:6
**ostensibly** 23:22
**outstanding**
31:2
**overhead** 73:9

**P**

**P.C** 2:16
**pad** 85:21
**PAGE** 3:2
**panel** 22:19
**Pannell** 13:3
17:8, 17:11
17:14, 17:15
18:7, 18:17
22:10, 22:14
25:1, 35:10
36:18, 37:7
37:21, 41:11
57:22, 75:9
94:13, 109:11
**Pannell's** 39:12
**parking** 13:24
14:1, 14:19
23:8, 23:8
23:11, 25:18
74:6, 75:4, 75:5
84:4, 85:17

**part** 15:6, 35:17
59:22, 83:23
84:3, 85:16
86:6, 86:8
87:19, 87:21
87:25, 88:24
89:2, 89:20
92:11
**participated**
77:9
**party** 116:13
**passing** 56:6
**patrol** 12:6
27:6, 28:7
30:19, 31:22
31:25, 57:23
**PAUL** 2:14
**paused** 52:4
**pavement** 75:10
98:4
**pay** 112:17
**penalty** 6:11
**people** 26:21
27:8, 32:24
38:14, 38:17
38:20, 39:1
42:9, 46:20
48:23, 62:2
62:8, 62:12
62:25, 63:2
63:7, 63:16
65:19, 69:9
69:10, 69:11
86:16, 101:23
111:8
**people's** 65:10
**perceive** 40:11
46:8, 46:14
**perceived** 110:9
**percent** 69:21
**percentage**
52:10, 52:11
52:12, 53:8
53:9
**period** 5:14
20:12

**peripherals**
76:19, 78:6
**perjury** 6:12
**person** 20:22
29:7, 31:4, 31:9
102:1
**personal** 57:9
76:2
**personally**
15:21, 15:22
45:25, 45:25
46:7, 78:12
83:5, 105:4
**persons** 30:16
31:14
**phone** 7:5, 7:7
68:20, 68:23
68:24, 68:25
69:2, 69:5, 69:5
69:14, 69:18
74:13
**phones** 69:10
**physical** 22:1
**physically** 80:13
95:20
**pick** 69:18
69:20, 106:25
107:9
**picked** 20:5
20:21, 25:16
69:19, 69:21
69:22, 105:1
**picture** 61:6
**pin** 30:23
**pinned** 33:6
71:15
**pipes** 84:10
**piss** 5:19
**place** 12:13
28:7, 28:10
29:16, 29:18
30:15, 31:10
33:13, 34:4
94:12, 97:8
99:13, 102:19
110:18

**placed** 21:7
27:5, 28:17
29:19, 30:19
33:20, 35:4
38:6, 96:21
108:19, 113:22
**Plaintiffs** 1:4
2:15
**plate** 13:18
54:3
**play** 50:15
80:22, 81:23
**playing** 83:11
83:24, 84:5
84:16, 85:8
86:11, 88:14
88:22, 89:6
**please** 6:4
44:23
**plenty** 5:10
**POII** 12:18
**point** 13:16
15:15, 16:9
18:8, 19:1, 19:9
21:2, 21:9
21:22, 22:9
23:24, 24:23
26:19, 27:2
29:15, 29:17
31:25, 32:22
33:1, 33:12
33:15, 33:19
36:14, 38:3
41:2, 44:22
47:8, 47:11
47:14, 48:9
57:3, 57:4
58:17, 59:4
61:2, 63:1
67:17, 67:18
67:18, 68:10
69:2, 69:13
70:6, 70:24
72:2, 74:4
75:18, 76:5
76:7, 78:22

79:7, 80:6
83:15, 83:16
92:8, 92:8
92:21, 92:25
95:4, 96:11
98:6, 99:9
100:3, 100:9
101:15, 102:22
105:15, 106:3
106:19, 107:4
108:22, 109:11
109:14, 111:2
111:5, 113:15
114:15
**pointer** 88:12
**pointing** 105:16
**poke** 34:10
34:12
**police** 8:13, 9:19
10:4, 12:20
20:9, 20:22
21:2, 28:15
28:17, 28:19
29:8, 29:19
29:21, 30:14
30:15, 31:11
32:20, 32:25
33:21, 45:17
62:22, 67:10
95:16, 100:17
100:22, 102:13
112:5
**policies** 90:23
**policy** 28:8, 29:1
29:3, 29:3
29:25, 30:8
31:13, 31:20
33:4, 33:7
41:18, 47:25
**portion** 67:9
**position** 75:10
**positioned** 20:1
**possession**
50:19, 51:7
51:13, 52:4
**possessions**

50:14
**Possibly** 37:9
**potential** 63:5
**pounds** 84:12
84:13, 96:9
107:17, 107:18
**pouring** 62:2
**power** 30:16
**practice** 15:9
15:13, 51:21
51:22, 52:1
52:6, 56:19
66:14
**preliminary** 5:5
**prepare** 7:10
**present** 36:3
36:4
**presented** 85:2
**presumption**
21:25, 22:2
**pretty** 14:18
15:10, 73:9
76:23, 98:1
**prevent** 96:23
97:2, 108:22
108:23, 109:2
112:4, 112:12
112:16
**prevented**
102:14, 103:12
108:21, 112:2
114:11
**prior** 77:17
77:18, 77:19
77:21
**probable** 29:5
29:9, 29:11
92:24, 93:9
96:3
**probably** 10:11
37:5, 39:21
42:1, 45:18
60:5, 66:19
84:13, 86:4
98:14, 106:16
106:17, 109:12

