IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

*******************************************************

SHANTA LYNETTE BROWN, et al.,

    Plaintiffs,

v.                             Case No. 6:23cv00054

THE CITY OF LYNCHBURG, et al.,

    Defendants.

*******************************************************

DEPOSITION OF SETH REED

October 29, 2024

12:09 p.m. – 1:06 p.m.

Lynchburg, Virginia

REPORTED BY:  Kimberly A. Henderson, RPR

```
 1        Deposition of SETH REED, taken and transcribed
 2   on behalf of the Defendants, pursuant to notice
 3   and/or agreement to take depositions; by and before
 4   Kimberly A. Henderson, a Registered Professional
 5   Reporter and Notary Public in and for the
 6   Commonwealth of Virginia at Large; commencing at
 7   12:09 p.m., October 29, 2024, at the offices of the
 8   Lynchburg City Attorney, 900 Church Street,
 9   Lynchburg, Virginia.
10   APPEARANCES OF COUNSEL:
11
12        JAMES RIVER LEGAL ASSOCIATES
          7601 Timberlake Road
13        Lynchburg, Virginia  24502
          434.845.4529
14        mvalois@vbclegal.com
     BY:  PAUL VALOIS, ESQUIRE
15        MARGARET VALOIS, ESQUIRE
               Counsel for the Plaintiffs
16
          GUYNN, WADDELL, CARROLL & LOCKABY, P.C.
17        415 S. College Avenue
          Salem, Virginia  24153
18        540.387.2320
          john@guynnwaddell.com
19   BY:  JOHN R. FITZGERALD, ESQUIRE
               Counsel for the Defendants
20
21
22
23
24
25
```

```
 1                    I N D E X

 2  WITNESS                                    PAGE

 3  SETH REED

 4      Examination by Mr. Valois              4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  (12:09 p.m., October 29, 2024)

 2

 3                    SETH REED

 4         was sworn and testified as follows:

 5              E X A M I N A T I O N

 6  BY MR. VALOIS:

 7         Q.   Can you state your name, sir?

 8         A.   Seth Reed.

 9         Q.   All right.  And you're Officer Seth

10  Reed of the Lynchburg Police Department?

11         A.   Yes.

12         Q.   All right.  And you're here for a

13  deposition?

14         A.   Yes.

15         Q.   And you've given at least one

16  deposition before?  We've had one before; right?

17         A.   Yes.

18         Q.   All right.  I won't give you the

19  whole spiel, but if for any reason you need a

20  break, just let me know.

21         A.   Okay.

22         Q.   Be happy to accommodate that.  All

23  right.  We have to record this, so let's try not to

24  talk over each other.  I'm guilty of it, too, but

25  it makes it hard on the court reporter.  So if I
```

```
 1   could -- if you could wait until I finish asking my
 2   question.  I will try and wait until you finish
 3   answering a question, just to make her job easier,
 4   because she has to put this down in a transcript.
 5   Okay?
 6           A.    Okay.
 7           Q.    Everything you testify here under
 8   oath is subject to perjury, just like in court.
 9                 You understand that; correct?
10           A.    Yes.
11           Q.    You're able to testify today?
12           A.    Yes.
13           Q.    I see that you're injured, you have a
14   broken arm?
15           A.    Yes.
16           Q.    Are you under any medication, or
17   anything that would prevent you from being able to
18   testify accurately?
19           A.    No.
20           Q.    What have you done to prepare for
21   your testimony today?
22           A.    I read a report, my report, and the
23   initial report, and then I watched body camera,
24   in-car camera footage.
25           Q.    Did you discuss your testimony with
```

```
 1  anyone who is not an attorney?
 2          A.   No.
 3          Q.   You may hear objections from your
 4  counsel.
 5               Do you understand that unless your
 6  counsel instructs you not to answer that you can
 7  still answer despite the objection?
 8          A.   Yes.
 9          Q.   All right.  We've done this in a
10  previous deposition, but unfortunately we have to
11  do it in every deposition.
12               Can you tell us about your high
13  school, or your background, let's say, starting in
14  where you went to high school, where you lived at
15  the time, and then just move forward?
16          A.   I lived in New York State starting
17  high school.  I transferred high schools to LCA
18  down here in Lynchburg.  After LCA, or Liberty
19  Christian Academy, I attended Liberty University.
20  I graduated with my bachelor's degree at Liberty
21  University.
22          Q.   All right.  And can you tell me about
23  your job history, starting from your first job,
24  moving forward?
25          A.   How young?  I started working when I
```

**EXHIBIT 8**

```
 1  was like a child, ckck want raking leaves or like
 2  real employment?
 3           Q.   Let's start with a W2 actual job job.
 4           A.   Started working in food service in
 5  New York State.  I don't recall exactly how old I
 6  was, continued working in food service right
 7  through college.  That was my primary form of
 8  employment.  Just odds and end jobs here and there.
 9  2015, I was accepted to the Virginia Beach Police
10  Department.
11               That's where I started my law
12  enforcement career, was in the City of Virginia
13  Beach, attended the police academy there.  I
14  graduated the academy 2015.  I worked there until
15  roughly April of 2017, then I transferred here to
16  Lynchburg Police Department, where I'm currently
17  employed.
18           Q.   And what is your current position?
19           A.   I work in field ops.  I am assigned
20  to the K9 unit.
21           Q.   What is your rank?
22           A.   I'm a POIII.
23           Q.   And is that the highest level patrol
24  officer?
25           A.   Yes.
```

Page 8

```
 1              Q.   Have you been subject to any
 2   disciplinary proceedings either in any of your
 3   former employment?
 4              A.   No.
 5              Q.   Have you received any counseling from
 6   any of your employers for violations of policy?
 7              A.   We've had -- I've had, currently here
 8   in Lynchburg, I've had, they call it a policy
 9   training review, where they review, a supervisor
10   sits down and reviews, or re-reviews, a policy with
11   you.
12              Q.   How many of those have you had?
13              A.   I'm not sure.  Just a handful, a
14   couple.
15              Q.   What was the most recent one?
16              A.   I'm not sure.  It hasn't been
17   anything recent.
18              Q.   Anything related to the incident
19   involving Shanta Brown or Aquasha Brown?
20              A.   No, I did not have anything.
21              Q.   All right.  Moving forward to the
22   incident, we're talking about an incident that
23   occurred in April of 2020.
24              You familiar with that incident?
25              A.   Yes.
```

```
 1              Q.   And that's the body cam and the
 2    police reports that you reviewed?
 3              A.   Correct.
 4              Q.   All right.  Now, you were -- you
 5    didn't make the initial traffic stop?
 6              A.   Correct.
 7              Q.   At that time you were a K9 officer?
 8              A.   Yes.
 9              Q.   And your dog was Knox; is that right?
10              A.   Correct.
11              Q.   And Knox is trained in, I guess,
12    narcotics detection?
13              A.   Yes.
14              Q.   And so you were called to the scene
15    of a traffic stop; is that correct?
16              A.   Yes.
17              Q.   Who called you?
18              A.   Based off my recollection, I believe
19    Officer Miller called me.
20              Q.   Okay.  We have two Officer Millers
21    involved in this incident?
22              A.   Zach Miller.
23              Q.   Zach Miller; and how did he call you?
24              A.   I believe over the radio.
25              Q.   And your radio, is it multi-channel?
```

**EXHIBIT 8**

```
 1              A.   Yes.
 2              Q.   And would he have called you over the
 3  main channel?
 4              A.   I can't say whether or not, which
 5  channel.  Typically they call me over Channel 1.
 6              Q.   All right.  And was that to ask you
 7  to respond to his scene?
 8              A.   Yes.
 9              Q.   And what was your purpose in
10  responding?
11              A.   To conduct an open-air sniff around
12  the exterior of the vehicle.
13              Q.   All right.  And what is an open-air
14  sniff?
15              A.   Where the K9, you run the K9 around
16  the exterior of the vehicle.  And the K9, based off
17  an alert or no alert, will advise me, or I read his
18  behavior whether or not there's a presence or odor
19  of narcotics coming from the vehicle.
20              Q.   Do you open the doors or windows
21  before you conduct this free-air search?
22              A.   No.
23              Q.   Do you order occupants out of a
24  vehicle?
25              A.   Yes.
```

1          Q.    Does that involve opening the door to

2     get them out of the vehicle?

3          A.    Yes.  They have to open the door to

4     exit the vehicle.

5          Q.    And then you can -- after that, do

6     you leave the door open or do you shut the door?

7          A.    I close the door.

8          Q.    And leaving the door -- how soon

9     after you open the door and get them out do you

10    begin conducting this free-air search?

11         A.    Typically, I close the door after the

12    occupants exit.  Then I would walk back, retrieve

13    my K9 once when the occupants are out of the

14    vehicle, and then I would conduct an open-air sniff

15    around the exterior of the vehicle once the

16    occupants are out.

17         Q.    All right.  And the occupants would

18    be outside standing near the vehicle at this

19    point?

20         A.    I typically do not have them near the

21    vehicle.  I have them -- whenever possible, I'll

22    have them standing with another officer so I don't

23    have to worry about the occupants, I can just focus

24    on my K9.

25         Q.    All right.  And in this particular

```
1   case, when you rolled up on the scene, already

2   present were Officer Zachary Miller and Officer

3   Grooms, former Officer Grooms?

4            A.   Correct.

5            Q.   Right.  And you, when you got there,

6   you first contacted Officer Miller, and he told you

7   that consent had been denied; right?

8            A.   Yes.

9            Q.   And consent had been denied and that

10  you were going to conduct this search, this

11  free-air sniff of this vehicle; right?

12           A.   Correct.

13           Q.   All right.  Do you know why, why you

14  would ask for consent to a search prior to

15  conducting a free-air sniff, in practice?

16           A.   It's just the practice of the police

17  department, how we were trained.

18           Q.   And when you got there, you were

19  informed that the -- what was your reason, or what

20  reason was given to you for the detention there,

21  the traffic stop?

22           A.   I don't recall like off of memory.  I

23  recall based off of reading reports, if that's what

24  you're asking.

25           Q.   Well, yeah, I mean, why was -- what
```

```
 1  was the basis of the stop?
 2          A.   Based off of reading Officer Miller's
 3  report, the primary infraction was no front tag, no
 4  front license plate.
 5          Q.   But you didn't know that when you got
 6  there at the time?
 7          A.   I can't -- I don't know what my
 8  information was.  I can't testify to that.
 9          Q.   And so is it policy to get everybody
10  out of the car every time a free-air sniff is
11  conducted?
12          A.   That's how we were trained, yes.
13          Q.   Is it policy to bring a drug dog to
14  every traffic stop?
15          A.   No.
16          Q.   What's the criteria for calling you
17  to come for a traffic stop?
18          A.   Based off of what the officer is
19  encountering with the traffic stop.
20          Q.   Well, what kind of factors go into
21  that decision?
22          A.   If the potential suspect, or
23  occupants in the vehicle, are criminal gang
24  members, if they have drug history, a violent
25  history involving drugs are some of the factors
```

