IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| SHANTA LYNETTE BROWN, and AQUASHA SANDIDGE, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action: 6:23cv00054 |
| THE CITY OF LYNCHBURG, *et al.*, | ) ) ) |
| Defendants. | ) |

**DEFENDANT CITY OF LYNCHBURG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant City of Lynchburg (the "City"), by counsel, respectfully submits this memorandum in support of its motion for summary judgment.

INTRODUCTION

Plaintiffs Shanta Brown and Aquasha Sandidge allege that the City is liable for the alleged excessive force used against them by three Lynchburg Police officers under a theory of municipal liability. The claim is that the City maintains an unconstitutional policy or custom of permitting the use of excessive force by its police officers. In support of this allegation, Plaintiffs recited 15 separate instances over a 20 year span in which Lynchburg Police officers allegedly used excessive force. The Court found that these alleged incidents were enough to survive the City's motion to dismiss. However, the discovery cutoff has come and gone, and Plaintiffs have put forth no evidence to support these allegations. Nor have they put forth evidence of any official policy or custom of the City of permitting excessive force by its police officers. Accordingly, Plaintiffs have not met their burden and the City is entitled to summary judgment on these claims.

1

## STATEMENT OF FACTS[1]

On the night of April 28, 2020, Lynchburg Police Department ("LPD") Officer Zachary Miller ("Officer Miller") was monitoring traffic in his patrol vehicle from the parking lot in front of the Liberty warehouse on 12th Street in Lynchburg, VA. (Dep. Z. Miller at 13-14.)[2] Around 10:00 pm, a vehicle missing a front license plate drove past, so Officer Miller followed the vehicle into the parking lot of the Kemper Lofts apartment complex on Kemper Street. (*Id.*; Z. Miller Dash Cam at 00:24-44.[3]) The vehicle pulled into a parking spot in front of the Jobbers Overall apartment building, and Officer Miller pulled behind it and turned on his emergency lights signaling a traffic stop. (*Id.*)

Officer Miller exited his police cruiser and engaged with the young Black male driver, who he learned was Terron Pannell ("Pannell"). (Z. Miller Body Cam at 00:07-01:21.)[4] Officer Miller ascertained that Pannell did not have a driver's license and that the vehicle did not belong to him. (*Id.*) Pannell said he had borrowed the vehicle from his friend in order to get something to eat for his children and pick up their clothes from the washer. (Dep. Pannell at 7.)[5] While Officer Miller questioned Pannell, his back-up officer, LPD Officer Tereika Grooms ("Officer Grooms") arrived on scene. (Grooms Body Cam 00:00-15.)[6] Officer Miller returned to his police cruiser and began processing the summons for the traffic violation of not displaying a front license plate and driving without a license. (Z. Miller Body Cam 01:23-37.) In so doing, he discovered that Pannell had a prior conviction on his record for possession of marijuana. (Dep. Z. Miller at 50-51.)

---

[1] All exhibits cited herein are attached to the Defendant Officers' Memorandum in Support of their Motion for Summary Judgment filed contemporaneously herewith.
[2] The deposition transcript of Zachary Miller.
[3] The dash camera footage of Zachary Miller.
[4] The body camera footage of Zachary Miller.
[5] The deposition transcript of Terron Pannell.
[6] The body camera footage of Tereika Grooms.

Meanwhile Plaintiffs Shanta Lynette Brown ("Brown") and her daughter, Aquasha Sandidge ("Sandidge") (together, "Plaintiffs"), had observed from the window of their apartment Pannell, their son and brother, respectively, being questioned by Officer Miller. (Dep. Brown at 14-15[7]; Dep. Sandidge at 6-7[8].) Plaintiffs immediately left the apartment and went outside where they approached the stopped vehicle and asked what was going on. (*Id.*; Grooms Body Cam 00:27-30.) Officer Grooms asked Plaintiffs to stay back for a minute and said they would have to ask Officer Miller. (Grooms Body Cam 00:27-01:03.) Plaintiffs continued to approach the driver's side of the vehicle and Officer Grooms again asked them to stay away from the vehicle, but Plaintiffs disregarded her request. (*Id.*) Brown said "I'm his mother." (*Id.*) Officer Grooms said, "That doesn't matter. I asked you to stay back. I'm asking you to step back from the car. Can you step back from the car?" (*Id.*) Brown aggressively looked Officer Grooms up and down and then turned and walked toward the front of the vehicle. (*Id.*)

