CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

1/28/2025
LAURA A. AUSTIN, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| SHANTA LYNETTE BROWN<br>*and*<br>AQUASHA SANDIDGE,<br><br>*Plaintiffs,*<br><br>v.<br><br>THE CITY OF LYNCHBURG, *et al.*,<br><br>*Defendants.* | CASE NO. 6:23-cv-00054<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiffs Shanta Brown and Aquasha Sandidge sue the City of Lynchburg and three City of Lynchburg police officers for harms arising out of a police-citizen encounter. During the encounter, Brown and Sandidge intervened in the arrest of a family member (their son and brother, respectively), and they were subsequently detained for obstruction of justice and assault against a police officer. Brown and Sandidge allege in a 20-count complaint that their arrest violated their rights under the United States Constitution and Virginia common law. After disposing of several of these claims pursuant to Rule 12(b)(6), *see* Dkt. 29 (Order on Motion to Dismiss), the Court now considers the remaining claims at summary judgment.

As against the City, Plaintiffs assert claims for an unconstitutional pattern of excessive force under *Monell* (Counts 7-8). As against the individual police officers, Plaintiffs assert claims for unlawful seizure, excessive force, and malicious prosecution under 42 U.S.C. § 1983 (Counts 1-6), as well as claims for assault, battery, false imprisonment, and malicious prosecution under Virginia common law (Counts 15-20). The City and the officers move

separately for summary judgment on all counts, with the officers claiming qualified immunity. *See* Dkt. 42 (Officers' motion); Dkt. 44 (City's motion).

Upon consideration of Defendants' motions, the factual record, and the applicable law, the Court finds that no dispute of material fact exists as to any of the Plaintiffs' claims and that Defendants are each entitled to judgment as a matter of law. Therefore, in an order that will accompany this memorandum opinion, and for the reasons stated below, the Court will **GRANT** Defendants' motions for summary judgment, Dkts. 42 and 44, and **DISMISS** all other pending motions as moot. *See, e.g.,* Dkts. 37, 40 (pending motions in limine).

## I.    Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id*. (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id*. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

The moving party bears the burden of establishing that summary judgment is

warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this

burden, then the nonmoving party must set forth specific, admissible facts to demonstrate a

genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). The non-movant may not rest on allegations in the pleadings; rather, it must present

sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for

the non-movant. *Celotex Corp.*, 477 U.S. at 322–24; *Sylvia Dev. Corp. v. Calvert Cnty, Md.*, 48

F.3d 810, 818 (4th Cir. 1995). "The court need consider only the cited materials, but it may

consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II.    Background

The Court makes the following findings of fact after construing any disputed evidence in

the light most favorable to Brown and Sandidge.[1]

### A.  Plaintiffs' Encounter with Police

On the night of April 28, 2020, Lynchburg Police Department ("LPD") Officer Zachary

Miller ("Officer Miller") monitored traffic in his patrol vehicle from a parking lot on 12th Street

---

[1]      On summary judgment the Court must "take the evidence and all reasonable inferences to be drawn
therefrom in the light most favorable" to the non-moving parties, here Brown and Sandidge. *Graham v. Gagnon*,
831 F.3d 176, 184 (4th Cir. 2016). "The operation of these principles to the record here is straightforward: the
officers are assumed to have possessed the information they would have had if events unfolded" as Brown and
Sandidge assert. *Id*. ("The importance of summary judgment in qualified immunity cases does not mean that
summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the
defense.").

        However, these principles have limited application in the instant case, for two reasons. First, the facts of
this case are largely undisputed, because the relevant police-citizen interactions were captured by the officers' body
cameras and the recorded audio and video have been submitted to the Court. *See Witt v. W. Va. State Police, Troop
2*, 633 F.3d 272, 276–77 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (cleaned up) ("When
documentary evidence 'blatantly contradicts' a party's account 'so that no reasonable jury could believe it,' a court
should not credit that party's version on summary judgment."); *see also McKenna v. Police Chief*, No.
1:22CV00002, 2022 WL 15046725, at *1 (W.D. Va. Oct. 26, 2022) (In the instant case, the "facts are largely
undisputed, particularly those of the police officers' encounters with the plaintiff[s], because they were captured by
[the officers'] body camera[s] and the recorded audio and video have been submitted to the court."). Second,
Plaintiffs fail to submit any comprehensive statement of facts in their summary judgment briefing, *see* Dkt. 47 at 1-
2, thus obliging the Court to draw facts from the body camera footage and from Defendants' statement of facts and
discovery evidence.

in downtown Lynchburg, Virginia. Dep. Miller at 13-14. Around 10:00 pm, Officer Miller

observed a vehicle driving past which lacked a front license plate, so Miller pulled out and

followed the vehicle. Miller followed the vehicle a short distance before it pulled into the parking

lot of the Kemper Lofts apartment complex on Kemper Street. Miller Dash Cam at 00:24-44.2.

As the vehicle entered the parking lot and came to a stop, Officer Miller parked behind the

vehicle and activated his emergency lights. *Id*.

Officer Miller exited his patrol car and spoke to the driver at the driver-side window. The

driver was a young black male, eighteen-year-old Terron Pannell. Dkt. 1, ¶ 15. The vehicle was

parked nose-first in the parking space, so that the vehicle faced the apartment complex.

"Hey man. Office Miller, Lynchburg Police Department. Reason I pulled you over is

where's your front tag at, man?" said Miller. Miller Body Cam at 00:22-00:28.

"This is my friend's car, I'm just taking my kids something to eat, sir," said Pannell.

Officer Miller asked for Pannell's license, and Pannell admitted that he did not have a

license. Miller then asked for Pannell's name and social security number, in order to conduct a

record search and prepare a summons, and he wrote Pannell's information down on his notepad.