**probationary**
12:19
**problem** 95:5
**proceeding**
116:14
**proceedings**
65:12
**process** 11:8
11:9, 79:15
**Professional** 2:5
116:3
**promoted** 12:16
**promotions**
12:15
**provide** 64:10
**public** 2:5
61:24, 116:4
116:22
**pull** 25:10
26:23, 26:24
38:10, 41:10
49:19, 87:5
100:24, 101:11
107:15
**pulled** 13:14
14:15, 51:13
51:22, 52:3
52:23, 101:23
101:25, 102:1
102:3
**pulling** 14:19
26:23, 27:12
47:10, 94:24
107:3
**punch** 59:20
**punched** 59:21
**purpose** 15:4
15:8, 16:4, 16:6
23:21, 25:24
27:20, 27:22
27:25, 54:13
100:4, 103:5
103:7
**pursuant** 2:2
**push** 91:19, 94:2
95:20, 95:25

104:14
**pushed** 44:17
58:18, 65:24
66:1, 72:19
79:1, 79:3
80:24, 81:2
81:19, 105:14
**pushing** 44:16
92:14, 92:16
97:19
**put** 11:25, 20:7
24:18, 27:17
28:11, 28:14
28:19, 29:8
29:21, 65:15
66:11, 68:3
70:4, 70:20
70:21, 70:25
72:8, 73:20
74:2, 74:3, 74:6
74:17, 75:19
76:12, 79:25
80:1, 87:9
91:16, 91:24
95:3, 95:7
95:10, 95:11
96:17, 96:18
97:14, 97:20
97:21, 97:23
97:24, 98:9
99:3, 99:10
100:22, 103:1
104:2, 104:7
104:18, 104:19
105:8, 105:23
107:1, 109:13
111:3, 111:9
113:6, 114:8
**putting** 24:20
94:12, 96:5
108:21

**Q**

**quarter** 22:19
**question** 6:4

6:5, 6:9, 29:24
32:7, 51:2
51:24, 72:14
81:6, 93:2
93:24, 102:6
**questions** 6:22
82:12, 91:2
91:3, 92:2
114:20
**quick** 7:7, 83:3
94:18
**quickly** 20:11
57:18
**quite** 71:25

**R**

**radar** 13:15
**radio** 16:7
16:10, 56:4
57:11, 62:16
**raised** 45:16
**ran** 52:3
**reach** 19:2
**reached** 69:1
**Reading** 115:3
**real** 7:7, 43:7
89:24
**realize** 73:7
**really** 25:21
33:5, 72:5
76:14, 83:3
84:20
**rear** 75:11
**reason** 24:3
48:15, 70:3
70:3, 77:8
100:12, 100:16
**reasonable** 29:5
30:10, 31:6
31:24, 48:12
54:15, 54:20
55:1
**recall** 15:2
15:20, 15:22
20:14, 40:21

58:18, 59:7
64:22, 65:3
69:19, 69:21
70:21, 71:22
78:10, 78:12
80:4, 81:14
81:17, 82:14
83:5, 83:10
83:14, 91:12
95:9, 98:2
98:23, 99:3
**received** 12:15
108:3
**Recess** 82:8
**recognize** 53:24
54:5, 54:12
**recollection**
68:23, 72:5
**record** 53:17
53:22, 82:7
82:10, 84:24
100:15, 115:1
**recording** 68:19
68:22
**Reed** 15:25
17:6, 17:7, 18:5
18:12, 19:1
19:10, 21:13
21:14, 22:12
22:13, 23:23
24:9, 25:11
26:8, 27:3
29:12, 33:17
37:3, 37:3, 42:7
43:23, 47:15
47:21, 48:1
49:6, 55:10
56:4, 57:11
58:3, 59:10
70:14, 74:6
75:10, 75:18
78:25, 79:11
79:11, 79:21
80:2, 80:2
81:11, 81:11
81:12, 82:14

83:16, 94:25
95:1, 95:2
96:14, 96:15
96:15, 97:6
97:18, 97:20
97:24, 98:23
99:1, 99:2
99:10, 100:23
102:25, 104:10
104:18, 105:22
106:18, 107:8
107:12, 109:25
110:16, 112:18
113:2
**Reed's** 17:20
17:21, 24:16
24:23, 26:20
104:23, 107:8
**refuse** 32:18
**refused** 15:18
24:4, 47:13
**refuses** 56:14
**refusing** 32:14
47:7, 94:4
**regard** 7:23
29:24
**regarding** 77:20
**Registered** 2:4
116:3
**Registration**
116:5
**regular** 12:19
85:20
**related** 9:9
39:23, 39:25
80:10, 116:13
**relation** 59:3
80:11
**remember**
12:21, 13:7
15:21, 20:18
20:19, 22:19
22:21, 34:6
34:9, 34:11
35:14, 39:22
39:24, 44:6