**EXHIBIT 8**

Page 14

```
 1  officers will call me to the scene to conduct
 2  open-air sniff.
 3          Q.   Any drug history?
 4          A.   I don't recall looking at his
 5  transcript prior to getting there.
 6          Q.   Well, I mean, if you have a -- if
 7  someone's pulled over, say, coming home from work,
 8  and they have a two-year-old possession of
 9  marijuana ticket, a conviction for possession of
10  marijuana, would that be the basis to call in a
11  drug dog?
12          A.   I can't say what other officers are
13  going to call in drug dogs for.  I'm there to
14  assist other officers within the department.
15          Q.   So you're responding to -- you don't
16  have any participation in determining whether
17  there's a reasonable and articulable basis for the
18  detention; right?  Your job is just to run the dog
19  around the car; right?
20          A.   Correct.
21          Q.   All right.  And so when you got there
22  on the 28th, Terron Pannell was in the driver's
23  seat of a vehicle that Miller had stopped for a tag
24  violation; right?
25          A.   Yes.
```

```
1              Q.   But what you later found out, you
2   didn't know this then, but you later found out to
3   be a tag violation?
4              A.   Yes.  Correct.
5              Q.   Right.  And then you went to the door
6   and informed him that you were going to be running
7   a free-air sniff and to get out of the vehicle;
8   right?
9              A.   Correct.
10             Q.   And he refused?
11             A.   Correct.
12             Q.   Right.  And so as he's doing this,
13  Shanta Brown, who is this kid's mother, comes out
14  of the building; right?
15             A.   I believe she was already out of the
16  building.
17             Q.   Was she there when you got there?
18             A.   I believe she was standing at the
19  front of the vehicle when I arrived.
20             Q.   Okay.  So she starts squawking about
21  how what you're doing is illegal; right?  Fair
22  characterization of what she's saying?
23             A.   Correct.  I don't recall exactly what
24  she said.
25             Q.   But she's not happy with what's going
```

**EXHIBIT 8**

Page 16

```
 1  on?
 2          A.   Correct.
 3          Q.   Right.  And so she gets redirected to
 4  another area.  She's been told to stop standing in
 5  front of that car and go stand to an area closer to
 6  the door to the apartment building.
 7               You remember that happening?
 8          A.   That's where I pointed, yes.
 9          Q.   Okay.  And she did that?
10          A.   I don't recall if she stood over
11  there or not.
12          Q.   All right.  So then the kid, or I say
13  the kid, Terron Pannell, refused to get out of the
14  car, and then eventually you had to drag him out of
15  the car; right?
16          A.   We had to physically place hands on
17  him to pull him out of the car, yes.
18          Q.   All right.  You, when I say "you,"
19  you and Zachary Miller did this?
20          A.   Yes.
21          Q.   Right.  And you got him out of the
22  car?
23          A.   Correct.
24          Q.   Right.  And he was placed in
25  handcuffs?  Well, he was taken to the ground at
```

**EXHIBIT 8**

Page 17

```
 1   this -- this location, he's in a car in a parking
 2   lot in a marked parking space; right?
 3              A.    Yes.
 4              Q.    And there's another car right next to
 5   him?
 6              A.    Correct.
 7              Q.    Right.  And you're in that slot in
 8   between the driver's side of the car Pannell was
 9   driving and the passenger side of another car that
10   was parked to the left of him?
11              A.    Yes.
12              Q.    Right.  And that's where this
13   occurred, that's where you're pulling him into that
14   area; right?
15              A.    Correct.
16              Q.    You and Miller, you and Zachary
17   Miller, managed to pull him out of the car.  He's
18   on the ground for a brief period.  He's handcuffed,
19   and then he's stood up and put, placed on the
20   sidewalk; right?
21              A.    We walked him back to the -- Zachary
22   Miller's police car.
23              Q.    Well, eventually, but at least for a
24   few moments, he's standing on the sidewalk; right?
25              A.    I don't remember if he's standing on
```

**EXHIBIT 8**

```
 1   the sidewalk or not.  You're talking about the
 2   driver?
 3              Q.   The driver; right?
 4              A.   I don't -- I believe, when we stood
 5   him up, and this is off of memory, after we stood
 6   him up, we walked him back to Zachary Miller's
 7   police car.
 8              Q.   Immediately?
 9              A.   I don't know what the time frame was.
10              Q.   All right.  And so you get him back
11   to the car, you put him up against the car, and you
12   start to search him; right?
13              A.   Officer Miller attempts to search
14   him.
15              Q.   All right.  Is he under arrest at
16   this point?
17              A.   I don't believe that Officer Miller
18   had told him he was under arrest.
19              Q.   Had you placed him under arrest?
20              A.   I had not.
21              Q.   All right.  And so he's being
22   detained?
23              A.   Correct.
24              Q.   All right.  Still, again, for the
25   purpose of running this drug dog; right?  I mean,
```

**EXHIBIT 8**

Page 19

```
 1  that's the purpose, that's what you're there for,
 2  is to run the drug dog around the car?
 3            A.    That's what I was initially there
 4  for, yes.
 5            Q.    All right.  But at this point, he's
 6  detained, he's placed back into the -- you have him
 7  at the car, you begin to search him; right?  Do you
 8  search him?
 9            A.    I don't recall if I searched him or
10  if Officer Miller searched him.
11            Q.    What's the purpose of the search?
12            A.    Search incident to arrest.
13            Q.    But you just said he wasn't arrested?
14            A.    That's what I told --
15            Q.    You just said he was detained.  I
16  just asked you if he was arrested?
17            A.    I had not placed him under arrest.
18            Q.    Right.  So what's -- so it couldn't
19  have been search incident to arrest.
20                  He hadn't been arrested, so why is he
21  being searched?
22            A.    I can't answer that question.  I
23  don't know.
24            Q.    Well, you searched him, you see you
25  searching him on the video; right?
```

**EXHIBIT 8**

```
 1                MR. FITZGERALD:  Object to form.  You

 2   may answer.

 3   BY MR. VALOIS:

 4        Q.   You're participating in the search on

 5   the video; right?

 6        A.   If that's what's on the video.

 7        Q.   Well, you -- do you remember

 8   searching him?

 9        A.   I don't remember searching him, no. I

10   remember he was at the -- he was at the car with

11   Officer Miller, and I don't remember if I was

12   physically searching him or if Officer Miller was

13   searching.

14        Q.   But he was being searched?

15        A.   Correct.

16        Q.   And you were helping to accomplish

17   that?

18        A.   Yes.  I had physical control of him.

19        Q.   Right.  So what was it -- I mean, he

20   didn't consent to a search?

21        A.   Correct.

22        Q.   You didn't have a warrant to search

23   him; right?

24        A.   Correct.

25        Q.   And he didn't -- he wasn't being
```

```
 1  arrested, you already testified to that; right?
 2              A.   We hadn't told him that he was under
 3  arrest.
 4              Q.   Right.  So you just said you hadn't
 5  placed him under arrest?
 6              A.   Correct.
 7              Q.   Right.  And so you don't know
 8  that -- you don't know that Zachary Miller had
 9  placed him under arrest; right?
10              A.   Correct.
11              Q.   So the question -- and you can't say,
12  you can't say what the purpose was for searching
13  him, then?
14              MR. FITZGERALD:  Object to form.  You
15  may answer.
16              THE WITNESS:  To bring him to jail at
17  that point.  He was under arrest.  We just had not
18  physically told him he was under arrest.
19  BY MR. VALOIS:
20              Q.   Oh, whoa, whoa, whoa.  Well, now
21  we're changing our testimony here.
22              So he was under arrest?
23              MR. FITZGERALD:  Object to form.  You
24  may answer.
25              THE WITNESS:  We were going to be
```

```
 1   bringing him to jail at that point.
 2   BY MR. VALOIS:
 3          Q.   For what?
 4          A.   Obstruction.
 5          Q.   Obstruction of justice?
 6          A.   Yes.
 7          Q.   So he was under arrest for
 8   obstruction?
 9               MR. FITZGERALD:  Object to form.  You
10   may answer.
11               THE WITNESS:  Yes.
12   BY MR. VALOIS:
13          Q.   All right.  And so then you're
14   searching him incident to an arrest, and he was
15   legally under arrest at that time?
16          A.   Yes.
17          Q.   And the obstruction of justice was he
18   wouldn't get out of the car?
19          A.   Correct.
20          Q.   All right.  Why would he have to get
21   out of the car?
22          A.   So we could conduct an open-air sniff
23   around the exterior of the vehicle.
24          Q.   Okay.  What gives you the right to
25   make people randomly get out of their cars so that
```

```
 1  you can conduct a -- how does that jive with the

 2  Fourth Amendment, that you get to walk up to

 3  somebody in the parking lot and say get out of your

 4  car, I want to conduct a free-air sniff of your

 5  car?

 6           A.   Because of officer safety.

 7           Q.   You can do that to anybody?

 8                MR. FITZGERALD:  Object to form.

 9  BY MR. VALOIS:

10           Q.   You can walk up to Thomas Road

11  Baptist Church, to a lady sitting in her car, and

12  say, Ma'am, I want to conduct a free-air sniff of

13  your car and get out of your car, and she's got to

14  get out of her car?

15                MR. FITZGERALD:  Object to form.

16  BY MR. VALOIS:

17           Q.   Is that your belief?  You think you

18  got -- do you think you have the power to do that?

19                MR. FITZGERALD:  Object to form.

20  BY MR. VALOIS:

21           Q.   You can answer the question.

22           A.   So the vehicle was lawfully detained.

23           Q.   How do you know?  You didn't know why

24  it was detained.  I asked you that.  You hadn't

25  communicated.  You had no idea.  You said you
```

 1  didn't know what the basis for the detention was

 2  when you got there.  I asked you specifically that

 3  question.  You said you didn't know whether or not

 4  it had been lawfully detained or not.

 5          A.   I didn't know the reason for the --

 6              MR. FITZGERALD:  Let him ask a

 7  question, because he hasn't asked a question yet.

 8  BY MR. VALOIS:

 9          Q.   Yeah, that's what you testified to.

10  I asked you that, I think, three times, and you

11  said no, you didn't know then, that you found later

12  on the police report.

13              My question to you is when you roll

14  up on a scene and you see somebody in a car, you

15  don't know what's going on, is it your opinion that

16  you can just say I want to run my dog around your

17  car, therefore you must get out of your car?  I

18  mean, do you think that's how America works?

19              MR. FITZGERALD:  Object to form.

20  BY MR. VALOIS:

21          Q.   Do you think that's what the

22  Constitution allows you to do?

23              MR. FITZGERALD:  Object to form.  You

24  can answer.