Meanwhile, Officer Miller was also ordering Plaintiffs to move away from the vehicle and stand over near the building entrance while the officers conducted their traffic stop, and added that he would come talk to them. (Z. Miller Body Cam 01:38-02:01.) Plaintiffs moved away from the vehicle Pannell was in, but remained standing in front of the vehicle immediately to the right, and did not move back to the building entrance like Officer Miller had requested. (Grooms Body Cam 00:47-01:03.) Shortly thereafter, Officer Miller asked Officer Grooms to attempt to get consent for them to search the vehicle, and she obliged. (Z. Miller Body Cam 02:27-02:40; Grooms Body Cam 01:35-40.) As Officer Grooms circled behind the vehicle to approach the driver's door, Brown again moved from where she had been standing on the sidewalk and approached Officer Grooms' position near the front of the vehicle. (Grooms Body Cam 01:40-46.) While Officer

---

[7] The deposition transcript of Shanta Brown.
[8] The deposition transcript of Aquasha Sandidge.

3

Grooms began speaking to Pannell, Officer Miller once again had to order Plaintiffs to move away from the vehicle and stand by the front door to the building, or at least on the other side of the car. (Z. Miller Body Cam 03:00-33.) Brown argued with Officer Miller, shouting over Officer Grooms' questions to Pannell. (Grooms Body Cam 02:01-02:30.) Ultimately, Plaintiffs did move back to the other side of the car away from Officer Grooms. (*Id.*) Officer Grooms politely requested consent to search the vehicle from Pannell, but he refused. (Grooms Body Cam 02:15-02:40.) Officer Grooms informed Officer Miller that Pannell had refused consent. (*Id.* 02:40-43.)

Officer Miller then called LPD Officer Seth Reed ("Officer Reed") on the radio and requested that he come in order to perform a sniff test with his LPD K9 Officer Knox. (Dep. Z. Miller at 24, 57; Dep. Reed at 9-10[9]; Z. Miller Body Cam 03:42-54.) While Officer Miller did not have any evidence at that time that Pannell had any illicit drugs in his possession, he knew about Pannell's prior convictions and his lack of a driver's license while operating a motor vehicle that did not belong to him. (Dep. Z. Miller at 14, 16, 50.)

As Officer Miller continued to process the traffic summons, LPD Officer Seth Reed ("Officer Reed") arrived on scene and approached Officer Miller's police cruiser. (Reed Body Cam 00:28-38.[10]) Officer Miller informed him that consent to search had been denied, that Pannell was a known gang member and had marijuana history, and that there was just one person in the vehicle. (Z. Miller Body Cam 07:46-52.)

Officer Reed then approached the stopped vehicle and ordered Pannell out of the vehicle, which is routine in order to have the K9 perform an open air sniff of the car exterior. (Reed Body Cam 00:45-55; Dep. Reed at 10-11.) At this point, Brown interjected herself and told Officer Reed loud enough for Pannell to hear that Pannell did not have to exit the vehicle unless he was being

---

[9] The deposition transcript of Seth Reed.
[10] The body camera footage of Seth Reed.

4

detained. (*Id.* 00:55-59.) Officer Reed respectfully informed Brown that she was mistaken, that Pannell did need to exit the vehicle because he had ordered him to, and that she had nothing to do with this traffic stop. He also informed her that she needed to move away from the vehicle because he was going to conduct a scan on the vehicle with his K9. (*Id.* 00:59-01:13.)

At this, Pannell began claiming that he was "scared" and that he "fear[ed] for his life now." (*Id.* 01:13-22.) Officer Reed calmly and directly ordered Pannell out of the vehicle twice more so he could bring the K9 to perform an open air sniff of the car exterior, but Pannell refused the order, so Officer Reed then opened the driver's side door. (*Id.* 01:22-37.) Officer Miller saw this from his police cruiser, so he got out and approached the vehicle to assist Officer Reed. (Z. Miller Body Cam 08:42-49.) Pannell repeatedly told Officer Reed that he was scared of him and refused to exit the vehicle. Officer Reed then reached into the vehicle and grasped Pannell's arm. (*Id.* 01:37-44.) Pannell resisted being removed from the vehicle, so Officer Miller also grasped Pannell's arm. (*Id.*) Meanwhile Officer Grooms had circled around the front of the vehicle to insert herself in between Plaintiffs, who were verbally interjecting themselves in the situation, and Officers Reed and Miller. Officer Grooms also advised Pannell to "just step out of the car" and "make it easier" for Officer Reed to conduct his scan. (Grooms Body Cam 07:35-56.) Pannell actively resisted the officers removing him from the vehicle, so they took Pannell to the ground in between the vehicle he had been driving and the vehicle parked next to it. (Reed Body Cam 01:47-53.) Pannell began screaming and calling for his mother and telling Sandidge to "record this." (*Id.* 01:53-02:15.)