Miller Body Cam 00:50-01:20. During this time, two women exited the front door of the

apartment building. Officer Grooms also arrived on the scene as a backup officer—which is LPD

protocol for after-hours stops. Miller Body Cam 01:13-01:24.

As Officer Miller returned to his patrol car with Pannell's information in hand, the two

women who had exited the apartment building approached Pannell's vehicle. Miller Body Cam

01:20-01:50. The women would be later identified as Shanta Brown and Aquasha Sandidge,

mother and sister to Pannell, the driver.

4

### 1. *Brown and Sandidge Intervene*

Officer Grooms, standing on the passenger side of Pannell's vehicle, asked the women to stop. "Can I have y'all stay back for a minute?" said Grooms. Grooms Body Cam 00:25-00:30. The two women did not stop and proceeded to walk along the sidewalk from the passenger side of the vehicle, where Grooms stood, toward the driver side vehicle, coming within feet of Pannell's driver-side door. "Can I have you stay back from the car for me?" Grooms repeated.

"I'm his mother," said Brown.

"That doesn't matter, I asked you to stay back," said Grooms. Grooms Body Cam 00:25-00:38

With Brown and Sandidge proceeding forward, Grooms hurried behind Pannell's vehicle to confront the women on the driver's side of the car, where the women were now speaking with Pannell. Grooms Body Cam 00:25-00:30-00:44. Reaching the driver's side, Grooms spoke to the women again. "I'm asking you to stay back from the car. Can you step back from the car ma'am? This officer we'll be able to explain to you what's going on," she said, referring to Officer Miller.

Meanwhile, Officer Miller, observing these interactions from his patrol car, stood out of his seat. "Hey, get away from the car! Ma'am, . . .  I'll come talk to you, okay?" Miller Body Cam 01:10-01:52.

Brown and Sandidge partially acquiesced, stepping away from the driver's side door and appearing to look at the area of Pannell's vehicle where a front tag would have been displayed. "Yes, please do," said Brown.

Grooms followed them back to the passenger's side of the vehicle, while Miller still observed from his patrol car.

5

"Alright, just hang out by the door over there, please. And I'll come talk to you, okay?" said Miller, pointing to the door of the apartment complex from which the women had exited, which was a distance removed from Pannell's vehicle but still within earshot and sight of the scene. Miller Body Cam 01:20-01:52.

Brown and Sandidge, however, stopped short of the door and only walked as far as the parking spot next to Pannell's vehicle. Grooms Body Cam 01:00-01:04.

### 2.  *Seeking Consent to Search*

Officer Miller made several calls on his radio from the front seat of his patrol car.

"See if you can get consent," he radioed to Officer Grooms. Miller Body Cam 02:27-02:29.

"10-4," said Grooms. Grooms Body Cam 01:38.

Grooms returned to the driver's side of the car to speak with Pannell. Grooms asked for Pannell's information and engaged in conversation. Brown followed her and observed the interaction. Grooms Body Cam 01:38-02:00. Officer Miller, seeing that Brown and Sandidge had again approached the driver's side of the vehicle, shouted from his patrol vehicle. "Ma'am can y'all please stand by the door over there, please?" Miller Body Cam 03:00-03:05.

"Honey, I'm not even over there. She's right there. I'm not even by the car," said Brown. Grooms Body Cam 02:00-02:07.

"Can you just please stand by the door?" Miller Body Cam 03:00-03:15.

"What's the difference between here and there?" said Brown. Grooms Body Cam 02:07-02:12.

"Listen, can you please just stand by the door? That's all I'm asking. Just please stand by the door, okay, because then I gotta keep my eyes on you—I'm trying to do a job." Miller Body

6

Cam 03:00-03:15.

"Oh, let me tell you. I'm an officer myself." Grooms Body Cam 02:10-02:18. (Brown was employed as a Correctional Officer, *see* Dkt. 1 at 10).

"Then you understand where I'm coming from, correct?"

"I do, but I'm not doing anything illegal. I do, but I don't. I'm an officer, too." Grooms Body Cam 02:10-02:30.

"All I'm asking you to do is just please step over there, at least on the other side of the car." Miller Body Cam 03:00-03:15.

Brown and Sandidge again walked away from the driver's side of the vehicle, but they hardly went as far as the passenger side. Indeed, they still remained several car spaces away from the door of the apartment complex, where Miller had directed them to go. Grooms Body Cam 02:30-02:36. Meanwhile, Pannell denied Officer Grooms consent for the officers to search the vehicle, and Officer Grooms relayed this to Officer Miller. "Hey, that's a no." Grooms Body Cam 02:37-02:41.

### 3.  *Arrival of Officer Reed*

Noting Pannell's refusal of consent, Officer Miller made a second radio call to request that Officer Seth Reed come to the scene to conduct a free-air canine sniff of the vehicle. Miller Dep. at 57. Officer Miller testified that he "routinely" asks for a K9 officer when conducting traffic stops in the City of Lynchburg, especially if the person, after running a record search, is shown to have been involved with drugs. Miller Dep. at 49, 52. Pannell's record showed that he had a "simple possession of weed as a juvenile." Miller Dep. at 51.

After running the record search and getting more information from Pannell (*i.e.*, his address), Officer Miller took out his clipboard and began writing up a summons for the traffic

7

violation. Miller Body Cam 05:55-06:16. A little more than a minute later, Officer Reed arrived and approached Officer Miller's passenger-side vehicle, where Miller filled him in on the situation.

"Consent denied. . . . Has lots of marijuana history," said Miller. Miller Body Cam 07:40-07:50.

"How many people are in there?" asked Reed.

"Just one." Miller Body Cam 07:50-08:00.