57:15, 57:16
57:16, 57:19
58:15, 58:17
62:17, 62:18
62:20, 65:3
67:17, 68:17
68:21, 68:24
69:4, 69:25
78:13, 91:18
95:9, 95:10
95:11, 96:17
104:9, 104:15
105:3
**remove** 19:10
47:12
**removing** 20:20
**REPORTED**
1:25
**reporter** 2:5
5:18, 5:19, 51:5
116:3
**residents** 38:21
**resist** 91:22
**resisted** 91:22
**resisting** 111:6
**resources** 48:23
**respect** 69:16
**responding**
62:22
**responds** 41:15
**response** 6:5
**result** 31:4
**returned** 99:1
**reviewed** 13:1
**ride** 32:4, 32:9
32:10, 32:10
**right** 4:8, 4:11
4:19, 4:24, 5:2
5:4, 6:20, 6:25
8:24, 10:13
10:21, 11:2
11:11, 12:8
12:21, 12:25
13:3, 13:12
13:21, 14:9
14:11, 14:16

14:20, 14:25
15:4, 15:19
15:24, 16:2
16:21, 17:3
17:6, 17:12
17:25, 18:18
18:24, 19:18
21:3, 22:4, 22:9
22:13, 22:17
23:11, 23:12
23:22, 24:1
24:7, 24:24
25:22, 25:25
27:1, 27:13
28:22, 28:25
29:7, 30:12
31:9, 32:15
32:18, 33:22
33:25, 34:8
34:25, 35:21
36:9, 36:21
37:7, 37:8, 38:8
38:12, 38:15
39:9, 41:12
41:15, 42:7
42:8, 42:14
42:20, 42:20
42:24, 43:4
43:10, 43:12
43:20, 43:23
43:25, 44:2
44:9, 44:9, 44:9
44:12, 45:1
45:6, 46:6, 46:8
46:9, 46:21
48:11, 48:15
48:21, 51:10
51:11, 54:18
54:20, 54:22
55:11, 55:22
57:13, 57:17
57:21, 57:25
58:3, 58:5, 58:7
58:11, 58:25
59:9, 59:12
59:17, 59:17

59:20, 59:23
60:24, 61:2
61:2, 61:4, 61:5
61:5, 61:10
61:10, 61:13
61:16, 61:21
62:12, 62:13
62:15, 62:16
62:24, 63:2
63:21, 64:15
64:16, 64:17
65:2, 65:8
65:12, 65:14
66:3, 66:6, 66:9
66:13, 66:19
67:7, 67:13
67:23, 68:3
68:4, 68:13
69:25, 70:2
70:17, 71:10
71:13, 71:14
71:15, 71:18
73:13, 74:7
74:18, 75:11
75:12, 75:18
76:21, 76:24
77:15, 77:15
77:25, 78:8
78:9, 79:22
79:25, 80:2
80:15, 80:16
80:18, 81:3
81:6, 81:7
81:10, 81:16
82:3, 82:6
83:14, 84:7
84:8, 84:18
85:1, 85:11
85:15, 85:22
86:6, 88:8
88:12, 88:13
88:21, 88:23
89:3, 89:3, 89:9
92:19, 93:11
93:22, 94:20
95:13, 98:2

98:7, 98:25
99:4, 99:20
100:11, 101:1
101:17, 101:20
101:21, 101:24
102:8, 103:4
103:18, 104:8
104:21, 104:23
105:11, 106:9
106:11, 106:12
106:14, 108:8
108:8, 108:20
109:8, 109:23
110:3, 110:8
110:19, 110:21
110:24, 111:12
111:15, 111:18
111:21, 111:23
111:24, 113:6
113:12, 113:16
114:4, 114:16
**riot** 63:4, 63:5
63:13
**rise** 4:15
**River** 2:12
10:17
**Road** 2:12
49:19
**Roanoke** 10:20
**Rob** 61:11
61:12, 61:13
63:24, 64:12
68:2, 68:7
73:19, 76:25
77:10, 77:20
77:25, 109:18
111:9
**Rob's** 68:8
68:13
**Robbin** 61:11
61:12, 77:16
**rocks** 61:4
**rocky** 42:13
44:17
**rolling** 82:16
83:6

roughly 11:17
routine 82:19
routinely 21:18
  49:8
RPR 1:25
rule 6:17
rules 5:18
run 23:22, 24:24
  26:8, 26:12
  26:12, 26:14
  27:3, 49:7
  50:10, 50:11
  60:4
running 25:5
  25:24, 43:11
  58:8, 84:3, 86:9

**S**

Salem 2:17
sales/labor 10:7
Sandidge 39:6
  39:16, 63:24
Sandidge's
  39:15
satisfactorily
  11:23
saw 13:17, 19:1
  46:25, 61:18
  63:23, 64:12
  64:13, 68:5
  68:7, 68:9
  79:16, 79:17
  79:21, 81:12
  110:1, 112:21
  113:2
saying 25:10
  27:25, 34:11
  60:12, 70:21
  71:9, 74:5
  78:13, 83:10
  86:19, 95:10
  95:12, 112:13
says 74:6, 75:19
  97:24, 99:3
  99:10, 104:18