25  BY MR. VALOIS:

```
 1              Q.   Yeah, I need you to answer.
 2              A.   As long as a vehicle is lawfully
 3   detained, we can ask the occupants to step out of
 4   the vehicle to conduct an open-air sniff.
 5              Q.   Okay.  What steps did you take to
 6   make sure that this vehicle had been lawfully
 7   detained when you got there?
 8              A.   I don't recall exactly what our
 9   conversation was, Zachary Miller and I.
10              Q.   So you said before you didn't know,
11   you didn't know why it had been stopped.
12                   How do you know it had been lawfully
13   detained?  I need an answer.  I mean, we're going
14   to go until 4:00 if we have these continued -- I
15   need you to answer the questions when I ask them.
16   These empty pauses really don't help.
17                   MR. FITZGERALD:  He's entitled to
18   pause.  He's entitled to pause.
19                   MR. VALOIS:  Reasonably, but we can't
20   wait here until 5:00.
21                   MR. FITZGERALD:  That was like two
22   seconds.
23                   THE WITNESS:  I had no reason to
24   believe that the vehicle was unlawfully detained.
25   BY MR. VALOIS:
```

```
 1              Q.   So your presumption is that every

 2   detention is lawful, you just assume that?

 3                   MR. FITZGERALD:   Object to form.

 4   BY MR. VALOIS:

 5              Q.   When you bring your -- that's your

 6   assumption, your working assumption?

 7              A.   Is that I believe that the vehicle is

 8   lawfully detained when I arrive.

 9              Q.   Yes?

10              A.   Yes.

11              Q.   Okay.  All right.  And so it was on

12   that basis, then, that you showed up with a dog to

13   conduct this free-air sniff.  So you get the kid

14   out of the car.

15                   How tall are you?

16              A.   Five-ten.

17              Q.   How much do you weigh?  How much did

18   you weigh then?

19              A.   Approximately 200, 200-plus.

20              Q.   And you work out?

21              A.   I used to.

22              Q.   And you've had training in

23   hand-to-hand operations, I assume, and takedowns

24   and things, martial arts training, I assume; right?

25              A.   I've had training at the police
```

```
 1   academy.
 2           Q.   Yeah.  And Zach Brown's a big guy, I
 3   mean, Zach Miller's a big guy; right?
 4           A.   Yes.
 5           Q.   He's a big guy too.  There's two of
 6   you there.
 7                How big is this kid, this 18-year-old
 8   young man that you've taken out of the car?  He's
 9   what, five-six, something like that?
10           A.   I don't recall exactly his height.
11           Q.   All right.  So you got him out of the
12   car.  He's in handcuffs.  You're searching him,
13   because -- we don't know why at this point; right?
14   I mean, you said he was under -- now you're saying
15   he was under arrest, he just didn't know it?
16           A.   He was under arrest for obstruction.
17           Q.   Okay.  And so when you previously
18   testified that he wasn't under arrest, you were
19   wrong?
20                MR. FITZGERALD:  Objection.
21   BY MR. VALOIS:
22           Q.   When I previously asked you in this
23   deposition whether or not he was under arrest, and
24   you said he was not, that you had not placed him
25   under arrest and he was not under arrest, you had
```

```
 1  not done it, that was wrong?  He was under arrest,
 2  you just had not informed him of that?
 3            A.   The subject was under arrest.
 4            Q.   And you had not informed him of that?
 5            A.   Correct.
 6            Q.   Okay.  So he's under arrest, but he's
 7  not notified he's under arrest?  There's no warrant
 8  of arrest at this point; right?
 9            A.   Correct.
10            Q.   All right.  He's taken over to the
11  car and he's searched.
12                 Is he notified that he's being
13  searched?
14            A.   I don't recall if we notified him he
15  was being searched.
16            Q.   Did you ask him for consent to
17  search?
18            A.   No.
19            Q.   Okay.  So he obvious -- he resists
20  being searched, it's fair to say; right?
21            A.   Correct.
22            Q.   His legs are being kicked and
23  somebody kicks apart his legs in the video.
24                 Do you know who did that?
25            A.   I don't.
```

**EXHIBIT 8**

Page 29

```
 1              Q.   And at that point, he's taken to the
 2  ground.
 3                   Who directed that this young man be
 4  taken to the ground?
 5              A.   Well, I had control of his upper
 6  body.  Officer Miller had control of his lower
 7  body.
 8              Q.   Well, who made the decision to take
 9  him to the ground?  I mean, this isn't -- this is a
10  tactical maneuver; right?
11              A.   No.
12              Q.   Is it an accident?  Did he end up on
13  the ground by accident?
14              A.   No.
15              Q.   So it's a maneuver?
16              A.   Correct.  We placed him on the
17  ground.
18              Q.   Who made the decision to do that?
19              A.   I don't recall.
20              Q.   Well, didn't you recall testifying at
21  the jury trial we had with Shanta that you made
22  that decision?
23              A.   I don't recall who made the decision.
24              Q.   Do you recall testifying at the jury
25  trial on the criminal case that you made
```

1  the -- you testified that you made that decision?

2              MR. FITZGERALD:  Objection to form.

3  He's already answered the question.

4  BY MR. VALOIS:

5         Q.   You can answer.  Do you recall --

6         A.   I don't recall answering that

7  question, that I made the decision to take him to

8  the ground.

9         Q.   So you don't remember whether you

10  said that at the jury trial or not?

11        A.   No.

12        Q.   He gets on the ground.  You're trying

13  to put handcuffs on him; right?  And he's squawking

14  and squawking and screaming; right?  He's screaming

15  loudly for his mother; right?

16        A.   Correct.

17        Q.   And Shanta Brown is his mother;

18  right?  Did you ascertain that on your own?

19        A.   After the fact.

20        Q.   Okay.  And so when he ends up on the

21  ground, Shanta comes running out in between

22  the -- okay.  Back up.

23              This apartment building has a front

24  door to the building that's very close to the

25  parking area?

```
 1              A.    Correct.

 2              Q.    Is that right?  And if you come out

 3  of the front door of this building, you would be

 4  facing Kemper Street?

 5              A.    Correct.

 6              Q.    And looking at the parking lot, and

 7  the kid, the vehicle this kid was in would have

 8  been you would have turned right when you came out

 9  of the building, a few cars, one or two cars, and

10  that's where this parking spot was; right?

11              A.    Correct.

12              Q.    If you turn left out of this

13  building, there's an area behind other parked cars

14  with like rocks in it, like a little rocky area,

15  like a garden or a buffer zone or something; right?

16              A.    I'm not sure if there's rocks there

17  or not.  I know there's another parking lot to the

18  left.

19              Q.    But there's an area right next to the

20  door on the left side that's also -- but it's

21  adjacent to the parking area too, but that's where

22  Shanta came running from with Grooms; right?  Have

23  you seen the body cam video?

24              A.    Yes.

25              Q.    And that's where -- so while you and
```

**EXHIBIT 8**

Page 32

```
 1  Miller, Zach Miller, are dealing with Terron
 2  Pannell on the parking lot, right, Shanta Brown
 3  comes running with Grooms, right, towards Terron
 4  Pannell and towards where you are; right?
 5          A.   Yes.
 6          Q.   Okay.  And then she -- and she's
 7  screaming and Terron is screaming; right?
 8          A.   Correct.
 9          Q.   All right.  And then Grooms gets her
10  and takes her back towards the door area; right?
11          A.   I don't know what Grooms is doing
12  with her.
13          Q.   Well, Grooms gets her away from you
14  anyway; right?  You've seen, have you seen --
15          A.   Yes, I've seen the --
16          Q.   Do we need to play the video?
17          A.   I've seen the body camera.
18          Q.   Well, would you agree with that
19  statement, or do we need to refresh with that, that
20  Grooms assisted her in getting away from you guys?
21          A.   Eventually, yes.
22          Q.   Well, eventually, we're talking a
23  matter of a few seconds; right?  We're not talking
24  five minutes or anything.  We're talking a very few
25  seconds that Grooms has her headed back to that
```

**EXHIBIT 8**

Page 33

```
 1  area by the door; right?
 2          A.   Correct.
 3          Q.   Okay.  So then you say to Zach
 4  Miller, "Put cuffs on them," meaning Shanta Brown
 5  and Aquasha Sandidge; right?
 6          A.   Yes.
 7          Q.   Why did you -- why did you direct
 8  Zach Miller to put cuffs on them?
 9          A.   To detain them, because at that
10  point, I believed that Ms. Brown had assaulted
11  Officer Miller and I, as well as obstructed with
12  the traffic stop.
13          Q.   They assaulted you?
14          A.   Yes.
15          Q.   How did she assault you?
16          A.   When we were dealing with Mr. Pannell
17  on the ground, she ran up.  I felt a jolt, and when
18  I looked up, she was right there with Officer
19  Miller and I.
20          Q.   But Grooms was right there too;
21  right?
22          A.   Not between us, no.
23          Q.   So was your purpose to arrest her at
24  that point, with the handcuffs, to place her under
25  arrest?
```

```
 1                  A.   My statement was to place them in
 2    handcuffs.
 3                  Q.   Right.  But your purpose in making
 4    that statement, was your purpose to effect an
 5    arrest at that point?
 6                  A.   At that point it was to gain control
 7    of the situation.
 8                  Q.   All right.  And that left -- so Zach
 9    Miller left his position with Pannell, leaving you
10    there by yourself?
11                  A.   Yes.
12                  Q.   And he went and dealt with Shanta and
13    Aquasha, and then Robbin Miller -- you wouldn't see
14    this, because you can't see what's happening on the
15    other side of the cars.
16                       It's clear, it's clear from your
17    point of view, will you agree, that from where you
18    are on the ground in front of a bunch of cars, you
19    can't see what's happening on the other side of
20    this car?
21                  A.   I could see commotion.
22                  Q.   Yeah.  But you couldn't see anything,
23    any particular incidents happening; right?
24                  A.   Correct.
25                  Q.   Okay.  And you have Terron Pannell
```

```
1   there, right, on the ground?  Who -- how does he

2   get from where -- can you run me through the

3   process of how he gets from the ground into a

4   police car?

5           A.   We initially stood him up again.

6           Q.   Who's "we"?

7           A.   Or I stood him up.

8           Q.   Uh-huh.

9           A.   And then placed him back against a

10  police car with multiple officers there at this

11  time.

12          Q.   Okay.

13          A.   Again, I am not sure who searched

14  him.  He eventually started flailing around a third

15  time.  There was probably three or four officers

16  that took him to the ground, and then that was -- I

17  no longer had contact with Mr. Pannell at that

18  point.

19          Q.   What are you doing?

20          A.   I don't remember.  I just remember I

21  initially stepped away, and then, after reviewing

22  my body camera, then I have my police K9 there.

23          Q.   Is that the end of your participation

24  at the scene?

25          A.   Yes.
```

1          Q.    All right.  But you hung around the

2    scene until a supervisor came up; right?

3          A.    Yes.

4          Q.    And you told the supervisor at the

5    scene that you witnessed Mrs. Brown and her

6    daughter assault you and Miller?

7          A.    Correct.

8          Q.    But her daughter wasn't anywhere

9    around, it wasn't her daughter.  It was Shanta, and

10   it was Officer Grooms who were near you when you

11   had Terron Pannell; Aquasha never got close to you?

12         A.    Correct.

13         Q.    So why would you say that you

14   witnessed her assault you?  Why would you tell the

15   supervisor at the scene that you witnessed Aquasha

16   assaulting?

17         A.    So based off of everything that I

18   could recollect at that point, just in my mind,

19   like I said before, it was a very chaotic scene.

20   So just in my mind, that's what I believe had taken

21   place.  I was processing.  I was trying to process

22   everything that had just taken place.