At this, Brown began barging into Officer Grooms, disregarding police commands, in an attempt to get to her son, with such force that she actually knocked Officer Grooms' body camera off of her person and onto the ground. (Grooms Body Cam 1 08:00-12; Miller Dash Cam 09:54-10:10.) Sandidge began screaming, "What the fuck is y'all doing?" (*Id.*) Officers Reed and Miller

5

then lifted Pannell up off the ground and walked him toward Officer Miller's police cruiser in order to search him for weapons and place him into custody in the back of the cruiser so they could proceed with the K9 open air sniff of the exterior of the vehicle. (Reed Body Cam 02:17-37; Miller Body Cam 08:53-09:40; Grooms Dash Cam 1 9:25-50[11].)

When the three men arrived at the cruiser and Officer Miller attempted to spread Pannell's feet apart for the search, Pannell began thrashing around and kicking backwards, so the officers in tandem took Pannell back to the ground and held him there. (*Id.*) Pannell began screaming for his mother. (*Id.*) Brown rushed past Officer Grooms and toward the officers, who were attempting to restrain a resistant Pannell on the ground. (Grooms Dash Cam 1 09:27-59.) As Brown rapidly approached, Officer Miller used his left arm to deflect Brown, which sent a jolt through Officer Miller into Officer Reed, causing both officers unwanted physical contact. (*Id.*; Depo. Reed at 33, 51.)

After Brown had been pushed away, Officer Grooms, with Sandidge in tow, reinserted herself in between the other officers and Brown, while Brown continued to shout at the officers. (Grooms Dash Cam 1 09:45-59.) Sandidge also continued to scream and was filming the interaction on her cell phone. (*Id.*) Brown attempted to push past Officer Grooms yet again, so Officer Grooms circled behind her and attempted to restrain Brown's arms behind her to detain her. (*Id.*) But Brown yanked away. (*Id.*) Officer Grooms temporarily abandoned her attempt to detain Brown and continued to block her from assaulting the officers again. (*Id.* 09:58-10:12.) Officer Grooms, with Officer Miller's help, managed to corral Brown and Sandidge back toward the front of the building. (*Id.* 10:12-20.) That is when Officer Reed ordered the other officers to place Plaintiffs in handcuffs. (Reed Body Cam 03:11-15; Z. Miller Body Cam 10:20-24.)

---

[11] The first recording of dash camera footage of Tereika Grooms.

Officer Miller left Officer Reed with Pannell in handcuffs on the ground and proceeded toward Plaintiffs near the front entrance of the apartment building. (Z. Miller Body Cam 10:10-25.) Meanwhile LPD Detective Robbin Miller ("Detective Miller") arrived in plain clothes and approached Officer Reed, who asked Detective Miller to help the other officers with detaining Plaintiffs. (Reed Body Cam 03:15-20; Grooms Dash Cam 10:18-25.) At the front entrance to the building, Officer Miller ordered Brown to put her hands behind her back and as he and Officer Grooms attempted to restrain her, she resisted and they went to the ground. (Z. Miller Body Cam 10:27-38.) Sandidge was behind them screaming and filming on her phone, and Detective Miller ordered her to put her hands behind her back, attempting to restrain Sandidge. (Reed Dash Cam 03:43-59.[12]) Sandidge resisted and shoved Detective Miller in the chest, assaulting him. (*Id.*) Detective Miller proceeded to attempt to restrain Sandidge, who resisted, causing them to trip over Brown, who was lying on the ground. (*Id.*) Detective Miller and Sandidge lost balance and fell backwards. (*Id.*) Officer Miller saw them falling with Sandidge on top of Detective Miller and sprang into action to assist Detective Miller with gaining control of Sandidge. (*Id.*; Z. Miller Body Cam 10:40-50.) Officer Miller pulled Sandidge off of Detective Miller, who had injured his elbow during the fall. (Z. Miller Body Cam 10:48-53, 18:30-48; R. Miller Injury Report.[13]) Officer Miller assisted Detective Miller with restraining Sandidge on the ground and, seeing her cell phone lying on the ground next to her, picked it up, disconnected what he thought was a phone call, turned off the screen, and secured the phone on his person as evidence. (Z. Miller Body Cam 11:35-40; Depo. Z. Miller at 68-70.)