Reed left Miller's window and approached Pannell's vehicle. On his way, he addressed Officer Grooms. "Hey Grooms, I'm gonna pull him out." Reed Body Cam 00:40-00:51. Then arriving at Pannell's driver-side window, he said, "How you doing, man? I'm gonna have you step out of the car and stand with my partner, okay?" Reed Body Cam 00:50-00:56.

As Officer Reed spoke to Pannell, Brown came around the front of Pannell's vehicle and stood with her arms crossed, roughly at the driver-side headlight of the vehicle. "Is he being detained? Because he ain't gotta get outta that car," said Brown. Reed Body Cam 00:54-01:00.

"He does have to get out of the car if we ask," said Reed.

"We read up on it; he don't have to get out of that car."

"Ma'am, you have nothing to do with this traffic stop."

"That's my son."

"Okay, we'll need you to stand over there." Reed pointed to the front door of the apartment complex. "I'm a canine officer and I'm gonna be conducting a scan on the vehicle." Reed Body Cam 01:00-01:12. Reed paused momentarily while Brown continued to argue. Pannell was still seated in the driver's seat. "Mom, I fear for my life now!" he said. Reed Body Cam 01:12-01:24.

8

Returning his focus to Pannell, Reed repeated his command. "Okay, you need to step out of the car." He opened Pannell's door. "Step out of the car."

"I'm scared, bruh . . . . Please don't touch me," said Pannell.

"I am gonna touch you if you don't step out of the car," said Reed.

This back and forth repeated several times over before Reed stepped toward Pannell and grabbed him by the arm. Reed Body Cam 01:20-01:43. Noticing the escalating scene from his patrol car, Miller threw down his clipboard and joined Reed at the open door of Pannell's vehicle. Miller Body Cam 08:40-08:47. So did Grooms. "Hey just step out of the car and make it easy," said Grooms. Grooms Body Cam 07:45-07:53. Reed and Miller then took hold of Pannell's left arm and pulled. Pannell resisted. "I'm scared of y'all!"

"Step out of the car!" the officers repeated.

When Pannell did not comply, the officers pulled forcefully, and Pannell fell to the ground. Reed Body Cam 01:40-01:55. The scene erupted in screams, both from Pannell and from Brown and Sandidge. Brown rapidly approached the driver's side door to the point that she came in contact with Grooms, knocking Grooms' body camera off her uniform.

"See what I'm saying!" said Brown. "I want all your badge information!" Grooms Body Cam 08:00-08:06.

"What the fuck is y'all doing?" Sandidge screamed.

### 4. *Arrest of Brown and Sandidge*

After placing Pannell in handcuffs, the officers stood him up and walked him back to a patrol car. "What am I getting detained for? I didn't resist arrest or nothing," said Pannell. Reed Body Cam 01:55-02:20. Once at the patrol car, the officers asked Pannell to spread his legs so that they could conduct a pat down. Miller Body Cam 09:33-09:42. Whether Pannell complied or

9

resisted is not clear from the video; Defendants claim that he was "thrashing around and kicking backwards." *See* Dkt. 43 at 6. In any case, Pannell and the officers engaged in a brief struggle that led to the officers exerting substantial force and taking Pannell back to the ground. Grooms Body Cam 09:40-09:50. "Stop! Stop!" yelled Miller, attempting to control Pannell on the ground. Miller Body Cam 09:42-09:52.

Brown ran urgently toward her son. She came upon the scuffle in seconds. As she knelt down to reach Pannell, Officer Miller pushed her back with one arm. Grooms Body Cam 09:50-09:55. With Brown briefly repelled backward by Miller's shove, Officer Grooms then stepped in between Brown and the officers, presenting herself as a wall, insisting that the women step back. But Sandidge and Brown reengaged and proceeded to struggle with Grooms, all the while screaming at the officers who were wrangling Pannell on the ground. Miller Body Cam 09:52-10:03.

"Mom! Mom!" screamed Pannell. Miller Body Cam 09:50-10:05.

Though Grooms succeeded in gradually moving Brown and Sandidge away from Pannell and back toward the apartment complex, the women continued to press their cause, and tensions remained high. At this point Officer Miller stood up and approached them, speaking over Grooms' shoulder. "Walk away, or you're going to go to jail, too." Miller Body Cam 10:05-10:20. "Just walk away!"

Just as Brown and Sandidge appeared to turn around and take up a more removed position on the sidewalk, Officer Reed, still kneeling on Pannell, ordered Miller to detain Brown and Sandidge. "Throw them in handcuffs." Miller Body Cam 10:19-10:21. In that same span of seconds, Detective Robbin Miller, a plainclothes officer, arrived on the scene at a run. Grooms Dash Cam 10:18-10:20. Reed told Detective Miller to assist Officer Miller in detaining Brown

and Sandidge. "They go in handcuffs," Reed pointed. "Both of them." Grooms Dash Cam 10:18-
10:20; Reed Body Cam 03:12-03:20.

Acting on this order, Officer Miller was the first to approach Brown and Sandidge, and
he ordered them to put their arms around their backs. Miller Body Cam 10:21-10:28. Brown
resisted. "No, I ain't going . . . !" As Brown dodged Miller's advances, the officer repeated his
command, and the two went to the ground. Miller Body Cam 10:21-10:48. "Get off of me!"
screamed Brown. Detective Miller, joining the scene, attempted to assist Officer Miller in
controlling Brown, but he quickly turned his attention to Sandidge. When Sandidge resisted,
Detective Miller and Sandidge also went to the ground. The scuffle appears to have involved
some combination of Sandidge pushing Detective Miller, and the two tripping over Officer
Miller and Brown, who were already on the ground. Reed Dash Cam 03:35-04:00.

"She is pregnant!" someone screamed.