105:20, 110:16
scenario 32:21
scene 25:24
  35:16, 49:6
  70:7, 76:3
  78:11, 78:22
  92:11, 95:5
  101:8, 110:10
  111:1
school 10:11
  10:14, 10:16
  10:17
screaming
  26:21, 27:9
  40:8, 62:13
  84:8, 84:14
  92:13, 94:4
  94:24, 96:14
  97:19, 103:21
  105:17, 113:2
screenshot
  86:22, 86:23
  87:22
seal 116:16
search 15:7
  15:11, 17:15
  20:22, 27:21
  27:24, 28:3
  28:7, 29:7
  30:16, 31:14
  33:23, 34:19
  34:22, 34:25
  35:11, 35:13
  37:21, 48:7
  56:20, 56:21
  56:22, 57:2
  57:4, 102:19
  105:8, 109:12
  109:13
searched 28:11
  30:20, 31:25
  32:5, 32:12
  32:21, 33:1
  34:1, 34:4
  34:15, 34:17
  35:5, 102:12

102:16, 102:23
  103:22, 107:21
searching 29:20
second 7:6, 8:11
  88:13
seconds 19:14
  25:12, 37:25
  41:24, 57:25
securing 75:12
see 5:16, 11:8
  22:1, 40:1
  46:20, 47:15
  58:5, 58:12
  59:4, 59:5
  60:25, 65:20
  66:23, 68:8
  68:8, 73:8
  73:23, 73:23
  73:25, 74:1
  76:19, 85:15
  86:14, 86:19
  87:4, 87:7
  88:20, 89:4
  89:4, 89:13
  99:21
seeing 66:24
seen 7:12, 17:19
  65:18, 69:13
  78:5, 80:17
  89:18, 110:1
sent 7:13
separate 32:23
  33:11
September 8:4
serve 8:23
set 13:19, 75:1
  84:10
Seth 15:25
  17:20, 17:21
  59:10, 74:6
  75:4, 83:12
  83:15, 83:16
  98:23
Seth's 83:15
Shanta 1:3, 39:5
  39:11, 39:15

40:2, 59:9, 61:3
  61:4, 65:1
  65:16, 65:23
  65:24, 66:1
  66:9, 68:12
  71:23, 72:22
  73:2, 73:12
  73:14, 74:7
  74:9, 75:13
  75:16, 75:20
  76:4, 76:8
  76:18, 77:4
  77:7, 78:7
  78:23, 79:6
  79:22, 79:23
  80:12, 81:1
  84:3, 84:18
  86:9, 86:25
  91:7, 91:9
  91:12, 95:3
  96:12, 97:8
  97:11, 97:15
  97:15, 102:20
  102:24, 103:24
  104:11, 105:6
  105:10, 105:23
  106:15, 106:19
  107:4, 107:5
  109:16, 109:17
  110:2, 110:4
  110:9, 110:14
  110:22, 111:6
  112:8, 114:2
  114:12
she'll 5:25
sheriff's 8:1
  10:3
shifted 94:7
shirt 68:14
Shoe 14:4
short 5:13
  62:21
shoulder 94:3
shoved 79:23
show 67:5
  69:11

showed 15:25
  61:17
showing 16:4
  16:6, 66:22
shows 61:11
  61:15, 66:13
  67:13
shut 6:8
side 10:20
  14:10, 25:22
  37:21, 37:22
  41:3, 44:5
  44:24, 58:11
sidewalk 19:17
  19:19, 23:12
  71:24, 72:4
  72:6, 72:7, 98:3
signature 115:3
simple 50:19
  51:7, 63:3
single 53:6, 53:6
sir 4:9, 4:12
  4:16, 4:23, 5:1
  5:9, 5:15, 5:21
  6:2, 6:10, 6:13
  6:19, 6:21, 6:24
  7:17, 7:19, 7:22
  7:24, 8:2, 8:15
  8:17, 9:1, 9:5
  9:8, 9:11, 9:14
  9:23, 10:1
  10:15, 10:19
  10:22, 10:24
  11:13, 11:24
  12:5, 12:7
  12:10, 12:14
  12:18, 12:24
  13:2, 13:8
  13:13, 14:13
  14:15, 14:17
  14:21, 14:24
  15:3, 16:1, 16:3
  16:14, 16:15
  16:19, 17:10
  17:13, 17:24
  18:2, 18:4

18:19, 18:20
18:23, 19:13
19:16, 20:5
20:11, 21:6
21:10, 21:17
21:21, 22:8
22:14, 22:24
23:3, 23:13
23:20, 24:19
24:22, 29:22
33:24, 34:20
34:23, 35:14
35:24, 36:2
37:10, 37:24
38:1, 38:23
38:25, 39:4
39:8, 39:10
41:13, 41:19
41:22, 42:4
42:6, 42:18
43:9, 43:15
43:22, 44:5
45:5, 45:7
46:22, 46:24
48:5, 48:10
48:10, 48:14
48:23, 49:11
49:15, 50:5
50:15, 50:17
50:21, 51:9
52:8, 52:22
53:10, 53:14
53:22, 54:3
54:8, 54:11
54:17, 54:17
54:23, 54:25
55:9, 55:12
55:15, 55:19
57:24, 58:2
58:6, 58:10
59:1, 59:8
59:11, 59:16
59:21, 59:24
59:25, 60:7
60:21, 61:1
61:7, 61:9