23         Q.    Well, are you saying that your mind

24   is unreliable?  I mean, why does it need processing

25   to say this happened or that happened?

```
 1                    MR. FITZGERALD:  Object to form.
 2   BY MR. VALOIS:
 3          Q.   I mean, if you're telling your
 4   supervisor something happened that didn't happen,
 5   why -- I mean, how does processing result in that
 6   statement?
 7          A.   So I believed that I had been
 8   assaulted, as well as Officer Miller had been
 9   assaulted, at that point.  So that's why I relayed
10   that information to my supervisor.
11          Q.   And do you recall telling your
12   supervisor that Terron Pannell had just cursed at
13   you and had said that he -- don't fucking touch me,
14   and that he wasn't going to get out of the fucking
15   car?  Do you recall using those words to describe
16   what you said Terron Pannell had told you?
17          A.   Yes.
18          Q.   You agree that the kid never said
19   anything like that?
20          A.   He didn't use the F word.  He didn't
21   say fucking.
22          Q.   He didn't say I'm not getting out of
23   the car.  He said, "Please don't touch me, sir.
24   I'm scared of you."  Repeatedly.
25                    Could we agree to that?
```

```
 1              A.   Yes.  He was screaming that.

 2              Q.   Yeah.  And he never said anything

 3   about he wasn't going to get out of the car.  He

 4   just said, "Please don't touch me.  I'm scared.

 5   I'm scared.  I'm afraid.  I fear for my life";

 6   right?

 7              A.   Correct.

 8              Q.   Well, why would you make up to your

 9   supervisor the statement that this young man is

10   cursing you when it's just not true?

11              MR. FITZGERALD:  Object to form.

12   BY MR. VALOIS:

13              Q.   Why would you do that?

14              A.   Again, I was still processing

15   everything that had taken place.

16              Q.   Well, you understand people's freedom

17   is on the line based upon what you do out there;

18   right?  Do you understand that?  I mean, do you

19   understand that what you do -- I mean, people's

20   lives are on the line based upon what you do.  It's

21   not just your life that's on the line.  It is, but

22   it's other people's lives too.  I mean, do you get

23   that, how important it is to get things right?

24              MR. FITZGERALD:  Object to form.

25              THE WITNESS:  Yes.
```

```
 1  BY MR. VALOIS:
 2          Q.   You also told the supervisor at the
 3  scene that you personally witnessed Robbin Miller
 4  being assaulted.  But that could -- that wasn't
 5  possible from your vantage point, and you conceded
 6  that at trial.  We have the -- I mean, we have the
 7  transcript.  We can get the audio recording of your
 8  testimony at trial and put it up here.
 9          But do you concede that at trial, you
10  admitted you never saw that?
11          A.   Correct.  I could only see the
12  commotion.
13          Q.   Why would you tell your supervisor
14  you witnessed an assault if you didn't witness an
15  assault?  Same thing.
16          MR. FITZGERALD:  Object to form.
17  BY MR. VALOIS:
18          Q.   I mean, do you understand this
19  results in actual, real charges on real people and
20  real restrictions on people's liberty, that these
21  statements, they have real effects on people?
22          MR. FITZGERALD:  Object to form.
23  BY MR. VALOIS:
24          Q.   Do you get that?
25          A.   Yes.
```

```
 1              Q.   I mean, you recall an incident, you

 2   recall an incident involving Calvin Wesley; right?

 3   When, in March of 2021, there was an incident on

 4   Grace Street with your dog Knox; right?  Remember

 5   that?

 6              A.   Yes.

 7              Q.   All right.  And the dog, the dog tore

 8   up, or bit into Calvin's buttocks and leg, causing

 9   him some pretty severe injuries.

10                   Remember that?

11              A.   Yes.

12              Q.   All right.  You remember telling your

13   supervisor at the time, on the dispatch, actually

14   on the body cam, that Calvin had assaulted several

15   officers?

16              A.   Correct.

17              Q.   And then just one minute later,

18   Officer Bauserman shows up and you're like, "Well,

19   I don't know about the other officers, but he got

20   me"?

21              A.   Correct.

22              Q.   How can your tune change like that?

23   How can you go from reporting multiple assaults on

24   multiple officers and in one minute flip it around

25   to you don't know about other officers like that?
```

```
 1  How can that happen?
 2              A.   Again, I was still trying to process
 3  a high stress scene.
 4              Q.   Yeah, but you understand that that
 5  processing, I mean, it changed -- this is -- these
 6  are things that result in really serious
 7  detrimental effects to real people in their lives,
 8  you being wrong in your processing results in
 9  somebody going to jail?
10              MR. FITZGERALD:  Object to form.
11  BY MR. VALOIS:
12              Q.   Do you understand that?
13              A.   Yes.
14              Q.   And, in fact, Calvin Wesley was
15  charged with assault, and it was nolle prossed;
16  right, dismissed, because he didn't assault
17  anybody?  It's on video.  We have the body cam
18  video.  I mean, these, these are these serious,
19  serious things.
20              Can you explain all of these
21  different contradictory statements that you're
22  making to all these people, besides processing?
23  Can you elaborate on what you mean by processing?
24              A.   Just taking time to recollect all the
25  different events that have taken place.
```

```
 1              Q.   Well, how does that recollection,
 2   that processing time, always put the people in a
 3   worse light?
 4                   MR. FITZGERALD:  Object to form.
 5   BY MR. VALOIS:
 6              Q.   Why does it never seem to put people
 7   in a better light?
 8                   MR. FITZGERALD:  Object to form.
 9   BY MR. VALOIS:
10              Q.   I mean, how do you deal with
11   the -- let me rephrase this; okay?  How do you take
12   a kid who's obviously obnoxiously running off at
13   the mouth, a little punk kid, okay, who's being a
14   little twit in his car, screaming and yelling,
15   mama's boy, clearly, okay, running off at the
16   mouth.
17                   But how do you turn him into being
18   an -- a rude, cursing person who's openly defiant
19   and disrespectful?  How do you take a kid who's
20   saying, "I'm scared of you.  Please, sir.  Please,
21   sir," calling you by the name sir and turn him into
22   don't you fucking do this and fucking do that.  How
23   does processing do that?
24                   MR. FITZGERALD:  Object to form.
25                   THE WITNESS:  It was just a tense
```

```
 1  situation traffic stop.
 2  BY MR. VALOIS:
 3          Q.   I understand it's a tense -- my
 4  question to you is, you have a tense job.  You
 5  signed up for a tense job.  Look at your arm.  I
 6  don't know how that happened, but eventually it's
 7  going to happen to you on the job one day.  The
 8  odds are not good.
 9          You've signed up for a really hard
10  job.  I would never do it, couldn't do it.  And we
11  need to have people who, like you, who are willing
12  to do it.  But you understand it comes with a very
13  high responsibility.
14          Do you get that?
15          A.   Yes.
16          Q.   I mean, and you're taking -- you're
17  taking what these people are doing and you're
18  exaggerating it to make these people look worse to
19  your leadership than they are.  You're taking a
20  little punk, obnoxious young kid, and you're
21  turning him to be a disrespectful little thug, and
22  he's just not.  He's just a punk kid.
23          Do you see that?  I mean, can you see
24  how that effect happens?
25          MR. FITZGERALD:  Object to form.
```

**EXHIBIT 8**

Page 44

```
 1              THE WITNESS:  Yes.
 2  BY MR. VALOIS:
 3         Q.   Now, at the scene, after Shanta
 4  Brown, you guys are sitting around talking to each
 5  other and you go up to -- there's a scene in your
 6  body cam video -- well, it's actually in Zach
 7  Miller's body cam video, where you go up to him and
 8  say, "Are you still recording?  Are you still on?"
 9  Right.  And he turns his recorder off.
10              What's the point in asking an officer
11  to turn off the recording?  Why would you do that
12  in the middle of an active scene like that?
13              MR. FITZGERALD:  Object to form.
14              THE WITNESS:  So I could speak with
15  him.
16  BY MR. VALOIS:
17         Q.   But why?  Why would you not want to
18  speak with him on camera?  Why would you want to
19  speak with him off camera?
20         A.   I'm not sure what the circumstances
21  were then.
22         Q.   Okay.  Well, I'm not trying -- I'm,
23  in this case, I'm not trying to -- to be fair,
24  there are circumstances under which you would not
25  want to be recorded, a lot.  Relaying highly
```

**EXHIBIT 8**

Page 45

```
1  personal information about a colleague or
2  something; right?
3              I mean, things that are not pertinent
4  to the -- to the investigation.  I mean, I'm sure
5  there are a million reasons not to record.  I'm not
6  asking whether there was any wrongdoing associated
7  with that particular request.
8              What I'm asking is if you remember
9  your reason for, at that particular time, asking to
10 go off?
11         A.   I do not.
12         Q.   Okay.  But you have been counseled
13 about your use of body worn cameras?
14         A.   Correct.
15         Q.   What were the circumstances there?
16         A.   Having my body camera in sleep mode
17 or having my in-car camera not synced up to my
18 microphone.
19         Q.   None of that's related to this
20 incident?
21         A.   No.
22         Q.   This incident went from being a
23 traffic stop for a missing tag, which was
24 ultimately found in the back of the car after the
25 search of the car, this went from being a missing
```

```
1   tag thing to a melee near riot situation.
2               Is that a fair statement?
3           A.    Yes.  It was very chaotic.
4           Q.    Yeah.  I mean, in hindsight, is there
5   anything that you would have done differently?
6           A.    No.
7           Q.    Is there anything that anybody in the
8   police force should have done differently?
9           A.    I don't believe so, no.
10          Q.    Did everything you do, or did that
11  night, did it comport with your training?
12          A.    Yes.
13          Q.    Did anything you do that night
14  deviate from Lynchburg's policies?
15          A.    I don't believe so.
16          Q.    Is it official policy, was it
17  official policy to ask passengers out of the
18  vehicle every time you conduct a free-air sniff?
19          A.    You're asking if it's policy?
20          Q.    Yes.
21          A.    I can't point to an exact policy, no.
22          Q.    Do you ever conduct dog sniffs with
23  occupied vehicles?
24          A.    No.
25          Q.    Never?
```

**EXHIBIT 8**

Page 47

```
1              A.   No.

2              Q.   So you always do it?

3              A.   Correct.

4              Q.   Are you instructed to do it that way?

5              A.   Yes.

6              Q.   Who instructed you to do it that way?

7              A.   We're taught that way in basic

8    school, basic K9 school.

9              Q.   Basic K9 school, where is that?

10   Where is that school located?

11             A.   We have a master trainer that comes

12   in and teaches that.

13             Q.   Who is that master trainer?

14             A.   Harold Bennett.

15             Q.   Does he teach all of the dog handlers

16   here in Lynchburg?

17             A.   He is our master trainer, so some

18   handlers have gone to school other places.  Some of

19   us have gone to school here.  It just depends on

20   his schedule and availability whether or not he can

21   run a school.

22             Q.   Does he have a business that he works

23   for?  Is it just him?

24             A.   Yes.

25             Q.   What's the business?
```

EXHIBIT 8

Page 48

```
 1                A.   I believe it's called Bennett K9.

 2                Q.   Is it local?

 3                A.   He lives out of Chesapeake.

 4                Q.   So you responded to the magistrate

 5   and gave testimony in front of the magistrate; is

 6   that right?

 7                A.   Yes.

 8                Q.   Okay.  Did you testify in all three

 9   defendants?

10                A.   No.

11                Q.   Only Terron and Shanta; right?

12                A.   Correct.

13                Q.   So you did not pursue any charge

14   against Aquasha?

15                A.   Correct.

16                Q.   Why did you elect -- when you

17   reported that you were assaulted by both of them,

18   why did you elect to only take charges out against

19   Shanta?

20                MR. FITZGERALD:  Object to form.

21                THE WITNESS:  Again, after I had a

22   few minutes to process everything, based off my

23   recollection, I knew that Ms. Brown had assaulted

24   me and Officer Miller.

25
```

```
 1   BY MR. VALOIS:
 2           Q.   All right.  And you witnessed that
 3   assault on the video, on the --
 4                MR. VALOIS:  Can you let me see that
 5   computer real quick?  I'll tell you what, why don't
 6   we take a another 10-minute break, and then I'll
 7   have a video to play for a few minutes, and then I
 8   think I'll be done.
 9                THE WITNESS:  Okay.
10                (Recess.)
11   BY MR. VALOIS:
12           Q.   All right.  So Officer Reed, over the
13   break, I presented you with a snippet of a video
14   from, it looks like, another officer's body cam.
15   Honestly, I don't know the source.  Okay.
16                But it depicts, it depicts the
17   incident in which Shanta Brown came out from the
18   front of the building between the cars towards you
19   and Officer Zachary Miller while you were trying to
20   control Terron Pannell in the parking lot; is that
21   right?
22           A.   Yes.
23           Q.   All right.  And you've paused this at
24   approximately four seconds into the snippet video,
25   which shows Shanta, she's wearing a tank top, and
```

```
 1  it looks like shorts, and she's approached you, and
 2  that is the incident where you allege you were
 3  assaulted; right?
 4           A.   Correct.
 5           Q.   But we can agree, can't we, that this
 6  whole -- this whole contact was -- well, to the
 7  extent there was any contact, it was de minimis.
 8  It was very brief contact.  I mean, we're talking
 9  the whole, the whole video only lasts
10  four-and-a-half -- we got the four seconds.
11               (Video playing.)
12  BY MR. VALOIS:
13           Q.   By five seconds, she's back at the
14  cars again being redirected.  I mean, she's only
15  there for a brief instant.
16               Can we agree to that?
17           A.   Correct.
18           Q.   Okay.  She's not armed, you weren't
19  aware that she's armed anyway; right?
20           A.   Correct.
21           Q.   And she's not using her fist or
22  anything?  I mean, you can see her hands; right?
23           A.    I was dealing with the suspect.
24  Watching the video, correct.
25           Q.   Okay.  But you didn't see -- you
```