The Plaintiffs were both secured in handcuffs and ushered into the back of police cruisers. (Z. Miller Body Cam 12:10-13:12; Reed Dash Cam 05:10-36; Grooms Dash Cam 1 12:15-50.)

---

[12] The dash camera footage of Seth Reed.
[13] The injury report of Robbin Miller.

7

Brown received some abrasions on her legs, but neither received nor requested medical attention. (Dep. Brown at 32.) Sandidge suffered no injuries and sought no medical treatment. (Dep. Sandidge at 20.) Plaintiffs were then driven to the magistrate's office—Brown with Officer Grooms, Sandidge with LPD Officer Thomas Hall. (Hall Dash Cam 10:20-20:10[14]; Grooms Dash Cam 2 00:00-05:12[15].) Officer Miller and Officer Reed testified that they had been assaulted by Brown and that she had obstructed their investigation. (Reed Body Cam 20:37-23:23.) Detective Miller later obtained a warrant on Sandidge for assaulting a police officer. (Incident Report at 13[16]; Depo. R. Miller at 15[17].) Plaintiffs were charged accordingly. Brown was charged with felony assault on a law enforcement officer by Officer Reed and Officer Miller and misdemeanor obstruction of a law enforcement officer by Officer Miller. (Warrants of Arrest.[18]) Sandidge was charged was misdemeanor obstruction by Officer Miller and felony assault by Detective Miller. (*Id.*)

On or about March 10, 2023, Sandidge's charges were dismissed on the prosecution's motion for *nolle prosequi*. (Dep. Sandidge at 24; Compl., ECF 1, ¶ 81.) Brown was acquitted of all three criminal charges by a jury in the Lynchburg Circuit Court on March 14, 2023. (Acquittal Order.)[19]

There is no evidence on the record that the City maintains a custom or policy of permitting its police officers to use excessive force.

---

[14] The dash camera footage of Thomas Hall.
[15] The second recording of dash camera footage of Tereika Grooms.
[16] The LPD Incident Report from the April 28, 2020 incident.
[17] The deposition transcript of Robbin Miller.
[18] The arrest warrants against Shanta Brown and Aquasha Sandidge related to the April 28, 2020 incident.
[19] The March 14, 2023 Order from the Circuit Court for the City of Lynchburg noting the not guilty verdict on all three counts against Shanta Brown.

## PROCEDURAL HISTORY

On September 18, 2023, Plaintiffs filed their complaint (the "Complaint") against the City, as well as three LPD officers. (ECF 1). In the Complaint, Plaintiffs alleged *Monell* claims against the City for unconstitutional policy or custom (Counts 7 and 8), failure to train (Counts 9 and 10), failure to discipline (Counts 11 and 12), and under a theory of ratification (Counts 13 and 14).

On November 27, 2023, the City and LPD Officer Seth Reed filed their motion to dismiss (ECF 8) and memorandum in support (the "Memorandum") (ECF 9).

In its April 12, 2024 memorandum opinion and order, the Court dismissed Counts 9, 10, 11, 12, 13, and 14 against the City. The *Monell* claims against the City in Counts 7 and 8 for unconstitutional custom or policy survived.

## ARGUMENTS AND AUTHORITIES

### I. Standard of Review.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Establishing the parameters for consideration of a motion for summary judgment, the Supreme Court has stated that

> the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . .

9

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  To withstand a motion for summary judgment, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  *Abcor Corp. v. AM Int'l., Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249-50).

## II. The City is entitled to summary judgment on Plaintiffs' *Monell* claims for unconstitutional custom or policy (Counts 7 and 8).

Plaintiffs asserted *Monell* claims against the City in Counts 7 and 8 of unconstitutional custom or practice of permitting its officers to use excessive force.  At the outset, these claims must be dismissed because Plaintiffs cannot support the underlying constitutional claims against the individual officers.[20]  *See Turner v. Thomas*, 313 F. Supp. 3d 704, 716 (W.D. Va. 2018) ("For a municipality to be liable under 1983, a plaintiff must demonstrate an underlying constitutional violation.") (citing *Waybright v. Frederick Cty. MD*, 528 F.3d 199, 203 (4th Cir. 2008)).  Moreover, no reasonable juror could find the City had a policy or custom that caused a deprivation of Plaintiffs' Fourth Amendment rights.