"Then she shouldn't be fighting!" said Detective Miller.

As the officers struggled to place Sandidge and Brown in handcuffs, a crowd gathered in
the parking lot. "Stay back!" said Officer Miller. "Everybody stay back." Miller Body Cam
11:20-11:28. One man emerged from the apartment complex front door, coming within feet of
Plaintiffs and the arresting officers. Officer Miller approached him, pushed him away, and told
the man to go back inside. Brown and Sandidge, meanwhile, now secured in handcuffs, had
hardly capitulated. They protested loudly while a car alarm honked, sirens rang, and the flashing
lights of a dozen police cars illuminated the parking lot. Miller Body Cam 11:28-12:50. Roughly
twelve minutes had passed since the time Officer Miller initiated his traffic stop, and roughly
eight minutes had passed since Officer Reed first attempted to force Pannell's exit from the car.
Yet the scene had transformed from a routine traffic stop to a disorderly clash between police,

Pannell and his family, and concerned onlookers.

Eventually, the officers escorted Brown and Sandidge to separate police cruisers. Miller Body Cam 12:50-13:40. After nearly six minutes of struggle, Pannell was also placed in a patrol car—with the assistance of at least six different police officers. Grooms Dash Cam 12:45-18:34. Pannell conceded, while being placed in the patrol car, that he smoked weed and that he had weed on him. Miller Body Cam 17:40-17:54.

"All that for weed. All that for weed," said Officer Miller.

### B. Legal Proceedings

Thereafter, Brown and Sandidge faced various criminal charges arising under Virginia law. Brown was charged with two felony counts of assault and battery against a police officer (one count as to Officer Miller and one count as to Officer Reed). She was also charged with one misdemeanor count of obstructing justice. Dkt. 43-17 at 3-5.

Sandidge was charged with one felony count of assault and battery against a police officer as to Detective Miller, and one misdemeanor count of obstructing justice. Dkt. 43-17 at 1-2.

Brown was released on bond, while Sandidge was incarcerated for six days at the Lynchburg Adult Correction Center. Dkt. 1 at 10. Thereafter, both women lived under conditions of bond for approximately three years, awaiting trial. *Id*. Brown alleges that she lost her job as a correctional officer due to the pending charges and was forced to take work as a grocery store cashier. *Id*.

Three years later, in March 2023, the matters went to trial. Brown was acquitted by a jury of her peers on all counts. Dkt. 43-18. The charges against Sandidge were dismissed upon the prosecution's motion for *nolle prosequi*. Dkt. 1, ¶ 81. Brown and Sandidge brought the instant

action in September 2023 seeking civil relief.

## DISCUSSION

Plaintiffs present fifteen claims following Defendants' motion to dismiss. As against the police officers, Plaintiffs assert claims for unlawful seizure, excessive force, and malicious prosecution under 42 U.S.C. § 1983 (Counts 1-6), as well as claims for assault, battery, false imprisonment, and malicious prosecution under Virginia common law (Counts 15-20). As against the City, Plaintiffs assert claims for an unconstitutional pattern of excessive force under a *Monell* theory of municipal liability (Counts 7-8).

Upon Defendants' motion for summary judgment, the Court finds that no dispute of material fact exists and that Defendants are entitled to judgment as a matter of law. We begin with Plaintiffs' federal claims against the officers, before turning to their state law claims against the officers and, finally, their claims for municipal liability against the City.

## III.    Section 1983 Claims and Qualified Immunity

The Officer Defendants raise qualified immunity in defense to Plaintiffs' Section 1983 claims. "Qualified immunity shields government officials from liability in a § 1983 suit so long as their conduct did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As applied, qualified immunity gives "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502

U.S. 224, 229 (1991) (internal quotation marks omitted).

Thus, under this framework, we must determine whether the facts—viewed in the light most favorable to Plaintiffs—show that Officer Miller and/or Officer Reed violated Plaintiffs' constitutional rights, and whether those rights were clearly established at the time of the officers' conduct, such that a reasonable officer would have known that the conduct was unconstitutional. *See Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019).

The question of whether a right is clearly established is a question of law for the Court to decide. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992). The question of whether a reasonable officer would have known that the conduct at issue violated that right, on the other hand, is a question of fact which "cannot be decided on summary judgment if disputes of the historical facts exist." *Hupp v. Cook*, 931 F.3d 307, 317–18 (4th Cir. 2019). We may consider either prong of the analysis first, and "it is often the better approach to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all," *Dolgos*, 884 F.3d at 178, since "an officer [who] did not violate any right . . . is hardly in need of any immunity and the analysis ends right then and there." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).

Ultimately, Plaintiffs bear the burden of demonstrating that a constitutional violation occurred, while Defendants bear the burden of showing that the law was not clearly established. *Henry v. Purnell*, 501 F.3d 374, 377 (4th Cir. 2007).

### A.  Unlawful Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable seizures." U.S. CONST. amend. IV. To establish an unreasonable seizure under the Fourth Amendment, Plaintiffs must demonstrate that they were arrested without probable cause. *See Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *Dunaway v.*

*New York*, 442 U.S. 200, 213 (1979)).

Probable cause is determined from the totality of the circumstances known to the officer at the time of the arrest. *Gilmore*, 278 F.3d at 367; *see also Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003). These circumstances take two main shapes: "the suspect's **conduct** as known to the officer, and the **contours of the offense** thought to be committed by that conduct." *Id*. (citing *Pritchett*, 973 F.2d at 314. Therefore, probable cause "could be lacking in a given case . . . either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both." *Id*. At bottom, there need only be "enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Id.*; *see also Wilson*, 337 F.3d at 398 (4th Cir. 2003) (probable cause exists when the facts and circumstances would lead a reasonable person to believe the suspect "has committed, is committing, or is about to commit an offense"); *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1992) ("In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place.").