61:14, 62:14
62:23, 63:22
64:13, 64:18
65:9, 65:13
66:8, 67:12
67:15, 70:12
71:16, 73:22
74:24, 75:8
75:17, 77:14
77:23, 78:5
82:18, 82:18
84:9, 86:7, 90:6
90:15, 90:18
90:21, 90:25
91:8, 91:11
91:25, 93:10
93:15, 94:10
94:13, 94:22
96:22, 99:16
100:7, 100:10
100:13, 100:18
101:7, 101:21
102:9, 103:9
103:11, 106:5
106:13, 106:16
106:24, 107:7
108:4, 108:6
108:9, 108:14
109:2, 109:3
110:20, 110:25
111:19, 111:25
112:11, 112:14
113:7, 113:11
114:6, 114:17
**sister** 39:14
39:24
**sitting** 14:2
74:12
**situation** 22:6
26:20, 27:6
28:21, 28:24
31:6, 32:23
33:9, 33:10
45:24, 46:1
46:16, 47:6
61:23, 66:15

71:1, 103:14
114:3
**situations** 31:3
**six** 10:11, 11:17
11:17, 11:19
37:5, 37:6
**six-two** 36:24
**size** 107:22
107:22
**Skinny** 37:17
**slam** 34:9
**slammed** 46:20
**small** 79:19
110:7
**snap** 97:21
**sniff** 24:24
25:25
**snippet** 86:13
**soaking** 107:19
**somebody** 11:4
15:14, 22:7
29:4, 31:21
45:21, 46:25
51:13, 51:22
52:3, 61:20
72:13, 72:15
85:18, 105:13
107:20, 111:4
111:15, 113:12
114:8
**somebody's**
50:13
**Something's**
87:12
**son** 46:2
**soon** 25:7
**sorry** 18:12
23:17, 41:6
41:7, 51:25
90:10, 114:6
**sort** 13:7
**sound** 43:11
**speak** 29:11
110:13
**speaking** 82:22
83:4

**specialized**
108:10
**specific** 31:5
94:1
**specifically**
34:21, 35:9
39:5, 40:10
**speculate** 24:15
33:18
**speculation**
24:11, 60:3
**speed** 49:20
**spiel** 34:5, 67:20
**spoke** 67:22
78:25
**spot** 14:20
68:10
**spots** 23:9
**squawking** 40:3
**stand** 45:9
85:20, 98:10
98:16, 98:17
98:19, 98:20
99:12
**standard** 66:14
**standing** 19:19
20:13, 20:14
20:17, 20:19
25:21, 42:12
80:15, 91:13
95:15, 97:25
98:6, 98:9
98:15, 99:11
99:18, 99:22
103:25, 105:11
**start** 8:3, 41:8
87:4
**started** 6:23
12:3, 16:20
16:23, 55:7
55:13, 55:17
68:3, 110:14
**starts** 87:3
**state** 24:16
**statement** 77:14
**States** 1:1, 54:1

54:10
**status** 12:19
12:20
**Staunton** 10:17
**stay** 110:21
110:21
**stayed** 12:18
71:18, 109:17
109:20, 113:8
**staying** 96:16
**step** 41:2, 41:5
**steps** 99:2
104:17, 105:21
110:17, 113:1
**stick** 34:10
34:12
**stop** 17:23, 18:1
18:8, 42:3, 48:3
52:5, 53:24
54:4, 54:6, 54:6
54:13, 54:14
54:19, 55:5
55:22, 56:3
56:8, 63:3
**stopped** 54:2
**street** 2:8, 12:1
12:12, 13:21
13:25, 14:9
14:14
**striking** 94:2
**struck** 79:2
79:4, 80:25
81:20, 95:17
105:13
**struggle** 19:3
19:4, 36:19
62:19, 76:18
**struggling** 36:18
73:10, 78:6
78:7, 103:21
**stuff** 66:12
83:23
**subject** 9:12
21:21, 22:2
**subjects** 108:1
**substantial** 67:9

**successful** 19:12
61:3
**sudden** 76:22
80:9, 110:15
113:4
**summer** 12:4
**summons** 16:16
16:20, 16:23
17:1, 18:15
55:8, 55:14
55:18, 55:23
**Sunday** 49:19
**superior** 70:9
70:10
**supervisor**
66:13, 66:16
78:10, 78:18
81:9, 81:10
83:8
**sure** 39:13
57:12, 57:14
102:6, 112:1
112:3
**surrounded**
91:14
**suspicion** 29:6
30:11, 31:7
31:24, 48:12
54:15, 54:21
55:2, 100:14
**SUV** 13:7, 17:8
**SUV-type** 13:9
**sweeps** 108:12
**sworn** 4:4, 6:14
116:8
**system** 40:22

**T**

**tag** 54:14, 63:3
**take** 2:3, 5:8
5:11, 5:14, 47:3
64:8, 66:4
66:12, 78:19
81:22, 83:8
83:17, 99:2

104:17, 105:21
109:15, 113:1
**taken** 2:1, 20:4
20:21, 22:25
23:1, 25:15
45:8, 70:16
109:10, 109:10
**talk** 5:23, 22:7
67:14, 81:11
82:20, 107:11
**talked** 7:15
55:6, 73:2
79:10, 79:11
79:16, 81:8
81:18
**talking** 12:22
25:9, 30:6, 31:5
43:24, 44:14
52:10, 72:22
72:23, 83:1
83:22, 84:17
90:20, 96:8
**tall** 36:23, 37:3
37:11
**task** 94:6, 94:9
94:11
**technology** 7:6
**tell** 5:25, 9:16
32:13, 34:2
34:3, 34:14
44:9, 46:3, 47:3
49:17, 59:22
60:1, 63:12
67:16, 75:1
75:1, 75:2
78:17, 79:2
81:12, 81:21
83:7, 83:21
91:1, 105:18
105:19, 112:21
112:24
**telling** 69:9
74:2, 78:10
80:7, 81:9
83:16
**tells** 81:12