**EXHIBIT 8**

```
 1   didn't see any of this yourself then?
 2              A.    Correct.
 3              Q.    Okay.  But from this video, does she
 4   hit you?  Are you alleging she hits you?
 5              A.    I felt a jolt when I was dealing with
 6   the suspect.
 7              Q.    You don't know where that jolt came
 8   from?
 9              A.    Correct.
10              MR. VALOIS:  Okay.  All right.  I
11   think we're good.  I was -- I'm not going to bother
12   offering this snippet into -- I'm not going to
13   offer it into evidence.  I didn't even bring a
14   thumb drive yet, but I will.  You should already
15   have this.
16              MR. FITZGERALD:  Not the snippet, but
17   the full video.
18              MR. VALOIS:  Yeah.  Well, I could
19   give you the snippet.  I'll give you that, too, and
20   I think we're --
21              MR. FITZGERALD:  Unless it
22   was -- have you guys answered the interrogatories?
23   Did you produce it in that?
24              MR. VALOIS:  We're working on the
25   interrogatories now.
```

**EXHIBIT 8**

```
 1                    MR. FITZGERALD:  Okay.

 2                    MR. VALOIS:  Right.  And we're --

 3                    MS. VALOIS:  I'm working on the

 4   interrogatories.

 5                    MR. VALOIS:  The hardest -- off the

 6   record.  Oh, on the record.  No further questions.

 7   Do you have any redirect?

 8                    MR. FITZGERALD:  No.

 9                    MR. VALOIS:  Right.  So you're free

10   to go.

11           (Deposition concluded at 1:06 p.m.)

12             (Reading and signature waived.)

13                         * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2                 I, KIMBERLY A. HENDERSON, a
 3   Registered Professional Reporter and Electronic
 4   Notary Public in and for the Commonwealth of
 5   Virginia at Large, Notary Registration Number
 6   359658, whose commission expires November 30, 2025,
 7   do certify that the aforementioned appeared before
 8   me, was sworn by me, and was thereupon examined by
 9   counsel; and that the foregoing is a true, correct,
10   and full transcript of the testimony adduced to the
11   best of my ability.
12                 I further certify that I am neither
13   related to nor associated with any counsel or party
14   to this proceeding, nor otherwise interested in the
15   event thereof.
16                 Given under my hand and Notarial seal
17   at Forest, Virginia, this 19th day of November,
18   2024.
19
20
21
22         Kimberly A. Henderson, Notary Public
23             Commonwealth of Virginia at Large
24
25
```

**EXHIBIT 8**

Page 54

| A | | | | |
|---|---|---|---|---|

**A**

ability 53:11
able 5:11, 5:17
academy 6:19
7:13, 7:14, 27:1
accepted 7:9
accident 29:12
29:13
accommodate
4:22
accomplish
20:16
accurately 5:18
active 44:12
actual 7:3
39:19
adduced 53:10
adjacent 31:21
admitted 39:10
advise 10:17
aforementioned
53:7
afraid 38:5
agree 32:18
34:17, 37:18
37:25, 50:5
50:16
agreement 2:3
al 1:3, 1:6
alert 10:17
10:17
allege 50:2
alleging 51:4
allows 24:22
Amendment
23:2
America 24:18
and/or 2:3
answer 6:6, 6:7
19:22, 20:2
21:15, 21:24
22:10, 23:21
24:24, 25:1
25:13, 25:15
30:5

answered 30:3
51:22
answering 5:3
30:6
anybody 23:7
41:17, 46:7
anyway 32:14
50:19
apart 28:23
apartment 16:6
30:23
APPEARANC...
2:10
appeared 53:7
approached
50:1
approximately
26:19, 49:24
April 7:15, 8:23
Aquasha 8:19
33:5, 34:13
36:11, 36:15
48:14
area 16:4, 16:5
17:14, 30:25
31:13, 31:14
31:19, 31:21
32:10, 33:1
arm 5:14, 43:5
armed 50:18
50:19
arrest 18:15
18:18, 18:19
19:12, 19:17
19:19, 21:3
21:5, 21:9
21:17, 21:18
21:22, 22:7
22:14, 22:15
27:15, 27:16
27:18, 27:23
27:25, 27:25
28:1, 28:3, 28:6
28:7, 28:8
33:23, 33:25
34:5

arrested 19:13
19:16, 19:20
21:1
arrive 26:8
arrived 15:19
articulable
14:17
arts 26:24
ascertain 30:18
asked 19:16
23:24, 24:2
24:7, 24:10
27:22
asking 5:1
12:24, 44:10
45:6, 45:8, 45:9
46:19
assault 33:15
36:6, 36:14
39:14, 39:15
41:15, 41:16
49:3
assaulted 33:10
33:13, 37:8
37:9, 39:4
40:14, 48:17
48:23, 50:3
assaulting 36:16
assaults 40:23
assigned 7:19
assist 14:14
assisted 32:20
associated 45:6
53:13
ASSOCIATES
2:12
assume 26:2
26:23, 26:24
assumption
26:6, 26:6
attempts 18:13
attended 6:19
7:13
attorney 2:8
6:1
audio 39:7

availability
47:20
Avenue 2:17
aware 50:19

**B**

bachelor's 6:20
back 11:12
17:21, 18:6
18:10, 19:6
30:22, 32:10
32:25, 35:9
45:24, 50:13
background
6:13
Baptist 23:11
based 9:18
10:16, 12:23
13:2, 13:18
36:17, 38:17
38:20, 48:22
basic 47:7, 47:8
47:9
basis 13:1
14:10, 14:17
24:1, 26:12
Bauserman
40:18
Beach 7:9, 7:13
behalf 2:2
behavior 10:18
belief 23:17
believe 9:18
9:24, 15:15
15:18, 18:4
18:17, 25:24
26:7, 36:20
46:9, 46:15
48:1
believed 33:10
37:7
Bennett 47:14
48:1
best 53:11
better 42:7

big 27:2, 27:3
27:5, 27:7
bit 40:8
body 5:23, 9:1
29:6, 29:7
31:23, 32:17
35:22, 40:14
41:17, 44:6
44:7, 45:13
45:16, 49:14
bother 51:11
boy 42:15
break 4:20, 49:6
49:13
brief 17:18, 50:8
50:15
bring 13:13
21:16, 26:5
51:13
bringing 22:1
broken 5:14
Brown 1:3, 8:19
8:19, 15:13
30:17, 32:2
33:4, 33:10
36:5, 44:4
48:23, 49:17
Brown's 27:2
buffer 31:15
building 15:14
15:16, 16:6
30:23, 30:24
31:3, 31:9
31:13, 49:18
bunch 34:18
business 47:22
47:25
buttocks 40:8

**C**

call 8:8, 9:23
10:5, 14:1
14:10, 14:13
called 9:14, 9:17
9:19, 10:2, 48:1

**EXHIBIT 8**

Page 55

**calling** 13:16
42:21
**Calvin** 40:2
40:14, 41:14
**Calvin's** 40:8
**cam** 9:1, 31:23
40:14, 41:17
44:6, 44:7
49:14
**camera** 5:23
5:24, 32:17
35:22, 44:18
44:19, 45:16
45:17
**cameras** 45:13
**car** 13:10, 14:19
16:5, 16:14
16:15, 16:17
16:22, 17:1
17:4, 17:8, 17:9
17:17, 17:22
18:7, 18:11
18:11, 19:2
19:7, 20:10
22:18, 22:21
23:4, 23:5
23:11, 23:13
23:13, 23:14
24:14, 24:17
24:17, 26:14
27:8, 27:12
28:11, 34:20
35:4, 35:10
37:15, 37:23
38:3, 42:14
45:24, 45:25
**career** 7:12
**CARROLL**
2:16
**cars** 22:25, 31:9
31:9, 31:13
34:15, 34:18
49:18, 50:14
**case** 1:5, 12:1
29:25, 44:23
**causing** 40:8

**certify** 53:7
53:12
**change** 40:22
**changed** 41:5
**changing** 21:21
**channel** 10:3
10:5, 10:5
**chaotic** 36:19
46:3
**characterization**
15:22
**charge** 48:13
**charged** 41:15
**charges** 39:19
48:18
**Chesapeake**
48:3
**child** 7:1
**Christian** 6:19
**Church** 2:8
23:11
**circumstances**
44:20, 44:24
45:15
**City** 1:6, 2:8
7:12
**ckck** 7:1
**clear** 34:16
34:16
**clearly** 42:15
**close** 11:7, 11:11
30:24, 36:11
**closer** 16:5
**colleague** 45:1
**college** 2:17, 7:7
**come** 13:17
31:2
**comes** 15:13
30:21, 32:3
43:12, 47:11
**coming** 10:19
14:7
**commencing**
2:6
**commission**
53:6

**Commonwealth**
2:6, 53:1, 53:4
53:23
**commotion**
34:21, 39:12
**communicated**
23:25
**comport** 46:11
**computer** 49:5
**concede** 39:9
**conceded** 39:5
**concluded** 52:11
**conduct** 10:11
10:21, 11:14
12:10, 14:1
22:22, 23:1
23:4, 23:12
25:4, 26:13
46:18, 46:22
**conducted**
13:11
**conducting**
11:10, 12:15
**consent** 12:7
12:9, 12:14
20:20, 28:16
**Constitution**
24:22
**contact** 35:17
50:6, 50:7, 50:8
**contacted** 12:6
**continued** 7:6
25:14
**contradictory**
41:21
**control** 20:18
29:5, 29:6, 34:6
49:20
**conversation**
25:9
**conviction** 14:9
**correct** 5:9, 9:3
9:6, 9:10, 9:15
12:4, 12:12
14:20, 15:4
15:9, 15:11

15:23, 16:2
16:23, 17:6
17:15, 18:23
20:15, 20:21
20:24, 21:6
21:10, 22:19
28:5, 28:9
28:21, 29:16
30:16, 31:1
31:5, 31:11
32:8, 33:2
34:24, 36:7
36:12, 38:7
39:11, 40:16
40:21, 45:14
47:3, 48:12
48:15, 50:4
50:17, 50:20
50:24, 51:2
51:9, 53:9
**counsel** 2:10
2:15, 2:19, 6:4
6:6, 53:9, 53:13
**counseled** 45:12
**counseling** 8:5
**couple** 8:14
**court** 1:1, 4:25
5:8
**criminal** 13:23
29:25
**criteria** 13:16
**cuffs** 33:4, 33:8
**current** 7:18
**currently** 7:16
8:7
**cursed** 37:12
**cursing** 38:10
42:18

| **D** |
| --- |

**daughter** 36:6
36:8, 36:9
**day** 43:7, 53:17
**de** 50:7
**deal** 42:10

**dealing** 32:1
33:16, 50:23
51:5
**dealt** 34:12
**decision** 13:21
29:8, 29:18
29:22, 29:23
30:1, 30:7
**defendants** 1:7
2:2, 2:19, 48:9
**defiant** 42:18
**degree** 6:20
**denied** 12:7
12:9
**department**
4:10, 7:10, 7:16
12:17, 14:14
**depends** 47:19
**depicts** 49:16
49:16
**deposition** 1:9
2:1, 4:13, 4:16
6:10, 6:11
27:23, 52:11
**depositions** 2:3
**describe** 37:15
**despite** 6:7
**detain** 33:9
**detained** 18:22
19:6, 19:15
23:22, 23:24
24:4, 25:3, 25:7
25:13, 25:24
26:8
**detection** 9:12
**detention** 12:20
14:18, 24:1
26:2
**determining**
14:16
**detrimental**
41:7
**deviate** 46:14
**different** 41:21
41:25
**differently** 46:5