A local government entity cannot be held liable under § 1983 for injuries inflicted solely by its employees or agents.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Local governments are only liable for their own illegal acts.  Accordingly, to impose liability on a governmental entity, a plaintiff must establish the existence of an official policy or custom that caused the constitutional deprivations.  *Id.*  The entity may be held liable only when its policy or custom is "the moving force of the constitutional violation."  *Id.*

---

[20] See the memorandum in support of motion for summary judgment of the defendant officers, filed contemporaneously herewith.

### A. No reasonable juror could find that the City maintains a custom or policy of permitting excessive force.

In Counts 7 and 8, Plaintiffs assert *Monell* claims based on a theory of unconstitutional custom. In other words, Plaintiffs attempt to show that the City "fail[ed] to put a stop to or correct a widespread pattern of unconstitutional [excessive force by police officers]." *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402 (4th Cir. 2014) (citing *Spell*, 824 F.2d at 1389). Prevailing under this theory "is no easy task." *Id.* Plaintiff must point to a "persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." *Id.* (internal citations omitted). "A court may infer that a custom exists 'from continued inaction in the face of a known history of *widespread* constitutional deprivations on the part of city employees' but not 'merely from municipal inaction in the face of *isolated* constitutional deprivations by municipal employees.'" *Booker v. City of Lynchburg*, 2021 U.S. Dist. LEXIS 26538, at *9 (W.D. Va. Feb. 11, 2021) (quoting *Milligan v. Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984)). Further, the custom "must be of such a character that municipal employees could reasonably infer from it tacit approval of the conduct in issue." *Id.* (citing *Milligan*, 743 F.2d at 230).

To demonstrate the requisite causation, Plaintiffs must show the unconstitutional custom proximately caused their alleged Fourth Amendment deprivations. *Jackson v. Brickey*, 771 F. Supp. 2d 593, 604 (W.D. Va. 2011). That is, Plaintiffs must show there existed a pattern of widespread constitutional violations that were "specific and similar enough" to the conduct at issue that the City's indifference to them could be seen as a "deliberate choice." *Booker*, 2021 U.S. Dist. LEXIS at *9-10 (citing *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Plaintiffs have neither adduced evidence to demonstrate a history of widespread, similar uses of excessive force by City police officers, nor have they shown deliberate indifference by the City. Plaintiffs' *Monell* claims require that City officials—independent from the Chief or other law enforcement—have a constitutional duty to investigate uses of force by LPD officers. But the constitutional mandate is that the City not consciously disregard widespread uses of excessive force by its police officers. There is no evidence to demonstrate that the LPD's investigatory process is inadequate, or that widespread excessive force either occurs or is permitted to go unchecked. And there is no case establishing a constitutional duty for a municipality to have non-law enforcement officials conduct independent excessive force investigations.

In short, given the total lack of evidence for the claim, no reasonable juror could find the City has a custom or policy of permitting excessive force by LPD officers.

## CONCLUSION

For the foregoing reasons, Defendant City of Lynchburg respectfully requests that the Court grant its motion for summary judgment and dismiss the Plaintiffs' claims with prejudice.

CITY OF LYNCHBURG

By /s/ John R. Fitzgerald
Jim H. Guynn, Jr. (VSB #22299)
John R. Fitzgerald (VSB #98921)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia  24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
          johnf@guynnwaddell.com
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of November, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

M. Paul Valois (VSB 72326)
James River Legal Associates
7601 Timberlake Road
Lynchburg, VA 24502
T: 434-845-4529
F: 434-845-8536
Email: mvalois@vbclegal.com
*Counsel for Plaintiffs*

                                      /s/ John R. Fitzgerald
                                      Jim H. Guynn, Jr. (VSB # 22299)
                                      John R. Fitzgerald (VSB # 98921)
                                      GUYNN WADDELL, P.C.
                                      415 S. College Avenue
                                      Salem, Virginia  24153
                                      Phone: 540-387-2320
                                      Fax:    540-389-2350
                                      Email: JimG@guynnwaddell.com
                                                 JohnF@guynnwaddell.com
                                      *Counsel for Defendants*