Here, Plaintiffs were arrested for assault and for obstruction of justice. Thus, Plaintiffs must show that the officers lacked probable cause to make an arrest with respect to each charge, considering what the officers knew of the Plaintiffs' conduct and its conformity with the applicable laws. We conclude that Plaintiffs cannot make such a showing, and that the officers operated with probable cause.

### 1. *Assault*

As to assault, Brown and Sandidge were arrested and charged according to Va. Code § 18.2-57, which criminalizes "an assault and battery against another[,] knowing or having reason

to know that such other person is . . .  a law-enforcement officer." Va. Code § 18.2-57(C). This statute "proscribes a very broad range of conduct," considering that "it is a mainstay of Virginia jurisprudence that the common law crime of assault and battery may be accomplished by the slightest touching or without causing physical injury to another." *United States v. Carthorne*, 726 F.3d 503, 514 (4th Cir. 2013).

Here, based upon the totality of the facts and circumstances known to Reed and Miller at the time (namely, Brown and Sandidge's actions—verbal and physical—plus the setting of the interaction), we find that the officers had a reasonable belief that Plaintiffs had committed, were committing, or were about to commit assault—as supported by the following factual cues.

The first factual cue occurred when Brown and Sandidge rushed over to intervene after the officers forcibly removed Pannell from the vehicle. As the scene erupted in screams, from both Plaintiffs and Pannell, Plaintiffs (especially Brown) rapidly approached Pannell's driver's side door to the point that Brown came in contact with Grooms, <u>knocking Grooms' body camera off her uniform</u>. *See* Grooms Body Cam 07:55-08:10; Miller Dash Cam 09:50-10:00; Reed Body Cam 01:40-01:55. (This would have been enough for Grooms to press an assault charge had she desired.) Plaintiffs proceeded to struggle with Officer Grooms and protest the officers' actions in agitation. "See what I'm saying!" said Brown. "I want all your badge information!" Grooms Body Cam 08:00-08:06. "What the fuck is y'all doing?" Sandidge screamed.

Second, when Pannell was taken to the ground a second time (for apparently refusing to be strip-searched), Plaintiffs (especially Brown) again rushed the scene in an agitated manner. Brown came close enough to Pannell and the arresting officers that Officer Miller was able to push Brown away with one arm, without moving from Pannell. *See* Reed Dash Cam 02:55-03:05. Once Officer Grooms stepped in between Brown and the officers, presenting herself as a

wall, Sandidge and Brown only reengaged and proceeded to struggle with Grooms, all the while screaming at the officers who were wrangling Pannell on the ground. *See* Miller Body Cam 09:52-10:03; Reed Dash Cam 03:05-03:15.

Finally, once Officer Miller and Detective Miller approached Brown and Sandidge to place them in handcuffs, both Brown and Sandidge resisted, physically and verbally. "No, I ain't going!" Brown declared, as she forcibly resisted and repelled Miller's advances. Miller repeated his command, and the two went to the ground. Miller Body Cam 10:21-10:48. Likewise, when Sandidge resisted Detective Miller, he and Sandidge also went to the ground. The scuffle appears to have involved some combination of Sandidge pushing Detective Miller, and the two tripping over Officer Miller and Brown, who were already on the ground. Reed Dash Cam 03:35-04:00.

These circumstances are far and away sufficient to support the officers' reasonable belief that Plaintiffs had committed, were committing, or were about to commit assault. Between Plaintiffs' agitated manner, Plaintiffs' repeated occasions of rushing the officers, and the subsequent physical scuffle that ensued, the Court finds that Officer Miller and Officer Reed had probable cause to arrest Plaintiffs for violating Va. Code § 18.2-57(C), for which they were later charged.

Plaintiffs submit counterarguments that invariably boil down to an argument that no contact actually occurred. *See, e.g.*, Dkt. 47 at 2 ("Miller himself in his deposition . . . testified that . . . [he] did not observe Brown contact him, the contact he felt could have been accidental or incidental and that his belief that he was assaulted was founded upon his own 'speculation.'"). The Court rejects this contention, first because several portions of video footage show contact occurring, and second because whether contact actually occurred is beside the point. Virginia's Section 18.2-57(C) "proscribes a very broad range of conduct," since the common law crime of

17

assault and battery "may be accomplished by the slightest touching or without causing physical injury to another." *United States v. Carthorne*, 726 F.3d 503, 514 (4th Cir. 2013). Here, Plaintiffs had already forcefully contacted Officer Grooms, and Officer Miller had already once been required to push them away. The officers were thus manifestly justified in believing that Plaintiffs had committed, were committing, or were about to commit assault.

### 2. *Obstruction of Justice*

Next, Brown and Sandidge were charged with obstruction of justice under Va. Code § 18.2-460, which provides that a person is guilty of a Class 1 misdemeanor where she "without just cause knowingly obstructs . . . any law-enforcement officer . . . in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by . . . law-enforcement officer." Va. Code § 18.2-460.

Virginia courts have interpreted this statute narrowly. *Cromartie v. Billings*, 837 S.E.2d 247, 256 (Va. 2020). "Merely making the officer's task more difficult but not impeding or preventing the officer from performing that task is not obstruction." *Id*. (quoting *Ruckman v. Commonwealth*, 505 S.E.2d 388, 389 (Va. Ct. App. 1998)). Nor does obstruction "occur when a person [merely] fails to cooperate fully with an officer." *Jordan v. Commonwealth*, 643 S.E.2d 166, 171 (Va. 2007) (quoting *Ruckman*, 505 S.E.2d at 389). "Obstruction ordinarily implies opposition or resistance by direct action." *Cromartie*, 837 S.E.2d at 256. "The act done must be with an intention on the part of the perpetrator to obstruct the officer himself, not merely to oppose or impede the process." *Id*. (quoting *Jones v. Commonwealth*, 126 S.E. 74, 77 (Va. 1925)). At an absolute minimum, something she did must have "obstructed" an attempted action of one of the officers. *Graham v. Gagnon*, 831 F.3d 176, 186 (4th Cir. 2016).