110:18
**ten** 37:25
**tend** 21:21
**Tereika** 56:5
102:24, 104:12
110:1, 110:5
110:7
**terminated** 8:25
**Terron** 13:3
19:10, 19:11
22:10, 26:22
39:11, 40:25
41:1, 41:10
41:11, 61:10
66:10, 70:15
71:15, 75:9
83:8, 83:23
84:7, 94:12
96:5, 96:6
96:13, 96:21
97:19, 104:3
104:5, 104:24
105:1, 106:15
108:15, 109:11
111:4, 111:14
112:18, 112:24
113:13, 113:21
114:1, 114:2
**Terron's** 39:16
84:10, 104:2
**testified** 4:4
27:22, 31:11
48:21, 58:20
59:6, 64:16
64:20, 74:9
80:1, 110:8
**testify** 47:21
53:6, 57:13
64:11, 67:21
78:1, 113:3
**testifying** 6:11
59:7
**testimony** 65:7
77:6, 116:10
**Thank** 115:1
**theory** 81:25

**thereof** 116:15
**thing** 36:11
66:19, 68:7
68:20, 81:23
85:14, 87:3
90:11, 103:1
**things** 30:2
57:19, 82:13
99:16, 107:23
108:12
**think** 11:17
11:18, 12:17
13:8, 20:9
23:15, 28:20
35:20, 36:6
36:16, 36:16
39:14, 60:17
64:22, 65:1
66:5, 66:23
69:4, 69:15
69:20, 69:20
69:22, 84:17
85:24, 89:13
90:10, 90:15
92:9, 93:9
113:20
**Thomas** 49:19
**thoroughly**
109:13
**thought** 52:16
101:25
**threat** 110:9
**three** 15:25
25:21, 25:23
35:20, 109:12
110:16, 110:17
111:7, 111:8
**throw** 72:15
72:16, 102:12
**thrown** 45:2
45:17, 45:21
47:1, 47:2
61:19
**Timberlake**
2:12
**time** 5:10, 5:11

5:14, 5:14, 8:21
12:14, 15:10
16:14, 16:15
17:2, 17:24
20:24, 20:25
27:8, 27:14
28:20, 28:23
29:4, 29:9
29:25, 35:18
35:18, 36:6
37:9, 38:13
39:20, 39:22
40:12, 41:19
42:9, 49:13
49:14, 51:18
51:22, 51:23
53:6, 53:6, 53:8
53:10, 53:14
53:15, 58:12
59:2, 62:3, 69:7
69:23, 69:25
85:4, 85:6, 90:2
92:7, 93:7
94:14, 94:15
98:7, 98:8
99:10, 99:17
102:15, 102:16
104:4, 104:23
109:20, 113:17
114:9
**times** 5:2, 18:18
49:15, 49:16
50:14, 52:7
52:10, 53:7
82:22, 83:3
**title** 4:20
**today** 7:11
**told** 7:18, 72:13
72:15, 79:21
80:2, 80:4
91:15, 91:17
94:5, 98:10
98:16, 98:16
98:19, 98:20
99:12, 113:4
**toned** 36:19