46:8
**direct** 33:7
**directed** 29:3
**disciplinary** 8:2
**discuss** 5:25
**dismissed** 41:16
**dispatch** 40:13
**disrespectful**
42:19, 43:21
**DISTRICT** 1:1
1:1
**DIVISION** 1:2
**dog** 9:9, 13:13
14:11, 14:18
18:25, 19:2
24:16, 26:12
40:4, 40:7, 40:7
46:22, 47:15
**dogs** 14:13
**doing** 15:12
15:21, 32:11
35:19, 43:17
**door** 11:1, 11:3
11:6, 11:6, 11:7
11:8, 11:9
11:11, 15:5
16:6, 30:24
31:3, 31:20
32:10, 33:1
**doors** 10:20
**drag** 16:14
**drive** 51:14
**driver** 18:2
18:3
**driver's** 14:22
17:8
**driving** 17:9
**drug** 13:13
13:24, 14:3
14:11, 14:13
18:25, 19:2
**drugs** 13:25

**E**

**easier** 5:3

**effect** 34:4
43:24
**effects** 39:21
41:7
**either** 8:2
**elaborate** 41:23
**elect** 48:16
48:18
**Electronic** 53:3
**employed** 7:17
**employers** 8:6
**employment** 7:2
7:8, 8:3
**empty** 25:16
**encountering**
13:19
**ends** 30:20
**enforcement**
7:12
**entitled** 25:17
25:18
**ESQUIRE** 2:14
2:15, 2:19
**et** 1:3, 1:6
**event** 53:15
**events** 41:25
**eventually**
16:14, 17:23
32:21, 32:22
35:14, 43:6
**everybody** 13:9
**evidence** 51:13
**exact** 46:21
**exactly** 7:5
15:23, 25:8
27:10
**exaggerating**
43:18
**Examination**
3:4
**examined** 53:8
**exit** 11:4, 11:12
**expires** 53:6
**explain** 41:20
**extent** 50:7
**exterior** 10:12

10:16, 11:15
22:23

**F**

**facing** 31:4
**fact** 30:19
41:14
**factors** 13:20
13:25
**fair** 15:21, 28:20
44:23, 46:2
**familiar** 8:24
**fear** 38:5
**felt** 33:17, 51:5
**field** 7:19
**finish** 5:1, 5:2
**first** 6:23, 12:6
**fist** 50:21
**FITZGERALD**
2:19, 20:1
21:14, 21:23
22:9, 23:8
23:15, 23:19
24:6, 24:19
24:23, 25:17
25:21, 26:3
27:20, 30:2
37:1, 38:11
38:24, 39:16
39:22, 41:10
42:4, 42:8
42:24, 43:25
44:13, 48:20
51:16, 51:21
52:1, 52:8
**five** 32:24, 50:13
**five-six** 27:9
**Five-ten** 26:16
**flailing** 35:14
**flip** 40:24
**focus** 11:23
**follows** 4:4
**food** 7:4, 7:6
**footage** 5:24
**force** 46:8

**foregoing** 53:9
**Forest** 53:17
**form** 7:7, 20:1
21:14, 21:23
22:9, 23:8
23:15, 23:19
24:19, 24:23
26:3, 30:2, 37:1
38:11, 38:24
39:16, 39:22
41:10, 42:4
42:8, 42:24
43:25, 44:13
48:20
**former** 8:3, 12:3
**forward** 6:15
6:24, 8:21
**found** 15:1, 15:2
24:11, 45:24
**four** 35:15
49:24, 50:10
**four-and-a-half**
50:10
**Fourth** 23:2
**frame** 18:9
**free** 52:9
**free-air** 10:21
11:10, 12:11
12:15, 13:10
15:7, 23:4
23:12, 26:13
46:18
**freedom** 38:16
**front** 13:3, 13:4
15:19, 16:5
30:23, 31:3
34:18, 48:5
49:18
**fucking** 37:13
37:14, 37:21
42:22, 42:22
**full** 51:17, 53:10
**further** 52:6
53:12

**G**

**gain** 34:6
**gang** 13:23
**garden** 31:15
**getting** 14:5
32:20, 37:22
**give** 4:18, 51:19
51:19
**given** 4:15
12:20, 53:16
**gives** 22:24
**go** 13:20, 16:5
25:14, 40:23
44:5, 44:7
45:10, 52:10
**going** 12:10
14:13, 15:6
15:25, 21:25
24:15, 25:13
37:14, 38:3
41:9, 43:7
51:11, 51:12
**good** 43:8, 51:11
**Grace** 40:4
**graduated** 6:20
7:14
**Grooms** 12:3
12:3, 31:22
32:3, 32:9
32:11, 32:13
32:20, 32:25
33:20, 36:10
**ground** 16:25
17:18, 29:2
29:4, 29:9
29:13, 29:17
30:8, 30:12
30:21, 33:17
34:18, 35:1
35:3, 35:16
**guess** 9:11
**guilty** 4:24
**guy** 27:2, 27:3
27:5
**GUYNN** 2:16

**guys** 32:20, 44:4
51:22

## H

**hand** 53:16
**hand-to-hand**
26:23
**handcuffed**
17:18
**handcuffs** 16:25
27:12, 30:13
33:24, 34:2
**handful** 8:13
**handlers** 47:15
47:18
**hands** 16:16
50:22
**happen** 37:4
41:1, 43:7
**happened** 36:25
36:25, 37:4
43:6
**happening** 16:7
34:14, 34:19
34:23
**happens** 43:24
**happy** 4:22
15:25
**hard** 4:25, 43:9
**hardest** 52:5
**Harold** 47:14
**headed** 32:25
**hear** 6:3
**height** 27:10
**help** 25:16
**helping** 20:16
**Henderson** 1:25
2:4, 53:2, 53:22
**high** 6:12, 6:14
6:17, 6:17, 41:3
43:13
**highest** 7:23
**highly** 44:25
**hindsight** 46:4
**history** 6:23

13:24, 13:25
14:3
**hit** 51:4
**hits** 51:4
**home** 14:7
**Honestly** 49:15
**hung** 36:1

## I

**idea** 23:25
**illegal** 15:21
**Immediately**
18:8
**important** 38:23
**in-car** 5:24
45:17
**incident** 8:18
8:22, 8:22, 8:24
9:21, 19:12
19:19, 22:14
40:1, 40:2, 40:3
45:20, 45:22
49:17, 50:2
**incidents** 34:23
**information**
13:8, 37:10
45:1
**informed** 12:19
15:6, 28:2, 28:4
**infraction** 13:3
**initial** 5:23, 9:5
**initially** 19:3
35:5, 35:21
**injured** 5:13
**injuries** 40:9
**instant** 50:15
**instructed** 47:4
47:6
**instructs** 6:6
**interested** 53:14
**interrogatories**
51:22, 51:25
52:4
**investigation**
45:4

**involve** 11:1
**involved** 9:21
**involving** 8:19
13:25, 40:2

## J

**jail** 21:16, 22:1
41:9
**JAMES** 2:12
**jive** 23:1
**job** 5:3, 6:23
6:23, 7:3, 7:3
14:18, 43:4
43:5, 43:7
43:10
**jobs** 7:8
**JOHN** 2:19
**john@guynnw...**
2:18
**jolt** 33:17, 51:5
51:7
**jury** 29:21
29:24, 30:10
**justice** 22:5
22:17

## K

**K9** 7:20, 9:7
10:15, 10:15
10:16, 11:13
11:24, 35:22
47:8, 47:9, 48:1
**Kemper** 31:4
**kicked** 28:22
**kicks** 28:23
**kid** 16:12, 16:13
26:13, 27:7
31:7, 31:7
37:18, 42:12
42:13, 42:19
43:20, 43:22
**kid's** 15:13
**Kimberly** 1:25
2:4, 53:2, 53:22

**kind** 13:20
**knew** 48:23
**know** 4:20
12:13, 13:5
13:7, 15:2, 18:9
19:23, 21:7
21:8, 23:23
23:23, 24:1
24:3, 24:5
24:11, 24:15
25:10, 25:11
25:12, 27:13
27:15, 28:24
31:17, 32:11
40:19, 40:25
43:6, 49:15
51:7
**Knox** 9:9, 9:11
40:4

## L

**lady** 23:11
**Large** 2:6, 53:1
53:5, 53:23
**lasts** 50:9
**law** 7:11
**lawful** 26:2
**lawfully** 23:22
24:4, 25:2, 25:6
25:12, 26:8
**LCA** 6:17, 6:18
**leadership**
43:19
**leave** 11:6
**leaves** 7:1
**leaving** 11:8
34:9
**left** 17:10, 31:12
31:18, 31:20
34:8, 34:9
**leg** 40:8
**LEGAL** 2:12
**legally** 22:15
**legs** 28:22
28:23

**level** 7:23
**liberty** 6:18
6:19, 6:20
39:20
**license** 13:4
**life** 38:5, 38:21
**light** 42:3, 42:7
**line** 38:17, 38:20
38:21
**little** 31:14
42:13, 42:14
43:20, 43:21
**lived** 6:14, 6:16
**lives** 38:20
38:22, 41:7
48:3
**local** 48:2
**located** 47:10
**location** 17:1
**LOCKABY**
2:16
**long** 25:2
**longer** 35:17
**look** 43:5, 43:18
**looked** 33:18
**looking** 14:4
31:6
**looks** 49:14
50:1
**lot** 17:2, 23:3
31:6, 31:17
32:2, 44:25
49:20
**loudly** 30:15
**lower** 29:6
**Lynchburg** 1:2
1:6, 1:12, 2:8
2:9, 2:13, 4:10
6:18, 7:16, 8:8
47:16
**Lynchburg's**
46:14
**LYNETTE** 1:3

**EXHIBIT 8**

Page 58

## M

Ma'am 23:12
magistrate 48:4
  48:5
main 10:3
making 34:3
  41:22
mama's 42:15
man 27:8, 29:3
  38:9
managed 17:17
maneuver 29:10
  29:15
March 40:3
MARGARET
  2:15
marijuana 14:9
  14:10
marked 17:2
martial 26:24
master 47:11
  47:13, 47:17
matter 32:23
mean 12:25
  14:6, 18:25
  20:19, 24:18
  25:13, 27:3
  27:14, 29:9
  36:24, 37:3
  37:5, 38:18
  38:19, 38:22
  39:6, 39:18
  40:1, 41:5
  41:18, 41:23
  42:10, 43:16
  43:23, 45:3
  45:4, 46:4, 50:8
  50:14, 50:22
meaning 33:4
medication 5:16
melee 46:1
members 13:24
memory 12:22
  18:5
microphone