Here, many of the facts that supported a finding of probable cause for assault also support

probable cause for obstruction of justice, because assaulting a police officer while he is

conducting the arrest of another person likely impedes that officer's task. Thus, we reiterate the

circumstances noted above—*viz*., Plaintiffs' agitation and hostility, Plaintiffs' repeated occasions

of rushing the officers, and Plaintiffs' contribution to the physical scuffle that ensued—and find

that these circumstances would likewise lead a reasonable officer to believe that Plaintiffs were

engaged in obstruction.

Further relevant circumstances include Plaintiffs' persistent failure to comply with the

officers' orders. Officer Grooms, Officer Miller, and Officer Reed each requested, at various

stages of the encounter, that Plaintiffs stay back from the scene and stand by the door to the

apartment complex. Officer Miller and Officer Grooms made this request at the very beginning

of the interaction, and the three officers each repeated it throughout the encounter. Yet the

officers' orders went unheeded as Plaintiffs questioned the worth of the officers' directive

("What's the difference between here and there?" said Brown. Grooms Body Cam 02:07-02:12),

asserted their own authority to remain as watchdogs over the investigation into Pannell ("I'm his

mother . . . Oh, let me tell you. I'm an officer myself." Grooms Body Cam 00:25-00:38; 02:10-

02:18.), and ultimately violated the officers' orders numerous times by never actually going

where they were directed and, more importantly, encroaching upon the officers' interactions with

Pannell at critical times. These facts suggest that Plaintiffs had no intention of complying with

the officers' attempts to maintain an orderly traffic stop, such that the officers reasonably

believed Plaintiffs were obstructing justice or were about to obstruct justice and needed to be

restrained.

Together, the circumstances illustrated above constitute "enough evidence to warrant the

belief of a reasonable officer" that obstruction had been or was being committed; "evidence

sufficient to convict is not required." *See Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)

Moreover, a finding of probable cause for obstruction on these facts squares with Fourth Circuit

caselaw on the matter. *Compare Figg v. Schroeder*, 312 F.3d 625 (4th Cir.2002) (holding that

officer had probable cause to detain person for obstruction where she arrived on the scene

agitated and physically encroached upon a nascent police investigation, while the larger scene

appeared highly volatile, with uncertain numbers of angry, potentially hostile, and likely armed

individuals in the immediate vicinity); *with Wilson v. Kittoe*, 337 F.3d 392, 402 (4th Cir. 2003)

(holding that officer had no probable cause to detain Wilson for obstruction when he was "at all

times composed, polite, and circumspect;" Wilson "remained at a distance, on his own driveway

or out in the street  . . . and never attempted to approach" either the officer or the person being

detained; and there was no evidence that the scene appeared to be "anything other than highly

secure.").[2]

Plaintiffs argue that they cannot, as a matter of law, obstruct justice where they intervene

in an *unlawful* seizure: "One cannot be guilty of obstructing justice by interfering the *illegal*

conduct of a police officer. If . . . Pannell was unlawfully detained, then Brown did not obstruct

justice by protesting at the scene, but in fact furthered justice with her actions." *See* Dkt. 47 at 2

(emphasis added). However, Plaintiffs submit no legal authority for this proposition, and further,

---

[2]     For further cases assessing probable cause for obstruction, *see generally Bostic v. Rodriguez*, 667 F. Supp. 2d 591 (E.D.N.C. 2009) (interpreting substantially identical North Carolina obstruction statute and finding that officer had probable cause to detain Bostic for obstruction due to his "persistent badgering, yelling, and hand-waiving" which may have been intended to prevent the officer from explaining the citation, delivering the citation, and clearing the traffic stop); *Graham v. Gagnon*, 831 F.3d 176 (4th Cir. 2016) (holding that officers did not have probable cause to arrest mother for obstruction when she stood at the door of her home, told police not to come in, and went into her kitchen to seek her son, for whom the police had a warrant); *Smith v. Tolley*, 960 F. Supp. 977, 994–95 (E.D. Va. 1997) (holding that officers had probable cause to arrest Smith for obstruction when the officers arrived at Smith's home to serve his wife with arrest warrant, at which point Smith began a "series of confrontational actions" insisting the police officers were violating the law, refused to answer the officers' questions, and began videotaping the interaction, all reflective of Smith's agitation and hostility toward the officers' attempt to serve a warrant).

the Court finds that their submission is an incorrect statement of law. First, Plaintiffs lack legal standing to argue that Pannell's detention was unlawful, as they can only challenge government action relevant to their own rights: "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969))); *accord Steagald v. United States*, 451 U.S. 204, 219 (1981) ("[R]ights such as those conferred by the Fourth Amendment are personal in nature . . . ."), *reh'g granted*, 664 F.2d 1241 (1981). Thus, Plaintiffs can neither vicariously assert Pannell's rights nor establish that Pannell's detention was unlawful.

Second, even if Pannell's detention was unlawful, Plaintiffs would not be then licensed to intervene in police conduct. To the contrary, our system of law provides for the person whose rights were violated to take up their cause in court, and/or for bystanders to serve as witnesses and proponents in support of such a person's cause. Otherwise, all police investigations would be subject to the scrutiny and intervention of any bystander who believed the police had done wrong, no matter how well-founded the police action. Plaintiffs here seek to take up Pannell's rights and Pannell's cause as a justification for their own obstruction. This cannot lie.