| | | | | |
|---|---|---|---|---|
| **top** 9:16, 82:17 | 102:25, 105:18 | 25:16, 25:21 | 34:14, 47:8 | 101:5, 114:18 |
| **total** 10:11 | 105:22 | 30:2, 37:20 | 52:14, 86:1 | 115:1 |
| **touch** 43:12 | **trying** 19:9 | 41:16, 58:9 | 100:19 | **VCIN** 50:11 |
| 85:20 | 19:10, 26:23 | 80:14, 94:18 | **uses** 9:15 | 52:3 |
| **touched** 43:19 | 26:24, 27:14 | 94:20, 99:2 | **utilize** 16:11 | **vehicle** 13:9 |
| 59:13 | 31:20, 32:6 | 104:6, 104:17 | | 14:12, 15:7 |
| **touching** 95:16 | 32:22, 33:2 | 105:21, 107:14 | **V** | 15:12, 17:16 |
| 95:23 | 33:5, 33:13 | 109:10, 110:16 | | 19:11, 19:20 |
| **town** 11:12 | 38:4, 38:9 | 113:1 | **Valois** 2:14 | 20:2, 20:3 |
| 102:1 | 38:10, 42:15 | **two-on-one** | 2:15, 3:4, 3:6 | 21:15, 22:16 |
| **traffic** 13:17 | 44:21, 46:4 | 41:18 | 4:6, 7:9, 18:16 | 22:20, 22:21 |
| 13:20, 14:2 | 47:15, 50:23 | **type** 45:16 | 19:25, 26:4 | 22:23, 23:2 |
| 17:23, 42:2 | 50:24, 60:18 | | 26:25, 28:12 | 27:3, 27:15 |
| 48:3, 53:24 | 61:6, 72:3 | **U** | 32:1, 32:7, 33:2 | 28:10, 32:6 |
| 54:4, 54:6, 54:6 | 72:10, 73:11 | | 35:7, 40:9 | 34:23, 36:7 |
| 54:6, 54:13 | 73:15, 73:20 | **Uh-huh** 16:18 | 42:19, 43:16 | 36:7, 38:5 |
| 56:3, 56:8 | 74:3, 74:24 | **unable** 87:16 | 44:25, 45:13 | 40:25, 41:3 |
| **trained** 33:8 | 78:2, 78:22 | 103:22, 114:10 | 46:13, 47:17 | 44:23, 47:7 |
| 33:9, 49:4 | 78:24, 85:4 | **understand** | 48:19, 50:1 | 47:10, 47:12 |
| 107:25, 108:7 | 90:10, 92:15 | 21:4, 54:24 | 51:1, 51:6, 53:3 | 47:13, 47:14 |
| **training** 11:14 | 93:13, 93:21 | 65:8, 65:10 | 53:23, 56:17 | 47:19, 47:23 |
| 11:15, 11:18 | 94:12, 94:24 | 93:17, 99:25 | 60:15, 60:22 | 56:22, 56:23 |
| 11:21, 90:17 | 95:24, 96:10 | 102:5, 108:23 | 62:1, 62:9 | 57:5, 70:17 |
| 108:3, 108:4 | 98:21, 98:22 | 110:6, 112:3 | 63:14, 64:7 | 94:13, 100:24 |
| 108:5, 108:10 | 100:2, 100:2 | **understanding** | 67:1, 72:9 | 101:12, 101:15 |
| 108:11 | 100:7, 102:21 | 28:14, 29:2 | 74:20, 75:24 | 101:18, 102:4 |
| **transcribed** 2:2 | 102:24, 104:22 | 29:25, 30:8 | 80:21, 81:21 | 102:11, 109:14 |
| **transcript** | 105:24, 105:24 | 30:18, 31:20 | 81:25, 82:1 | **vehicles** 101:24 |
| 116:10 | 107:4, 107:15 | 33:3, 33:7 | 82:6, 82:9 | **verbatim** 74:3 |
| **transpired** | 114:10, 114:19 | 47:21, 47:22 | 82:11, 83:19 | 81:15, 105:19 |
| 79:17 | **tugging** 107:3 | 47:24, 47:24 | 84:1, 84:6 | **verbatimally** |
| **travel** 8:21, 8:21 | **turn** 42:24 | 75:25, 95:14 | 84:19, 85:1 | 34:16 |
| **treat** 69:15 | 63:12, 80:9 | 101:14 | 85:9, 85:19 | **vertical** 37:22 |
| **trial** 58:20, 59:6 | 80:24, 80:25 | **unfortunately** | 85:24, 86:5 | **vest** 68:16 |
| 59:7 | 88:17, 97:18 | 93:11 | 86:8, 86:21 | **video** 5:12, 40:1 |
| **tried** 38:3, 38:5 | 99:6, 104:17 | **uniform** 35:25 | 87:2, 87:9 | 58:5, 80:18 |
| 56:22 | 104:19, 110:12 | 61:16 | 87:11, 87:21 | 80:22, 83:11 |
| **true** 116:9 | **turned** 38:6 | **United** 1:1, 54:1 | 87:24, 88:4 | 83:24, 84:5 |
| **trust** 45:21 | 59:24, 60:8 | 54:10 | 88:6, 88:7 | 84:16, 84:21 |
| **truthfulness** | 61:1, 69:2, 80:8 | **units** 36:13 | 88:11, 88:17 | 84:23, 84:24 |
| 65:11 | 98:23, 109:25 | 36:13 | 88:20, 89:1 | 85:2, 85:3, 85:7 |
| **try** 6:3, 6:6, 15:7 | **tussle** 67:24 | **unsure** 14:8 | 89:7, 89:10 | 85:8, 86:11 |
| 27:6, 33:11 | **twelve** 63:20 | 110:15 | 89:14, 89:18 | 86:22, 87:8 |
| 33:11, 44:8 | **twice** 10:10 | **upset** 66:18 | 89:22, 90:4 | 87:10, 88:14 |
| 46:2, 87:11 | **two** 8:7, 15:24 | 66:23, 67:2 | 90:7, 90:12 | 88:22, 89:6 |
| 95:1, 96:2 | 21:24, 23:10 | **use** 7:4, 9:12 | 91:1, 92:4 | 89:23, 89:23 |

99:21
**videos** 81:24
**videotaping**
73:17
**view** 26:20
29:16, 76:3
96:11, 105:15
**viewing** 84:24
**violated** 46:23
47:1
**violation** 54:14
**Virginia** 1:1
1:12, 2:6, 2:9
2:13, 2:17
116:1, 116:5
116:17, 116:23
**VLC** 85:11
85:13

**W**

**WADDELL**
2:16
**wait** 5:16, 6:4
6:6, 6:6, 48:20
**waited** 55:16
**waived** 115:3
**walk** 38:5, 104:6
111:18
**walking** 56:6
105:15, 110:4
112:20
**want** 4:22, 8:22
13:6, 22:18
24:11, 24:12
24:15, 24:17
24:17, 24:18
24:20, 51:1
67:5, 67:5
69:14, 69:24
83:13, 84:23
86:1, 86:7, 88:9
88:24, 89:1
89:3, 89:4
89:21, 90:5
90:6, 107:21