45:18
middle 44:12
Miller 9:19
  9:22, 9:23, 12:2
  12:6, 14:23
  16:19, 17:16
  17:17, 18:13
  18:17, 19:10
  20:11, 20:12
  21:8, 25:9, 29:6
  32:1, 32:1, 33:4
  33:8, 33:11
  33:19, 34:9
  34:13, 36:6
  37:8, 39:3
  48:24, 49:19
Miller's 13:2
  17:22, 18:6
  27:3, 44:7
Millers 9:20
million 45:5
mind 36:18
  36:20, 36:23
minimis 50:7
minute 40:17
  40:24
minutes 32:24
  48:22, 49:7
missing 45:23
  45:25
mode 45:16
moments 17:24
mother 15:13
  30:15, 30:17
mouth 42:13
  42:16
move 6:15
moving 6:24
  8:21
multi-channel
  9:25
multiple 35:10
  40:23, 40:24
mvalois@vbcle...
  2:14

## N

name 4:7, 42:21
narcotics 9:12
  10:19
near 11:18
  11:20, 36:10
  46:1
need 4:19, 25:1
  25:13, 25:15
  32:16, 32:19
  36:24, 43:11
neither 53:12
never 36:11
  37:18, 38:2
  39:10, 42:6
  43:10, 46:25
New 6:16, 7:5
night 46:11
  46:13
nolle 41:15
Notarial 53:16
Notary 2:5, 53:4
  53:5, 53:22
notice 2:2
notified 28:7
  28:12, 28:14
November 53:6
  53:17
Number 53:5

## O

oath 5:8
Object 20:1
  21:14, 21:23
  22:9, 23:8
  23:15, 23:19
  24:19, 24:23
  26:3, 37:1
  38:11, 38:24
  39:16, 39:22
  41:10, 42:4
  42:8, 42:24
  43:25, 44:13
  48:20

objection 6:7
  27:20, 30:2
objections 6:3
obnoxious 43:20
obnoxiously
  42:12
obstructed
  33:11
obstruction
  22:4, 22:5, 22:8
  22:17, 27:16
obvious 28:19
obviously 42:12
occupants 10:23
  11:12, 11:13
  11:16, 11:17
  11:23, 13:23
  25:3
occupied 46:23
occurred 8:23
  17:13
October 1:10
  2:7, 4:1
odds 7:8, 43:8
odor 10:18
offer 51:13
offering 51:12
officer 4:9, 7:24
  9:7, 9:19, 9:20
  11:22, 12:2
  12:2, 12:3, 12:6
  13:2, 13:18
  18:13, 18:17
  19:10, 20:11
  20:12, 23:6
  29:6, 33:11
  33:18, 36:10
  37:8, 40:18
  44:10, 48:24
  49:12, 49:19
officer's 49:14
officers 14:1
  14:12, 14:14
  35:10, 35:15
  40:15, 40:19
  40:24, 40:25

offices 2:7
official 46:16
  46:17
Oh 21:20, 52:6
okay 4:21, 5:5
  5:6, 9:20, 15:20
  16:9, 22:24
  25:5, 26:11
  27:17, 28:6
  28:19, 30:20
  30:22, 32:6
  33:3, 34:25
  35:12, 42:11
  42:13, 42:15
  44:22, 45:12
  48:8, 49:9
  49:15, 50:18
  50:25, 51:3
  51:10, 52:1
old 7:5
once 11:13
  11:15
open 10:20, 11:3
  11:6, 11:9
open-air 10:11
  10:13, 11:14
  14:2, 22:22
  25:4
opening 11:1
openly 42:18
operations
  26:23
opinion 24:15
ops 7:19
order 10:23
outside 11:18

## P

P.C 2:16
p.m 1:11, 1:11
  2:7, 4:1, 52:11
PAGE 3:2
Pannell 14:22
  16:13, 17:8
  32:2, 32:4

**EXHIBIT 8**

33:16, 34:9
34:25, 35:17
36:11, 37:12
37:16, 49:20
**parked** 17:10
31:13
**parking** 17:1
17:2, 23:3
30:25, 31:6
31:10, 31:17
31:21, 32:2
49:20
**participating**
20:4
**participation**
14:16, 35:23
**particular** 11:25
34:23, 45:7
45:9
**party** 53:13
**passenger** 17:9
**passengers**
46:17
**patrol** 7:23
**PAUL** 2:14
**pause** 25:18
25:18
**paused** 49:23
**pauses** 25:16
**people** 22:25
39:19, 39:21
41:7, 41:22
42:2, 42:6
43:11, 43:17
43:18
**people's** 38:16
38:19, 38:22
39:20
**period** 17:18
**perjury** 5:8
**person** 42:18
**personal** 45:1
**personally** 39:3
**pertinent** 45:3
**physical** 20:18
**physically** 16:16

20:12, 21:18
**place** 16:16
33:24, 34:1
36:21, 36:22
38:15, 41:25
**placed** 16:24
17:19, 18:19
19:6, 19:17
21:5, 21:9
27:24, 29:16
35:9
**places** 47:18
**Plaintiffs** 1:4
2:15
**plate** 13:4
**play** 32:16, 49:7
**playing** 50:11
**Please** 37:23
38:4, 42:20
42:20
**POIII** 7:22
**point** 11:19
18:16, 19:5
21:17, 22:1
27:13, 28:8
29:1, 33:10
33:24, 34:5
34:6, 34:17
35:18, 36:18
37:9, 39:5
44:10, 46:21
**pointed** 16:8
**police** 4:10, 7:9
7:13, 7:16, 9:2
12:16, 17:22
18:7, 24:12
26:25, 35:4
35:10, 35:22
46:8
**policies** 46:14
**policy** 8:6, 8:8
8:10, 13:9
13:13, 46:16
46:17, 46:19
46:21
**position** 7:18

34:9
**possession** 14:8
14:9
**possible** 11:21
39:5
**potential** 13:22
**power** 23:18
**practice** 12:15
12:16
**prepare** 5:20
**presence** 10:18
**present** 12:2
**presented** 49:13
**presumption**
26:1
**pretty** 40:9
**prevent** 5:17
**previous** 6:10
**previously**
27:17, 27:22
**primary** 7:7
13:3
**prior** 12:14
14:5
**probably** 35:15
**proceeding**
53:14
**proceedings** 8:2
**process** 35:3
36:21, 41:2
48:22
**processing**
36:21, 36:24
37:5, 38:14
41:5, 41:8
41:22, 41:23
42:2, 42:23
**produce** 51:23
**Professional** 2:4
53:3
**prossed** 41:15
**Public** 2:5, 53:4
53:22
**pull** 16:17
17:17
**pulled** 14:7

**pulling** 17:13
**punk** 42:13
43:20, 43:22
**purpose** 10:9
18:25, 19:1
19:11, 21:12
33:23, 34:3
34:4
**pursuant** 2:2
**pursue** 48:13
**put** 5:4, 17:19
18:11, 30:13
33:4, 33:8, 39:8
42:2, 42:6

**Q**

**question** 5:2
5:3, 19:22
21:11, 23:21
24:3, 24:7, 24:7
24:13, 30:3
30:7, 43:4
**questions** 25:15
52:6
**quick** 49:5

**R**

**radio** 9:24, 9:25
**raking** 7:1
**ran** 33:17
**randomly** 22:25
**rank** 7:21
**re-reviews** 8:10
**read** 5:22, 10:17
**reading** 12:23
13:2, 52:12
**real** 7:2, 39:19
39:19, 39:20
39:21, 41:7
49:5
**really** 25:16
41:6, 43:9
**reason** 4:19
12:19, 12:20

24:5, 25:23
45:9
**reasonable**
14:17
**Reasonably**
25:19
**reasons** 45:5
**recall** 7:5, 12:22
12:23, 14:4
15:23, 16:10
19:9, 25:8
27:10, 28:14
29:19, 29:20
29:23, 29:24
30:5, 30:6
37:11, 37:15
40:1, 40:2
**received** 8:5
**Recess** 49:10
**recollect** 36:18
41:24
**recollection**
9:18, 42:1
48:23
**record** 4:23
45:5, 52:6, 52:6
**recorded** 44:25
**recorder** 44:9
**recording** 39:7
44:8, 44:11
**redirect** 52:7
**redirected** 16:3
50:14
**Reed** 1:9, 2:1
3:3, 4:3, 4:8
4:10, 49:12
**refresh** 32:19
**refused** 15:10
16:13
**Registered** 2:4
53:3
**Registration**
53:5
**related** 8:18
45:19, 53:13
**relayed** 37:9

**Relaying** 44:25
**remember** 16:7
 17:25, 20:7
 20:9, 20:10
 20:11, 30:9
 35:20, 35:20
 40:4, 40:10
 40:12, 45:8
**Repeatedly**
 37:24
**rephrase** 42:11
**report** 5:22
 5:22, 5:23, 13:3
 24:12
**reported** 1:25
 48:17
**reporter** 2:5
 4:25, 53:3
**reporting** 40:23
**reports** 9:2
 12:23
**request** 45:7
**resists** 28:19
**respond** 10:7
**responded** 48:4
**responding**
 10:10, 14:15
**responsibility**
 43:13
**restrictions**
 39:20
**result** 37:5, 41:6
**results** 39:19
 41:8
**retrieve** 11:12
**review** 8:9, 8:9
**reviewed** 9:2
**reviewing** 35:21
**reviews** 8:10
**right** 4:9, 4:12
 4:16, 4:18, 4:23
 6:9, 6:22, 7:6
 8:21, 9:4, 9:9
 10:6, 10:13
 11:17, 11:25
 12:5, 12:7

12:11, 12:13
14:18, 14:19
14:21, 14:24
15:5, 15:8
15:12, 15:14
15:21, 16:3
16:12, 16:15
16:18, 16:21
16:24, 17:2
17:4, 17:7
17:12, 17:14
17:20, 17:24
18:3, 18:10
18:12, 18:15
18:21, 18:24
18:25, 19:5
19:7, 19:18
19:25, 20:5
20:19, 20:23
21:1, 21:4, 21:7
21:9, 22:13
22:20, 22:24
26:11, 26:24
27:3, 27:11
27:13, 28:8
28:10, 28:20
29:10, 30:13
30:14, 30:15
30:18, 31:2
31:8, 31:10
31:15, 31:19
31:22, 32:2
32:3, 32:4, 32:7
32:9, 32:10
32:14, 32:23
33:1, 33:5
33:18, 33:20
33:21, 34:3
34:8, 34:23
35:1, 36:1, 36:2
38:6, 38:18
38:23, 40:2
40:4, 40:7
40:12, 41:16
44:9, 45:2, 48:6
48:11, 49:2

49:12, 49:21
49:23, 50:3
50:19, 50:22
51:10, 52:2
52:9
**riot** 46:1
**RIVER** 2:12
**Road** 2:12
 23:10
**Robbin** 34:13
 39:3
**rocks** 31:14
 31:16
**rocky** 31:14
**roll** 24:13
**rolled** 12:1
**roughly** 7:15
**RPR** 1:25
**rude** 42:18
**run** 10:15, 14:18
 19:2, 24:16
 35:2, 47:21
**running** 15:6
 18:25, 30:21
 31:22, 32:3
 42:12, 42:15

---

**S**

**safety** 23:6
**Salem** 2:17
**Sandidge** 33:5
**saw** 39:10
**saying** 15:22
 27:14, 36:23
 42:20
**scared** 37:24
 38:4, 38:5
 42:20
**scene** 9:14, 10:7
 12:1, 14:1
 24:14, 35:24
 36:2, 36:5
 36:15, 36:19
 39:3, 41:3, 44:3
 44:5, 44:12