Accordingly, as explained above, the Court finds that Plaintiffs have not alleged facts to show that the officers violated their Fourth Amendment right against unlawful seizure, because the officers had probable cause to arrest Plaintiffs for assault and obstruction of justice. The officers are therefore entitled to qualified immunity on this claim.

### B.  Excessive Force

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). This constitutional command "requires a careful balancing of the nature and

quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake." *Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). In

conducting this inquiry, courts analyze excessive force claims under an "objective

reasonableness standard." *Bellotte v. Edwards*, 629 F.3d 415, 424 (4th Cir. 2011) (quoting

*Graham v. Connor*, 490 U.S. 386, 389 (1989)).

Objective reasonableness means that courts must examine the officer's actions "in light

of the facts and circumstances confronting her, without regard to her underlying intent or

motivation." *Dolgos*, 884 F.3d at 179 (quoting *Graham*, 490 U.S. 397). The reasonableness of a

particular use of force must be judged "from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 ("Not every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the

Fourth Amendment."). Though it focuses on the objective facts, a court's inquiry "must be

filtered through the lens of the officer's perceptions at the time of the incident in question."

*Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).

Courts tend to evaluate three factors for excessive force claims: (1) the severity of the

crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or

others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

*Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (citing *Graham*, 490 U.S. at 397). "But these factors

are not exclusive," and courts may identify "other objective circumstances potentially relevant to

a determination of excessive force." *Id*. (finding it "prudent to consider also the suspect's age

and the school context"). An additional factor relevant here is whether the officers' use of force

was necessary in light of an escalating situation external to the arrestees.

Here, the instances of force used include Officer Miller and Detective Miller placing

Brown and Sandidge in handcuffs after a physical struggle which led to Brown, Sandidge,

Detective Miller, and Officer Miller all going to the ground. We conclude that the use of force

was not excessive.

First, both Brown and Sandidge exhibited behavior which led the officers to conclude

that handcuffs would be necessary to detain their ongoing intervention in the officers'

investigation of Pannell. *See* Section A(2), *supra* (finding probable cause to believe Plaintiffs

were engaged in obstruction when, *inter alia*, they refused to comply with police orders to leave

the scene).

Second, both Brown and Sandidge resisted arrest once Officer Reed gave the order to put

them in handcuffs. When Officer Miller first approached Brown and Sandidge and ordered them

to put their arms around their backs, neither complied. Brown actively resisted. "No, I ain't

going . . . !" Miller Body Cam 10:21-10:28. Miller repeated his command, and the video shows

Miller and Brown struggling in close quarters, with Brown actively yelling and dodging or

repelling Miller's advances. In this tumult, the two went to the ground. Miller Body Cam 10:21-

10:48. "Get off of me!" screamed Brown. "What the fuck are you arresting me for?"

Detective Miller, joining the scene, turned his attention to Sandidge. While Sandidge did

not at first appear as a confrontational—she appeared to be holding a phone attempting to record

the situation—neither did she comply and allow Detective Miller to place her in handcuffs.

When Sandidge more forcefully resisted by twisting and spinning around, Detective Miller and

Sandidge also went to the ground. The scuffle appears to have involved some combination of

Sandidge pushing Detective Miller, and the two tripping over Officer Miller and Brown, who

were already on the ground. Reed Dash Cam 03:35-04:00.

These circumstances, filtered through the "perspective of a reasonable officer on the

23

scene," *Graham*, 490 U.S. at 396, strongly suggest that Brown and Sandidge were actively and

fervently resisting arrest, such that the use of force involved was not excessive. Although

Plaintiffs were being arrested for a relatively modest crime and did not appear to present serious

threats of physical harm to the officers (considering they were two unarmed females up against

two armed male officers, plus other backup officers), the Court finds, nonetheless, that the

officers could have reasonably perceived the situation as threatening due to the escalating tension

of the larger environment. Before and during the officers' attempt to place Sandidge and Brown

in handcuffs, a crowd had gathered in the parking lot. The video shows at least six to seven

onlookers approaching the tumult, verbally interceding and physically encroaching, and it is

possible there were far more than this number. It was late evening. At one point a man emerged

from the apartment complex front door, coming within feet of Plaintiffs and the arresting

officers. Though the man and the other onlookers never manifested violence, the officers had no

way of knowing which, if any, onlookers may have sought to interfere, perhaps violently. We

find that the growing environment of chaos and hostility, in part fostered by Plaintiffs'

interference with police action and their resistance to arrest, provides an additional justification

for the officers' use of force.

Based on these factors, and resisting any temptation to scrutinize the officers' actions

with the benefit of hindsight, the Court concludes that the officers' use of force was reasonable

and not excessive. Accordingly, Plaintiffs have not alleged facts to show that the officers

violated their Fourth Amendment rights against unlawful force, and the officers are entitled to

qualified immunity on this claim.

### C. Malicious Prosecution

"A malicious prosecution claim under Section 1983 is properly understood as a Fourth

Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). To prevail on such a claim, a plaintiff must show that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor. *Id.* (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir.2012)). Accordingly, Plaintiffs cannot prevail on a malicious prosecution claim if the officer-defendants had probable cause for Plaintiffs' arrest. *See, e.g., Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005) ("In order for a plaintiff to state a section 1983 malicious prosecution claim . . . , we have required that the defendant have 'seized' plaintiff pursuant to legal process that was not supported by probable cause."); *Street v. Surdyka*, 492 F.2d 368, 372–73 (4th Cir. 1974) ("Accordingly, there is no cause of action for 'false arrest' under section 1983 unless the arresting officer lacked probable cause."); *Lucas v. Shively*, 31 F. Supp. 3d 800 (W.D. Va. 2014) ("Lucas cannot prevail on any of his federal claims if the defendants had probable cause for Lucas' arrest."), *aff'd*, 596 Fed. Appx. 236 (4th Cir. 2015) (unpublished).