108:20, 112:1
112:3, 112:25
**wanted** 11:8
26:5, 27:17
35:6, 35:6
102:5
**wanting** 67:4
**wants** 49:7
111:9
**warehouse**
13:23, 13:23
13:25, 14:6
**warrant** 31:14
78:20
**warrants** 31:2
66:12
**waste** 85:5
**wasting** 90:1
**watch** 17:21
17:22, 105:5
113:15
**watched** 12:25
**watching** 14:2
40:22
**way** 5:22, 9:11
33:10, 45:16
49:4, 69:17
77:6, 106:2
**We've** 73:2
**weapons** 34:6
**wearing** 35:25
61:15, 68:13
**weed** 51:7
53:13
**weigh** 36:25
**weird** 88:11
**went** 11:11, 17:7
19:6, 33:22
34:5, 62:15
63:3, 64:15
71:23, 71:25
79:13, 79:14
79:15, 83:14
91:12, 97:3
102:17, 102:18
104:1, 106:15

106:22, 109:6
**WESTERN** 1:1
**wet** 107:19
**whatever's**
46:15, 46:16
**Whichever**
64:24
**wife** 80:11
**willing** 31:8
57:13
**window** 85:4
**wit** 116:1
**WITNESS** 3:2
18:11, 19:24
26:18, 28:6
31:18, 35:3
40:7, 42:18
43:15, 44:21
46:12, 47:6
49:24, 51:3
53:21, 60:21
62:7, 63:11
64:6, 66:22
71:22, 74:17
82:5, 83:12
84:17, 85:22
85:25, 86:3
86:6, 86:12
86:24, 87:6
87:14, 87:18
87:23, 88:1
88:9, 88:15
88:19, 88:21
88:23, 89:8
89:12, 89:20
90:3, 90:5
101:4
**witnessed** 81:13
**woman** 59:13
**word** 40:13
40:13, 67:17
67:18, 67:22
67:22, 104:15
104:15
**words** 24:18
24:21

**work** 4:10, 8:14
10:2, 10:9
47:25, 82:2
85:11, 86:5
90:9
**worked** 9:25
10:4
**working** 9:18
13:15, 85:7
**works** 5:17
**worry** 90:11
**wrestling** 76:22
76:24
**writing** 16:20
17:1, 18:14
55:8, 55:13
55:17, 55:22
**written** 16:16
**wrong** 44:7
75:2, 99:10

**Y**

**yanked** 45:2
**yeah** 4:21, 8:5
8:10, 9:7, 11:16
13:7, 14:5, 14:7
20:11, 23:15
24:14, 26:6
26:10, 36:10
36:16, 37:9
37:16, 37:16
37:18, 38:17
39:13, 39:13
40:7, 40:8
40:17, 40:17
40:18, 41:4
41:16, 41:25
42:1, 42:2
42:15, 43:3
43:19, 44:1
44:10, 44:13
44:18, 45:4
45:15, 46:12
46:15, 48:25
51:9, 51:17

61:6, 62:7
62:11, 62:17
63:7, 63:11
63:21, 64:6
66:15, 66:15
66:16, 67:8
68:2, 68:15
68:17, 68:19
69:3, 69:4, 73:5
79:13, 79:23
80:23, 82:1
82:5, 82:21
82:21, 84:2
84:11, 84:15
84:20, 85:14
85:15, 86:3
86:15, 86:15
87:14, 87:21
90:10, 91:15
92:22, 93:3
93:3, 93:16
98:11, 98:13
99:15, 99:24
103:15, 104:9
106:16, 106:18
108:2, 108:25
110:11
**year** 8:9, 8:11
10:25, 12:11
**years** 8:7, 10:11
30:2, 65:19
65:19
**yell** 110:11
110:12
**yelling** 27:9
40:13, 40:14
40:14, 40:19
62:13, 104:16
105:17
**yesterday** 83:2
**young** 13:3

**Z**

**Zach** 4:21
**Zachary** 1:9

**EXHIBIT 1**

2:1, 3:3, 4:3
4:13

## 1

**1** 43:5
**10:11** 1:11, 2:7
  4:1
**100** 69:21
**10-minute** 82:2
**11** 88:10
**11:51** 1:11
  115:2
**12th** 13:21
  13:25, 14:9
**15** 98:12, 98:14
**150** 37:15, 37:16
  84:12, 107:16
  107:18
**18** 37:8
**19th** 116:17

## 2

**2:00** 43:5
**20** 75:5, 98:14
**2013** 11:1
**2019** 9:20, 12:2
  12:3, 12:4
**2020** 12:9, 12:23
  30:7
**2022** 8:5
**2023** 8:8
**2024** 1:10, 2:7
  4:1, 116:18
**2025** 116:6
**22-ish** 8:4
**24153** 2:17
**24502** 2:13
**25** 74:12, 75:5
**280** 37:2
**285** 37:2
**28th** 12:22, 30:7
**29** 1:10, 2:7, 4:1

## 3

**30** 116:6
**300** 96:9
**359658** 116:6

## 4

**4** 3:4
**400** 96:9
**415** 2:17
**434.845.4529**
  2:13
**450** 84:13

## 5

**540.387.2320**
  2:18
**5-foot-6** 107:18

## 6

**6:23cv00054** 1:5

## 7

**7601** 2:12

## 9

**900** 2:8
**91** 3:5
**92** 3:6