**schedule** 47:20
**school** 6:13
 6:14, 6:17, 47:8
 47:8, 47:9
 47:10, 47:18
 47:19, 47:21
**schools** 6:17
**screaming**
 30:14, 30:14
 32:7, 32:7, 38:1
 42:14
**seal** 53:16
**search** 10:21
 11:10, 12:10
 12:14, 18:12
 18:13, 19:7
 19:8, 19:11
 19:12, 19:19
 20:4, 20:20
 20:22, 28:17
 45:25
**searched** 19:9
 19:10, 19:21
 19:24, 20:14
 28:11, 28:13
 28:15, 28:20
 35:13
**searching** 19:25
 20:8, 20:9
 20:12, 20:13
 21:12, 22:14
 27:12
**seat** 14:23
**seconds** 25:22
 32:23, 32:25
 49:24, 50:10
 50:13
**see** 5:13, 19:24
 24:14, 34:13
 34:14, 34:19
 34:21, 34:22
 39:11, 43:23
 43:23, 49:4
 50:22, 50:25
 51:1
**seen** 31:23

32:14, 32:14
32:15, 32:17
**serious** 41:6
 41:18, 41:19
**service** 7:4, 7:6
**Seth** 1:9, 2:1
 3:3, 4:3, 4:8, 4:9
**severe** 40:9
**Shanta** 1:3, 8:19
 15:13, 29:21
 30:17, 30:21
 31:22, 32:2
 33:4, 34:12
 36:9, 44:3
 48:11, 48:19
 49:17, 49:25
**shorts** 50:1
**showed** 26:12
**shows** 40:18
 49:25
**shut** 11:6
**side** 17:8, 17:9
 31:20, 34:15
 34:19
**sidewalk** 17:20
 17:24, 18:1
**signature** 52:12
**signed** 43:5
 43:9
**sir** 4:7, 37:23
 42:20, 42:21
 42:21
**sits** 8:10
**sitting** 23:11
 44:4
**situation** 34:7
 43:1, 46:1
**sleep** 45:16
**slot** 17:7
**sniff** 10:11
 10:14, 11:14
 12:11, 12:15
 13:10, 14:2
 15:7, 22:22
 23:4, 23:12
 25:4, 26:13

46:18
sniffs 46:22
snippet 49:13
    49:24, 51:12
    51:16, 51:19
somebody 23:3
    24:14, 28:23
    41:9
someone's 14:7
soon 11:8
source 49:15
space 17:2
speak 44:14
    44:18, 44:19
specifically 24:2
spiel 4:19
spot 31:10
squawking
    15:20, 30:13
    30:14
stand 16:5
standing 11:18
    11:22, 15:18
    16:4, 17:24
    17:25
start 7:3, 18:12
started 6:25, 7:4
    7:11, 35:14
starting 6:13
    6:16, 6:23
starts 15:20
state 4:7, 6:16
    7:5
statement 32:19
    34:1, 34:4, 37:6
    38:9, 46:2
statements
    39:21, 41:21
STATES 1:1
step 25:3
stepped 35:21
steps 25:5
stood 16:10
    17:19, 18:4
    18:5, 35:5, 35:7
stop 9:5, 9:15

12:21, 13:1
13:14, 13:17
13:19, 16:4
33:12, 43:1
45:23
stopped 14:23
    25:11
Street 2:8, 31:4
    40:4
stress 41:3
subject 5:8, 8:1
    28:3
supervisor 8:9
    36:2, 36:4
    36:15, 37:4
    37:10, 37:12
    38:9, 39:2
    39:13, 40:13
sure 8:13, 8:16
    25:6, 31:16
    35:13, 44:20
    45:4
suspect 13:22
    50:23, 51:6
sworn 4:4, 53:8
synced 45:17

**T**

tactical 29:10
tag 13:3, 14:23
    15:3, 45:23
    46:1
take 2:3, 25:5
    29:8, 30:7
    42:11, 42:19
    48:18, 49:6
takedowns
    26:23
taken 2:1, 16:25
    27:8, 28:10
    29:1, 29:4
    36:20, 36:22
    38:15, 41:25
takes 32:10
talk 4:24

talking 8:22
    18:1, 32:22
    32:23, 32:24
    44:4, 50:8
tall 26:15
tank 49:25
taught 47:7
teach 47:15
teaches 47:12
tell 6:12, 6:22
    36:14, 39:13
    49:5
telling 37:3
    37:11, 40:12
tense 42:2
    43:3, 43:4, 43:5
Terron 14:22
    16:13, 32:1
    32:3, 32:7
    34:25, 36:11
    37:12, 37:16
    48:11, 49:20
testified 4:4
    21:1, 24:9
    27:18, 30:1
testify 5:7, 5:11
    5:18, 13:8, 48:8
testifying 29:20
    29:24
testimony 5:21
    5:25, 21:21
    39:8, 48:5
    53:10
thereof 53:15
thing 39:15
    46:1
things 26:24
    38:23, 41:6
    41:19, 45:3
think 23:17
    23:18, 24:10
    24:18, 24:21
    49:8, 51:11
    51:20
third 35:14
Thomas 23:10

three 24:10
    35:15, 48:8
thug 43:21
thumb 51:14
ticket 14:9
Timberlake
    2:12
time 6:15, 9:7
    13:6, 13:10
    18:9, 22:15
    35:11, 35:15
    40:13, 41:24
    42:2, 45:9
    46:18
times 24:10
today 5:11, 5:21
told 12:6, 16:4
    18:18, 19:14
    21:2, 21:18
    36:4, 37:16
    39:2
top 49:25
tore 40:7
touch 37:13
    37:23, 38:4
traffic 9:5, 9:15
    12:21, 13:14
    13:17, 13:19
    33:12, 43:1
    45:23
trained 9:11
    12:17, 13:12
trainer 47:11
    47:13, 47:17
training 8:9
    26:22, 26:24
    26:25, 46:11
transcribed 2:1
transcript 5:4
    14:5, 39:7
    53:10
transferred
    6:17, 7:15
trial 29:21
    29:25, 30:10
    39:6, 39:8, 39:9

true 38:10, 53:9
try 4:23, 5:2
trying 30:12
    36:21, 41:2
    44:22, 44:23
    49:19
tune 40:22
turn 31:12
    42:17, 42:21
    44:11
turned 31:8
turning 43:21
turns 44:9
twit 42:14
two 9:20, 25:21
    27:5, 31:9
two-year-old
    14:8
typically 10:5
    11:11, 11:20

**U**

Uh-huh 35:8
ultimately 45:24
understand 5:9
    6:5, 38:16
    38:18, 38:19
    39:18, 41:4
    41:12, 43:3
    43:12
unfortunately
    6:10
unit 7:20
UNITED 1:1
University 6:19
    6:21
unlawfully
    25:24
unreliable 36:24
upper 29:5
use 37:20, 45:13

**V**

Valois 2:14

| | | | | |
|---|---|---|---|---|
| 2:15, 3:4, 4:6 | **violations** 8:6 | **witness** 3:2 | 27:2, 27:3, 32:1 | **415** 2:17 |
| 20:3, 21:19 | **violent** 13:24 | 21:16, 21:25 | 33:3, 33:8, 34:8 | **434.845.4529** |
| 22:2, 22:12 | **Virginia** 1:1 | 22:11, 25:23 | 44:6 | 2:13 |
| 23:9, 23:16 | 1:12, 2:6, 2:9 | 38:25, 39:14 | **Zachary** 12:2 | |
| 23:20, 24:8 | 2:13, 2:17, 7:9 | 42:25, 44:1 | 16:19, 17:16 | **5** |
| 24:20, 24:25 | 7:12, 53:1, 53:5 | 44:14, 48:21 | 17:21, 18:6 | |
| 25:19, 25:25 | 53:17, 53:23 | 49:9 | 21:8, 25:9 | **5:00** 25:20 |
| 26:4, 27:21 | | **witnessed** 36:5 | 49:19 | **540.387.2320** |
| 30:4, 37:2 | **W** | 36:14, 36:15 | **zone** 31:15 | 2:18 |
| 38:12, 39:1 | | 39:3, 39:14 | | |
| 39:17, 39:23 | **W2** 7:3 | 49:2 | | **6** |
| 41:11, 42:5 | **WADDELL** | **word** 37:20 | **1** | |
| 42:9, 43:2, 44:2 | 2:16 | **words** 37:15 | | **6:23cv00054** 1:5 |
| 44:16, 49:1 | **wait** 5:1, 5:2 | **work** 7:19, 14:7 | **1** 10:5 | |
| 49:4, 49:11 | 25:20 | 26:20 | **1:06** 1:11, 52:11 | **7** |
| 50:12, 51:10 | **waived** 52:12 | **worked** 7:14 | **10-minute** 49:6 | |
| 51:18, 51:24 | **walk** 11:12, 23:2 | **working** 6:25 | **12:09** 1:11, 2:7 | **7601** 2:12 |
| 52:2, 52:3, 52:5 | 23:10 | 7:4, 7:6, 26:6 | 4:1 | |
| 52:9 | **walked** 17:21 | 51:24, 52:3 | **18-year-old** | **9** |
| **vantage** 39:5 | 18:6 | **works** 24:18 | 27:7 | |
| **vehicle** 10:12 | **want** 7:1, 23:4 | 47:22 | **19th** 53:17 | **900** 2:8 |
| 10:16, 10:19 | 23:12, 24:16 | **worn** 45:13 | | |
| 10:24, 11:2 | 44:17, 44:18 | **worry** 11:23 | **2** | |
| 11:4, 11:14 | 44:25 | **worse** 42:3 | | |
| 11:15, 11:18 | **warrant** 20:22 | 43:18 | **200** 26:19 | |
| 11:21, 12:11 | 28:7 | **wrong** 27:19 | **200-plus** 26:19 | |
| 13:23, 14:23 | **watched** 5:23 | 28:1, 41:8 | **2015** 7:9, 7:14 | |
| 15:7, 15:19 | **Watching** 50:24 | **wrongdoing** | **2017** 7:15 | |
| 22:23, 23:22 | **way** 47:4, 47:6 | 45:6 | **2020** 8:23 | |
| 25:2, 25:4, 25:6 | 47:7 | | **2021** 40:3 | |
| 25:24, 26:7 | **We've** 4:16, 6:9 | **Y** | **2024** 1:10, 2:7 | |
| 31:7, 46:18 | 8:7 | | 4:1, 53:18 | |
| **vehicles** 46:23 | **wearing** 49:25 | **yeah** 12:25, 24:9 | **2025** 53:6 | |
| **video** 19:25 | **weigh** 26:17 | 25:1, 27:2 | **24153** 2:17 | |
| 20:5, 20:6 | 26:18 | 34:22, 38:2 | **24502** 2:13 | |
| 28:23, 31:23 | **went** 6:14, 15:5 | 41:4, 46:4 | **28th** 14:22 | |
| 32:16, 41:17 | 34:12, 45:22 | 51:18 | **29** 1:10, 2:7, 4:1 | |
| 41:18, 44:6 | 45:25 | **yelling** 42:14 | | |
| 44:7, 49:3, 49:7 | **Wesley** 40:2 | **York** 6:16, 7:5 | **3** | |
| 49:13, 49:24 | 41:14 | **young** 6:25 | | |
| 50:9, 50:11 | **WESTERN** 1:1 | 27:8, 29:3, 38:9 | **30** 53:6 | |
| 50:24, 51:3 | **whoa** 21:17 | 43:20 | **359658** 53:6 | |
| 51:17 | 21:20, 21:20 | | | |
| **view** 34:17 | **willing** 43:11 | **Z** | **4** | |
| **violation** 14:24 | **windows** 10:20 | | | |
| 15:3 | **wit** 53:1 | **Zach** 9:22, 9:23 | **4** 3:4 | |
| | | | **4:00** 25:14 | |