Here, as determined above, the officers possessed probable cause to arrest Brown and Sandidge for obstruction of justice and assault. Thus, Plaintiffs cannot assert claims for malicious prosecution, and the officers are entitled to qualified immunity on these counts.

***

Accordingly, the Officer Defendants are entitled to qualified immunity and judgment as a matter of law on each of Plaintiffs' claims arising under Section 1983.

## IV.    Common Law Claims

Next, Plaintiffs assert claims under Virginia common law for false imprisonment,

25

malicious prosecution, and assault and battery. *See* Dkt. 1 (Counts 15-20). Plaintiffs' claims

invariably fail, however, either because Plaintiffs cannot show the officers lacked probable cause

or because their state law claims are subsumed by their defeated federal claims.

### A.  Common Law Malicious Prosecution

In Virginia, a plaintiff asserting malicious prosecution must prove that the prosecution

was: (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without

probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Hudson v.*

*Lanier*, 255 Va. 330, 497 S.E.2d 471, 473 (1998). "The necessary factual predicates for probable

cause under federal law and Virginia law are essentially the same." *King v. Darden*, No. 3:17-cv-

742, 2019 WL 1756531, at *4 (E.D. Va. Apr. 19, 2019), *aff'd* 812 F. App'x 163 (4th Cir. 2020);

*see also Bennett v. R&L Carriers Shared Servs., LLC,* 492 F. App'x 315, 324 (4th Cir. 2012)

(stating that probable cause means "knowledge of such facts and circumstances to raise the belief

in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the

crime of which he is suspected"); *see also Kaley v. United States*, 571 U.S. 320, 338 (2014)

(probable cause "is not a high bar"). Furthermore, "[a]ctions for malicious prosecution in

Virginia and the requirements for maintaining such actions are more stringent than those applied

to other tort cases to ensure that criminal prosecutions are brought in appropriate cases without

fear of reprisal by civil actions." *Lewis v. Kei*, 281 Va. 715, 708 S.E.2d 884, 889 (2011).

Here, as explained previously, Plaintiffs have failed to allege facts that show the officers

lacked probable cause for their arrest. Since this a required showing, Plaintiffs' failure in this

regard is fatal. Plaintiffs' claims for common law malicious prosecution must therefore be

dismissed and the officers are granted judgment as a matter of law.

### B.  Common Law False Imprisonment

The Virginia Supreme Court has defined false imprisonment as "the direct restraint by one person of the physical liberty of another without adequate legal justification." *Jordan v. Shands*, 255 Va. 492, 500 (1998). Thus, claims of false imprisonment may be defeated by showing a sufficient legal excuse, e.g., probable cause, to restrain the plaintiff's liberty. *Jackson v. Brickey*, 771 F. Supp. 2d 593 (W.D. Va. 2011) (citing *Zayre of Va., Inc. v. Gowdy*, 207 Va. 47, 147 S.E.2d 710, 713–14 (1966)).

Here, as with Plaintiffs' malicious prosecution claims, Plaintiffs fail to show that the officers lacked probable cause. Accordingly, their false imprisonment claims must be dismissed, and the officers are entitled to judgment as a matter of law.

### C.  Assault and Battery

Finally, as the officers are entitled to summary judgment on Plaintiffs' excessive force claims under Section 1983, so too must Plaintiffs' assault and battery claims fail, brought as they are against the same officers based upon the same conduct. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (explaining that a "parallel state law claim of assault and battery is subsumed within the federal excessive force claim"); *Njang v. Montgomery Cnty., Md*., 279 F. App'x 209, 216 (4th Cir. 2008) (unpublished, per curiam) (concluding that Fourth Amendment excessive force inquiry "also controls [a party's] actions for battery and gross negligence); *Calloway v. Lokey*, 948 F.3d 194, 205 (4th Cir. 2020) (affirming district court's dismissal of state law claims when Fourth Amendment claim failed).

Accordingly, Plaintiffs' assault and battery claims must be dismissed, and the officers are entitled to judgment as a matter of law.

V.    *Monell* **Claims Against the City**

Last, Plaintiffs assert claims against the City for an unconstitutional pattern of excessive force under *Monell*.[3] *See* Dkt. 1 (Counts 7-8). The City has moved for summary judgment, *see* Dkt. 44, and Plaintiffs entirely neglected to oppose the motion. Failure to respond to conspicuous, nonfrivolous arguments in an opponent's brief constitutes a waiver, and failure to oppose a motion *in toto* amounts to waiver of all the arguments therein. *See* Dkt. 10, ¶7 (Pretrial Order stating that a motion will be considered unopposed if a party fails to submit opposition brief); *see also Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief.").

Accordingly, based on Plaintiffs' failure to oppose the City's non-frivolous motion for summary judgment, the Court will enter judgment in favor of the City on Counts 7 and 8.

VI.    **Conclusion**

In an order that will accompany this memorandum opinion, and for the reasons stated above, the Court will **GRANT** Defendants' motions for summary judgment on all counts. *See* Dkt. 42 (Officers' motion); Dkt. 44 (City's motion). All other pending motions are dismissed as moot. *See, e.g.,* Dkts. 37, 40 (pending motions in limine). As a result, all claims are hereby **DISMISSED** with prejudice, and this case is stricken from the active docket of this Court.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to the parties.

Entered this 28<u>th</u> day of January, 2025.

Norman K. Moon

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[3]    Monell v. Dept. of Soc. Services of City of New York, 436 U.S. 658 (1978).